UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
━━━━━━━━━━━━━━━━━━━━━━━━━━━

BEECHWOOD RESTORATIVE CARE
CENTER, BROOK CHAMBERY, and
OLIVE CHAMBERY,

                         Plaintiffs,

              -vs-
                                                    PRINCIPLE
                                                    RULE 56
                                                    STATEMENT
                                                    02-CV-6235

LAURA E. LEEDS, EDMUND RUSSELL
ALTONE, ROBERT W. BARNETT,
ANNA D. COLELLO, ARLENE L. GRAY,
HENRY M. GREENBERG, ANTONIA C.
NOVELLO, STEVEN B. STEINHARDT,
DENNIS P. WHALEN, SANFORD RUBIN,
SUSAN T. BAKER, SHARON A. CARLO,
CYNTHIA T. FRANCIS, NAOMI B. HAUSER,
JOSEPH P. MOORE, MARY ELIZABETH
RICH, and BARBARA W. SANER,

                         Defendants.
_____

        Defendants by their attorney, Andrew Cuomo, Attorney General of the State

of New York, Gary M. Levine, Assistant Attorney General, of counsel, as and for a

Rule 56 Statement herein submit that there are no genuine issues to be tried with

regard to the following material facts:

1.  In 1955, the Beechwood Nursing Home, a twenty-five (25) bed facility located

    at 900 Culver Road, Rochester, New York, was a partnership owned by plaintiff

    Brook Chambery's parents, Herb and Olive (Chambery 6, 19, 21, 31; hearing

    transcript HT1703-04, 1731-32, hereinafter HT).

2. In 1974, Beechwood expanded to eighty (80) beds with the construction of a new building and to eighty-two (82) beds in1995 (Chambery 6, 31-32; HT1704).

3. In 1972, Brook Chambery ("Chambery ") graduated from Calvin College with an undergraduate business degree and went to work for the family nursing home business as the controller who handled the partnership's finances (Chambery 5-7, 29; HT1702-03, 1931).

4. In 1972, Chambery obtained his Nursing Home Administrator's license from the State of New York, which did not require or provide any medical training (Chambery 8-9; HT1703).

5. In 1976, Chambery obtained his MBA from the University of Rochester with a major in finance and monetary economics (Chambery 5-6; HT1703).

6. Chambery worked his entire career as Beechwood's controller (Chambery 6, 8-9, 29; HT1703, 1932).

7. Since Beechwood's closure in 1999, Chambery has had no employment except the Beechwood litigation (Chambery 3).

8. In the Fall of 1992, Chambery's father became ill, and Chambery began to take over the business (Chambery 21, 25, 38; HT1703, 1708, 1821, 1933).

9. By the time of the father's death in March 1993, Chambery was fully in charge (Chambery 39; HT1703, 1708, 1933).

10. Chambery was not on record as the Administrator because of his involvement in other businesses (HT1703).

11. Chambery was involved in a software company, known as Beechwood Inc.,
    that Chambery started in 1979 and sold in 1998 for 3.9 million dollars
    (Chambery 18-20; HT1704-06, 1821).

12. After Chambery's father died in March 1993, Chambery's mother, plaintiff Olive
    Chambery, became the sole owner of Beechwood and the Administrator of
    record (Chambery 21, 23).

13. Paul Kesselring had a business degree (Kesselring 8).

14. Mrs. Chambery, who had no formal training, along with Paul Kesselring, ran
    the day-to-day operations of Beechwood (Chambery 25-26; HT1730).

15. Mrs. Chambery dealt with office functions, laundry, housekeeping, personnel
    and administration, and delegated duties to Chambery (Chambery 26;
    HT1934).

16. Kesselring was Chambery's "right hand man" who handled the nursing and
    maintenance issues and day-to-day administration of the facility (Chambery
    26).

17. In 1999, Chambery became a 9% partner in Beechwood and in 2005, after the
    facility closed, Chambery became a 60% owner of a partnership without any
    assets (Chambery 21-22).

18. In the 1990's, hospitals were under pressure to reduce costs and one way to
    do that was to release rehabilitation patients to nursing homes, such as
    Beechwood, which could provide patient care at a lower cost (Chambery 39;
    HT1710).

19.  Rehabilitation patients provided nursing homes a higher Medicare reimbursement rate and, consequently, nursing homes experienced higher profits than they had with the traditional long term care patients (Chambery 40; HT1939).

20.  After assuming control of Beechwood, Chambery decided to make a "monumental" change in the nature of Beechwood's business from long term residential care into short term rehabilitation care (Chambery 25-26; HT1709, 1935-36).

21.  Beginning in 1994, they converted one of the two patient floors at Beechwood from residential to rehabilitation patients. The transition was not fully implemented until 1998 because they had to wait for a resident to be discharged (die, return home or be hospitalized) before the empty bed could be converted to a rehabilitation bed (Chambery 41-43, 47; HT1711).

22.  The conversion changed the character of Beechwood's business, in part, because they were receiving and discharging rehabilitation patients at a rate of fifteen (15) patients *per week* compared to thirty-five to forty (35-40) patients *per year* under the traditional long term care business model (Chambery 46-47; HT1715).

23.  The rehabilitation patients were people recovering from serious and acute medical events such as accidents, strokes and cardiac problems (HT1710, 1940).

24.  As part of the transition to short term care, Beechwood hired therapists (Chambery 43-44).

25. Beechwood did not hire new nurses with different skills even though rehabilitation nursing skills are totally different than long term care nursing skills because of the different characteristics of the patients (Chambery 43-44; HT1738).

26. Beechwood had increased complaints from their rehabilitation patients and families (Chambery 48).

27. A typical rehabilitation business dealt with an increased number of complaints (Chambery 47; HT1828-29).

28. Chambery believed there were no problems at Beechwood related to rehabilitation patients (Chambery 44).

29. Beechwood's gross revenues and profits increased with the change to rehabilitation care (Chambery 45-46).

30. By the end of 1998, the last full year of business, Beechwood did about $5.9 million worth of business (Chambery 33-35).

31. Before closing in 1999, Beechwood had about ninety (90) employees (Chambery 32; HT1730, 1911-12).

32. In 1998, Olive Chambery earned $550,000 in profit as the sole partner and in 1999, Brook Chambery's salary was $900,000 (Chambery 35, 37).

33. A nursing home, such as Beechwood, is a business regulated by both the New York State Department of Health (DOH) and the federal Health Care Financing Administration (HCFA)(Chambery 48-49).

34. As a condition of Beechwood's receipt of federal Medicare funds, it was subject to "surveys" under the federal regulations (Chambery 49).

35. The federal regulators delegated the surveys to the State DOH employees, who acted as agents of the federal government (Chambery 62).

36. There were annual surveys (standard) typically conducted over a period of a week by a group of DOH employees with a variety of specialties (Chambery 60-61, 66, 68).

37. There were also complaint surveys (Chambery 60-61).

38. In both standard and complaint surveys the DOH "surveyors" talked to residents and staff, reviewed medical records, examined the residents, and observed nurses as they worked (Chambery 63-65).

39. As far back as 1992, the surveys created tension between the DOH and Beechwood staff (Chambery 53, 59).

40. The survey process was stressful to the Beechwood staff (Chambery 68-69).

41. Chambery considered the survey process to be a negative process where the DOH cited the facility for deficiencies (Chambery 59, 61).

42. Chambery sent a letter dated July 26, 1996 to DOH Commissioner DeBuono entitled "Report Card on the New York State Long Term Care Industry," in which he stated, "The survey is a negative process and holds facilities in constant fear of trying any innovation in operations." (Chambery 118-19; Exhibit 387 at pgs. M08105-09).

43. A recurring frustration for Chambery was that the surveyors identified the problems but did not provide the solutions (Chambery 94).

44. Surveyors are not supposed to tell a facility how to fix a problem (Chambery 94; Proschel 52).

45.  Even if Beechwood disagreed with the SOD, they must provide an acceptable POC (Chambery 85; Proschel 121-23, 131-32).

46.  Chambery was very concerned about any deficiency because they were made available to the public and put on the internet (HT1825-28).

47.  Generally, Paul Kesselring handled the survey process at Beechwood (Chambery 50).

48.  Chambery rarely interacted with the surveyors unless there was a problem or there was a need for a Plan of Correction (POC) or an Informal Dispute Resolution (IDR)(Chambery 51, 56-57; HT1934).

49.  Chambery admitted that he was resistant to comments made by the surveyors about how things should be done at Beechwood (Chambery 57-58).

50.  In 1993 and 1994, there were no deficiencies found at the Beechwood annual survey (Chambery 75-76; Exhibit 384).

51.  In 1995, there were two (2) deficiencies cited at the annual survey and one (1) deficiency at a complaint survey (Chambery 76-78; Exhibit 384).

52.  On November 29, 1995, Chambery wrote two (2) letters to the DOH regarding the deficiencies (Chambery 118-19; Exhibit 387 at pgs. M08161, 08164).

53.  Both deficiencies were rescinded after the IDR process (Chambery 76-78; Exhibits 384, 387 at pgs. M08165).

54.  On September 23, 1996, the annual survey revealed three (3) deficiencies; one was rescinded at the IDR and the other two were resolved when Beechwood submitted an acceptable POC (Chambery 78-80, 82-83; Exhibit 384).

55. On October 28, 1996, Chambery sent a fax to DOH employee Kathleen

Cantaben regarding the October, 1996 survey:

Important!
Re: Survey Report Dated October 25, 1996
Questions:

1.      Is the summary and material submitted as part of the Informal
Review Process part of the formal record?

2.      The deficiency statement for F322 was not changed in response to
the facts presented by Beechwood.

A)  Does this mean that the survey team is denying the facts
presented by Beechwood in it's responses: namely, that there was a
difference between feeding methods between the two residents?  If so,
where? If the facts resented are being accepted, please explain why the
method used for Resident #19  was not acceptable to "assure that the
ordered amount of feeding is received by the resident". What more would
recording the time on the bag as the treatment sheet have accomplished?

B)  Please state the Department's position as to the accuracy of
measurement expected of a facility for 24 hr. tube feedings, taking into
account the equipment specifications, resident care requirements and
interruptions, and absorption problems that typically accompany the need
for 24 hr. feedings.

C)  Please state the method used to determine the "755cc of product
was left"; the beginning point of measurement and method used to
determine that "150cc of product had gone in - not the ordered 240cc";
whether the surveyor is accepting the volume meter of "21cc" short as
accurate; and how labeling the bottle for Resident #2 could have "assured"
that mistakes such as the one made by the night nurse would not have
happened.

3.      The deficiency statement regarding F324 has not been modified in
response to the facts presented by Beechwood.

A)  Does this mean that the survey team disagrees with the facts
presented by Beechwood concerning which window had the board in the
track? If so, where? If the facts as presented are being accepted, why has
the basis of concern as discussed by Ann at the conference not been
overcome?

B)  Please tell Beechwood what was wrong with the assessment made, as documented on the incident reports, and evidenced by the actions taken. What is the expectation of the survey team? If there was this level of concern, why was the resident's physician not consulted when she was in the facility during the time of survey?

4.      Regarding the deficiency listed under F284, would you please have the survey team explain their expectations?

I am faxing these questions to you because time is of the essence. Please respond as quickly as possible. Thank you very much.

(Exhibit 387 at pgs. M08156-57).

56. On October 30, 1996, Cantaben wrote the following response to Chambery:

Dear Mr. Chambery:

Following is our response to the questions raised in your letter of 10/28/96:

1.  Any Informal Dispute Resolution (IDR) material that is submitted becomes part of the survey file.

2.  The deficiency for F322 stands, and you have submitted an acceptable Plan of Correction for it.

3.  The Statement of Deficiencies (SOD) for F324 has not been modified after the Stage II IDR. The facts as presented in the SOD have been verified by the surveyors. You must submit an acceptable Plan of Correction (POC) that identifies:

- How correction will be made related to the individual;

- How other residents in similar situations will be protected;

- How the facility will prevent a recurrence;

- Plans to monitor its performance to ensure solutions are permanent.

4.  These expectations were discussed in the IDR process.

The meeting on 10/21/96 concluded the IDR process, and a Plan of Correction must be submitted.

(Exhibit 387 at pg. M08158).

57. On November 4, 1996, Chambery responded by fax to Cantaben:

> URGENT!
> Re: Your response of October 30, 1996
>
> Please either answer the questions posed in my fax of October 28, 1996, or provide the legal basis for not doing so.
>
> The survey process should not be a one way street with a black box at the end. Legitimate concerns about the facts that form the basis for the deficiency statements were voiced by both sides. Not one word has been put forth to discuss the facts presented by both sides, or to provide any report from the informal dispute resolution process. This does not "resolve" anything, and is clearly a violation of the intent of the Informal Dispute Resolution Process and the rights of the Provider.
>
> The surveyors also have an obligation to define what is expected in a plan of correction. To state a deficiency, reject the plan of correction that followed what seemed to be prompted by the statement of deficiency, and then answer the providers' request for help with statements like "I don't know, I am not a nursing home administrator" is totally unreasonable and directly against instructions provided in the survey manual.
>
> Please provide a response within 24 hours, since time is of the essence.

(Exhibit 387 at pg. M08159).

58. On November 5, 1996, Chambery and Rubin spoke on the telephone regarding a tube feeding issue (Chambery 86-89; Exhibit 385). Chambery's notes indicated:

> Started out conversation stating that they had sent me all that they were going to send me. [handwritten: "The IDR is closed."] They had given me their conclusions. They did not have anymore time to devote to this issue. If I wanted to go to my attorney, so be it.
>
> In the meantime, I had better write up a plan of correction for the one issue. If I pursue an appeal, it will be interesting to see what "HCFA does with these things".
>
> He felt that we had done pretty good, should take our lumps and forget it.
>
> He said that they did the best they could. They were going by surveyor "recollections". And he was accepting Ann's word about accepted practice

on the stamping of the tube feeding. He would not listen to the fact that that was irrelevant on one resident.

He said that he would guarantee that he will be there at our exit conference next year to make sure that they have covered all bases and no rock has been left unturned.

He said he would review things again with Ann. Did not tell me when he would get back to me with the result, for he stated the conversation "is finished" and hung up.

(Exhibit 385).

59. On November 7, 1996, Chambery sent another letter to Cantaben:

Enclosed is our response to the new deficiency report issued on October 25, 1996.

I would like to point out that we are very concerned about the deficiencies cited the accuracy of the findings supporting these deficiencies, the procedural process, and the lack of formal response to the facts submitted or questions raised by the facility throughout this process. This is aggrevated (sic) by the fact that at the exit conference, in front of the ombudsman, the assistant administrator, and the director of nursing, the head of the survey team stated that there were no resident care concerns, other than "maybe" the tube feeding issue. She stated that there were no negative outcomes, residents and families were happy, and the staff was working well as a team.

To begin with, the exit conference did not follow instructions in the survey manual. A meeting which the facility staff was to have with the surveyors concerning documentation previously requested was turned into an exit conference. They proceeded to read off the issues as potential deficiencies without having been given or considering the documentation requested, and thus not fully investigated yet. This is in violation in that the manual which states that at the exit conference the surveyors are to "describe to the facility the deficiencies that have been identified and the findings that substantiate these deficiencies". In addition the manual states ". . . there should be few instances where the facility . . . has not had an opportunity to present additional information prior to the exit conference".

It was later, on Oct. 23, 1996 that the survey team leader came to the facility, had a quick discussion with the assistant administrator and director of nursing, and left a signed document listing the tag numbers under which deficiencies would be cited and which included a vague statement that "we deleted some of our findings and the remaining findings will result in

11

deficiencies". It also stated that "today will be called the exit date". However, this did not identify the specific deficiencies or findings in support of the deficiencies, or give the facility the proper opportunity to "discuss and supply additional information that they believed pertinent to the identified findings." Thus, one more opportunity for the facility to hear the specifics and respond has been left out.

This lack of opportunity to communicate about concerns also violates the Department's stated goal for the dispute resolution process, namely that it begin with "communication between the surveyor(s) and the provider during the survey", and "in a timely manner while the issues and facts are still fresh", so that the "Statement of Deficiencies . . . accurately identify a provider's state of compliance . . ."

There has been no adequate "communication" about these matters even after the dispute resolution conference. A determination was made which stated "a new statement of deficiencies is enclosed, "but the statements did not change and there was no discussion of the facts submitted by the facility. Without some sort of recognition and discussion based on the provider's input there is nothing left but to carry the matter further, which violates another objective of the system, namely to "resolve differences outside of formal litigation, thereby avoiding unnecessary costs to providers and the state." In fact, this is what we were encouraged to do, because of lack of any more time to spend on this survey.

Both in the Plan of Correction and the Dispute Resolution Conference, the facility questioned the accuracy of the finding supporting the deficiency statements. Other than a few pages from a manufacturer's equipment manual, a feeding tube policy and an internal memo to facility maintenance staff, no new materials were submitted at the conference. Most of the materials submitted was duplicative of the materials submitted earlier to the surveyors, but with which they were showing no familiarity. A document was submitted which summarized the provider's position, and addressed concerns raised at the conference. Although nothing in the survey manual specifically addresses the type of response a facility should get to the informal dispute resolution process, it is only reasonable to provide answers or explanation as a result of the decision making process. This was not done.

In addition, continued requests for clarification or guidance as to what is expected of the provider as a plan of correction under tag F324 have gone unanswered. We have done the best we can to try and put forth a plan of correction.

Please give these concerns adequate consideration as you continue to review our response to the deficiencies and our plans of correction. We are

appealing for reasonableness to adequately hear and discuss our concern, and the facts as we have presented them. That is all.

(Exhibit 387 at pgs. M08169-71).

60. On November 21, 1996, Chambery sent a letter to Acting Director of the

Bureau of Long Term Care Services Laura Leeds:

Dear Ms. Leeds:

I am writing this letter after conversation with HCFA staff. It is a request that you review the deficiencies issued, the findings behind them, and the procedural issues which we have raised.

Please be advised that we have no problem with being issued deficiencies if they are justified. I believe that in this case they are not justified. As a HCFA official stated, it seems that "a working relationship" was not established which has been the source of continuing friction. I believe this official is correct.

The HCFA official stated that the exit conference appears to be a problem; the lack of clarification as to the reasoning behind the IDR determination would seem unreasonable, although not required; and that the decision to change direction and require an (sic) revisit to determine compliance, could on the surface appear suspect, although completely within regulatory authority.

Enclosed is the latest deficiency report, the facility response, and the DOH response. Please review these matters and notify us as to the results.

(Exhibits 330, 387).

61. Over the years, Beechwood initiated many lawsuits against the Department of

Health (Chambery 140-150; Exhibits 389, 390, 391).

62. In the early to mid-1990's, Beechwood filed an Article 78 regarding

reimbursement rates, but withdrew its Petition to join an association's action

involving the same issue (Chambery 147-48).

63. In 1994, Beechwood brought an Article 78 Petition to compel DOH to allow it to expand their permit by two (2) beds which was resolved when DOH agreed to the expansion (Chambery 140, 145-47).

64. On November 8, 1996, there was a deficiency from a complaint survey regarding a patient named Langeveld which was rescinded after the IDR (Chambery 83-84, 95, 151; Exhibit 384).

65. Mrs. Langeveld was a resident that Beechwood wanted to discharge but she refused to leave the facility (Chambery 151).

66. Mrs. Langeveld's family complained to DOH (Chambery 151).

67. On November 25, DOH surveyors went to Beechwood to investigate and in a November 26, 1996 letter from Sanford Rubin, DOH agreed with Beechwood that Mrs. Langeveld should be discharged (Chambery 152-54; letter attached as Exhibit A to Rubin declaration).

68. On November 26, 1996, Beechwood commenced an Article 78 Petition in Monroe County Supreme Court against Commissioner DeBuono and Sanford Rubin in their official capacities (Chambery 149,154, 157-58; HT2032; Exhibit 392).

69. Beechwood did not seek damages against the respondents but complained that DOH did not follow the correct procedures regarding Langeveld (Chambery 154, 158).

70. Mrs. Langeveld joined the lawsuit seeking to prevent her discharge from Beechwood (Chambery 154).

71. On January 3, 1997, Beechwood was dismissed from the action (Chambery 155; Exhibit 393).

72. DOH agreed to give Mrs. Langeveld a discharge hearing in accordance with Federal regulations (Chambery 155; Exhibit 331).

73. After a hearing before an Administrative Law Judge, it was determined that Mrs. Langeveld should not be discharged (Chambery 156).

74. This decision was upheld by the Appellate Division. Beechwood v. DeBuono, 247 A.D. 2d 928 (4th Dept. 1998).

75. Consequently, Mrs. Langeveld remained at Beechwood until Beechwood closed (Chambery 157).

76. As a result of the Article 78, DOH changed the way nursing home discharges were handled (Exhibits 206, 331, 334, 375).

77. On August 15, 1997, Leeds sent a letter to Nursing Home Administrators, stating, in part:

> This letter will advise nursing homes of the interim policy for handling discharge or transfer from a nursing facility. The policy is in effect as of September 1, 1997.
>
> The current New York State regulations [10 NYCRR 415.3(h)] governing the discharge and transfer notification and appeal process for nursing home residents are being revised. This action is the result of recent litigation, Beechwood Sanitarium v. DeBouno, Supreme Court Monroe County, related to the notification and provision of a due process fair hearing regarding the proposed discharge of a nursing home resident in accordance with 42 CFR part 431 and Subpart E of part 483.

(Exhibits 206, 334).

78. Throughout 1997 and 1998, Chambery made numerous complaints about the regulatory process (Exhibits 184, 224, 314-17, 333, 336, 337, 351, 386, 387).

79. Chambery did not make complaints about any surveyors (Chambery 74).

80. On October 3, 1997, the Beechwood annual survey revealed three (3) deficiencies (Chambery 95-96; Exhibits 48, 384).

81. On October 21, 1997, there was a deficiency cited as a result of a complaint survey (Chambery 104; Exhibits 384).

82. The 1997 surveys were conducted by a Buffalo survey team, not by any defendants (Chambery 97).

83. Chambery recalled that the Buffalo survey team was very difficult to deal with and these surveys were contentious (Chambery 97-98).

84. On November 24, 1997, Chambery made a note about an IDR: "Sandy [Rubin] was starting to get confrontational in the beginning, but had to leave. Didn't come back until just as ending." (Chambery 99-101; Exhibit 385 at pg. M08175).

85. Chambery did not recall any of specifics about Rubin's conduct referred to in the November 24, 1997 note (Chambery 100).

86. On December 24 and December 29, 1997, Chambery called and faxed HCFA to complain about the 1997 surveys (Chambery 98, 110-111; Exhibit 386 at pgs. M08044-47 and M08049-50).

87. Copies of the letters sent by Chambery to HCFA were not sent to anyone at DOH (Chambery 134).

88. The DOH defendants did not participate in any of the telephone conversations between Chambery and HCFA (Chambery 140).

89. As a result of the 1997 surveys, Beechwood was headed towards a cutoff of federal money (Chambery 98, 110-111).

90. On December 30, 1997, after Beechwood submitted acceptable POCs, Beechwood was returned to substantial compliance status (Chambery 98, 104-05; Exhibit 384).

91. On February 24, 1998, there was a deficiency cited as a result of a complaint survey involving actual harm to a patient over a decubitus issue (Chambery 106, HT2034, Exhibit 384).

92. At the IDR, Chambery argued that there was no decubitus issue and Rubin supported his nurse surveyors observations and conclusions (Chambery 107).

93. Rubin advised Chambery that they had serious concerns about the skin care at Beechwood (Chambery 108; HT2020, 2035-36).

94. In the Spring of 1998, Chambery was out of ideas as to how to do a POC regarding skin care (HT1738-39).

95. On March 18, 1998, Chambery wrote to HCFA seeking assistance with his POC and questioning what to include in a POC and the survey procedure (Chambery 138; Exhibit 386).

96. On March 20, 1998, Chambery made a note of a telephone call with a HCFA representative indicating that HCFA cannot help him write the POC  (Chambery 138; Exhibit 386, at pg. M08053).

97. On April 14, 1998, there was another facsimile from Chambery to HCFA regarding the IDR (Exhibit 386, at pg. M08056).

98. The issue was resolved when Beechwood submitted an acceptable POC to the DOH (Chambery 107; Exhibits 50, 384).

99. On October 26, 1998, the Beechwood annual survey revealed six (6) deficiencies; one was rescinded at the IDR and the others were resolved when Beechwood submitted an acceptable POC (Chambery 108-09; Exhibits 52, 384).

100. In attendance at the IDR was Arlene Gray, Susan Baker, Sharon Carlo and DOH counsel Marie Shea on behalf of DOH and Brook Chambery, Donna Richardson and Beechwood attorney Kevin Cooman on behalf of Beechwood (HT 3078-79).

101. On December 2, 1998, Baker sent a letter to Beechwood indicating the POC was unacceptable (Exhibit 52).

102. On December 3, 1998, Chambery wrote a letter to HCFA regarding the survey (Exhibit 384, M08059).

103. On January 5, 1999, Beechwood was found to be substantial compliance (Chambery 110; HT932-33; Exhibit 100).

104. On January 7, 1999, Chambery wrote a letter to HCFA complaining about DOH surveys (Exhibits 344, 384, at pgs. M000229-30).

105. On January 11, 1999, Baker sent a letter to Beechwood advising that Beechwood was in substantial compliance (Exhibit 100).

106. On March 10, 1999, three (3) complaints against Beechwood were investigated by DOH staff (Chambery 163-64).

107.   The survey on the three (3) complaints was completed on March 19, 1999

and led to a March 26, 1999 SOD (HT929-30, 939-966, 1058; Exhibits 8, 17,

54).

108.   On March 19, 1999, the family of David Moore made a complaint against

Beechwood:

> 1) The call light was not operational and when it was, no one responded.
> 2) Facility understaffed …
> 3) Resident admitted with a stage I decubitus, which progressed to a stage
> 5? He laid in feces for long period of time….
> 4) Social Worker, Jennie Orrico constantly threatened and intimidated the
> family and continued to be insensitive.
> 5) Resident was sent to hospital on 2/9/99 and was to receive antibiotics
> and cough syrup; neither was given to res.
> 6) On 2/14/99 the resident was found by family to be receiving oxygen and
> to increased pain; family had not been notified. Resident was receiving extra
> strength Tylenol at NH and when hospitalized received morphine for pain.
> Resident evaluated at RGH and was found to need extensive surgery
> (family opted not to do the surgery).

(Chambery 164; Exhibit 32).

109.   Beechwood received a copy of the complaint directly from the Moore family,

did an internal investigation and Beechwood concluded there was not a

problem (Chambery 164-65; HT2022).

110.   The Moore complaint raised the reoccurring issue related to skin care

(HT1867, 1994)

111.   On March 26, 1999, Beechwood was sent a letter indicating there were

deficiencies from the March 19, 1999 complaint survey (HT1904; Exhibit 54).

112.   On March 31, 1999, DOH surveyor Mary Elizabeth Rich went to Beechwood

regarding the Moore complaint (Chambery 165; HT1997).

113.   On April 6, 1999, Chambery had a conversation with DOH representatives including Rubin in which Chambery described in his notes as a "very heated conversation" (Chambery 174-77; Exhibit 385, at pg. M08184).

114.   On April 6, 1999, Chambery wrote a letter to HCFA: "Here is the latest! Please take a close look at it. When is this going to end?.(sic) I need to have a meeting with you as quickly as possible." (Exhibits 59, 384, at pg. M08067).

115.   On April 6, 1999, Chambery sent a letter to Baker with the POC for the March 26, 1999 SOD (Exhibit 14).

116.   On April 6, 1999, DOH received a compliant about Beechwood patient E.O.:

> Resident died at 6:30 pm on Easter; no one in family notified of resident's condition had changed; called after she expired. … At 8:30 pm family members came to the facility and the resident's wedding band and engagement ring were missing; taken off resident's finger. The social worker Jennie Orrico accused family of taking rings, but prior to that, she said the facility would make out a police report and never did.

(Exhibits; 142, 143).

117.   On April 15, 1999, surveyors Rich and Cynthia Francis went to Beechwood where they met with Chambery regarding the Moore and E.O. complaints (Chambery 166-68; HT1997, 2024-26).

118.   Chambery learned that the surveyors expanded their survey to include other Beechwood residents (Chambery 166-67; HT1997).

119.   Chambery was called to his Director of Nursing, Donna Richardson's, office to discuss records requested by the surveyors (Chambery 167).

120.   Chambery learned from meeting with the surveyors that they had concerns they were continuing to look into and they would go back to their office to determine how to write up their concerns (HT1998).

121.   Chambery denied raising his voice, but acknowledged that he may have clenched his fists and admits that he threw a book down on the desk which prompted the surveyors to walk out of the office (Chambery 160-61, 168).

122.   On April 16, 1999, the Stage I IDR regarding the March 26, 1999 SOD was submitted (Exhibit 8).

123.   On April 19, 1999, Rich, Francis and Susan Baker returned to Beechwood to review additional records as part of an extended survey (Chambery 169; HT1997-98).

124.   There was a disagreement over the copying of medical records (Chambery 169-70; HT1818, 1846).

125.   On April 20, 1999, Chambery met with Baker, Rich and Francis where Chambery was advised of the potential problems (Chambery 171-72; HT1998).

126.   On April 22, 1999, Chambery attended an Exit Conference with Rubin, Carlo, Baker, Rich and Francis and was advised of the widespread problems and the Immediate Jeopardy (IJ) status for Beechwood (Chambery 173; HT1840).

127.   At this conference, Rubin told Chambery: "I don't believe you can take care of these yourself. You might need some outside help." (Chambery 173-74).

128.   On April 27, 1999, the SOD was delivered to Chambery by Rubin and others (Chambery 178; HT1841, 2004-05; Exhibit 10).

129.   Rubin advised Chambery that this was a big job, to take it seriously and that often facilities will get a consultant to help them (Chambery 179; HT2002, 2004-08, 2036):

> Rubin: This is a big job and we want to warn you that you've only got 23 days or from the date of the exit conference to get this taken care of. And normally facilities go out and get consultants and whatever to help them get over this time crunch. And you need to take this very seriously.
>
> Chambery: Well, these 'alleged' deficiencies that you have here.
>
> Rubin: I have to remind you, you've got to take this seriously.
>
> Chambery: Don't worry, I am.

(HT1842-43).

130.   On April 26, 1999, Chambery wrote a letter to HCFA (Exhibit 384, at pgs. M000008-09).

131.   On May 6, 1999, a Stage II IDR regarding the March 26, 1999 SOD was conducted by Sharon Carlo with Chambery and Beechwood attorney Kevin Cooman (Exhibit 8; HT930, 939-966, 1526).

132.   As a result of the IDR, one of the deficiencies was rescinded and on May 6, 1999 a letter was sent to Beechwood advising that the POC for the March 19, 1999 complaint survey was acceptable (Exhibit 55).

133.   The POC for the April survey was due on Friday, May 7, 1999 (HT 1844; Exhibit 10).

134.   On May 7, 1999, Beechwood submitted their rebuttal and on May 10, 1999, the POC was submitted to the DOH (HT1844-46, 1848, 1856-57; Exhibits 7, 11).

135.   Chambery's May 7, 1999 letter to Susan Baker stated:

> Dear Ms. Baker,
>
> Enclosed is the completed POC to the Statement of Deficiencies and the Directed Plan of Correction which resulted from the abbreviated survey of 4/22/99. This letter and the accompanying POC is to act as our written

allegation of compliance. In addition, as requested in the earlier fax, the facility is requesting a meeting under the Informal Dispute Resolution Process established to question the cited deficiencies.

I am sorry for getting this to you after the close of the business day, but getting all the computer files, documents, exhibits, etc. coordinated and copies proved a little more than expected. It also proved to be too much to fax as usual. This, we will be hand delivering it at the beginning of the next business day.

We must still request that we be granted more time to get the physician statements in. I expect that we should be able to submit them by the close of Monday, but would like another day if we need it.

(Exhibit 11).

136.    On May 10, 1999, the surveyors Rich and Francis were at Beechwood for a

monitoring visit and advised Chambery that there were more deficiencies noted

as a result of what was found during the monitoring visits (Chambery 179-80;

HT1862).

137.    On May 12, 1999, DOH conducted a Post Survey Visit regarding the April

22, 1999 survey (Exhibit 19).

138.    At a May 13, 1999 Exit Conference, Baker and Francis advised Chambery

of the current deficiencies, that Beechwood was no longer considered in

immediate jeopardy (IJ) but was still considered in substandard quality of care

(SQC) and that unless substantial compliance was achieved there would be a

ban on payment effective June 17, 1999 (Chambery 180-81; HT1885-86).

139.    With the SOD was a Directed Plan of Correction (DPOC) directing, in part,

Beechwood to get a consultant (HT1895, 2008, 2012).

140.    By letter dated May 18, 1999, Beechwood was advised that the POC for the

April survey was unacceptable (HT1860, 1884; Exhibit 13).

141.   On May 20, 1999, Beechwood was notified of Stage I IDR determination

regarding the April 27, 1999 survey (Exhibit 18).

142.   On May 21, 1999, there was a new SOD from the May surveys and a HCFA

letter regarding the potential ban on payment (HT1886, 1888-89; Exhibit 162):

> The abbreviated survey of your facility on 4/22/99 found deficiencies
> whereby immediate jeopardy and substandard quality of care were
> identified.
>
> A post survey revisit conducted on the above referenced date found that the
> immediate jeopardy had been resolved but that substandard quality of care
> remained in F224 and new deficiencies were found. The most serious
> deficiencies found were a pattern of deficient practices that constitute actual
> harm that was not immediate jeopardy **whereby the facility was not in
> substantial compliance (H)** and substandard quality of care was also
> identified in F314. (emphasis in original).

(Exhibit 162).

143.   On May 21, 1999, Chambery facsimiled a letter to Baker regarding his

frustration with the DOH response to his POC (HT1861; Exhibit 175).

144.   On June 1, 1999, Beechwood submitted a second POC which, per June 11,

1999, letter was also rejected by the DOH (HT1889-90).

145.   Mary Jane Proschel was the DOH quality control employee in Rochester

that reviewed the surveyor work regarding Beechwood (Proschel 4-5, 19-25,

103).

146.   Proschel looked at surveyor notes and spoke with the surveyors to make

sure that their observations and conclusions were supported by the facts

(Proschel 19-25, 103).

147.   Proschel reviewed the SODs for accuracy and was involved with the scope

and severity decisions (Proschel 50, 100-01).

148.   In addition to Proschel's review, because Beechwood was a more serious matter, the quality assurance staff in Albany also reviewed the surveyor's work (Proschel 21).

149.   Albany did not provide directions regarding outcomes (Proschel 143).

150.   Albany did not direct anyone to deny Beechwood's POC (Proschel 150).

151.   There was no discussions between Proschel and the staff in Albany (Proschel 106, 174-75).

152.   Proschel reviewed the SOD and POC regarding Beechwood for the March 19, 1999, April 22, 1999 and May 12, 1999 surveys (HT1474).

153.   With regards to the March 19, 1999 survey, Proschel stated the first POC was deemed unacceptable but the amended POC was acceptable (HT1475).

154.   The April 22, 1999 SOD was reviewed and was acceptable but Beechwood's POC was not acceptable (HT1475-79, 1503, 1546).

155.   Beechwood was directed to amend the unacceptable POC but never did (HT1479-80).

156.   The May 12, 1999 SOD was reviewed and was acceptable but Beechwood's POC was not acceptable (HT1480-82, 1549).

157.   With the second POC was a Directed Plan of Correction (DPOC) directing Beechwood to obtain a consultant (HT1481-83, 1485).

158.   It was a group decision that Beechwood needed a consultant and made this a requirement in the DPOC, in part to help Beechwood prepare an acceptable POC (HT1485, 1538).

159.   On June 3, 1999, Proschel called Mr. Chambery to learn if he had obtained
a consultant (Chambery 186, 188-190; HT1895).

160.   Chambery knew that other facilities regularly retained consultants (HT2013).

161.   It was Chambery's opinion that Beechwood ran sufficiently well and had the
resources that obviated the need to hire a consultant (HT2013).

162.   Chambery never obtained a consultant (Chambery 191; HT1482, 1898,
2008, 2013).

163.   On June 7,1999, DOH Counsel, Henry Greenberg, on behalf of Executive
Deputy Commissioner Dennis Whalen, signed the notice of hearing which
commenced the Beechwood revocation proceedings and Chambery was
personally served with copies of the Notice of hearing and Statement of
Charges (Exhibits 242, 282, 371).

164.   On June 9, 1999, Chambery and his attorneys, Kevin Cooman and Paul
Barden, attended the IDR with Carlo and DOH attorney Shea (Chambery 186;
HT1890-91).

165.   At the June 9, 1999 meeting, Cooman served Carlo with a §1893 federal
lawsuit (99-cv-06241) including an application for an injunction (Chambery 187-
88; HT1892-93).

166.   On June 10-11, 1999, additional monitoring visits to Beechwood revealed
more deficiencies (HT1893).

167.   On June 11, 1999, Beechwood was notified of IDR determination regarding
April 27, 1999 survey (Exhibit 18).

168.   On June 11, 1999, Baker sent a letter to Beechwood stating:

> We have received the Plan of Correction (POC) from the above referenced survey and determined that the POC is unacceptable. The unacceptable items are listed on the enclosed report. The plan for correcting each deficiency must reflect the four elements listed at the top of the report.
>
> You are expected to amend the POC for each of the unacceptable items. Development of a complete POC will assist the facility to attain and maintain substantial compliance with federal and state requirements.

(Exhibit 353).

169.   On June 10-11, 1999, a letter was sent advising Beechwood that the POC for the May surveys was not accepted (Exhibit 353).

170.   On June 11, 1999, an Order to Show Cause to apply for a caretaker was filed with the Court (Steinhardt 97-100; Exhibit 235).

171.   Although a caretaker would have allowed Beechwood to stay open, Chambery opposed the application (Chambery 197-199).

172.   Chambery believed a caretaker would ruin his business (HT1897-98).

173.   The caretaker application was denied (Exhibit 238).

174.   On June 14, 1999, a Post Survey Revisit for the April 22, 1999, March 19, 1999 and May 12, 1999 surveys removed the substandard quality of care status but determined that significant corrections were still required (Exhibit 21).

175.   On June 15, 1999, Antonio Novello became the Commissioner of the Department of Health (Novello 7, 17).

176.   By a letter dated June 16, 1999, DOH advised Beechwood that they were not in substantial compliance with federal program requirements and would be terminated from the Medicare/Medicaid Programs effective June 17, 1999:

27

Dear Mrs. Chambery:

The abbreviated surveys of your facility on 3/19, 4/22 and 5/12/99 found deficiencies whereby significant corrections were required and substandard quality of care was identified.

A post-survey revisit on 5/12/99 found the facility was not in substantial compliance with program requirements. As a result of that visit, the Health Care Financing Administration (HCFA) imposed a denial of payment for new admissions at your facility.

Another post-survey revisit completed on 6/14/99 to validate compliance found that your facility was still not in substantial compliance and a new deficiency was identified. The most significant deficiencies were isolated deficiencies that constitute actual harm with potential for more than minimal harm that is not immediate jeopardy (G).

As a result of the outcome of the 6/14/99 post-survey revisit, this office will notify HCFA that the facility is not in substantial compliance with federal program requirements. Your facility will be terminated from the Medicare/Medicaid Program effective 6/17/99 as recommended by HCFA. A copy of the Post-Survey Revisit Report and Residential Health Care Facility profile Summary is enclosed.

This office has also identified one new deficiency on the 6/14/99 post-survey revisit. As a result of the new deficiency, we expect that accurate information will be provided to new residents regarding their Medicare/Medicaid coverage.

In addition, the State of New York is taking appropriate action under Article 28 of the Public Health Law or other applicable provisions.

You are required to make survey reports and the Residential Health Care Facility Profile Summary available in a place readily accessible to residents and their representative, without asking. If necessary, a notice of the place where these documents are available is to be posted in a public place. The reports become disclosable immediately, or within 14 days, after being made available to the facility and must remain accessible until you receive the results of a new recertification survey. To protect resident confidentiality, do not post the resident code roster.

In accordance with Public Health Law and Department policy, a copy of the survey results will be shared with board members, trustees, operators or responsible public officials.

Please contact me at (716) 423-8020, if you have any questions about the survey results.

cc:     Health Care Financing Administration

(Exhibit 38).

177.   On June 16, 1999, Beechwood's application for an injunction was denied.

(Exhibit 167).

178.   On June 17, 1999, HCFA terminated Beechwood's Medicare and Medicaid

provider agreement (Exhibit 113; Colello affidavit, paragraph #22).

179.   On June 21, 1999, Judge Affronti denied the caretaker application, stating in

part:

> Now, that being said, the Court is mindful of the fact that there is a
> Department of Health administrative proceeding to commence on
> Wednesday, June 23rd. The Administrative Law Judge at that time
> will, as acknowledged by counsel, review and consider, if not
> substantially the same, in all probability the exact allegations and
> contentions that are now before this Court.
> *     *     *     *
> I can also advise counsel that this administrative hearing through
> the Department of Health will certainly occur much earlier and
> much more expeditiously and quickly than any hearing that this
> Court would be granting.
> *     *     *     *
> In that regard, I am of the opinion that any hearing that this Court
> would be granting, if at all, would be protracted and in all probability
> redundant and repetitive of the same hearing on the same issues
> that the Administrative Law Judge would be considering.
> *     *     *     *
> The Court is of the opinion that it should and I will at this time defer
> to the expertise of the Department of Health as well as the
> Administrative Law Judge in ultimately resolving and concluding the
> contested issues and all the matters presently existing between the
> parties….
> *     *     *     *
> Therefore, this Court in the exercise of its discretion which it does
> have under Public Health Law Section 2806 subdivision (b), and
> also upon a complete review of the respective submissions does
> hereby decline to appoint a caretaker as requested by the
> Petitioner.

(Exhibit 238).

180.   On June 23, 1999, the DOH advised the Beechwood residents of the situation relating to the Federal and New York State actions against Beechwood (Exhibit 89).

181.   The New York State DOH Administrative Hearing started on June 23, 1999 (Chambery 205; Exhibits 371, 372).

182.   The transcript of the administrative hearing is attached as Exhibits B and C to the Affidavit of Charles Steinman (Docket # 73).

183.   There were three to four (3-4) IJ cases per year in Rochester (Proschel 117, Camp 97).

184.   At the time that Beechwood was sited, there were two (2) other facilities with IJ citations, both of which got a consultant and worked out their problems (HT3904).

185.   Revocations proceedings are rare (Altone 89, 95).

186.   Beechwood was one of three revocations recalled by long time DOH attorney Altone (Altone 285-91, 295-98).

187.   Other facilities facing significant problems take immediate action to correct the problems (HT 594-95, 701-02, 710, 1486).

188.   On June 29, 1999, Chambery received a notice of termination from HCFA (Chambery 199-200).

189.   The termination of Federal funding was a virtual death notice for Beechwood (Chambery 201-03; HT1912).

190.   Beechwood received a substantial portion of their income from federal funding and the insurance companies and HMOs will not use a facility that is not Medicare certified (Chambery 201; HT1912).

191.   The private pay patients were told they had to leave because Beechwood could not afford to operate on income of the approximately twenty (20) remaining patients (Chambery 204).

192.   The HCFA letter meant that Beechwood ceased operations as of July 16, 1999 (Chambery 203-04).

193.   The residents were moved out the first half of July, 1999 while the New York State Administrative Hearing was proceeding (Chambery 204).

194.   In July, 1999, Beechwood submitted rebuttals and a POC for the June deficiencies (HT1894).

195.   On August 5, 1999, after nineteen (19) days of testimony, New York State Administrative hearing concluded (see hearing transcript).

196.   The hearing transcript totaled 3,999 pages (Chambery 205, see hearing transcript).

197.   After the hearing, there were no celebrations and a secretary of the Rochester DOH just observed many tired DOH employees (Camp159-60).

198.   On October 8, 1999, ALJ Zylberberg signed a ninety-six (96) page report and recommendations recommended that Beechwood's operating certificate be revoked and Beechwood pay a $54,000 fine (Chambery 205; see Colello January 24, 2003 affidavit, exhibit A).

199.    The ALJ report and recommendation is attached to Colello's January 24, 2003 affidavit, Exhibit A.

200.    Settlement discussions took place but the matter was not resolved by agreement (Exhibits 194, 246, 251, 292, 299, 301).

201.    On December 23, 1999, Commissioner Novello signed the order adopting the report and recommendations that revoked Beechwood's license and the order was mailed to Chambery on December 30, 1999 (Chambery 205-06; Exhibit 298).

202.    On February 2, 2000, Cooman wrote to DOH Counsel Greenberg about the sale of the Beechwood building (Exhibit 193).

203.    The Beechwood building was sold at an auction for $600,000 (Chambery 219).

204.    The Beechwood equipment was sold at an auction for about $43,000 (Chambery 219-20).

205.    Beechwood paid the fine imposed by the New York State DOH administrative hearing (Chambery 205).

206.    On February 28, 2000, Beechwood filed an Article 78 petition in New York State Supreme Court, Monroe County, seeking, a declaration that the DOH administrative proceeding, the ALJ's report, and the DOH's December 23, 1999 order were null and void (Chambery 209-13).

207.    The Article 78 action consisted of a verified petition, memorandum and an extensive seven (7) volume record of the recently concluded hearing including the transcript and exhibits (Chambery 209-22).

208.   On May 15, 2000, Justice Francis A. Affronti issued a decision finding that

plaintiffs' petition "raise[d] a question relative to the sufficiency of the evidence

at the [DOH] hearing ...," which required that the Article 78 proceeding be

transferred to the appellate division under C.P.L.R. § 7804(g).

209.   The Article 78 was never litigated by the Appellate Division (HT212).

210.   Assistant Attorney General Jerry Solomon was interested in identifying

possible nursing home targets for an investigation and looked at Beechwood as

a possible target (Solomon 44, 99-101).

211.   On April 27, 2000, an opening memorandum of the Medicaid Fraud Unit

stated, in part:

> A case file is being opened in the Rochester Regional Office based on a
> NYSDOH decision that caused Beechwood to be terminated from the
> Medicare and Medicaid program as residents were in imminent danger. The
> DOH surveys found numerous findings of significant and severe quality of
> case deficiencies, including serious resident harm that the owner refused to
> address. The facility was closed and residents were transferred to other
> facilities.

(Exhibit 211).

212.   On April 10, 2003, the closing memorandum, stated, in part:

> RECOMMENDATION
> This facility has been closed and the owners heavily fined. Based upon
> insufficient evidence upon which to base a criminal prosecution, I
> recommend this investigation be closed.

(Exhibit 212).

213.   There were no charges against the plaintiffs (Chambery 229).

214.   On May 22, 1999, Mr. Cooman requested a hearing to challenge the federal

administrative decision to terminate federal funding to Beechwood (Chambery

215; Exhibit 388, pgs. M000151-62).

215. A federal ALJ held a hearing on April 3 and 17, 2001 and issued a decision in which he concluded that Beechwood was not in substantial compliance as of DOH's May and June 1999 surveys and sustained HCFA's determination to terminate Beechwood. Beechwood Sanitarium v. Centers for Medicare & Medicaid Services, DAB CR 821, 2001 WL 1329831 (2001).

216. Beechwood appealed the ALJ's decision to the Department of Health and Human Service's Departmental Appeals Board ("DAB"); the Board reversed and remanded the case to the ALJ for further proceedings, including a new decision. Beechwood Sanitarium v. Centers for Medicare & Medicaid Services, DAB CR 1824, 2002 WL 848030 (2002).

217. On remand, the ALJ again upheld HCFA's termination of Beechwood. Beechwood Sanitarium v. Centers for Medicare & Medicaid Services, DAB CR 966, 2002 WL 31599189 (2002).

218. Beechwood again appealed to the DAB, which held that the ALJ's findings of fact and conclusions of law in both of decisions should be sustained with two (2) exceptions. Beechwood Sanitarium v. Centers for Medicare & Medicaid Services, DAB No.1906, 2004 WL 230866 (2004).

219. The federal administrative determination was appealed to this Court. In Beechwood Restorative Care Center v. Thompson, 494 F.Supp.2d 181 (W.D.N.Y. 2007). This Court upheld the decision and the federal termination.

220. The parties settled the remaining financial issue in the federal administrative action, there was no appeal and the litigation over the federal administrative hearing was concluded (Chambery 218-19).

221.   Plaintiffs' complaint paragraph 278 outlined damages sought by plaintiffs.

222.   Plaintiff's experts opine that the total damages are worth about 48 million

dollars (see expert report summary attached to Levine Declaration).

Dated: December 30, 2010

ANDREW CUOMO
Attorney General of the State of New York
Attorney for Defendants

 s/Gary M. Levine _____  _____
GARY M.  LEVINE
Assistant Attorney General of Counsel
NYS Office of the Attorney General
144 Exchange Boulevard - Suite 200
Rochester, New York 14614
Telephone: (585) 546-7530
gary.levine@ag.ny.gov

## CERTIFICATE OF SERVICE

I certify that on December 30, 2010, I electronically filed the foregoing Rule 56 Statement, with the Clerk of the District Court using CM/ECF system, which sent notification of such filing to the following:

1.   Kevin S. Cooman, Esq.
     25 East Main Street, Suite 500
     Rochester, New York 14614

2.   David Rothenberg, Esq.
     45 Exchange Boulevard, Suite 800
     Rochester, New York 14614
     drothenberg@geigroth.com

And, I hereby certify that I have mailed, by the United States Postal Service, the document to the following non-CM/ECF participant(s):

1.   N/A

ANDREW M. CUOMO
Attorney General of the State of New York
Attorney for Defendants

 s/Gary M. Levine
GARY M. LEVINE
Assistant Attorney General of Counsel
NYS Office of the Attorney General
144 Exchange Boulevard, Suite 200
Rochester, New York 14614
Telephone:  (585) 546-7430
gary.levine@ag.ny.gov