UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BEECHWOOD RESTORATIVE CARE CENTER,
BROOK CHAMBERY,
OLIVE CHAMBERY,

                                        Plaintiffs,

                                                        DECISION AND ORDER

                                                        02-CV-6235L

                        v.

LAURA E. LEEDS,
EDMUND RUSSELL ALTONE,
ROBERT W. BARNETT,
ANNA D. COLELLO,
ARLENE L. GRAY,
HENRY M. GREENBERG,
ANTONIO C. NOVELLO,
STEVEN B. STEINHARDT,
DENNIS P. WHALEN,
SANFORD RUBIN,
SUSAN T. BAKER,
SHARON A. CARLO,
CYNTHIA T. FRANCIS,
MARY ELIZABETH RICH,
BARBARA W. SANER,

                                        Defendants.

_____

## INTRODUCTION

This long-running case has its origins in a series of disputes between plaintiff Brook Chambery ("Chambery") and state and federal regulatory authorities over the operation of Beechwood Restorative Care Center ("Beechwood"), a nursing home owned by Chambery and his mother Olive Chambery (collectively "the Chamberys") in Rochester, New York. Those disputes, and the matters underlying those disputes, eventually led to Beechwood losing its state-issued operating certificate and closing in 1999.

In this action, which was commenced in 2002, the Chamberys and Beechwood brought various civil rights claims against seventeen state and two federal defendants, who were employed by the New York State Department of Health ("DOH") and the federal Health Care Financing Administration ("HCFA") respectively.  Plaintiffs alleged, in short, that defendants had targeted Beechwood for closure in retaliation for Chambery's many complaints, protests, and lawsuits over the years, in which he challenged regulatory policies and practices that he considered wrongheaded, foolish, or unreasonable.  Plaintiffs have alleged that defendants subjected Beechwood to continual nitpicking inspections and surveys, which they used to generate fodder for trumped-up allegations of deficiencies, which in turn provided the basis for the state's revocation of Beechwood's operating certificate.

While the full procedural history of this case would take several pages to recite, much of that history has been set forth in other decisions of this Court and of the Court of Appeals for the Second Circuit, familiarity with which is assumed.  *See* 436 F.3d 147 (2d Cir. 2006); 494 F.Supp.2d 181 (W.D.N.Y. 2007); 317 F.Supp.2d 248 (W.D.N.Y. 2004).  The full history of this litigation will therefore not be repeated here, and a short summary will suffice.

In 2004 this Court granted summary judgment for defendants, dismissing all of plaintiffs' claims.  In 2006, the Court of Appeals for the Second Circuit affirmed in part and vacated and remanded in part this Court's decision.  436 F.3d 147.  The court affirmed my dismissal of all of plaintiffs' claims, except for one: plaintiffs' First Amendment retaliation claim against the state defendants.  The Court of Appeals remanded the action for further proceedings as to that single claim.[1]

---

[1]In 2005, plaintiffs also filed an action seeking judicial review of the decision of the federal Department of Health and Human Services upholding penalties imposed on Beechwood by that agency, including the termination of Beechwood's participation in the Medicare and Medicaid programs.  In July 2007, this Court granted summary judgment for the defendants in that case as to all but one of plaintiffs' claims, relating to the untimely notice of denial of payment for new admissions.  *See Beechwood Restorative Care Center v. Thompson*, 494 F.Supp.2d 181, 207 (W.D.N.Y. 2007).  The parties have since resolved that claim, which is no

(continued...)

Additional discovery followed the Second Circuit's remand.  In addition, the claims against two of the state defendants, Naomi Hauser and Joseph Moore, have been dismissed by stipulation of the parties.  The remaining fifteen state defendants have once again moved for summary judgment, asserting that the record now before the Court conclusively demonstrates the lack of merit to plaintiffs' claims.  Plaintiffs have filed papers in opposition to defendants' motion, and the Court heard oral argument on that motion on June 7, 2011.

## SECOND CIRCUIT DECISION OF 2006

Before analyzing the pending summary judgment motion which relates to all fifteen of the remaining defendants, it is prudent to review certain aspects of the Court of Appeals' 2006 Decision. The relevant factual background of the case was set forth with some precision in that decision, 436 F.3d at 149-51.  The only claim of plaintiffs' to survive this Court's prior summary judgment decision and the Court of Appeals' decision is plaintiffs' First Amendment retaliation claim.

There are several aspects of the Second Circuit's decision relating to retaliation which bear repeating here. Of particular importance is, first, that court's holding that "issue preclusion does not bar litigation of the First Amendment retaliation claim." *Id.* at 153.  In so ruling, the court rejected defendants' argument that the court should give preclusive effect to the decision of a state administrative law judge ("ALJ") who found, after an evidentiary hearing on DOH's claim that Beechwood's operating certificate should be revoked, that DOH had proved several serious deficiencies at Beechwood that justified revocation.

In his decision, the ALJ rejected Beechwood's allegations of improper motive on the part of DOH officials, finding that DOH acted in good faith and that it had attempted to keep Beechwood open, but that Beechwood and the Chamberys failed to take advantage of the opportunities afforded

---

[1](...continued)
longer at issue, and that case is closed.

by DOH to rectify the problems with the facility.  As the Second Circuit put it, "[t]he ALJ 'emphatically rejected Beechwood's allegations of regulatory 'bias or ill will.'"  436 F.3d at 151.

The Court of Appeals, however, held that these findings concerning DOH's motives are not entitled to preclusive effect in this case.  The court explained that although the issue of improper motive was "actually decided" by the ALJ, it was not "necessarily decided," because the ALJ's decision on that issue was not "necessary to support a valid and final judgment on the merits' ... ." *Id.* (quoting *Leather v. Eyck*, 180 F.3d 420, 426 (2d Cir. 1999)).  Therefore, the court concluded, "issue preclusion does not bar litigation of the First Amendment retaliation claim."  *Id.*

The Court of Appeals went on to hold that "Beechwood [had] produced sufficient evidence of retaliatory motive to survive summary judgment."  *Id.*  The court cited evidence of "[s]uspect chronology–the close sequence of protest [by Chambery] and scrutiny" of Beechwood by DOH, which the court stated constituted circumstantial evidence of retaliatory motive, as well as "direct evidence ... that the State's hostile pursuit of the partnership was motivated by an intent to punish the partnership for exercising First Amendment rights of speech and petition ... ."  *Id.* at 153, 154. Noting evidence of statements by some DOH officials to the effect that they "were going to get" Chambery for his previous lawsuits against DOH, as well as evidence concerning other statements expressing similar motives, the court concluded that "[t]his is evidence from which a jury could reasonably find that the DOH was campaigning against the partnership as retaliation for the exercise of First Amendment rights."  *Id.* at 154.

As stated, having held that plaintiffs had presented sufficient evidence for a jury to find in their favor on the retaliation claim, the Court of Appeals  remanded the action to this Court for further proceedings on that claim.

The Second Circuit's decision might seem, then, to have foreclosed any argument that plaintiffs' First Amendment claim should be dismissed as a matter of law, prior to trial.  That is, however, precisely what defendants now seek to do.

Of course, this Court must comply with directives from the appellate court and must adhere to its mandate.  Therefore, it indeed seems audacious, to say the least, for defendants to seek dismissal in favor of *all* the remaining defendants, in the face of the very clear Court of Appeals decision.  That court found sufficient evidence to warrant a trial on the retaliation claim, and this Court must be ever mindful of that.

I do, however, recognize that a party is not generally precluded from making successive motions for summary judgment, as long as the party is not simply asking the court to rethink its earlier decision.  *See Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004) ("district courts enjoy considerable discretion in entertaining successive dispositive motions") (citing *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 835 (6ᵗʰ Cir. 2000) ("District courts may in their discretion permit renewed or successive motions for summary judgment"); *see also Campers' World Int'l, Inc. v. Perry Ellis Intern., Inc.*, 221 F.R.D. 409, 409 (S.D.N.Y. 2004) ("it is improper for a party to file a successive motion for summary judgment which is not based upon new facts and which seeks to raise arguments it could have raised in its original motion").

Defendants contend that their new motion for summary judgment is appropriate because it is based on evidence obtained through discovery following the Second Circuit's decision, as well as on new grounds.  Defendants contend that "[e]xtensive discovery, including numerous depositions, have [sic] been conducted and before the Court is a new summary judgment [motion] on a complete record."  Def. Mem. (Dkt. #187) at 3.  Defendants also argue that whereas their prior motion, and this Court's and the Court of Appeals' previous decisions were based on the general legal principles of issue preclusion and absolute and qualified immunity, their present motion is based, in part, on the particular facts as to each individual defendant.  It is also true, though, that defendants did not move previously on the primary ground raised here, *i.e.*, that the evidence was lacking as to each individual defendant.

Although I am not convinced that some of the grounds now asserted in support of defendants' current motion could not have been presented previously, there has been a significant amount of

discovery since the Second Circuit issued its decision in 2006.  Whether the evidence unearthed in that discovery helps or hurts defendants is one of the points of contention here, but since defendants are not simply seeking to reargue matters that they raised, or could have raised, on their prior motion, I conclude that they are not precluded from again seeking summary judgment.  *See Seal v. Morgan*, 229 F.3d 567, 580 (6th Cir. 2000) (noting that a district court has the discretion to entertain a successive or renewed summary judgment motion, and that doing so is particularly appropriate when the factual record upon which summary judgment is sought has been expanded) (citing *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995)); *accord Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010).  Of course, the pending motions must be viewed and decided consistent with the ruling from the Circuit as to the sufficiency of the evidence.

While the Second Circuit found plaintiffs' evidence sufficient to give rise to genuine issues of material fact as to plaintiffs' First Amendment claim, the court did not analyze the evidence as to each individual defendant, nor did the court intimate that its ruling was meant to apply across the board to all the defendants. The Court of Appeals determined, in summary fashion, that there was evidence that "the Department of Health" engaged in retaliatory conduct against plaintiffs.  The Court of Appeals did cite some evidence and referenced certain defendants but did not do a defendant-by-defendant analysis.  Because it is necessary for plaintiffs to establish each defendant's personal involvement in the alleged constitutional violation, the task falls to this Court to determine whether any genuine issues of material fact exist as to each defendant's involvement in the alleged retaliatory action.  The Court of Appeals has spoken as to some of the evidence, and this Court has no basis to second-guess the Court of Appeals' findings relative to those matters.  The parties have referenced many additional items of evidence which they claim bear on whether defendants should defend their conduct at trial.

## CONSPIRACY

Defendants devote several pages of their brief to arguing that plaintiffs cannot establish that defendants conspired to violate their rights.  They also argue that any conspiracy claims here are subject to dismissal pursuant to the intracorporate conspiracy doctrine, under which "officers, agents and employees of a single corporate entity are legally incapable of conspiring together."  *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (internal quote omitted).

In response, plaintiffs disavow any reliance on a conspiracy claim or theory.  They contend instead that each defendant was personally involved in what they describe as DOH's "offensive" against Beechwood, *i.e.*, defendants' orchestrated campaign to put Beechwood out of business and to punish Chambery for his exercise of his First Amendment rights.  Plaintiffs assert that defendants acted in concert, that defendants' actions caused plaintiffs to suffer one indivisible injury, and that all the defendants are therefore jointly and severally liable for plaintiffs' damages, but, they contend, such a claim does not require proof of the elements of a conspiracy.

Although the complaint does make some references to defendants having conspired together, *see, e.g.*, Complaint ¶¶ 280, 285, 290, 295, conspiracy and indivisible injury are distinct concepts. *See McKinnon v. City of Berwyn*, 750 F.2d 1383, 1387 (7th Cir. 1984) (defendants "would be [jointly liable] either if they had conspired against [plaintiff] or if it just was not possible to say what portion of his injuries would have been avoided if a particular defendant had not participated in the wrongful conduct"); *see also Sershen v. Cholish*, No. 3:07-CV-1011, 2008 WL 598111, at *5 (M.D.Pa. Feb. 29, 2008) ("Although 'joint activity' and 'conspiracy' are often both present in the same case, the two tests for state action are ... distinct"); *Ramos v. Town of Cicero*, No. 04 C 2502, 2005 WL 1838334, at *3 (N.D.Ill. July 28, 2005) ("Plaintiffs respond that they are not alleging a conspiracy, and we do not believe that the allegation [that 'The defendants acted in concert with a common purpose and contributed to the same indivisible injuries sustained by plaintiffs'], read in its context ..., can fairly be read as an attempt to state a conspiracy claim").

Plaintiffs have not asserted a civil rights conspiracy claim under § 1985, and in any event the only claim left, following the remand from the Second Circuit, is a First Amendment retaliation claim under § 1983.  While plaintiffs need not prove all the elements of a conspiracy, then, they will have to prove, as to each defendant, that the defendant was personally involved in the violation of plaintiffs' rights, and that each defendant contributed to plaintiffs' injury.  *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).  Whether defendants should be held jointly and severally liable for that injury is an issue that can better be addressed at trial.  *See Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 315 (7th Cir.) ("liability among defendants in a § 1983 case is joint and several–at least in the usual case of one plaintiff with a single indivisible injury") (emphasis omitted), *cert. denied*, ___ U.S. ___, 131 S.Ct. 643 (2010).

## IMMUNITY

In their papers, defendants raise arguments concerning both qualified immunity, and, as to some defendants, absolute prosecutorial or quasi-judicial immunity.  The Second Circuit stated that defendants had "mention[ed] an absolute immunity defense in passing," but the court added that such a "defense [wa]s considered waived since it only appear[ed] in a footnote."  436 F.3d at 154 n.3.  As explained below, I find it unnecessary to consider an absolute-immunity defense as to any of the defendants.

With regard to qualified immunity, the Court of Appeals has also made clear, both in this case and elsewhere, that summary judgment on that ground is generally inappropriate with respect to First Amendment retaliation claims.  If defendants acted with retaliatory intent, then no rational factfinder could conclude that they could have reasonably believed that their actions were lawful.  *See  id.* ("Where specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate") (quoting *Mandell*

*v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003)).  *See also Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003) ("Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail").[2]

## SUMMARY JUDGMENT MOTION ON RETALIATION
## CLAIM AS TO EACH DEFENDANT

Despite the Second Circuit's seemingly unequivocal statement that "Beechwood produced sufficient evidence of retaliatory motive to survive summary judgment," defendants now contend that "the retaliation claim against *each* defendant should be dismissed."  Def. Mem. (Dkt. #187) at 49 (emphasis added).  The chief basis for that argument is defendants' assertion that "there is no evidence that any defendant personally retaliated against any plaintiff ... ."  *Id.*

In other words, defendants contend that there is no evidence of sufficient personal involvement on the part of any particular defendant to hold that defendant liable for unconstitutional retaliation against plaintiffs.  By their motions, defendants appear to take the startling position that in spite of the Court of Appeals' clear statement as to the sufficiency of proof, no defendant should proceed to trial.  If accepted, that argument would leave plaintiffs in the curious position of having stated a retaliation claim against defendants generally, which the Second Circuit has held should go to a jury, yet being unable to establish liability against any individual defendant.  That cannot be the case.

Plaintiffs must establish each defendants' personal involvement, and each defendant is entitled to argue, on the basis of the expanded record now before me, that there is insufficient evidence of his or her personal involvement in the alleged constitutional deprivation.  Having

---

[2]Arguably, a different result might obtain if reasonable persons could differ about whether Chambery had engaged in protected activity, *i.e.*, whether his speech addressed a matter of public concern.  *See Huth v. Haslun*, 598 F.3d 70, 73-74 (2d Cir. 2010).  Chambery's speech, however, which concerned DOH policies and practices concerning nursing homes in New York State, clearly related to matters of public concern.

reviewed that record, I find that defendants have carried their burden of showing that some, but not all, of them are entitled to summary judgment, as discussed below.

I have analyzed the evidence relating to retaliation as to each defendant. I have not, though, listed every piece of evidence and the permissible inferences from that evidence that could be considered by a jury as to any particular defendant. The Court of Appeals has already determined that issues of fact exist as to plaintiffs' First Amendment retaliation claim generally. It is not necessary, therefore, to go through the entire body of evidence before the Court. The only task left before me now is to decide whether enough evidence has been presented to give rise to issues of fact as to each individual defendant.

The Court of Appeals focused on some evidentiary items, *e.g.*, the timing of certain actions and defendants' failure to follow normal procedures. The accumulation of all that proof–both direct and circumstantial–may be considered by the jury and may support a verdict if the jury concludes that the actions taken, and the circumstances under which they were taken, warrant the conclusion that a particular defendant acted with the particular retaliatory animus, or, knowing that others acted with such a state of mind, intentionally joined in the efforts to deprive plaintiffs of rights protected under the First Amendment.

## A. SANFORD RUBIN

In holding that there was sufficient evidence to create a triable issue of fact as to plaintiffs' retaliation claim, the Second Circuit specifically cited the evidence concerning defendant Sanford Rubin, who at all relevant times was DOH's Regional Director. The court cited a third-party affidavit indicating that DOH and Rubin "were going to get" Chambery for his previous lawsuits against DOH and Rubin, and stated that "[a] gloating e-mail from defendant Rubin to DOH personnel is fairly explicit: '[a]nother advantage on our side is that HCFA claims it will back us all the way ... they too have been harassed by Chambery. The chickens are coming home to roost.'" The Court of Appeals stated that "[t]his is evidence from which a jury could reasonably find that the

DOH was campaigning against the partnership as retaliation for the exercise of First Amendment rights."  436 F.3d at 154.

That statement by the court could hardly have made any clearer that the Court of Appeals believed there to be sufficient evidence to proceed on plaintiffs' claims against Rubin.  While defendants have attempted to explain away those statements by Rubin, arguing that they show only that Rubin believed that "Chambery was a weak nursing home leader," but that "Beechwood was strong in legal matters," Dkt. #226 at 28-29, such inferences are not for the Court to draw on a motion for summary judgment.  A jury may find defendants' arguments persuasive, but I cannot say as a matter of law that defendants' proffered interpretation of Rubin's remarks is the only reasonable one, particularly after the Court of Appeals has plainly ruled otherwise.  *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir.), *cert. denied*, 549 U.S. 953 (2006); *Lundy v. Town of Brighton*, 732 F.Supp.2d 263, 274 (W.D.N.Y. 2010).  Frankly, after reviewing all the material presented on this motion, the evidence is most compelling against this particular defendant.


**B.  LAURA E. LEEDS**

Until her resignation in September 2000, defendant Laura Leeds was Deputy Director of the Office of Continuing Care at DOH.  In that capacity, she played a significant role in the decisions concerning Beechwood, including the revocation of its operating certificate.  Leeds was in frequent contact with Rubin concerning Beechwood, and the evidence suggests that she was clearly in agreement with him that Beechwood should be shut down.

While there does not appear to be any direct evidence of retaliatory intent on Leeds's part, comparable to Rubin's statements about "chickens ... coming home to roost" and the like, there is nonetheless evidence that Leeds was determined to see Beechwood closed, or at least that Chambery be removed as its operator; regardless of the actual situation at Beechwood in the Spring of 1999. For instance, in an email to certain DOH employees dated May 13, 1999, Leeds stated that DOH was "removing immediate jeopardy,"  that is, that immediate patient concerns had been resolved.  From

the removal of that "immediate jeopardy" classification, it would seem that Beechwood was more in compliance with DOH's requirements but, in spite of this now more favorable status, Leeds pressed ahead in the email to remove Chambery.  She stated:  "We will continue to see if we can make the case for caretaker [*i.e.*, to take Chambery's place] next week."  In parentheses, she added to one of the recipients of the email, "John this is the only piece we do not want [made] public."  Pl. Ex. 76.[3]

Those statements are, of course, subject to varying interpretations.  Leeds may have simply meant that DOH would continue to monitor the situation, and that they would revisit the issue of whether Chambery should be allowed to continue to operate Beechwood the following week.  It is not within the province of the Court, though, to draw such inferences on a motion for summary judgment. *Cioffi*, 444 F.3d at 162.  Likewise, Leeds's parenthetical statement that DOH did not want her statement about the caretaker to be made public may have simply reflected a desire to avoid fueling public speculation or uncertainty about whether Beechwood was going to be shut down, but it might also indicate that Leeds was trying to create the impression that DOH was working with Beechwood to resolve the problems there so that it could remain in operation, while secretly she and others at DOH continued to pursue the goal of ousting Chambery and eventually shutting Beechwood down.

Plaintiffs have also submitted an affidavit of Paul Kesselring, who formerly was employed at Beechwood as an assistant administrator.  He states that in September 1999, he attended a seminar concerning health care issues, at which Leeds spoke.  According to Kesselring, at one point Leeds, referring to Beechwood, stated that DOH "had to close a facility this year.  The staff at that facility were excellent.  It was a horrible situation that I hope to never go through again.  We had to close that facility for all the wrong reasons."  Pl. Ex. 395 ¶ 5.  Kesselring states that during a break that followed, he observed Leeds engaged in a "very animated conversation" with defendant Anna

---

[3]Plaintiffs' exhibits ("Pl. Ex.") are attached to the affidavit of Brook Chambery filed as Docket #257.

Colello from DOH's Bureau of Surveillance and Quality Assurance.  After the seminar resumed, Leeds returned to the subject of Beechwood, backtracking a bit by saying that "[w]hen [DOH] closed Beechwood all the staff weren't really terrific.  There were a lot of very serious care concerns and problems that were legitimate.  The administration refused to cooperate."  *Id.* ¶ 7.

In its 2006 decision in this case, the Second Circuit specifically cited Leeds's alleged "all the wrong reasons" statement as among the "evidence from which a jury could reasonably find that the DOH was campaigning against the partnership as retaliation for the exercise of First Amendment rights."  436 F.3d at 154.

Again, more than one inference could be drawn from this evidence.  In particular, Leeds's alleged statement about closing Beechwood "for all the wrong reasons" is somewhat cryptic.  While it would be surprising if Leeds had meant that as a public acknowledgment that DOH had closed Beechwood for *unlawful* reasons, that statement, coupled with Leeds's later alleged statement in which she seemed to back off from her earlier comment about the employees at Beechwood being "excellent" is evidence that a jury could consider in determining whether she acted with retaliatory intent.  In short, there are issues of fact as to Leeds's personal involvement in the alleged retaliation.


## C.  ANTONIO C. NOVELLO

Defendant Antonia Novello was Commissioner of DOH from June 15, 1999 to January 1, 2007.  She signed the order revoking Beechwood's operating certificate on December 23, 1999.

At her deposition in this case, Novello claimed to have had very little knowledge of DOH's activities concerning Beechwood.  She testified, for example, that she could not recall having read or reviewed the administrative record before she signed the revocation order.  Novello Tr. (Dkt. #218 Ex. 1) at 44-46.  When asked what she "remember[ed] about the ALJ report and recommendation," Novello replied, "I just saw a document by an ALJ and I assumed he knew what he was talking about.  I just signed it in the process of all the things that came in that day."  *Id.* at 47.

In support of their claim against Novello, plaintiffs point to a memorandum dated July 23, 1999, addressed from, and signed by, Novello to then-Governor George Pataki.  The subject line of the memo describes it as "Department of Health Monthly Report for July, 1999."  Under the heading, "Activities of which the Governor should be aware," one of the eleven entries states:

> **Beechwood Restorative Care Center:**  Based on continuing serious deficiencies, the Department is seeking to revoke the license of the facility's operators.  The operators are suing DOH in federal court, alleging we have unfairly singled them out for scrutiny, and have mounted an aggressive public relations campaign in an attempt to sway public opinion.  All Rochester-area media are following this story closely.

Pl. Ex. 308.

Novello testified that she did not personally prepare this memo, and stated that she did not recall whether she read it in its entirety before signing it.  Novello Tr. at 24-25.  She stated that at the time she submitted it to the governor, she had only been in office for about a month, and that she was "not going to question what [wa]s put in front of [her]," and that she "assume[d] that everyone who writes it is correct."  *Id.* at 25.

Aside from that memo, plaintiffs' claim against Novello mostly rests on certain alleged "procedural irregularities" concerning the manner in which the decision was made to revoke Beechwood's operating certificate.  In short, plaintiffs allege that certain prescribed procedures were bypassed, and that Novello improperly accepted the recommendations of defendants Dennis Whalen, a then-deputy commissioner who had been the Acting Commissioner of DOH at the time the revocation proceedings were commenced, and Henry Greenberg, the then-General Counsel for DOH.  Plaintiffs allege that the ALJ had directed that any DOH attorneys who had previously been involved in the Beechwood proceedings make no recommendations to Novello, as a matter of fairness, but that both Greenberg and Whalen ignored that directive.  Similarly, they allege that although the DOH Adjudication Plan then in effect prohibited Greenberg, as someone who had performed advocacy functions on behalf of DOH in the Beechwood case, from advising Novello, Greenberg improperly

- 14 -

sent Novello a proposed revocation order, along with erroneous instructions about how she should handle the order.

Even viewing this evidence in the light most favorable to plaintiffs, I do not believe that there are any genuine issues of material fact as to Novello on the remaining claim of retaliation, and I conclude that she is entitled to summary judgment. Even if, as plaintiffs allege, "Novello completely abdicated her responsibilities as the final decision maker and merely rubberstamped the order Greenberg had sent her," Pl. Mem. of Law (Dkt. #243) at 4, that is not enough to show her personal involvement in the alleged constitutional deprivation. The fact that Novello held a position of authority does not render her liable for the acts of her subordinates, even if she simply signed off on Greenberg's and Whalen's recommendations. *See Brown v. Rinehart*, 325 Fed.Appx. 47, 50 (3d Cir. 2009) (summary judgment was properly entered in favor of police sergeant, where, although plaintiff contended that sergeant signed off on police reports documenting plaintiff's arrest, plaintiff cited no evidence of sergeant's personal involvement through participation, knowledge, or acquiescence); *Espey v. Spectrum Health Systems, Inc.*, No. 1:09-0090, 2010 WL 3341938, at *3-*4 (M.D.Tenn. July 12, 2010) (dismissing § 1983 claim in part because plaintiff's allegations that defendants "acted as a 'rubber stamp' for the decisions of their subordinates" did not sufficiently allege their personal involvement); *see also Garcia v. Selsky*, 680 F.Supp.2d 479, 481 (W.D.N.Y. 2010) ("while personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the [administrative findings] as opposed merely to rubber-stamping the results") (internal quotes omitted).

As to the July 23, 1999 memo from Novello to Governor Pataki, at most that shows that Novello had been made aware that DOH officials were seeking to revoke Chambery's operating license, and that he had sued DOH in federal court. The memo, which was dated just over a month after Novello became Commissioner, contains no hint that Novello herself had been involved in the investigation or proceedings involving Beechwood. While it does indicate that she had been made aware of Chambery's lawsuit, it does not suggest that she had knowledge of his various complaints

about, or disputes with, DOH over the years, much less that she had any retaliatory intent, or that she knew of such intent on her subordinates' part. To the contrary, the memo states that the DOH was seeking to revoke the Chamberys' license "[b]ased on continuing serious deficiencies" at Beechwood. It therefore does not give rise to any genuine issues of material fact.[4]

## D.   STEVEN B. STEINHARDT

Defendant Steven Steinhardt was an attorney with DOH from 1975 until 2002. He was involved in preparing and submitting the application for appointment of a caretaker for Beechwood in June 1999, pursuant to § 2806 of the New York State Public Health Law.[5] That application, if granted, would have resulted in the ouster of the Chamberys, and their replacement by a caretaker while the revocation proceedings were pending. Although the application was denied by a state court judge, there is nothing in the state court's decision suggesting that it was presented in bad faith. *See* Pl. Ex. 238.

Although plaintiffs strive to show that Steinhardt was well award of Chambery's past lawsuits and complaints, and that he directly participated in DOH's alleged "offensive" against Beechwood, the evidence before me does not support such an inference. There is evidence that Steinhardt participated in some telephone calls and meetings with other DOH officials concerning Beechwood, but nothing in the record suggests that Steinhardt ever harbored any retaliatory animus toward Beechwood. As a DOH attorney, it was Steinhardt's job to handle caretaker and receivership

---

[4]My finding in this regard renders it unnecessary for me to consider defendants' argument that Novello is entitled to absolute judicial immunity, or whether the Court of Appeals' holding that defendants had waived that argument on appeal, *see* 436 F.3d at 154 n.3, should apply now, before this Court, on remand.

[5]Section 2806-b provides that when the commissioner determines that that there exist operational deficiencies in a residential health care facility warranting revocation of the facility's operating certificate, the commissioner shall take steps to do so, and that where the commissioner "deems it to be in the public interest, he may petition a court of competent jurisdiction to appoint a caretaker" for the facility. The caretaker would take charge of the facility, and safeguard the health, safety and welfare of the residents pending completion of the revocation proceedings.

litigation, and there is no evidence that he was involved in the underlying decision to seek revocation of Beechwood's license, that he had any reason to question the decisions of the relevant DOH officials in that regard, or that Steinhardt had any particular grudge against Chambery. Plaintiffs' allegations of animus on Steinhardt's part are entirely conjectural, and do not give rise to a genuine issue of material fact.[6]

## E. EDMUND RUSSELL ALTONE

Defendant Russell Altone is also an attorney. In 1999, he was working as the Director of the Bureau of Administrative Hearings ("BAH") for DOH's Department of Legal Affairs. He was involved in a number of respects in bringing enforcement proceedings against Beechwood and the termination of Beechwood's provider agreement.

Defendants contend that Altone is entitled to absolute immunity for his actions, which they contend were analogous to those of a prosecutor. Plaintiffs respond that Altone was intimately involved in the investigative phase of the so-called "offensive" against Beechwood, and that he was not acting in a role comparable to that of a prosecutor.

The Second Circuit has adopted a "functional approach" to determine whether actions taken by agency officials are entitled to absolute immunity. *DiBlasio v. Novello*, 344 F.3d 292, 297 (2d Cir. 2003), *cert. denied*, 541 U.S. 988 (2004). Under that approach, the court must consider the extent to which the relevant administrative proceedings share "characteristics of the judicial process," and whether the defendant official was functioning in a manner sufficiently analogous to that of a judge or prosecutor. *Id.* at 297-98.

In evaluating the process, the court should assess the following six factors:

---

[6]My finding in this regard renders it unnecessary for me to consider defendants' argument that Steinhardt is entitled to absolute prosecutorial immunity, or whether the Court of Appeals' holding that defendants had waived that argument on appeal, *see* 436 F.3d at 154 n.3, should apply now, before this Court, on remand.

(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Id.* at 298 (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985)).  With respect to the official's actions, courts in this circuit "look to whether [those] actions ... are 'functionally comparable' to that of a judge or a prosecutor."  *Id.* at 297 (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)).

The Second Circuit also explained in *DiBlasio* that

[g]overnment actors who seek absolute immunity bear the burden of showing that public policy requires an exemption of that scope.  However, once a court determines that an official was functioning in a core judicial or prosecutorial capacity, absolute immunity applies however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff.

*Id.* (internal quotes omitted).  Because of its sweeping scope where it does apply, "courts are generally 'quite sparing' in their recognition of absolute immunity," *DiBlasio*, 344 F.3d at 296 (quoting *Burns v. Reed*, 500 U.S. 478, 486-87 (1991)).  *See also Standard Investment Chartered, Inc. v. National Ass'n of Securities Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011) ("We have cautioned that the [absolute immunity] doctrine 'is of a rare and exceptional character'") (quoting *Barrett v. United States*, 798 F.2d 565, 571 (2d Cir. 1986)).

Plaintiffs here do not appear to argue that the revocation proceedings were not sufficiently judicial in character for immunity to apply, and I conclude that they were.  Such proceedings are governed by New York Public Health Law §§ 2806 and 2806-b, which set forth certain procedures that must be followed when DOH seeks to revoke a health care facility's operating certificate.  Those provisions provide the facility with notice and hearing rights, *see St. Joseph Hosp. of Cheektowaga v. Novello*, 43 A.D.3d 139, 150-51 (4th Dep't) (Fahey, J., dissenting), *appeal dismissed*, 9 N.Y.2d 988 (2007), and judicial review is available by means of an Article 78 proceeding, *see Hodes v. Axelrod*, 70 N.Y.2d 364, 368 (1987); *Lap v. Axelrod*, 97 A.D.2d 583 (3d Dep't 1983).  *See Applewhite v. Briber*, 506 Fed.Appx. 181, 182-83 (2d Cir. 2007) (holding that absolute judicial immunity attaches to medical license revocation proceedings because the statutory scheme governing

- 18 -

such proceedings sets forth certain safeguards against arbitrary action, and provides for administrative review).

As stated, the next question is whether the acts of the official in question were analogous to those of a prosecutor in a judicial proceeding.  In making that determination, however, the court need not–indeed, should not–take an all-or-nothing approach.  In other words, the court must focus not simply on the defendant's status or title, but on his actions.  Acts that are "intimately associated" with judicial proceedings, such as acts concerning the decision to prosecute, are generally shielded by absolute immunity, but acts that are more aptly characterized as administrative or investigative are not. *DiBlasio*, 344 F.3d at 301.  The focus, then, is not on the official's title, but on the nature of the act in question. *See Lacey v. Maricopa County*, ___ F.3d ___, 2011 WL 2276198, at *7 (9th Cir. 2011) ("we employ a functional analysis, looking not at the office or title of the actor but at the act performed.  Thus, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor") (internal quote and citation omitted); *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999) ("Courts take a functional approach when evaluating a defendant's entitlement to absolute immunity for a particular act.  Under this functional analysis, the level of immunity 'flows not from rank or title or location within the Government,' but from the nature of the responsibilities of the individual official") (quoting *Cleavinger*, 474 U.S. at 201) (additional internal quotes omitted).

In the case at bar, there is evidence that Altone became involved from early on in DOH's activities concerning Beechwood, while those activities were still in the investigative stage, and that he very early began talking about, if not planning, revocation proceedings.  Anna Colello, from the Bureau of Surveillance and Quality Assurance, testified that typically that office "would make a decision and there would be a formal referral over to our counsel's office to take the enforcement action."  Dkt. #200-1 at 24.  Altone has also stated in an affidavit that the BAH "became involved in the prosecution of plaintiffs only after the [DOH] ... referred the matter to the [BAH] for preparation and commencement of an enforcement proceeding."  Pl. Ex. 240 ¶ 5.  Altone went on

to say that in May 1999, he was consulted by DOH staff concerning a possible enforcement action against Beechwood, and that "[i]t was only on or about May 25, 1999 that the [BAH] received" a formal request to commence such an action.  *Id.* ¶¶ 7, 8.

Yet there is also evidence that as early as mid-April 1999, Altone was already discussing possible termination of Beechwood's provider agreement.  In an email dated April 15, 1999, Arlene Gray (a DOH employee) informed Altone about an "unsubstantiated" complaint of patient neglect at Beechwood, and stated that an HCFA official had "requested information about the evidence gathered" by DOH.  Pl. Ex. 118.  Gray asked, "How much if anything can we disclose?"

On April 21, 1999, Altone forwarded the body of Gray's email to Colello, adding:  "How does this particular incident relate, if at all, to the basis for potentially terminating the provider agreement?  I recall that you and John Stefani discussed this last Friday, but I don't see it in the context of the bigger picture."  *Id.*

At his deposition in this case, however, Altone testified that the April 15 email was the first time he had ever heard of Beechwood, and that he could not remember having learned anything more about Beechwood prior to his April 21 email to Colello.  Dkt. #188-1 at 145, 147.  He stated that Gray's April 15 email about an unsubstantiated complaint did not contain any information that would have justified discussing terminating Beechwood's provider agreement, and he was at a loss to explain why he brought up that subject in his April 21 email to Colello.  *Id.* at 145-47.  Altone also testified that he could not remember what he meant by the term, "bigger picture."  *Id.* at 148.

There is also some evidence that in May 1999, Altone gave Marie Shea, a BAH attorney whom Altone had assigned to work on the Beechwood revocation proceeding, instructions to "find ... bad things" about Beechwood.  Shea's handwritten notes indicate that at some point, Altone recommended that DOH "[c]ommence a revocation action," and that she should "[f]ollow-up & find

more bad things" so that DOH could "[s]how more widespread [deficiencies] than [we] currently have ... ." Pl. Ex. #364.[7]

Finally, I note that after the revocation proceedings, when Chambery inquired through his attorney about the possibility of transferring Beechwood's operating certificate to another owner, Altone opined in a January 7, 2000 memo to his supervisor, defendant Greenberg, that this was not acceptable or permissible, and that "Chambery has nothing but bricks & mortar to sell." Pl. Ex. 253. That statement is subject to more than one interpretation, but viewing it in the light most favorable to plaintiffs, it could indicate Altone's animus toward Chambery, inasmuch as it suggests that Altone sought to ensure that Chambery was left with nothing but the Beechwood building itself once the DOH proceedings were concluded.

Viewing this evidence in the light most favorable to plaintiffs, then, I conclude that at least some of Altone's actions concerning Beechwood appear to have been non-prosecutorial in nature, and more a part of the investigative process. As to such actions, prosecutorial immunity would not apply. While it is generally preferable to decide questions of immunity early in litigation, here there are issues of fact concerning precisely what Altone did, in the context of the overall proceedings involving Beechwood. Resolution of those issues can await trial. Depending on the proof at trial, Altone may be entitled to judgment as a matter of law as to some or all of plaintiffs' claims against him, if the facts show that he was acting in a prosecutorial role. If not, then further factual findings will be required to determine whether he acted with retaliatory intent. Altone's motion for summary judgment is therefore denied. *See Devers-Scott v. Markowitz*, 307 Fed.Appx. 481, 483 (2d Cir. 2008) (some, but not all, of plaintiff's claims against secretary of state "may not fall within

---

[7]Defendants contend that the Court should not rely on other DOH employees' notes with respect to the claims against a particular defendant. While I find the evidence against Altone sufficient to defeat his motion for summary judgment, even without Shea's notes, I also conclude that the manner and extent to which these notes may be admissible against Altone–or whether the matters referred to in those notes may be put before the jury by other means, such as live testimony–can be best addressed at or before trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("the nonmoving party [need not] produce evidence in a form that would be admissible at trial in order to avoid summary judgment").

[defendant]'s prosecutorial role, and so might not be barred by prosecutorial immunity"); *Dacenzo v. Crake*, No. 3:CV-10-1776, 2010 WL 4781099, at *2 n.2 (M.D.Pa. Oct. 8, 2010) ("at this stage of the case, it may be too early to decide if absolute prosecutorial immunity applies to this Defendant," since the court lacked the necessary information to determine whether defendant was acting in prosecutorial role).

## F.  SUSAN T. BAKER

Defendant Susan Baker was a certified federal surveyor who became the DOH surveyor team coordinator in Buffalo in 1997.  She became aware of, and was involved with, the various investigations and proceedings concerning Beechwood relatively early on, and by April 1999, Baker had assumed a leading role in the investigation.

As with many of the other defendants, the evidence concerning Baker is conflicting, and could be interpreted in different ways.  On the motion before me, however, I must construe the record in the light most favorable to plaintiffs.  *See, e.g.*, *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011).  Applying that standard here, I conclude that there are genuine issues of material fact that preclude the entry of summary judgment.

As early as September 1, 1998, Baker asked her supervisor, defendant Arlene Gray, for a "federal surveyor or someone from QA [Quality Assurance] to accompany the [DOH] surveyors because of the many problems in the past with this facility and their administration."  Pl. Ex. 51. Baker testified at her deposition that she could not recall what problems she was referring to.  Dkt. #191-1 at 93.  She also testified at the hearing before the state ALJ that by October 1998, she was aware that "[t]here had been concerns generated by the facility in terms of [DOH] being fair and objective."  Hearing Transcript ("HT") (Cooman Aff., Dkt. #254 Ex. J) at 575.

In December 22, 1998, Baker stated in a missive to HCFA that DOH was "attempt[ing] to effectively deal with Mr. Brook Chambery at Beechwood Sanitarium ... ."  Pl. Ex. 53.  It is notable

that this memo referred to dealing with Chambery himself, rather than with perceived problems at the facility.

In December 1998, Chambery requested informal dispute resolution ("IDR") with respect to certain deficiency allegations in a recent survey.  Following the IDR, Beechwood was found to be in substantial compliance with state and federal requirements.  Pl. Ex. 100.  Around April 1999, however, when a complaint about Beechwood arose but was found to be unsubstantiated, Baker was discussing a possible finding of immediate jeopardy ("IJ"), which carried potentially serious consequences for the facility.  Pl. Ex. 29.  Baker then went to Beechwood with defendants Francis and Rich, and together they examined records of various patients, including some who were no longer at the facility.  HT 581-82.

The evidence also shows that Baker was closely involved with preparing the April 1999 Statement of Deficiencies ("SOD"), which ultimately led to the revocation of Beechwood's operating certificate.  Just a few weeks after a complaint had been found to be "unsubstantiated," and after previous deficiencies had been corrected, DOH was moving ahead anyway with this SOD, alleging "immediate jeopardy" to Beechwood residents and threatening termination of Beechwood's Medicare and Medicaid participation unless the alleged deficiencies were corrected within about two weeks.  Curiously, those IJ allegations were apparently based on residents who had previously been discharged from Beechwood and were no longer there and thus could not be in immediate jeopardy.  *See* HT 629, 630.  The notice of that SOD, dated April 27, 1999, was signed by Baker.  Pl. Ex. 50.

Baker also signed the May 18, 1999 letter from DOH to Chambery rejecting Chambery's proposed Plan of Correction ("POC").  Pl. Ex. 13.  The record also shows, however, that on May 13, 1999, Baker reported to HCFA that no IJ still existed at Beechwood, although she also stated that "[n]one of the deficiencies [had been] corrected from the initial visit."  Pl. Ex. 78.  Baker's handwritten notes from around this time indicate that there was a consensus or agreement to the effect that "anything D or above still terminate," (Pl. Ex. 80), in other words, if any deficiency still

existed, DOH would proceed with termination proceedings, apparently with little regard for Chambery's efforts at remediation.

To be sure, some of the evidence also suggests that Baker and her colleagues at DOH genuinely believed that Beechwood had serious problems with respect to patient care, and that their movement toward termination was entirely proper and justified. But certainly some of this evidence could indicate that Baker shared in others' determination to put Beechwood out of business, for reasons that had little or nothing to do with any actual deficiencies regarding patient care.

Which of those competing inferences should be drawn from this evidence is for a jury to decide. Suffice it to say at this point that there is evidence from which a jury could find that Baker was well aware of, and shared in, the animus toward Chambery on the part of some DOH officials, stemming from his First Amendment activity, and that she participated in the retaliatory "offensive" against him. Baker's motion for summary judgment must therefore be denied.


## G. ROBERT W. BARNETT

Defendant Robert Barnett was employed by DOH from 1979 to 2008, and at the time of the relevant events, was the Director of the Office of Continuing Care. According to Barnett, he was primarily responsible for financial oversight matters, and Leeds, his deputy director, was primarily responsible for quality oversight. Barnett reported to defendant Dennis Whalen, the then-Deputy Commissioner of DOH.

There is no dispute here that Barnett had some knowledge of, and involvement in, the proceedings involving Beechwood. In my view, however, the evidence concerning Barnett is not enough to give rise to a genuine issue of material fact concerning plaintiffs' retaliation claim against him.

Barnett was, to some extent, "kept in the loop" with regard to some of the matters involving Beechwood. There is evidence that Barnett was sent or copied in on various emails and letters concerning Beechwood and Chambery. *See, e.g.*, Pl. Exs. 66, 67, 208, 318.

Plaintiffs have not pointed to any correspondence, however, that suggests that Barnett was aware of, or shared in, any retaliatory motive toward Chambery. There is some evidence that Barnett may have known that Chambery was viewed as litigious or obstructionist; for example, an April 27, 1999 email from Rubin to Barnett stated that "Mr. Chambery has routinely mistreated our survey staff," and that "we now expect that the current survey outcome will be contested in some type of hearing setting." Pl. Ex. 67. Rubin also stated in that email, however, that "the sole focus of our attention is the poor care at Beechwood that has now turned into neglect of and harm to its residents." *Id.*

Otherwise, plaintiffs rely to a great extent on surmise and supposition about what Barnett knew or might have known about Chambery. For instance, they cite a January 8, 1998 letter from Leeds to Chambery, concerning some issues that Chambery had raised in a prior letter about "conflicts in regulations and lack of policies and procedures" by DOH, and advising him that if he "ha[d] any further questions," he should "feel free to contact [Leeds] or Robert Barnett, Director of the Office of Continuing Care." Pl. Ex. 387. Plaintiffs argue that "the obvious inference is that both Leeds and Barnett ... had gotten themselves on the same page in terms of how to respond to [Chambery's] persistent inquiries." Dkt. #248 at 5.

Plaintiffs also cite an email from Rubin to Leeds on April 8, 1998, mentioning that Chambery "consistently challenges the authority of DOH," and suggesting that a letter "co-signed by you/Bob [Barnett] ... warning him that he must cease and desist his unacceptable behavior" might help. Dkt. #248 at 5 (citing Pl. Ex. 318). Plaintiffs also mention testimony by defendant Gray that Chambery was well known by "everybody" at DOH because he was "so confrontational." Dkt. #248 at 6 (citing HT at 3084-85).

All that this evidence shows, however, is that Barnett may have had some general awareness of ongoing problems with Beechwood, and the general perception among DOH staff that Chambery was part of the problem. The most that can reasonably be inferred from this evidence is that Barnett had been led to believe–correctly or incorrectly–that there were continual deficiencies at Beechwood,

with serious implications for its residents, and that Chambery had displayed a pattern of resisting changes to correct those deficiencies.

To the extent that there is evidence of Barnett's direct personal involvement in any of these matters, that evidence also fails to show that he harbored any animus toward plaintiffs, or that he acted out of any impermissible motives. Barnett was in contact with some of the other defendants about the Beechwood proceedings, *see. e.g.*, Dkt. #196, and he did participate in some conference calls about those proceedings, *see, e.g.*, Dkt. #73, but while he did ask some questions or offer some input about strategy, the evidence does not show that Barnett ever expressed any bias against Beechwood or Chambery, or any awareness of others' animus in that regard.

Perhaps unsurprisingly, in light of the paucity of such evidence, the gist of plaintiff's claim here against Barnett seems to be that at no point did Barnett do anything to stop or slow down the headlong rush toward revocation that was being pursued by others within DOH. Absent some evidence that Barnett either shared, or was at least aware of the other defendants' allegedly retaliatory motives, however, plaintiffs' claims against him cannot survive summary judgment. *See Queer v. Westmoreland County*, 296 Fed.Appx. 290, 295 (3d Cir. 2008) ("Personal involvement can be shown when a supervisor either personally directs the retaliatory action or has actual knowledge of, and acquiesces in, the retaliatory action"); *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) ("what we have meant by using phrases such as 'direct participation' as a basis of liability is personal participation by one who has knowledge of the facts that *rendered the conduct illegal*") (emphasis added).

## H. SHARON A. CARLO

Defendant Sharon Carlo was a nurse and the Director for the Western Region of the Continuing Care Program. During the events concerning Beechwood in the spring of 1999, Carlo was in direct contact with DOH surveyors at Beechwood, and with Rubin and other DOH officials, including some of the DOH lawyers who were involved in the legal proceedings against Beechwood.

In her brief, defendant Carlo argues that the evidence does not demonstrate any retaliatory motive on her part.  A jury may well find those arguments to be persuasive, but it should be a jury that makes that decision, and not this Court on a motion for summary judgment.

It is unnecessary to recite all of the evidence concerning Carlo here, but several items are worth mentioning.  For one, it was Carlo who coined the term, "DOH offensive" to describe DOH's proceedings against Beechwood.  Dkt. #29 at A325.  Though that term–which plaintiffs have missed no opportunity to recite in their papers–does not necessarily evince an unconstitutional motive, it is some evidence of her understanding and agreement that DOH was not simply seeking to correct the problems at Beechwood, but was engaged in a campaign to shut it down, for whatever reason.

Carlo also stated in a May 14, 1999 email to Leeds that "we're all on the same page" concerning Beechwood, explaining that "the staff are working on the new deficiencies from Beechwood even as we speak."  Pl. Ex. 82.  Again, those statements may simply reflect a shared belief that Beechwood was a substandard facility that needed to be shut down for the good of its residents, but to the extent that the evidence shows that some defendants were seeking to punish Chambery for exercising his First Amendment rights–and the Second Circuit has already held that there is enough evidence to support such a finding–Carlo's statement about being "on the same page" as the other defendants is further evidence that she had such motives as well.

I also note that in explaining its conclusion that Beechwood had "produced sufficient evidence of retaliatory motive to survive summary judgment," the Court of Appeals specifically cited an email authored by Carlo, in which–as the Second Circuit put it–she "rejoiced with [the] exclamation[] ... 'HOT DIGGITY DAWG' (followed by 50 exclamation marks)."  Pl. Ex. 88; *Beechwood*, 436 F.3d at 154.

Finally, it should be noted that Carlo took extensive and detailed notes from April through June 1999 concerning Beechwood and the more than forty conversations that she had with various persons referencing Beechwood over that period. At her deposition, Carlo stated that she could not remember what some of those notes (such as her reference at one point to the "global picture"

concerning Beechwood, Pl. Ex. 29 at A288) meant, but she did acknowledge that the proceedings against Beechwood were a departure from the norm in some respects.  *See, e.g.*, Carlo Depo. Tr. (Dkt. #197-1) at 126-27, 174, 229.  That could, of course, reflect the extraordinarily poor conditions at Beechwood, which called for an unusually vigorous response from DOH, but it could also be taken as some evidence that Beechwood was singled out because of Chambery's unusually vociferous opposition to DOH practices.  *See, e.g.*, *Dillon v. Morano*,

497 F.3d 247, 252 (2d Cir. 2007) (employer's "departure from [its] usual hiring practice provide[d] evidentiary support for [plaintiff's] claim that the true reason for [defendant's] decision [not to select him to fill certain job opening] was retaliation"); *Denhof v. City of Grand Rapids*, 494 F.3d 534, 545 (6th Cir. 2007) ("The jury could have easily concluded on the basis of ... the [police] chief's departure from past department practice that something other than concern about the plaintiffs' fitness, namely retaliation, was motivating [the chief's] actions"); *DeNovellis v. Shalala*, 135 F.3d 58, 76-77 (1st Cir. 1998) ("'[d]epartures from the normal procedural sequence' are among the factors a court may consider in assessing discriminatory motive") (quoting *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 489 (1997)) (additional internal quote omitted).

## I. ARLENE L. GRAY

Defendant Arlene Gray is a registered nurse who worked for DOH from 1991 to 2000.  In 1998 she became the Assistant Director of Quality Assurance in what would become known as the Office of Continuing Care.  In that capacity, Gray reviewed SODs and worked with DOH surveyors with regard to quality control matters.  She reported directly to defendant Colello.

Although Gray clearly took some actions with respect to Beechwood, there is scant evidence that she had any decisionmaking role in the investigation or proceedings against Beechwood, or that she harbored any retaliatory animus toward Beechwood or Chambery.  Gray did testify that she became aware at some point that Chambery was considered "very litigious and very argumentative," Gray Depo. Tr. (Dkt. #206-1) at 74, and that she had been told that Chambery had filed a lawsuit

against DOH, so she should "be careful, do everything according to process, you know, dot your I's, cross your T's, that sort of thing." *Id.* at 75.  Gray was also among a number of recipients of an email from Rubin in 1999 stating that "we are concerned that [Chambery] has consistently challenged our authority ... ."  Pl. Ex. 318.

Gray, with numerous other DOH employees (including eight defendants), did participate in a conference call on May 11 in which DOH's continued pursuit of Beechwood's revocation was discussed.  Plaintiffs make much of the fact that Beechwood had submitted its POC only a day earlier, and that Gray stated at her deposition that she did not know whether anyone had reviewed the POC prior to that conference call.  Gray Depo. Tr. at 146.  Again, though, the evidence does not suggest that Gray was involved in making any decisions concerning whether to accept or reject the POC, or that she knew of or shared in any desire to retaliate against Chambery because of his protected activity.  If anything, her deposition testimony indicated that Gray was scrupulous about doing everything "by the book" where Beechwood was concerned.

Plaintiffs also cite an email from Gray to several other DOH employees dated June 21, 1999, in which she stated that "Beechwood remains on termination track."  Pl. Ex. 178.  That, however, was no more than a statement of fact, reflecting or recognizing the current status of the Beechwood investigation and proceedings.  There is no indication that Gray decided that DOH should pursue termination, much less any suggestion that retaliatory animus on her part played a role in determining the course of those proceedings.

The one piece of evidence that arguably suggests some animus on Gray's part is an email that she sent to Carlo on June 16, 1999, in reaction to the news that the federal government was going to revoke Beechwood's Medicare/Medicaid provider agreement.  The entire body of Gray's email consisted of the statement, "AMEN & HALLELUJAH."  Pl. Ex. 143.

The Second Circuit did cite this email (along with Carlo's "HOT DIGGETY DAWG" reply) as circumstantial evidence of retaliatory motive, although the court noted that the "sense of triumph and satisfaction" conveyed by these emails could also "be as consistent with a job well done as with

an improper motive." 436 F.3d at 153-54. Whereas there is other evidence that Carlo understood, accepted and agreed with a general desire to punish Chambery for his First Amendment activity, however, this is the only evidence suggesting such animus on Gray's part. Even viewing the factual record in the light most favorable to plaintiffs, I conclude that no reasonable inference of retaliatory motive on Gray's part can be drawn from the evidence. This one isolated statement by a relatively low-level DOH employee, whose role in the underlying decisions concerning Beechwood was tangential at most, is simply too little to support a finding of liability on Gray's part.

## J. CYNTHIA T. FRANCIS, MARY ELIZABETH RICH, BARBARA W. SANER

Defendants Cynthia Francis, Mary Rich and Barbara Saner were all employed as DOH surveyors at the time of the relevant events. While the facts must be evaluated as to each of those defendants individually, these three defendants have enough in common that they may conveniently be discussed together.

As with most of the other defendants, there is some evidence that Francis, Rich and Saner, at some point at least, became generally aware that Beechwood was a particular concern of certain officials within DOH. Since they were sent there with some frequency to perform inspections, the results of which formed part of the basis for the SODs and administrative proceedings concerning Beechwood, they could hardly have been oblivious to that fact.

What is a far closer question is whether the evidence gives rise to any genuine issues of material fact as to whether any of these defendants acted out of any animus directed at plaintiffs. Plaintiffs must demonstrate defendants' personal involvement in the alleged constitutional violation for defendants to be held liable. Since the alleged wrong here–retaliation for the exercise of protected rights–is grounded in defendants' wrongful intent, it is not enough simply to show that defendants performed some acts that may have contributed to the harm suffered by plaintiffs. Plaintiffs must show that each defendant acted for constitutionally impermissible motives–specifically, in this case, for retaliatory reasons, or at least with an eye toward knowingly

advancing others' retaliatory goals.  *See, e.g., Becker v. Kroll*, No. 2:02-CV-24, 2009 WL 819373, at *7-*9 (D.Utah Mar. 26, 2009) (stating that "[i]ndividual liability under 42 U.S.C. § 1983, must be based upon personal participation of the individual in the alleged constitutional violation," and proceeding to analyze whether there was evidence of retaliatory motive by each defendant); *Lopez v. Cook*, No. S-03-1605, 2008 WL 111021, at *6 (E.D.Cal. Jan. 9, 2008) ("To prevail on his retaliation claims, plaintiff must prove that he was retaliated against for exercising his First Amendment rights and that retaliation was a substantial or motivating factor for the acts or conduct of each defendant") (citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-87 (1977)).

With respect to Saner, there is little evidence that she did much of anything relative to Beechwood, and even less that she acted out of retaliatory motives.  Plaintiffs have submitted some evidence that Saner, among others, was made aware that there was no love lost between Rubin and Chambery, but not that Saner was ever instructed to try to "get" Chambery or Beechwood because of Chambery's protected First Amendment activity.  One email that Saner and other surveyors received from Rubin, in fact, instructed the surveyors "not to do anything different at Beechwood than anywhere else, but just be sure to document our findings well."  Pl. Ex. 98.  Although plaintiffs cite this as an example of how Rubin made clear to Saner and the other surveyors that "Beechwood was to be treated as a special case," Dkt. #251 at 9, it nonetheless does not suggest that Beechwood was to be held to higher standards than other facilities.  The mere fact that Chambery was known or perceived to be litigious or combative does not show that Saner acted out of any retaliatory motives.

Saner did participate in some of the surveys of Beechwood, and contributed to some of the allegations of substandard care that eventually led to Beechwood's termination and closing.  There is simply no evidence, however, that she consciously sought to drum up any charges against Beechwood, or that she knowingly or intentionally falsified any of her findings.  Plaintiffs note that Saner acted at the direction of her superiors, but that is hardly a basis in itself for imputing any unlawful motives to her.  The relevant question is whether Saner herself had any retaliatory animus,

or whether she was aware of such animus on the part of her supervisors, and sought to carry out their retaliatory scheme.  I see no evidence to support such a finding.

The evidence concerning Francis stands on a different footing.  In 1999, Francis was supervisor of the complaint unit at the Rochester DOH office.  HT 578.  It appears that she spent more time at Beechwood than did Saner; there were several occasions on which she (and some others) went to Beechwood when Saner was not present, and that she participated in a very broad inquiry into Beechwood's practices, including the inspection of records of patients who were no longer there.

That alone, though, is not a basis for distinguishing between Saner and Francis.  The issue is not how much time they spent at Beechwood, or devoted to the Beechwood matter, but what they did, and why.

In that regard, there was testimony at the ALJ hearing that on one occasion, Francis made statements to a nurse working at Beechwood that indicated Francis's awareness or belief that the reason why Beechwood was being subjected to such exacting scrutiny was that there was some personal animus between Rubin and Chambery.  The nurse, Gwendolyn Ann Westbrook, testified that Francis and other DOH surveyors were scrutinizing Beechwood so closely and persistently that at one point Westbrook said, either to Francis or in her presence, "Oh, my God, what is this?  Do I have to find another job or what?"  HT at 2131.  Westbrook testified that Francis "leaned over to [her] ... and she goes, 'You know, there are better places to work at than this and if you value your license, you wouldn't work here no longer.'"  HT at 2132.

Apparently on another occasion, Westbrook testified, during a conversation with Francis, Francis stated, "You know, it's a personal thing."  When Westbrook asked her what she meant by that, Francis replied, "Between my boss and your boss."  Westbrook again asked Francis to explain, and Francis allegedly "told [Westbrook] about a lawsuit."  HT at 2132-33.  When asked at the hearing for more details about what Francis said to her, Westbrook replied, "A personal vendetta – I don't know the correct word.  A personal thing between her boss and my boss."  HT at 2133-34.

- 32 -

She also testified that Francis "said they [*i.e.* DOH] was going to get him [*i.e.* Chambery].  There weren't no but.  They weren't going to try to get him, they were going to get him."  HT at 2135.[8]

Westbrook's testimony, if believed by a jury, would certainly support an inference that Francis not only knew that Rubin and others within DOH were determined to "get" Chambery because of his prior litigation against DOH, but that she understood that part of her mission was to come up with evidence that DOH could use for that purpose.  The Second Circuit specifically cited this alleged exchange between Francis and Westbrook as part of the "evidence from which a jury could reasonably find that the DOH was campaigning against the partnership as retaliation for the exercise of First Amendment rights."  436 F.3d at 154.  I therefore conclude that there are genuine issues of fact as to whether Francis knowingly participated in the alleged plan to punish Chambery for his exercise of his First Amendment rights.

The evidence concerning Rich, while not as strong as that concerning Francis, also gives rise to genuine issues of material fact.  The record indicates that Francis and Rich worked closely together, that they often conducted surveys of Beechwood together, and that they were both involved in preparing the April 1999 SOD.

Francis and Rich also both signed a joint affidavit in June 1999, in support of the DOH caretaker petition in New York State Supreme Court.  In that document, they stated that Chambery had "demonstrated an inability and/or an unwillingness to correct deficiencies," adding, "In our opinion, it is imperative that this operator be replaced by a caretaker immediately."  Pl. Ex. 165 at 10, ¶ 10.  That application was denied by Justice Francis Affronti, based on Justice Affronti's conclusion that there were "seemingly inconsistent findings in the record as submitted ... by [DOH],"

---

[8]Westbrook also testified that on one occasion, Francis was looking at the physician log book when she noticed an apparent discrepancy or error.  According to Westbrook, Francis "was looking through something [in the book] and she goes, 'I got it.'"  HT at 2136.  Westbrook testified that she told Francis that she, Westbrook, had done nothing wrong, and Francis replied, "No, no, no, not you, the physicians."  *Id.*  While it is difficult to tell from the transcript what Francis meant by those statements, they could suggest that Francis was scouring the log book, hoping to find some mistakes, and that when she found one she reacted with what amounted to a "gotcha" expression.

concerning Beechwood's level of compliance with state regulations concerning patient care and medical treatment.  Pl. Ex. 238 at 7.

While that alone might not give rise to an issue of fact as to Rich, once again Westbrook's testimony at the ALJ hearing is relevant.  She testified that Rich "was very buddy, buddy, she was very informative."  HT at 2519.  Westbrook testified, Rich "told me [that Beechwood] was a very nice facility, she told me to be careful of what I say to her because we could end up on opposite sides of the courtroom."  Westbrook testified that she replied, "Liz, I thought you were here investigating," to which Rich replied, "You never know."  HT at 2519.  Westbrook also stated that on another occasion, she said to Rich, "If we could meet on any other circumstances, I would like to get to know you better," and that Rich replied, "[R]emember, you and I are just players in the greater scheme of things."  HT at 2519-20.

A reasonable factfinder could conclude, from this testimony, that Rich herself did not believe that there were significant problems at Beechwood, but that she nevertheless understood that her job, as a "player in the greater scheme of things," was simply to come up with identifiable problems at Beechwood.  A factfinder could also conclude that Rich understood that her task had less to do with unearthing actual deficiencies than with supplying ammunition for eventual legal action by DOH against Beechwood and Chambery.  I therefore deny defendants' motion for summary judgment as to the claim against Rich.


## K.  ANNA D. COLELLO

Defendant Anna Colello is an attorney who has been employed by DOH since 1986.  In 1999, she served as Director of the Bureau of Surveillance and Quality Assurance.

Plaintiffs have submitted evidence that Colello was aware, mostly through various emails, of the general perception within DOH of Chambery as a combative nursing home owner.  *See*, *e.g.*, Pl. Exs. 119, 120.  It is also undisputed that Colello participated in a number of conference calls with other DOH personnel concerning the various proceedings involving Beechwood, and there seems

to be little doubt or dispute that she was kept apprised of the current status of those proceedings throughout the relevant time period.

What is lacking, however, is evidence from which a factfinder could conclude that Colello played any significant role in carrying out the so-called "offensive" against Beechwood, or that she was aware of, or shared, any retaliatory animus toward plaintiffs. Plaintiffs' chief complaint about Colello seems to be simply that she knew that the usual DOH procedures were not being followed with respect to Beechwood, and that she did nothing to stop the "offensive" or to call attention to those procedural improprieties. Even if true, however, that does not make out a retaliation claim.

At her deposition in this case, Colello testified at some length about the proper procedures for DOH enforcement actions, and the sequence in which various actions are supposed to occur. *See* Dkt. #200-1 at 18 ff. In short, the process usually starts with a survey, followed by a statement of deficiency, a plan of correction, and, if warranted, a referral to DOH counsel for commencement of an enforcement action.

There is evidence that those procedures were not strictly followed here. Some evidence, for instance, indicates that DOH personnel were discussing an enforcement action against Beechwood even before a POC had been received from Beechwood or reviewed by DOH staff, and that inadequate time was given to Beechwood to correct any deficiencies. This evidence need not be recited in detail at this point, but I agree with plaintiffs that a factfinder could conclude that at some point, decisionmakers within DOH became bent on bringing an enforcement action against Beechwood, with the ultimate goal of revoking plaintiffs' operating certificate, without regard for whether Beechwood had presented a viable plan for correcting any deficiencies.

The most that the evidence shows with respect to Colello, however, is that she failed to do anything to stop the offensive from going forward. Plaintiffs repeatedly refer to conferences in which Colello took part, but they have shown no more than that she did not object to the plans to proceed with the enforcement action against Beechwood. Plaintiffs state, for example, that "neither the absence of immediate jeopardy, nor any of the procedural irregularities, nor any of the 'holes'

in the latest SOD [in May 1999] caused any defendant, including Colello, to pause or reconsider the offensive underway against Beechwood." Dkt. #241 at 12. Similarly, they state that Justice Affronti's decision denying the caretaker application gave Colello and the other defendants "one last opportunity ... to reconsider their plans for revocation," *id.* at 13, but that neither Colello nor the other defendants did so.

There were due process claims contained in the original complaint but those are gone now. In the wake of the Second Circuit's decision in this case, however, plaintiffs' remaining claim is not based simply on alleged procedural irregularities in connection with the enforcement proceedings, but on alleged retaliation for Chambery's First Amendment-protected activity. It is not enough, then, to show that DOH failed to follow its usual process or sequence of steps with respect to the enforcement proceedings against Beechwood, and that Colello stood by and did nothing; plaintiffs must show that she herself acted out of retaliatory animus, or at least that she knew of others' retaliatory motives, and that despite being in a position to intervene, she failed to do so. *See Shotz v. City of Plantation*, 344 F.3d 1161, 1183-84 (11th Cir. 2003) (city officials could not be held liable for retaliation, despite their participation in adverse action taken against plaintiff, where there was no evidence that they knew of action's retaliatory purpose); *Sunkett v. Misci*, 183 F.Supp.2d 691, 714-15 (D.N.J. 2002) (member of city attorney's office who, along with the city attorney and others in that office, shunned assistant city attorney, allegedly for her criticism of contracts she believed to be illegal, could not be held liable on plaintiff's First Amendment retaliation claim, since defendant did not know why plaintiff was being shunned, and did not know about her objections to the contracts).

The fact that Colello had been told that Chambery was combative, or that he had opposed DOH procedures in the past, does not change the equation here. There must be evidence that Colello understood that Chambery's protected activities were the reason or the impetus for the actions taken against him; in other words, that she knew that the enforcement action was intended to be punitive, in retaliation for those activities. *See Brenes v. City of New York*, No. 07-5549-CV, 2009 WL

- 36 -

742163, at *2 (2d Cir. Mar. 23, 2009) (finding that there was inadequate evidence to support plaintiff's retaliation claim against two defendants, in part because there was no evidence that either of them held retaliatory animus towards plaintiffs, or that they knew or should have known that their subordinates were retaliating against him); *Withrow v. Donnelly*, 356 F.Supp.2d 273, 276 (W.D.N.Y. 2005) (granting summary judgment for supervisory defendants on plaintiff's retaliation claim, where there was no basis in the evidence upon which one could reasonably have concluded that supervisory defendants should have known that lower-level employees might seek to retaliate against plaintiff). No such evidence has been presented.

## K.  DENNIS P. WHALEN

At the time of the relevant events, defendant Dennis Whalen was Executive Deputy Commissioner of DOH.  He also served as Acting Commissioner of Health until defendant Novello's appointment in June 1999.

As with the other defendants generally, there is some evidence here that Whalen knew, or might have known, about the prior litigation and some of the previous interactions between DOH and Chambery.  At various times, letters and memos crossed Whalen's desk concerning those matters, although at his deposition Whalen testified that he had no specific recollection of having been aware of such matters during 1999.  Dkt. #133-1 at 35-37.

There is almost no evidence, however, that Whalen had any knowledge of any retaliatory animus by others in DOH toward Beechwood, that he had any such animus himself, or that he did anything other than rely on reports from his subordinates in determining whether an enforcement action against Beechwood was justified.

Plaintiffs' memorandum of law concerning Whalen (Dkt. #250) inadvertently bears witness to that fact, as it appears to spend more space discussing Leeds, who reported directly to Whalen, than Whalen himself.  Plaintiffs go to some lengths to explain how Leeds forged ahead with the "offensive," with no legitimate basis in the facts, but there is precious little explanation of why

Whalen should have known that Leeds was simply providing cover for a plan of retaliation against Chambery. Indeed, at one point plaintiffs state that, "[k]nowing that Leeds was barreling ahead, [Whalen] sought her assurance that she knew what she was doing ... ." Dkt. #250 at 11.

That is not to say that Whalen was ignorant of the proceedings concerning Beechwood. He did ask to be kept "updated [because he] want[ed] to track this closely" and did not "want to get rolling too far along on a receiver without a discussion" between him and other DOH staff members. Pl. Ex. 192. In June 1999, Whalen also stated in a note to defendant Greenberg that he was "worried about the Beechwood case, which is very important to us," adding that "[w]e need to have our best and strongest on this." Pl. Ex. 284.

Again, though, all that the evidence shows is that Whalen had become convinced, based on the information that had been supplied to him by his subordinates, that there were serious problems at Beechwood that warranted its closure. If Chambery's past actions played any role in Whalen's thinking, the evidence shows only that Whalen felt the need to make a solid showing in any judicial proceedings, because Chambery was known to be the sort of owner who would vigorously oppose any charges which he disagreed with. There is no hint in Whalen's correspondence with other DOH officials of any desire on his part to punish Chambery.

In short, plaintiffs' claims against Whalen rest on little more than a theory of *respondeat superior*, which is not applicable in § 1983 actions. Plaintiffs' argument that "Whalen ... was where the buck stopped at DOH" does not set forth a legally sound basis for § 1983 liability.[9]

## J. HENRY M. GREENBERG

Defendant Henry Greenberg served as General Counsel for DOH from 1995 to October 2000. As such, he was kept apprised of the ongoing proceedings involving Beechwood, and he signed the

---

[9]My finding in this regard renders it unnecessary for me to consider defendants' argument that Whalen is entitled to absolute prosecutorial immunity, or whether the Court of Appeals' holding that defendants had waived that argument on appeal, *see* 436 F.3d at 154 n.3, should apply now, before this Court, on remand.

statement of charges and the notice of hearing in June 1999 that commenced the DOH revocation proceeding. In addition, Greenberg communicated with Beechwood and its counsel concerning the closure of Beechwood.

What is missing, however, is evidence that Greenberg harbored any unlawful animus toward Beechwood. Mostly the evidence simply shows that Greenberg was kept informed of the status of the Beechwood matter, and that he was given no reason to doubt his subordinates' statements that there were serious problems concerning resident care at Beechwood, which warranted enforcement action and ultimately revocation of its operating certificate.

In support of their allegations of retaliatory animus, plaintiffs point to handwritten notes by defendant Barnett indicating that during a meeting or conference among several DOH staff members and representatives of the New York State Health Facilities Association (a trade organization to which Beechwood belonged), Greenberg stated, in sum and substance, "We need to protect the Department as well as DOH employees from venomous attacks by Brook Chambery." *See* Pl. Ex. #204. Barnett testified at his deposition that his notes did reflect that statement by Greenberg. *See* Barnett Depo. Tr. (Dkt. #194-1) at 180. At his deposition, Greenberg stated that he did not recall making such a statement. Greenberg Depo. (Dkt. #209-1) at 151.

Even if the jury in this case found that Greenberg made such a statement, that would not support a finding of liability on Greenberg's part. That meeting took place in mid-November 1999. By that time, Beechwood had already ceased operating, its residents had been moved out, its federal funding had been cut off, and the state ALJ had issued his decision recommending that Beechwood's operating certificate be revoked. The purpose of the meeting, then, was to discuss where to go from there, and the only reasonable inference to draw from Greenberg's alleged statement, in the context of the other evidence, is that he wanted to reach a global settlement with Chambery to avoid future litigation.

That is consistent with other evidence relied on by plaintiffs. They note in particular that during discussions with Beechwood's counsel in September 1999, DOH counsel were insisting on

a global settlement that would include a general release of all federal civil claims against DOH officials.  Taken in context, then, Greenberg's statement, coming long after Beechwood had closed, did not suggest that he ever believed that Beechwood should be shut down *because* of Chambery's prior litigation, but only that, having shut it down, DOH and its employees needed to be shielded from unwarranted attacks by Chambery.

If there were other evidence of animus on Greenberg's part, this alleged statement might arguably tend to support plaintiffs' claims against him, by showing that his animus continued into late 1999.  Such other evidence is missing, however.  As the record stands, all that the evidence shows is that Greenberg, relying on reports from his subordinates, all of which indicated that the concerns about Beechwood were legitimate, concurred with and gave his approval to their plans to bring an enforcement action against the facility.  That is not enough to show retaliatory animus on Greenberg's part.[10]

## IV. Motion to Disqualify Plaintiff's Counsel

Defendants also move to disqualify one of plaintiffs' attorneys, Kevin Cooman, Esq., from acting as trial counsel in this case.  Defendants contend that because Cooman was involved in some of the events giving rise to this case, such as the state administrative proceedings, defendants would be prejudiced if he were allowed to question witnesses about those events, and that he would in effect become a non-testifying witness for plaintiffs.

I am not persuaded by these arguments.  Rule 3.7 of the New York Rules of Professional Conduct provides as subsection (a) that, with certain exceptions, "[a] lawyer shall not act as an

---

[10]My finding in this regard renders it unnecessary for me to consider defendants' argument that Greenberg is entitled to absolute prosecutorial immunity, or whether the Court of Appeals' holding that defendants had waived that argument on appeal, *see* 436 F.3d at 154 n.3, should apply now, before this Court, on remand.

advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact." As the Second Circuit has recognized, however, "Rule 3.7 lends itself to opportunistic abuse." *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009). "Because courts must guard against the tactical use of motions to disqualify counsel," therefore, such motions "are subject to fairly strict scrutiny, particularly motions" under the witness-advocate rule. *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989).

> The Court of Appeals
>
> ha[s] identified four risks that Rule 3.7(a) is designed to alleviate:  (1) the lawyer might appear to vouch for his own credibility; (2) the lawyer's testimony might place opposing counsel in a difficult position when she has to cross-examine her lawyer-adversary and attempt to impeach his credibility; (3) some may fear that the testifying attorney is distorting the truth as a result of bias in favor of his client; and (4) when an individual assumes the role of advocate and witness both, the line between argument and evidence may be blurred, and the jury confused.

*Ramey v. District 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 282–83 (2d Cir. 2004)

Defendants have failed to show that such dangers are present here.  Plaintiffs have stated that they do not intend to call Cooman as a witness, and even if he were called by defendants, it appears likely that his testimony would fall within one of the exceptions to Rule 3.7, such as that for uncontested issues or "matters of formality."  *See* Rule 3.7(a)(1), (4).  If, closer to or at trial, this matter appears to be more significant or intractable, it can appropriately be dealt with at that time.


## CONCLUSION

The motion for summary judgment (Dkt. #184) by defendants Altone, Baker, Barnett, Carlo, Colello, Francis, Gray, Greenberg,  Leeds, Novello, Rich, Rubin, Saner, Steinhardt, and Whalen is granted in part and denied in part.  The motion is granted as to defendants Novello, Steinhardt, Barnett, Gray, Saner, Colello, Whalen, and Greenberg, and plaintiffs' claims against those defendants are dismissed.  In all other respects, the motion is denied.

Defendants' motion to disqualify Kevin Cooman, Esq., from acting as plaintiffs' trial counsel (Dkt. #261) is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
September 12, 2011.