UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BEECHWOOD RESTORATIVE CARE CENTER,
BROOK CHAMBERY, and OLIVE CHAMBERY,

                            Plaintiffs,

        -vs-

LAURA E. LEEDS, EDMUND RUSSELL
ALTONE, SANFORD RUBIN, SUSAN T.
BAKER, SHARON A. CARLO, CYNTHIA T.
FRANCIS, and MARY ELIZABETH RICH,

                            02-cv-6235

                            Defendants.

---

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION *IN LIMINE*
## AND
## IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
## *IN LIMINE*


                    McCONVILLE CONSIDINE COOMAN &
                        MORIN, PC
                    25 East Main Street, Suite 500
                    Rochester, NY 14614

                    **-AND-**

                    GEIGER and ROTHENBERG, LLP
                    45 Exchange Street, Suite 800
                    Rochester, New York 14614


                    *Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page:

INTRODUCTION...................................................................... 1

RESPONSE TO DEFENDANTS' ARGUMENTS................................. 3

| | | |
|---|---|---|
| *Section 2 -* | *Attorney General MFCU Evidence*.................... | 3 |
| *Section 3 -* | *Justice Affronti's Decision*............................... | 8 |
| *Section 4 -* | *Settlement Discussions*.................................... | 11 |
| *Section 5 -* | *Altone Referrals*............................................. | 13 |
| *Section 6 -* | *Ethics Commission*.......................................... | 14 |
| *and* | | |
| *Section 7 -* | *Inspector General Investigation*......................... | 14 |
| *Section 8 -* | *Litigation Responses*....................................... | 14 |
| *Section 9 -* | *Witnesses' Personal Notes*................................ | 15 |
| *Section 10 -* | *Non-Party Affidavits, Interrogatories, and Memoranda*........ | 17 |
| *Section 11 -* | *Emails from Non-Parties*.................................. | 18 |
| *Section 12 -* | *Letters*........................................................ | 20 |
| *Section 13 -* | *Reports*....................................................... | 21 |
| *Section 14 -* | *Letters of Interest*.......................................... | 21 |
| *Section 15 -* | *Regulations arising from Langeveld litigation*...................... | 23 |
| *Section 16 -* | *Tape Recording and Transcript*.......................... | 24 |
| *Section 17 -* | *Time Records*................................................ | 25 |
| *Section 19 -* | *Redaction*.................................................... | 26 |
| *Section 20 -* | *Duplication*.................................................. | 26 |
| *Section 21 -* | *Antonia Novello's Conviction*............................ | 26 |
| *and* | | |
| *Section 22 -* | *Dennis Whalen's Ethical Violation*...................... | 26 |
| *Section 23 -* | *The Use of Litigation Software*.......................... | 27 |

### TABLE OF CONTENTS
#### cont'd.

Page:

Section 24 -   Defendants' Proposed Exhibits ........................................   27

Admissibility of the DOH ALJ's Report and
Recommendations to the Commissioner ............................   27

Additional Deposition Exhibits Proffered by Defendants ..........   28

Inadmissibility of the Federal Administrative Matters
Involving Beechwood ...............................................   29

CONCLUSION .................................................................................   34

## INTRODUCTION

For the Court's convenience, plaintiffs will respond to defendants' motion *in limine*, using the same numbering sequence that is found in defendants' "Motion in Limine Memorandum". Before addressing the specific sections of the motion *in limine*, however, plaintiffs wish to emphasize some general principles of law, which are applicable to many of the sections of defendants' motion.

One entire section (Section 18), and certain arguments within other sections, raise issues of relevancy under Rule 401 of the Federal Rules of Evidence ("FRE") or prejudicial impact, pursuant to Rule 403. For example, in Section 18, without stating the particulars relevant to any specific exhibit, defendants contend that 42 exhibits should be excluded either on grounds of relevancy or because their prejudicial impact outweighs their probative value. Plaintiffs respectfully submit, however, that (with certain exceptions) the Court cannot render rulings under Rules 401 and 403 at the present time, without the opportunity to consider the specific exhibits in the context of plaintiffs' overall proof. Accordingly, plaintiffs respectfully request that the Court reserve until the time of trial all rulings with respect the relevancy of particular exhibits, aside from the few exhibits that are specifically addressed in other sections of defendants' motion.

Secondly, because many of defendants' motions relate to FRE 801, some general discussion of that rule is appropriate in this introductory section. FRE 801 holds that an opposing party's statement when "offered against an opposing party," FRE 801(d)(2), is not hearsay if it was "made by that party in an individual or representative capacity," FRE 801(d)(2)(A), or made by the party's agent "on a matter within the scope of that relationship and while it existed." FRE 801(d)(2)(D).

Thus, a statement made by any of the defendants is admissible as an admission of that party under FRE 801(d)(2)(A), provided that it is offered against that defendant. Defendants, however, are not entitled to offer their prior statements under FRE 801, unless they are offered to rebut a charge of recent fabrication. FRE 801(d)(1)(B). Thus, even though plaintiffs have offered notes and emails which were authored by various defendants, that does not entitle those defendants to offer other notes or emails in support of their defenses.

In addition, statements made by a defendant's agent may be offered as admissions of that defendant, under Rule 801(d)(2)(D). Thus, by way of example only, when responsibilities in connection with the Beechwood Offensive[1] were delegated to subordinates within the Western Regional Office (WRO) or the Office of Continuing Care (OCC), statements made by those subordinates are admissible as against, for example, defendants Rubin and Leeds, who were the heads of those respective offices. As will be argued below, plaintiffs respectfully submit that once employees of the New York State Department of Health (DOH) were enlisted to assist in the Beechwood Offensive, they were acting in concert, not only with their immediate supervisors, but with all others participating in that Offensive. In other words, all were agents of each other and their statements made during the course of that Offensive are admissible as against all defendants. With these general principles in mind, plaintiffs turn to the specific sections of defendants' motion *in limine*.

---

[1]  The shorthand phrase "Beechwood Offensive" used by plaintiffs, and adopted by the Second Circuit, *Beechwood v Leeds,* 436 F.3d 147, 153 (2d Cir. 2006), was actually coined by defendant Carlo to describe the coordinated and concerted efforts by DOH personnel to put Beechwood and the Chamberys out of business. (Exhibit 29 at A325).

## RESPONSE TO DEFENDANTS' ARGUMENTS

*Section 2 - Attorney General MFCU Evidence*

Defendants oppose Beechwood's proferred admission of official public agency records obtained by Beechwood from the Attorney General's Medicaid Fraud Control Unit ("MFCU"). MCFU conducted an investigation of Beechwood, which was supervised by former Assistant Attorney General Jerry Solomon.   Numerous investigators and auditors worked on the investigation for almost three years, and ultimately declined either to prosecute a criminal case, or to seek any form of civil fine or other civil sanction against Beechwood.

The MFCU records are admissible in this civil action under the explicit exception to the hearsay rule provided by FRE 803(8):

> A record or statement of a public office if:
>
> > (A) it sets out:
> >
> > > (i) the office's activities; (ii) a matter observed while under a legal duty to report, ... or (iii) in a civil case … factual findings from a legally authorized investigation; and
> >
> > (B) neither the source of information nor other circumstances indicate a lack of trustworthiness.

The rule thus provides three alternative bases under which the MCFU documents are admissible, and the MFCU records in question qualify under all three.   First, the work that MCFU investigators, auditors and attorneys performed in reviewing the care provided by Beechwood to its residents and the administration of the facility was "the [MFCU] office's activities."  FRE 803(8)(A)(i).   Second, given the regulatory mission of the MFCU, its findings and conclusions concerning Beechwood's resident care and facility management fall squarely within the admissibility provisions of FRE 803(8)(A(ii) as "a matter observed while under a legal duty to report."   Third, all the MFCU "factual findings from a legally authorized investigation" related

to Beechwood are expressly admissible under FRE 803(8)(A)(iii).   *See* 42 U.S.C. § 1396b(q) (broad investigatory and criminal and civil enforcement authority given to MFCU).

FRE 803(8)'s three-pronged gateway for this type of evidence makes the admissibility of the proferred MFCU documents readily apparent:

- the MFCU auditor's report (Exhibit 213) contains detailed factual findings and conclusions related to the sufficiency of staffing and care at Beechwood;

- Jerry Solomon's summary memorandum to his MFCU colleagues as to why no criminal or civil sanction should be sought against Beechwood or its owners not only explains the process of the investigation, but the facts undergirding his decisions not to proceed (Exhibits 212, 510);

- Chief Investigator Neil Davis's closing memo pronounces the care at Beechwood "very good to excellent." (Exhibit 511).

- Exhibits 210, 622, 623, 624 and 625 (MFCU subpoenas for Beechwood records), Exhibit 211 (Davis memo explaining the opening and rationale for conducting the MFCU inquiry as being "based on a NYSDOH decision"), and Exhibit 214 (MCFU summary chart of the DOH's survey allegations, Beechwood response, and Beechwood plan of correction efforts) all illustrate the methodology of the MFCU investigation ("the office's activities" under FRE 803(8)(A)(i), as well as "matter observed while under a legal duty to report." FRE 803(8)(A)(ii).

When called upon to apply FRE 803(8), the Second Circuit has recognized the public policy favoring the broad admissibility in a civil case of all aspects of an investigatory agency's work product. *Bridgeway Corporation v Citibank*, 201 F.3d 134 (2d Cir. 2000). In *Bridgeway*, the Court noted that "Rule 803(8) is based upon the assumption that public officers will perform their duties, that they lack motive to falsify, and that public inspection to which many such

reports are subject will disclose inaccuracies." (citing 31 Michael H. Graham, Federal Practice and Procedure § 6759, at 663-64 (Interim ed. 1992)). The Second Circuit also made clear the breadth of the materials admissible as "factual findings" under FRE 803(8)(A):

> 'Factual finding' includes not only what happened, but how it happened, why it happened, and who caused it to happen." Id. at 689. The rule therefore renders presumptively admissible "not merely … factual determinations in the narrow sense, but also … conclusions or opinions that are based upon a factual investigation." *Gentile v County of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991).

Id. at 143. See also *Perrin v Anderson*, 784 F. 2d 1040, 1047 (10th Cir. 1986) ("Courts have construed this term ["factual findings"] broadly, however, and regularly have admitted conclusions and opinions found in the evaluative reports of public agencies.")

Using this standard, the admissibility of all the documents offered by plaintiffs from the MFCU investigation of Beechwood containing findings, conclusions and opinions – all of which are related to the very same time period and residents for which the DOH performed its surveys and enforcement activities – are admissible as explicit exceptions to the hearsay rule, and are highly relevant to the issues in this action.

In opposing the admissibility of the MFCU documents as evidence, defendants acknowledge their clear relevance – but then attempt to argue that the evidence is "unreliable" and "unduly prejudicial" under FRE 403. Defendants' argument that the MFCU documents ought to be excluded as "unreliable," citing *Young v James Green Management, Inc.,* 327 F.3d 616, 624 (7th Cir. 1986), borders on frivolous, given the regulatory mission of the MFCU, and the scope and length of the investigation which that office conducted with respect to Beechwood. Very obviously, the MFCU documents do not in any way "indicate lack of trustworthiness" – the only criteria for exclusion of such evidence under FRE 803(8). The burden to show "a lack of trustworthiness" of the MCFU reports is on defendants, and here they have failed to meet that

burden. *Bridgeway,* 201 F.3d at 143.   Moreover, the parties have had the ability during discovery to probe how the MFCU conducted its investigation, what the investigation covered, and the outcome of that investigation, because Mr. Solomon has been deposed as a non-party witness, and will be available for further examination and cross-examination during trial.

The fact that MFCU attorneys, and counsel for the defendants here, both carry the designation "assistant Attorney General" does not constitute "prejudice" to defendants that could possibly justify excluding otherwise relevant evidence.   (Defendants' Memorandum at 4). Defendants have been free to choose whomever they want to represent them in this litigation.   If the similarity of their attorney's title was going to pose some kind of problem for them with respect to the evidence that would be marshaled against them, then that is an issue that they should have considered and resolved long ago.[2]

The old trial adage that "all good evidence is prejudicial to the opponent" was never more apt than it is here with respect to the MFCU findings and conclusions.   The defendants, with a retaliatory ax to grind against the Chamberys and Beechwood, closed down in record time a facility that had never been on an enforcement focus list or previously had uncorrected deficiencies.   Four years later, at the conclusion of an exhaustive three year investigation that essentially audited the DOH survey allegations (Exhibit 214), the MFCU (with no ax to grind) concluded that Beechwood's staffing was more than adequate, and that the facility had provided "very good to excellent" care to its residents. (Exhibit 511).   This is precisely the sort of evidence that the jury needs to hear in order to determine whether defendants' actions against Beechwood were substantially motivated by their animus, and a desire to retaliate against plaintiffs.   This is the heart of the issue the jury must determine, and will not be confusing, but

---

[2]   Indeed, former defendant Joseph Moore, a DOH surveyor that plaintiffs dismissed from this action, was represented throughout the case by private defense counsel, an option that the remaining defendants could also have chosen, but did not.

rather clarifying: *why else could the defendants have reached conclusions about Beechwood so different from those of an independent investigatory body?*

Similarly helpful to the jury in evaluating the evidence from the MFCU will be the DOH documents demonstrating defendants' early attempts in 1998 and 1999 to co-opt MFCU into supporting their vendetta against Beechwood – an invitation that MFCU ultimately resisted:

- As early as the spring of 1998, defendant Rubin, and various of his Rochester surveyors, were involved in referring Beechwood-related incidents to the MFCU division of the Attorney General's Office pursuant to the work allocation agreement between DOH and MFCU (Exhibit 550), with the hope that the MFCU would take action against the facility.  (Exhibits 138, 376).  In February 1999, MFCU found no basis for taking such action, and punted back to DOH. (Exhibit 377).

- Two months later, on April 19, 1999 – before the April survey had been completed, a SOD issued, or a POC submitted and evaluated, defendants tried again.  Baker's notes reveal her hope that "DAG [Department of the Attorney General] getting involved." (Exhibit 62).

- In June 1999, Baker emailed defendant Carlo that "Jerry Solomon would like to meet again" and that "Beechwood comes to mind immediately." (Exhibit 79).

Accordingly, defendants' request to exclude from evidence the MFCU documents, and the documents detailing the relationship between the defendants and MFCU surrounding Beechwood must be denied.

***Section 3 – Justice Affronti's Decision***

Defendants oppose the admission of Justice Affronti's June 1999 decision ("Affronti

Decision") which denied DOH's request for the involuntary installation of a caretaker (receiver)

for Beechwood (Exhibit 238), arguing that it is irrelevant to any issue the jury will be

considering.   The Affronti Decision, however, is highly relevant for the jury's consideration

under familiar principles of full faith and credit.  28 U.S.C. § 1738; *Jenkins v City of New York,*

478 F.3d 76, 85 (2d Cir. 2007).

In June 1999, defendants Leeds, Francis and Rich, with the full support of the other

defendants, petitioned the New York Supreme Court pursuant to New York Public Health Law

("P.H.L.")§ 2806-b and 2810 to install an involuntary caretaker to run Beechwood, in place of

the Chamberys.   The identical issue that was to be litigated in the DOH Administrative

proceeding (whether there was "a condition or conditions in substantial violation of the standards

for health, safety or patient care established under federal or state law or regulations" or "any

other conditions dangerous to life, health and safety" or "that there exists at the facility a pattern

or practice of habitual violation of the standards of health, safety or patient care established

under federal or state law or regulation") was before Justice Affronti for decision, so that he

could determine whether the installation of a caretaker was justified.  P.H.L. § 2806-b(a), (b) and

(c).   Justice Affronti not only found that DOH had not met the statutory criteria, but also

specifically found that:

> [T]here are seemingly inconsistent findings in the record as submitted
> primarily by the Petitioner Department of Health regarding compliance
> regarding the regulations governing patient care and treatment.  That is my
> statement from my review of the documents; namely, some apparent
> inconsistent findings as presented by the Petitioner.

(Exhibit 238, p. 7.)  The "documents" which the Court reviewed and found "inconsistent" and inadequate to justify a caretaker to run Beechwood in place of the Chamberys, were the petition verified by defendant Francis, the joint affidavit of defendants Francis and Rich, and the affidavit of defendant Leeds.  The Affronti Decision was incorporated into an Order and Judgment (Appendix A hereto), and was not appealed by the defendants, making it definitive and final.  The defendants are clearly in "privity" with petitioner in the caretaker proceeding,[3] and hence bound by the outcome they chose not to appeal.  *D'Arata v New York Central Mutual Fire Ins. Co.,* 76 N.Y.2d 659, 664 (1990).  The defendants, having lost in an impartial judicial forum their contention that Beechwood's care for residents was so poor as of June 1999 that someone other than the Chamberys had to be appointed to run Beechwood, must now abide by a jury's determination as to what significance and weight to attach to the Affronti Decision.

Accordingly, the Affronti Decision is highly relevant proof that the objective facts related to resident care conditions at Beechwood as of June 1999 did not justify the enforcement actions being pursued by the defendants – and thus provides strong evidence to a jury that something *other than* objective facts related to resident care were driving defendants to seek license revocation and a caretaker under P.H.L. § 2806-b.  That "something else," the jury will be asked to conclude, was the animus against the Chamberys and the retaliatory intent to put them out of business by revoking their license to operate. *See Beechwood*, 436 F.3d at 153 ("even if the State must commence revocation proceedings once it has determined that certain classes of deficiencies exist, N.Y.Pub. Health Law § 2806-b, the identification, characterization and classification of the actual deficiencies found are within the State's discretion, and are therefore subject to a claim of improper motive.").

---

[3] Although former defendant Dennis Whalen was the nominal petitioner in the DOH caretaker proceeding, it was Francis who verified the petition, which was substantively supported by the Francis, Rich and Leeds affidavits.

The Affronti Decision is also highly relevant for a second reason: it furnishes the jumping off point in evaluating the reaction of the defendants to that decision. Since a DOH caretaker application had never before been denied (Appendix B [Steinhardt deposition, p. 67-68]), objective DOH decision makers should have at least paused to consider whether they were overreaching, or too aggressive in their enforcement activities, given this stern rebuff from a respected Supreme Court Justice.

But the evidence developed during discovery shows that defendant Rubin brushed off the Affronti Decision as a trifle, and told his DOH colleagues that the "sound bite" they should use in dealing with that Decision was that "We believe the caretaker request dismissal was merely a technical determination." (Exhibit 380[a]). Carlo's notes of the meeting among defendants the day Justice Affronti denied the caretaker shows no signs of a reflective pause, but rather redoubled efforts to accomplish their goals. Carlo wrote that the "denial caretaker application" triggered a "need to identify overall strategy DOH offensive" and a "need to expedite admin[istrative] proceed[ing] for revoc[ation] due to no caretaker." (Exhibit 29 at A325). Rubin, Carlo, and Altone, along with the other defendants, thus continued without a moment's pause in their enforcement efforts to take down Beechwood. This is strong circumstantial evidence that their actions were motivated not by an objective assessment of resident care at Beechwood, but rather by their focused desire to be rid of the Chamberys.

Accordingly, the Affronti Decision (Exhibit 238), and the Order and Judgment incorporating the Affronti Decision (Appendix A) must be admitted as evidence at trial, as it has a "tendency to make a fact more or less probable than it would be without the evidence." FRE 401.

*Section 4—Settlement Discussions.*

Defendants object to plaintiffs' offer of ten (10) exhibits on the grounds that they are inadmissible under FRE 408.  Defendants contend that these exhibits are "statements made in compromise negotiations regarding the claim" under Rule 408(a)(2).  However, defendants misconstrue both plaintiffs' offer of the referenced exhibits, as well as the context of the discussions in which the statements were originally made.

During the summer of 1999 and continuing through the end of that year, while the revocation proceedings were pending, plaintiffs attempted to sell the Beechwood facility to third-parties.  Had Beechwood been operating some business other than a skilled nursing facility, plaintiffs would have been free in 1999 to sell their business to a third-party, notwithstanding the pendency of administrative proceedings.  However, the sale of any skilled nursing facility in the State of New York requires explicit approval of DOH, because the sale includes not only the physical facility, but the Certificate of Need (CON), which permits the certificate holder to operate a facility with a specified number of beds.  Thus, discussions to convey Beechwood to interested third parties required the approval of DOH, so that the purchaser could operate the facility with the authorized number of beds therein.

Plaintiffs were unable to convey the Beechwood facility to interested third parties, because DOH insisted that plaintiffs release defendants and other DOH officials from any potential liability, before such sale would be approved.  Additionally, while such discussions were ongoing, some defendants insisted that, notwithstanding any such sale, DOH should reserve its rights to bring additional administrative charges against plaintiff Brook Chambery and/or Beechwood's employees.

In support of their motion, defendants cite this Court's decision in *Rubery v. Buth-Na-Bodhaige, Inc.,* 470 F.Supp.2d 273 (W.D.N.Y. 2007).  In excluding evidence that had been

produced during the course of settlement negotiations, this Court held as follows: "*Rule 408(a)(2)* provides that 'statements made in compromise negotiations' regarding a disputed claim are not admissible when offered to prove liability for that claim." *Id.* at 279 (emphasis in original). Defendants' reliance on *Rubery, supra,* is misplaced, however, because the exhibits to which defendants object do not meet either of the conditions required by Rule 408 that are referenced in the quoted passage.

First of all, the statements made in the exhibits in question are not about any disputed claim. When plaintiffs sought to sell the Beechwood facility and requested DOH approval of that sale, plaintiffs were not asserting any claim, making any allegations against DOH, or doing anything other than requesting approval of the sale. It was defendants who unilaterally injected the topic of a release into the discussions about the proposed conveyance of the Beechwood facility. Secondly, plaintiffs offer these exhibits to prove defendants' retaliatory intent, as evidenced by defendants' refusal to permit Beechwood's sale, such that the facility was essentially reduced to "bricks and mortar". (*See,* Exhibit 253). In other words, the referenced exhibits are not admissions of past wrongdoing; rather, they are acts which, in themselves, demonstrate retaliatory intent.

Viewing these exhibits from another perspective, it is clear that the defendants' insistence on a release was not relevant to negotiations to sell the Beechwood facility. "[O]ne party cannot conduct an ex parte negotiation with the other party." *Lee Middleton Original Dolls, Inc. v. Seymour Mann, Inc.,* 299 F.Supp.2d 892, 895 (E.D.Wisc. 2004). Statements made by defendants when frustrating the sale of Beechwood are likewise not made in the course of settlement discussions. "Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise ... ." *Uforma/Shelby Business*

*Forms, Inc. v. NLRB*, 111 F.3d 1284, 1293-94 (6th Cir. 1997).  For example, when Altone wrote

Greenberg in January of 2000 and stated that Chambery could not sell Beechwood's Certificate

of Need, because he only had bricks and mortar, that statement was not made in the course of

any settlement discussion.  It had nothing to do with the validity or invalidity of plaintiffs' claim

in this case or in the underlying revocation proceeding.

In sum, Rule 408 has no bearing on any of the evidence in this case.


***Section 5—Altone Referrals.***

Defendants object to the admission of eleven (11) emails authored by defendant Altone.

The grounds for the objection are unclear.  What is clear, however, is that emails authored by a

defendant are admissible under Rule 801(d)(2).  No foundation of personal knowledge regarding

the statements within the email need be shown.  *United States v. Ammar,* 714 F.2d 238, 254 (3d

Cir. 1983).  Nor must there be any showing that the admissions contained in the emails were

contrary to Altone's interests.  *Savarese v. Agriss,* 883 F.2d 1194, 1201 (3d Cir. 1989).

Furthermore, admissions in emails can be considered against any recipient who assented, either

explicitly or by silence.  The Second Circuit has long recognized, even before the adoption of the

Federal Rules of Evidence, the doctrine of admission by silence in civil cases.  *See Hellenic*

*Lines Ltd. v. Gulf Oil Corp.,* 340 F.2d 398, 401 (2d Cir. 1965).

Apparently invoking some rule of reciprocity, defendants contend that if some of

Altone's emails are admitted, then all of Altone's emails should be admitted, and they offer six

exhibits into evidence:  Exhibits 239, 250, 254, 255, 257, and 356.  The problem with

defendants' argument, however, is that a party's statements can be offered in evidence against

that party under Rule 801(d)(2), under which circumstances the party's statements are not

hearsay.  However, this rule does not allow a party to offer his or her own prior statements, as

reflected in prior emails, notes, or other documents, except under very limited circumstances, such as when a claim of recent fabrication has been made. *See* FRE 801(d)(1)(B).

### Section 6—Ethics Commission
 *- and -*
### Section 7—Inspector General Investigation

Defendants object to Exhibit 190, a case completion report of the Office of State Inspector General; and Exhibit 349, a notice of reasonable cause, alleging violation of the Public Officers Law by defendant Laura Leeds.  Plaintiffs do not intend to offer these exhibits during their case-in-chief.  Rather, the exhibits would be offered, if at all, during cross-examination of defendant Leeds.  Because any decision to use these exhibits during cross-examination and any ruling by the Court on whether the exhibits may be used will depend, in large part, on the testimony of defendant Leeds during direct examination, plaintiffs respectfully submit that it is premature to rule on their admissibility or use at the present time.  Rather, the Court should reserve its ruling until the time of trial.


### Section 8—Litigation Responses.

Defendants object to the admission of Exhibit 574, which is a memorandum from defendants Baker and Carlo, which was drafted in response to a complaint served on DOH officials in 1999, while the DOH Offensive was underway.  Defendants concede that this exhibit was, in fact, drafted by defendants Baker and Carlo; thus, Exhibit 574 is admissible pursuant to Rule 801(d)(2).  Secondly, it is unquestionably relevant.  All of the matters discussed in Exhibit 574 are directly related to the events alleged in plaintiffs' complaint and the anticipated proof at trial in this action.

Defendants raise two grounds for their objection to Exhibit 574. The first is that the exhibit ought not to be admitted because it is a response to a document not in evidence. This objection is meritless. There is no requirement that an admission under Rule 801(d)(2) be conditioned on the prior receipt of a communication to which the admission responds. Of course, defendants have the option of offering the document to which Exhibit 574 responds—namely, a complaint which was filed shortly prior to the exhibit's creation.

The second objection is based on Rule 403. Once again, this objection is meritless. The only prejudice that would inure to the defendants are adverse inferences related to defendants' conduct during the course of the DOH Offensive against Beechwood. This is not the type of prejudice against which Rule 403 protects. In fact, that argument is a lot like a criminal defendant claiming that his confession ought not to be admitted because it is prejudicial. Of course it is prejudicial. However, it is both prejudicial and probative. As such, Exhibit 574 is admissible.

### *Section 9—Witnesses' Personal Notes.*

Defendants object to 43 exhibits, all of which are handwritten notes made by participants in the DOH Offensive against Beechwood. To assist the Court in its ruling on this aspect of defendants' motion, the following list identifies the authors of each of these exhibits:

| Author: | Exhibits: |
|---|---|
| Defendant Altone | 229, 259, and 260 |
| Defendant Baker | 45, 58, 61, 62, 69, 71, 73, 74, 77, 80, 122, 504, 516, 553-555, 557, 558, 593-595, 598, and 599 |
| Defendant Carlo | 29 |
| Defendant Francis | 503 |
| Defendants Baker and Carlo | 574 (*see* Section 8, *supra*) |
| Former Defendant Barnett | 203, 204, and 501 |

| Former Defendant Whalen | 284 |
| DOH Attorney Marie Shea | 364-370 |
| Dr. Mario Lomanaco | 569 |
| Plaintiff Brook Chambery | 526 |
| Unidentified DOH Author | 402 |

Handwritten notes made by a party defendant have long been admissible as admissions of that party.  *Vaccaro v. Alcoa Steamship Co.,* 405 F.2d 1133, 1137 (2d Cir. 1968).   Such handwritten notes are non-hearsay, and are admissible under Rule 801(d)(2)(A).  *United States v. Evans,* 575 F.2d 455, 488 (5th Cir. 1978).   Thus, all of the notes made by defendants Altone, Baker, Carlo, and Francis are admissible.

Secondly, all of these notes are admissible as past recollection recorded, pursuant to Rule 803(5).  While there may be a few instances of when the authors of these notes testified to a present recollection of events described in the notes, for the most part, when these defendants (and other witnesses) testified at depositions in this case, they denied recollection of most of the events described in the notes, and relied on their notes for any testimony regarding the details of what occurred.   Under those circumstances, the notes would also be admissible as past recollection recorded.  *United States v. Lewis,* 954 F.2d 1386, 1393-94 (7th Cir. 1992); *Overton v. City of Harvey,* 29 F.Supp.2d 894 (N.D. Ill. 1998).

Insofar as the notes of DOH Attorney Marie Shea are concerned, plaintiffs contend that they are admissible as statements of defendants' agent.  Marie Shea was handpicked by defendant Altone to work on the revocation proceedings against Beechwood.  She was assigned by Altone; she reported to Altone; some of her notes reflect conversations with Altone.  She participated in conferences and conference calls with many defendants.  Clearly, she was defendants' agent "on a matter within the scope of [her DOH employment]".  FRE 801(d)(2)(D).

*See, In re: Bankaltlantic Bancorp Inc.,* 2011 US.Dist.LEXIS 48057 *95 (S.D. Fl. 2011).  As such, her notes are admissible.

As far as the notes of former defendants Barnett and Whalen are concerned, as well as Dr. Lomanaco and plaintiff, plaintiffs' withdraw their offer of these exhibits at the present time. Plaintiffs reserve their right, however, to reoffer these exhibits into evidence should circumstances develop at trial that warrant their admission.

Lastly, Exhibit 402 is a set of handwritten notes from 2001 that were never disclosed by defendants, pursuant to any of the discovery demands in this case, or any of the FOIL proceedings brought against DOH.  Rather, they were located in a file cabinet in the Rochester DOH office in 2010.  They are relevant to the issue of spoliation of evidence, which will be the subject of a separate application by the plaintiffs.  This exhibit demonstrates that defendants were gathering Beechwood records in early 2001 for some unspecified purpose.  As other proof will demonstrate, however, at the same time defendants were gathering these records, they were losing all kinds of other important records.  Accordingly, plaintiffs will renew their offer of Exhibit 402, at such time as the other spoliation evidence is offered.

*Section 10—Non-Party Affidavits, Interrogatories, and Memoranda.*

The Court's pre-trial order of September 27, 2011 requires the parties to list on their exhibit list not only exhibits which that party intends to offer in its case-in-chief, but also materials to be used for cross-examination.

For that reason, plaintiffs listed affidavits and interrogatory responses on their exhibit list. However, plaintiffs do not intend to offer, during their case-in-chief, any of the exhibits listed in Section 10 of defendants' motion with two exceptions:  (1) Exhibit 205 is memorandum relating to proposed regulations which were required as a consequence of the *Langeveld* litigation.  The

admissibility of this exhibit will be discussed in Section 15, *infra*; and (2) Exhibit 222 is an affidavit by DOH attorney Rosenthal that may be relevant to the spoliation issue discussed above. Plaintiffs withdraw their offer of Exhibit 222 at the present time, and reserve their right to reoffer it during the trial of this action.

Lastly, plaintiffs reserve their right to use all affidavits and interrogatory responses during cross-examination of the authors of those affidavits or responses.


### Section 11—Emails from Non-Parties.

Defendants object to the introduction of 43 separate emails allegedly authored by non-parties. Defendants raise several objections to the admission of these emails.

First of all, defendants contend that many are not relevant, but this objection must be considered in the context of the entire proof at trial; these relevance objections cannot properly be determined at the present time. Secondly, defendant argues that the emails must be based on personal knowledge of the author. However, to the extent that the emails are admissible as party-admissions, there is no requirement of personal knowledge on the part of the author. *See United States v. Ammar*, 714 F.2d 235, 254 (3d Cir. 1983). Third, defendant contends that emails are admissible only if the author is a defendant. However, that argument ignores Rule 801(d)(2)(D), which defines the statements of defendants' agents as non-hearsay admissions of the defendants. Lastly, defendants contend that emails are not business records under Rule 803(6). With the exception of certain weekly status reports referenced below, plaintiffs do not offer the emails as business records, although there is some support in the case law for such a conclusion. *See, United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010). The Court need not

wrestle with the business records argument, however, because there are many other bases for the admissions of these emails.

Plaintiffs offer the following exhibits, all of which are email correspondence authored by participants in the DOH Offensive against Beechwood and all of which, therefore, constitute admissions by agents, pursuant to Rule 801(d)(2)(D): Exhibits 20, 25, 60, 116, 128, 243, 285, 318, 354, 561, 565, 567, 573, 576, 585, and 611. *See United States v. Rioux,* 97 F.3d 648, 661 (2d Cir. 1996).

Many of these emails contain highly probative statements, relevant to the issue of defendants' retaliatory intent. Thus, Exhibit 25, an email sent to defendant Baker, suggests that she and others should "have a couple drinks on us." Exhibit 243, an email to defendant Altone from another DOH attorney, suggests that Altone's insistence on a release as a condition of the sale of Beechwood is perhaps an "overreach". Exhibit 567 is an email discussing testimony at the administrative hearing and how one witness did a good job of "sullying" Beechwood.

One DOH employee, Lisa Cahill, prepared weekly reports regarding the activity of defendants and other DOH employees in WRO. These emails are offered as business records pursuant to Rule 803(6) because, quite obviously, it was the practice of Ms. Cahill to prepare these reports on a weekly basis. These exhibits include Exhibits 28 and 560.

Additionally, the following exhibits are relevant to the spoliation issue in this case, either because they acknowledge one or more defendants' understanding of the requirement to retain records, or because they identify or discuss records which no longer exist. The emails and other exhibits which are relevant to the spoliation issue are Exhibits 352, 413, 568, 586, 587, 607, and 657.

Plaintiffs withdraw their offer of other emails cited in Section 11 of defendants' motion, without prejudice to plaintiffs' ability to offer these exhibits during trial, should the proof so warrant.


### Section 12—Letters.

Defendants object to the introduction of 15 letters, authored primarily by the plaintiffs, again on grounds of relevancy and hearsay. Most of the referenced exhibits are plaintiffs' letters, which are not hearsay because they are not offered for the truth of the matters asserted therein. *See* FRE 801(c). Rather, these letters are part of plaintiffs' protected First Amendment activity in this case, an essential element of their case-in-chief. The Second Circuit has already held that it is "undisputed that Brook Chambery's complaints, protests and lawsuits are protected speech." *Beechwood*, 436 F.3d at 152. As such, plaintiffs are entitled—in fact, they are required—to offer these letters into evidence.

Of the remaining letters not authored by plaintiff Brook Chambery, one was written by his attorney, Kevin Cooman: Exhibit 301. This letter is relevant because it establishes Beechwood's continuing efforts to sell the facility as of January 2000. It is also relevant because, on the very same day, defendant Altone, in reaction to Exhibit 301, authored a handwritten note stating that all Brook Chambery had at that date was "bricks + mortar to sell." Exhibit 253. Exhibit 519 is a letter written by defendant Altone—a party admission. Exhibits 135 and 153 are letters written by former defendants Colello and Greenberg respectively, and are admissions by agents, under Rule 801(d)(2)(D). Plaintiffs withdraw their offer of Exhibit 505, without prejudice.

***Section 13—Reports.***

Defendants object to a number of exhibits that summarize data, compiled and maintained on publicly accessible government databases. These exhibits are admissible under a two-step analysis. First, all of the data is taken directly from databases maintained by the DOH, or the United States Department of Health and Human Services ("HHS"). DOH maintains a database of Medicaid cost reports; and HHS maintains a database of survey results. All of the data maintained in these databases is admissible under Rule 803(8). Secondly, because this data is voluminous and not organized in any fashion that is quickly understandable, plaintiffs have prepared charts and summaries which are admissible pursuant to Rule 1006.

Plaintiffs wish to emphasize that shortly after their exhibits were disclosed to defense counsel, they also provided defense counsel with a CD containing all of the underlying data which has been compiled and organized in the referenced exhibits. Thus, defendants cannot contend that the data is untrustworthy; nor can they argue surprise. Rather, defendants object solely on the grounds of relevance. This objection is unfounded. The reports will corroborate plaintiffs' contention and testimony that the Beechwood facility was, statistically speaking, among the top performers in the state in terms of many survey categories. This proof is obviously relevant to the issue of whether the extreme remedy of revocation was warranted. Furthermore, insofar as cost data is concerned, this information is highly relevant to testimony regarding Beechwood's value as a going concern business. Thus, defendants' objections to plaintiffs' reports have no merit.

***Section 14—Letters of Interest.***

Defendants have moved to exclude two letters written by a prospective purchaser of the Beechwood facility, each expressing an interest in purchasing the facility, and each referencing a

specific price.  Without citing any authority, defendants contend that the letters are hearsay or, in the alternative, that they should be excluded pursuant to Rule 403, as unduly prejudicial.

First of all, the letters are admissible as evidence of Beechwood's value.  The Second Circuit has long held that letters representing *bona fide* offers to purchase or sell are, in fact, "admissible evidence of value."  *Caten v. Salt City Movers & Storage Co., Inc.,* 149 F.2d 428, 433 (2d Cir. 1945).  More recently, the Second Circuit has reaffirmed the principle that value can be defined as "the price at which a willing buyer **would** purchase the good from a willing seller." *In re: Tax Refund Litigation (Barrister Associates v. United States),* 989 F.2d 1290, 1297 (2d Cir. 1993) (emphasis added).  The only qualification on this type of evidence is that the offer must result from good faith, arms-length negotiations.  *Id.* at 1298.  Clearly, the exhibits in question represent good faith offers from a disinterested third party.  Moreover, the defendants have not raised any issue regarding the reliability or trustworthiness of these offers.

Defendants' argument regarding undue prejudice has even less foundation.  The offers in question propose to purchase the Beechwood facility at a tiny fraction of its going-concern value. If anything, the offers are prejudicial to the plaintiffs, and not the defendants.  They are relevant, however, to the expert's overall determination of value as they are representative of a residual value of the facility and Certificate of Need, even after Beechwood had closed its doors and ceased operating as a going concern.  In sum, defendants' objections have no merit and Exhibits 525 and 621 should be admitted.

### Section 15—*Regulations arising from Langeveld litigation*

Defendants object to the admission of four exhibits (Exhibits 205, 225, 335 and 533) relating to the regulations required to be enacted as a result of the Langeveld Litigation because

defendants claim that such documents are not relevant, and would cause unfair prejudice, confusion of the issues and mislead the jury.  However, such documents are clearly admissible, as they are relevant to defendants' motivation to retaliate against the plaintiffs.

The impact that the Langeveld Litigation and resulting Consent Order had on the DOH and many of the defendants in this case cannot be understated.  Indeed, the Second Circuit highlighted the Langeveld Litigation itself as one example of Chambery's protected speech.  *See, e.g., Beechwood,* 436 F.3d at152 ("In 1996, Chambery commenced an Article 78 proceeding challenging DOH's procedures for the transfer and discharge of residents from nursing homes; the proceeding was ultimately resolved by a consent order in March 1997.").

On April 29, 1999, in the early days of the Offensive, Leeds was complaining about Chambery to Rubin because he "changed the entire way we do discharge appeal" – a specific reference to the *Langeveld* litigation outcome.  (Exhibit 68).  This was more than two years after the Langeveld Consent Order was entered (Exhibit 331), so it was obviously a source of particular and continuing irritation.  Indeed, in a letter to Chambery shortly after the Consent Order was entered, Leeds noted that "there is no easy or quick fix to what [Chambery] identified as conflicting regulations." (Exhibit 224).  She also noted that:

> Regulatory changes, especially changes which impose significant impact on providers and consumers, typically take approximately one year to process through the State's rule making process.  We anticipate, based on past experience with related issues, that the formal rule making process will be at least as lengthy.

(Exhibit 224).   The exhibits defendants seek to exclude chronicle DOH's efforts to comply with the terms of the Consent Order in the Langeveld Litigation.  (*See, e.g.,* Exhibits 205 and 335).  Ultimately, it took three years before the DOH finally published a notice of proposed rule-making. (Exhibit 225).  With Chambery effectively silenced, the defendants had one less thing

to deal with.  Hence, the notice ultimately expired on May 2, 2001, without any new, federally-compliant regulations ever being implemented.  (Exhibit 533).  The DOH remains out of compliance to this day.

The defendants' objection with respect to these exhibits should be overruled.

**Section 16—Tape recording and Transcript.**

Exhibit 227 is a tape recording of a voicemail message of former defendant, Steven Steinhardt, informing plaintiffs' attorneys that DOH will not consent to the installation of a voluntary receiver at Beechwood.  Defendants object to this recording on the grounds that it is hearsay and not relevant.  Neither objection has merit.

First, the statement is relevant because it corroborates Brook Chambery's testimony that Beechwood offered to have a receiver installed to operate the facility, until such time as defendants determined that any purported deficiencies had been corrected.  There will be testimony that DOH regularly permitted the installation of receivers (or caretakers as DOH called them in this case) to run facilities that were under DOH scrutiny, in order to allow those facilities to correct deficiencies.  In Beechwood's case, however, the unprecedented enforcement remedy of revocation was pursued by DOH, despite the facts that no immediate jeopardy was present at Beechwood; that no one ever reviewed Beechwood's Plans of Correction to determine whether deficiencies had been corrected; and in this instance, that Beechwood agreed to the installation of a voluntary receiver.

Secondly, Steinhardt's statement is not hearsay, is the non-hearsay admission of an agent of the defendants, under Rule 801(d)(2).  Steinhardt stated that he "double checked" on this issue (*see* Exhibit 227A) and that the "Department" will not withdraw the revocation proceedings.  Id. Steinhardt had previously been assigned by defendant Altone to bring a caretaker proceeding

against Beechwood in New York State Supreme Court.  His statement clearly indicates that he is not making any decision on his own, but on behalf of others within DOH.  Steinhardt was the agent of defendant Altone and all others who participated in the DOH Offensive.  As such, his voicemail message is admissible.


### Section 17—Time Records.

Defendants object to 22 exhibits, which they characterize as "time records."  In point of fact, some are timesheets, but some are contemporaneously kept calendars of individual defendants from 1999.  Defendants do not dispute that these records are admissible either as business records within the meaning of FRE 803(6), or as public records under FRE 803(8). Rather, defendants argue only that the "time records" are not relevant.

The proof at trial will establish the relevance of these records.  However, plaintiffs can give the Court examples of why these time records will be relevant.  For instance, the proof will show that, under ordinary circumstances, DOH Central Office officials in the Albany area would not be involved with survey results, survey findings, or scope and severity of deficiency findings, even with respect to the most serious levels of deficiencies, until the surveyors had conducted their survey and preliminarily reported their findings to Central Office.  In this case, defendants' time records, when coupled with emails and other exhibits, will show that Central Office officials were involved in the Beechwood survey before the surveyors even had an opportunity to report preliminary observations or results.  In other words, the time records will be evidence of "suspect chronology" which the Second Circuit held to be circumstantial evidence of retaliatory motive.  *Beechwood,* 436 F.3d at 153.  Similarly, insofar as defendants contend that revocation was warranted because Beechwood did not correct its deficiencies, defendants' time records can

show that defendants had no opportunity even to review plaintiffs' Plans of Correction prior to the time they proclaimed that Beechwood was not correcting its deficiencies. The time records are clearly relevant and defendants' objection lacks merit.

**Section 19—Redaction.**

Defendants object to a series of exhibits that contain handwritten notes. Several of these objections are beside the point, as the notes appear on exhibits which are not being offered in evidence, but rather, reserved for cross-examination. To the extent that plaintiffs intend to offer exhibits with handwriting during their case-in-chief, plaintiffs will establish a foundation identifying the handwriting. Thus, plaintiffs respectfully urge the Court to reserve any ruling on redaction, until the time of trial.

**Section 20—Duplication.**

To the extent that there are duplicate exhibits on plaintiffs' exhibit list, plaintiffs do not really intend to offer these exhibits more than once. Owing to the number of exhibits and the fact that they became sequentially numbered during the deposition process, some exhibits were apparently included more than one time. At trial, however, plaintiffs only need one copy of each exhibit.

**Section 21—Antonia Novello's Conviction.**
 **- and -**
**Section 22—Dennis Whalen's Ethical Violation.**

These exhibits are listed for use in cross-examination, not during plaintiffs' case-in-chief. However, if these witnesses are unavailable at the time of trial and plaintiffs offer portions of their deposition testimony during plaintiffs' case-in-chief, plaintiffs reserve the right to offer the

referenced exhibits—Novello's conviction and Whalen's ethical violation—for purposes of impeaching that testimony.   Rule 607 permits plaintiffs to attack the credibility of these witnesses, even if it is plaintiffs who "call" the witnesses by offering their deposition testimony into evidence.

### Section 23 – The Use of Litigation Software

After a thorough search to obtain an inexpensive and user-friendly presentation software for use at trial, plaintiffs communicated the specifications to defendants' counsel, in a letter which "crossed in the mail" with defendants' motion.   At this time, plaintiffs' and defendants' counsel have agreed to the software program and technology to be used, and are working cooperatively with respect to this issue.   Plaintiffs do not believe that any further specific directive is necessary from the Court on this issue.

### Section 24 – Defendants' Proposed Exhibits

#### Admissibility of the DOH ALJ's Report and Recommendations to the Commissioner.

The defendants seek admission of the Report and Recommendations of Administrative Law Judge Mark Zylberberg from 1999 following an internal DOH enforcement hearing against Beechwood ("ALJ Report").   The ALJ Report recommended that Beechwood be fined, and that its operating certificate as a skilled nursing facility be revoked.

The evidentiary status of the ALJ Report received passing attention at oral argument before the Court in December 2011.   Plaintiffs did not concede the admissibility of the ALJ Report, but indicated that, after further review of the evidentiary standards and precedents, its admission might not be opposed.   Given the evidentiary standards of FRE 803(8) discussed above, plaintiffs do not oppose the admission into evidence of the ALJ Report as the findings of

a public agency. *Henry v Daytop Village, Inc.*, 42 F.3d 89 (2d Cir. 1994)("the ALJ's decision would be admissible evidence under Rule 803(8)(C) of the Federal Rules of Evidence"). However, the ALJ Report was the product of a hearing initiated and supported by defendants, and presided over by a fellow DOH employee. Therefore, that ALJ Report is "to be given weight in accordance with the nature of the administrative proceeding, including the participation of the parties." *Fitch v R.J. Reynolds Tobacco Co.*, 675 F. Supp. 133 (S.D.N.Y.1987). The admission of the ALJ Report must be accompanied by cautionary instructions from the Court to the effect that "the report was an agency hearing of its own personnel and for its own purpose and was to have no determinative effect on any issue in the case." *Perrin*, 784 F.2d at 1047. The jury will be permitted to give to the ALJ Report whatever weight it believes is justified, in light of such considerations as the fact that the report emanated from a self-contained DOH process, and "any possible motivational problems in the preparation of the report." *Id.*

### *Additional Deposition Exhibits Proffered by Defendants*

Plaintiffs have no objection to most of the exhibits presently offered by defendants. There is no objection to Exhibits 26, 52, 98, 120, 181, 300, 336, and 513. However, to the extent that defendants are concerned about duplication of exhibits, plaintiffs note that Exhibit 120 is the same as 67, and that 513 is the same as 104.

Plaintiffs do object to two of defendants exhibits. Exhibit 105 is a prior statement of one of the defendants—Cynthia Francis. Prior statements of witnesses are inadmissible, unless offered pursuant to Rule 801(d)(1)(B). Exhibit 282 is actually two documents. The first is a notice of hearing, to which plaintiffs do not object. In addition, however, Exhibit 282 includes

the statement of charges in the revocation proceedings.  Plaintiffs' object to that portion of Exhibit 282 which is the statement of charges.  This document represents charges, not findings; is classic hearsay, and is not admissible under any exception to the hearsay rule or any provision in the Federal Rules of Evidence.  Permitting defendants to offer the statement of charges would be akin to allowing plaintiffs to offer, as evidence-in-chief, complaints in lawsuits filed against the defendants, or other DOH officials.  Clearly, none of these charges is admissible.

### *Inadmissibility of the Federal Administrative Matters Involving Beechwood.*

Plaintiffs object to defendants' offer of the federal administrative decisions of the Department of Health and Human Services Departmental Appeals Board ("DAB") related to Beechwood, and this Court's decision following those proceedings.  First of all, the Second Circuit has already held that federal administrative proceedings are irrelevant: "it is the revocation of Beechwood's *state* operating certificate, not Beechwood's termination as a *federal* Medicare/Medicaid provider, that is at issue in this case." *Beechwood,* 436 F.3d 147,155 n. 4 (2d Cir. 2006) (emphasis in original).  Hence, the DAB decisions and proceedings ("Federal Administrative Matters") must be excluded from evidence in this trial.

Second, the federal DAB proceedings are irrelevant, because the nature of the federal administrative process is entirely different from the state enforcement remedy of revocation imposed by DOH.  Federal program termination is a temporary measure, and facilities are reinstated based upon a showing of future compliance.  42 C.F.R. § 489.57.  By contrast, revocation of the operating certificate by the DOH defendants was a permanent enforcement action that prevented plaintiffs from ever again conducting their nursing home business, and was, as various defendants have explained, based on different criteria (*See* Appendix C [Baker testimony at HT 833-835; Altone deposition testimony at 151]).  The difference between the

separate sovereigns undertaking the enforcement action (federal versus state), as well as differences in the scope and nature of the remedy (funding termination versus license revocation) render any consideration of the Federal Administrative Matters irrelevant in this action (FRE 402), as well as confusing or misleading to the jury. FRE 403.

Third, the weight and significance that the jury should or should not accord to the DOH's ALJ Report will be probed and tested during this trial. Defendants, who engineered and effectuated the DOH revocation proceedings have been deposed, and will be subject to cross-examination and impeachment at trial. This cross-examination will allow the jury to determine not only if revocation was warranted, but whether revocation would ever have been considered, in the absence of defendants' retaliatory motive. By contrast, plaintiffs have no such ability to do likewise with respect to the Federal Administrative Matters. When Beechwood subpoenaed HCFA surveyor Michael Daniel, and HCFA Associate Regional Administrator Sue Kelly to appear at the DOH Administrative Hearing in 1999 in order to explore issues related to the relationships and understandings between the DOH personnel and HCFA personnel related to federal termination proceedings against Beechwood, HCFA refused to comply. HCFA would not allow its personnel to have any part in that DOH proceeding, asserting that "a state court or administrative body is without authority to compel testimony by an employee of HHS since such testimony is prohibited by Federal law." (*See* Appendix D [HCFA Letter to Beechwood counsel, July 12, 1999; DOH Hearing Transcript p. 3337-3339, and Subpoena Duces Tecum to Michael Daniel).

This inability to conduct any discovery of federal witnesses has continued in this lawsuit. The HCFA defendants, Sue Kelly and Michael Daniel, were dismissed from the case. *Beechwood*, 436 F.3d at 155-156. Later, in 2009 when plaintiffs sought permission pursuant to

the so-called "Touhy" rules to depose Ms. Kelly as a non-party witness, CMS rejected such request. (See Appendix E hereto [Letter of CMS Consortium Administrator Jackie Garner to Peter J. Weishaar, Esq. dated 11/17/09]).

The end result is that plaintiffs would be severely prejudiced by allowing the Federal Administrative Matters to be put before the jury, since plaintiffs have not, and cannot explore in any reasonable way the defects in those proceedings; the full extent to which the HCFA actors were influenced by the DOH defendants in making their termination decision; or Beechwood's opportunity to gain reinstatement of federal reimbursement upon a showing of correction.

Fourth, contrary to defendants' contention, the Federal Administrative Matters do not serve even the limited purposes of establishing a *Mt. Healthy* defense, or minimizing damages. (Defendants' Memorandum at 22-23). The undisputed fact that HCFA terminated Beechwood's federal funding in June 1999 has no bearing on the issue of whether the DOH defendants here "would have disciplined the plaintiff even in the absence of the protected conduct," and hence is irrelevant. FRE 401, 402. Here again defendants miss completely the distinction between their retaliatory conduct which resulted in the permanent revocation of Beechwood's state operating license, and the federal program termination which HCFA imposed.

The factual record developed during discovery confirmed that obtaining Beechwood's federal termination was not sufficient to accomplish the ultimate goal of these defendants: they wanted full extinction of Beechwood, which could only be accomplished by revoking the state operating license -- a sanction wholly within DOH control, irrespective of what HCFA chose to do about federal funding. Early in the 1999 Offensive, defendants Leeds and Rubin made clear in their April 29, 1999 email exchange that their goal was not merely persuading HCFA to

terminate the federal funding to Beechwood, but rather to take away Beechwood's license to operate at all:

> The issue is how much of [Chambery's] resident population is private pay. He may not be concerned because he has a strong private pay contingent in his home.  So that being the case if he does not correct we have to be prepared to revocate [sic] his operating certificate.

(Exhibit 68, attached hereto as Appendix F).  Defendant Carlo underscored this ultimate goal in her letter to Beechwood residents on June 23, 1999:

> Since Beechwood Restorative Care Center is no longer allowed to participate in the Medicare and Medicaid program, residents who rely on these insurance programs to pay for the care and services received at the home must be transferred to another location by July 17, 1999.  I must also inform you that a separate but related action has been initiated by the New York State Department of Health to revoke the facility's license to operate this nursing home.  If the Department prevails in that administrative proceeding, the remaining residents that pay privately or are covered by other insurance programs would also be required to relocate due to the closure of the facility.

(Exhibit 89, attached hereto as Appendix G).  As Carlo and her cohorts well knew, it was license revocation, not merely federal funding termination, which would put Beechwood out of business forever.

Lastly, any decisions, documents or testimony related to Federal Administrative Matters ought to be excluded as evidence because of the special "other circumstances" apparent in this case.   FRE 803(8)(B).   On this motion, defendants mistakenly claim that "the federal administrative determination was appealed to this Court *which upheld the administrative determination."* (Defendants' Memorandum at 22) (emphasis added).  In fact, the Court did not "uphold" the termination action taken by HCFA, but rather declined to review it as moot.  When Beechwood appealed the final decision of the DAB to the District Court, the Court ruled that:

> I find that to a great extent, Beechwood's claims in this action are moot. Beechwood is closed, its state operating license has been revoked by the

> State DOH, and the building where the nursing facility was operated has
> been sold. ...  All of plaintiff's claims are dismissed as moot except for
> the sixth claim.

*Beechwood Restorative Care Center v Thompson*, 494 F.Supp. 2d 181, 187, 207 (W.D.N.Y.

2007).[4] Hence, Beechwood was expressly denied complete judicial review, and the opportunity

to question and test the propriety and validity of HCFA's termination of Beechwood from the

federal programs, and any facts which purportedly justified that outcome.   Under these

circumstances, the underlying and unreviewed Federal Administrative Matters related to

termination must be deemed inadmissible as evidence with respect to the issue to be tried in this

lawsuit. *Beechwood,* 436 F.3d 147,155 n. 4.

In conclusion, there was no "break in the chain of causation" helpful to defendants.  Their

intention from the beginning of the Offensive was to ensure that Beechwood and the Chamberys

would no longer have a license to operate the facility, ensuring its complete and permanent

closure.  The Federal Administrative Matters may not be as admitted into evidence because they

will undoubtedly result in "confusing the issues" of termination and revocation, *Beechwood,* 436

F.3d 147,155 n. 4, and, thus, "misleading the jury."  FRE 403.

---

[4]  On its Sixth Claim, Beechwood prevailed, and received a monetary recovery from HCFA because
notice of the federal remedy known as a "denial of payment for new admissions" was improperly given.
*Id.* at 199-204, 207.

## CONCLUSION

Defendants' motion *in limine* should be denied in all respects.  Plaintiff's cross-motion to exclude or condition the admission of defendants' preferred exhibits should be granted.

Dated:   January 26, 2012
         Rochester, NY

                              McCONVILLE, CONSIDINE,
                              COOMAN & MORIN, PC


                              s/ Kevin S. Cooman
                              Kevin S. Cooman, Esq.
                              Peter J. Weishaar Esq.
                              25 East Main Street, Suite 500
                              Rochester, NY 14614
                              Tel:  (585) 546-2500
                              Fax:  (585) 546-7218
                              kcooman@mccmlaw.com
                              pweishaar@mccmlaw.com

                              -AND-

                              GEIGER and ROTHENBERG, LLP
                              David Rothenberg, Esq.
                              45 Exchange Street, Suite 800
                              Rochester, New York 14614
                              Tel:  (585) 232-1946
                              Fax:  (585) 232-4746
                              drothenberg@geigroth.com

                              *Attorneys for Plaintiffs*


TO:   Gary M. Levine, Esq.
      Assistant Attorney General
      NYS ATTORNEY GENERAL'S OFFICE
      *Attorneys for Defendants*
      144 Exchange Boulevard, Suite 200
      Rochester, NY  14614
      gary.levine@ag.ny.gov