```
 1                    UNITED STATES DISTRICT COURT

 2                    WESTERN DISTRICT OF NEW YORK

 3

 4

 5

 6
   - - - - - - - - - - - - - - - X
 7  BEECHWOOD RESTORATIVE CARE      )    02-CV-6235(L)
    CENTER, BROOK CHAMBERY AND      )
 8  OLIVE CHAMBERY,                 )
                 Plaintiffs         )
 9  vs.                             )
                                    )    Rochester, New York
10  LAURA E. LEEDS, EDMUND RUSSELL  )    May 15, 2012
    ALTONE, SANFORD RUBIN,          )    8:30 a.m.
11  SUSAN T. BAKER, SHARON A. CARLO,)
    CYNTHIA T. and ELIZABETH RICH,  )
12              Defendants.         )
   - - - - - - - - - - - - - - - X
13

14

15

16

17                 TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE DAVID G. LARIMER
18                UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24  COURT REPORTER:      Christi A. Macri, FAPR, RMR, CRR, CRI
                         Kenneth B. Keating Federal Building
25                       100 State Street
                         Rochester, New York 14614-0222
```

2

1                    A P P E A R A N C E S

2                         *      *      *

3

4    GEIGER & ROTHENBERG, LLP
     BY:   DAVID ROTHENBERG, ESQ. (Not present)
5    45 Exchange Boulevard
     Suite 800
6    Rochester, New York 14614
              - and -
7    MCCONVILLE CONSIDINE COOMAN & MORIN, P.C.
     BY: KEVIN S. COOMAN, ESQ.
8    25 East Main Street
     Suite 400
9    Rochester, New York 14614
     Appearing on behalf of the Plaintiffs
10

11

12

13   ERIC T. SCHNEIDERMAN, ESQ.
     Attorney General of the State of New York
14   BY: GARY M. LEVINE, ESQ.
          BERNARD SHEEHAN, ESQ.
15   Assistant Attorneys General
     144 Exchange Boulevard
16   Suite 200
     Rochester, New York 14614
17   Appearing on behalf of the Defendants

18

19

20

21

22

23

24

25

1                          I N D E X

2

3  Preliminary charge by Judge Larimer      Page  4

4  Opening statement by Mr. Cooman          Page 25

5  Opening statement by Mr. Levine          Page 89

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2                        *          *          *

3              (WHEREUPON, the jury is not present).

4              THE COURT: Ready for the jury?

08:36AM    5              MR. COOMAN: Your Honor, if I just may bring two things

6      to your attention?  Mrs. Chambery is in the courtroom this morning

7      seated with me at the table.

8              Also, my colleague Mr. Rothenberg is not feeling well.

9      He was at the doctor at 7:30 this morning and not likely to be

08:37AM   10      here for the day.  He's hoping it's the flu and not something

11      more, but I just wanted to explain his absence this morning.

12              THE COURT: Well, I have some other issues too.   Perfect

13      storm, but in any event, I guess we're otherwise ready to proceed?

14      And we'll talk about that issue.

08:37AM   15              Good morning, Mrs. Chambery.

16              Let's get our jurors in and we will proceed.  Good

17      morning to all parties and of course to you, Mr. Levine.

18              MR. LEVINE: Thank you, Judge.

19              THE COURT:  I'll do my remarks and I think we'll take a

08:38AM   20      break and let you set  up.

21              (WHEREUPON, the jury is present).

22              THE COURT: Good morning, ladies and gentlemen.  We are

23      ready to proceed.  And as I told you yesterday, the first thing we

24      will do this morning is to present to you my opening charge on the

08:39AM   25      law.  I am sure at the end of the case there will be some

5

1   additions because things will occur during the trial which

2   necessitate my saying some additional things, but I think much of

3   what you'll hear now you'll also hear at the end of the case.

4          As I said yesterday, it just seems to make sense to me

08:39AM   5   to let jurors know from the beginning some of the rules that are

6   going to guide your consideration of this case rather than wait

7   four or five weeks and tell you at the end of the case.

8          I think you have notebooks, but you don't have to take

9   notes here.  We'll talk about notes in a minute during the trial,

08:40AM   10   but just listen.  I think this will help you; and the lawyers in

11   their opening statements may refer to some of the things I talk

12   about, too.

13          In effect, in any trial there are really two judges.  I

14   am obviously one of them:  I'm the judge of the law.  You're the

08:40AM   15   judges of the facts here:  You decide the factual issues in this

16   case.  And that's such a strong rule that if I were to tell you,

17   you know, I think this is what the facts are, you have a complete

18   right to disregard that because that's not my province.  I would

19   never say that, but I say it just as an example to show you how

08:41AM   20   important your job is.

21          I must preside over the case to make sure that it's run

22   orderly and efficiently, make sure only legal evidence is

23   presented to you, and now my task is to instruct you on the law.

24          You should consider all of my instructions on the law,

08:41AM   25   not pick out one particular instruction as covering the whole

1    issue to be decided.  You also can't substitute your notion or

2    opinion as to what the law should be.  No.  You're charged with

3    following the law and deciding this case regardless of the

4    consequences.

08:41AM  5        The parties expect that you'll carefully and impartially

6    consider the evidence, not be governed by sympathy, prejudice or

7    public opinion, but that you'll reach a just verdict regardless of

8    the consequences.

9        We talked quite a bit about some of the issues

08:42AM  10   yesterday, so some of this will be repetitive, but Mr. Chambery,

11   the plaintiff who was introduced to you yesterday, is suing seven

12   State Department of Health employees, present or former.  The

13   allegation is that all were involved in investigating or reviewing

14   the operation of the Beechwood nursing home before, during and to

08:42AM  15   some extent in 1999, which seems to be the crucial years in

16   question here.

17        Eventually I believe you'll hear that after the review

18   process action was taken against Beechwood which led to Beechwood,

19   Mr. Chambery losing its operating certificate, which precluded him

08:42AM  20   from running the nursing home, the plaintiff claims that his

21   constitutional rights were violated in this process.  He claims he

22   was targeted and retaliated against for complaining to the

23   Department of Health and about the Department of Health, about its

24   policies, regulations, et cetera.

08:43AM  25        And his complaints, I think you'll hear, took many

1  forms.  The gist of his claim here is the Department of Health

2  officials were angered by that, upset by it and they took action

3  against him because of that.

4          As I said yesterday, the defendants, each of them,

08:43AM  5  denied that they had any improper motive for doing what they did.

6  They reviewed Beechwood's activities, they found problems and they

7  did what they felt was necessary to do without any motivation to

8  retaliate against Mr. Chambery for his speech.

9          Mr. Chambery and Beechwood brings this action to recover

08:44AM  10  damages for the loss of the business.  As I said yesterday, we are

11  focusing on a constitutional violation, and that's important to

12  remember because the claim is very specific:  That Mr. Chambery

13  was punished or retaliated against in violation of his

14  constitutional rights.

08:44AM  15          I'm sure you're all familiar with the Constitution, read

16  it often.  But Article I of the First Amendment to the

17  Constitution provides for many things.  One is that when it was

18  originally written, the law was just directed against Congress,

19  the federal government.  But over the years the Constitution has

08:44AM  20  interpreted that it also applies to state governments and local

21  governments.

22          So essentially now the First Amendment, as interpreted,

23  means that no governmental body shall make any law or take any

24  action prohibiting the free exercise of speech or abridging the

08:45AM  25  freedom of speech.  Also shall make no law preventing individuals

1  from petitioning the government for what's called a "redress of

2  grievances."  It's that amendment that Mr. Chambery believes was

3  violated.

4       As I said to you yesterday, we are here because Congress

08:45AM  5  passed a statute that says people that believe their rights were

6  so violated have the right to come into federal court to attempt

7  to prove their case.  The statute is not a model of draftsmanship,

8  but it essentially says that any person under color of law that

9  subjects or causes another person or a citizen of the United

08:46AM  10  States to the deprivation of any rights and privileges protected

11  by the Constitution, that person who does that shall be liable in

12  an action at law.

13       That basically means there's a vehicle, there's a remedy

14  in federal court against someone who causes the deprivation of

08:46AM  15  rights protected by the Constitution, whether it's the First

16  Amendment, the Fourth Amendment, the Fifth Amendment or whatever

17  it might be.

18       So there are several things that the plaintiff must

19  prove here.  At least one of them is not disputed at all and you

08:47AM  20  won't hear anything more about it, and others really I don't think

21  there is much dispute.

22       There is one element here that is very much in dispute,

23  but Mr. Chambery, to prove his case against the defendants, must

24  first establish that he engaged in speech or activity that was

08:47AM  25  protected by the First Amendment.  I think you'll hear some

1    testimony about what Mr. Chambery did and when he did it and the

2    nature of it, but I don't really think that the defense really

3    contends that Mr. Chambery didn't engage in protected speech.

4         The next thing is that Mr. Chambery must establish that

08:47AM    5    the defendants took some adverse action against him, but that what

6    they did was detrimental to him.  I think Mr. Chambery will

7    testify, and Mr. Cooman in his opening will talk about the things

8    that Mr. Chambery says were done adverse to him because of his

9    speech.

08:48AM   10         The next thing which is an element or aspect of the case

11    is that the action, the adverse action, must have been done under

12    color of law.  I wasn't even going to mention this because it's

13    really not an issue here, but what it means is that if your

14    neighbor, who is not a government official, takes some action

08:48AM   15    against you, tries to get you not to engage in free speech or

16    something, that's not actionable here.

17         What's actionable is government action.  That the

18    government can't limit your speech or retaliate against you.  So,

19    for instance, sometimes there are cases where a government agent

08:49AM   20    does something against somebody and the question is was he or she

21    doing it as part of his job or her job.

22         In other words, just because you happen to be, you know,

23    a government agent and you do some wrongful act, if it's not part

24    of your job, if you're not acting as a state official, then it's

08:49AM   25    not covered by the statute.

1     Well, again, I spoke too much about this because it's

2   something that's not really an issue.  Nobody disputes that the

3   Department of Health officials when they did what they did, they

4   were acting in their official capacities as state officers, state

08:49AM   5   agents.  They weren't private citizens.  So you'll probably never

6   hear about this aspect again and I probably talked too much about

7   it already since it's not really in dispute.

8     I think the focus on the case is about government

9   agents, government actors taking certain action as part of their

08:50AM   10  job for the government.

11     The next element, if you will, or requirement is that

12  the actions taken against Mr. Chambery were done because of

13  something, and specifically Mr. Chambery must prove that his

14  protected speech was a motivating factor in the defendants'

08:50AM   15  decision to take adverse actions against him.

16     I don't think I'm giving away any secrets here that this

17  is probably one of the most disputed issues in the case, that is,

18  was Mr. Chambery's protected speech the motivating factor for the

19  defendants  to do what they did when they did it?

08:51AM   20     The last thing is that the adverse action caused by the

21  defendants, was it the proximate cause of the injuries about which

22  Mr. Chambery complains?

23     So there are those five aspects or elements, one of

24  which, that is, under color of state law, really is not disputed.

08:51AM   25  Nobody will probably talk about it further.

1        I instruct you that if a person complains or protests or

2   files lawsuits against a governmental agency, is critical of that

3   agency, a person has a right to engage in that type of speech;

4   it's protected speech.

08:52AM  5        This case is brought by Brook Chambery.  The complaint

6   also lists Olive Chambery, his mother, who happens to have joined

7   us here in court this morning.  It's not necessary that plaintiff

8   prove that both Chamberys engaged in protected speech.  No.  It's

9   just whether one did, and I think the proof will show that

08:52AM 10  Mr. Chambery engaged in what we call "protected speech" or

11  "protected activity."

12        The next element is that the plaintiffs must show that

13  there was some action taken against him because of the speech.  I

14  really don't think there's going to be much dispute that there was

08:52AM 15  some adverse action taken against Mr. Chambery and Beechwood.

16  Certain things were done, letters were filed, eventually leading

17  to the revocation of something called an "operating certificate"

18  that allows one to run a nursing home.  And there were other

19  actions taken which essentially put Mr. Chambery and Beechwood out

08:53AM 20  of business.  So I really don't think there's going to be much

21  dispute about the State took adverse action against Mr. Chambery

22  and Beechwood.

23        To make out a claim under the First Amendment,

24  Mr. Chambery must show that his protected speech was a motivating

08:53AM 25  factor in the defendants' decision to take adverse action against

1    him.  You may find that Mr. Chambery's protected speech and

2    activity was a motivating factor if that speech played a

3    substantial or important part in the defendants' decision.  Did

4    his speech enter into the decision?  Did it play some part in the

08:54AM   5    decision of the State officials to do what they did?  Did it

6    influence the decision in some way?

7         The defendants may have taken the action for many

8    reasons, but if one of the reasons was Mr. Chambery's protected

9    speech and their desire to get him or retaliate against him, then

08:54AM   10   you may find that his speech played a substantial part in the

11   decision to take action against the plaintiffs.

12        So I'm going to repeat this.  Mr. Chambery's protected

13   speech may be considered a motivating factor if that speech played

14   a substantial or important part in the defendants' decision.  Did

08:55AM   15   his speech enter into the decision?  Did it play some part in the

16   decision to take action?  Did it influence the decision?  If you

17   find any of those things, then you may find that, yes, his speech

18   was a substantial or motivating factor in their decision to take

19   action against him.

08:55AM   20        Finally, Mr. Chambery must prove that whatever damages

21   or injuries he suffered was caused by the defendants' improperly

22   motivated actions.  Did his damage flow directly from the conduct

23   that he's complained about?

24        Now, we talk here a lot about claims on one side or the

08:55AM   25   other.  Anyone who brings a lawsuit has an obligation to prove his

1    or her case.  In this civil case, the law is that the plaintiff

2    has to prove the case by a preponderance of the evidence.  If

3    after considering all the evidence presented here you feel that

4    the plaintiff has established his case by a preponderance of the

08:56AM  5    evidence, then you may find in favor of that plaintiff.

6              What do we mean by "preponderance of the evidence"?

7    Language you probably haven't heard before.  Preponderance of the

8    evidence means to establish something or to prove that the fact is

9    more likely true than not true.  Preponderance of the evidence

08:56AM 10    means the greater weight of the evidence.  It refers to the

11    quality and persuasiveness of the evidence, not to the number of

12    witnesses or documents.

13              It has nothing to do with criminal law, which requires a

14    party to prove the case beyond a reasonable doubt.  That's not at

08:56AM 15    all the test here.  It's simply has the plaintiff established to

16    your satisfaction that what he claims occurred is more likely true

17    than not true.

18              I often use the visual image of the scales of justice.

19    That if the scales tip, however slightly, in favor of the party

08:57AM 20    having the burden of proof -- in this case the plaintiff -- we say

21    that he has "met" his burden of proof.  The scales don't have to

22    flop over completely, but just tip in favor of the party having

23    the burden of proof.

24              You should consider the testimony of all the witnesses,

08:57AM 25    regardless of which side called them and produced them; all the

1  exhibits that will be received; there may be some stipulations and
2  you may consider those as well.

3        If you find the evidence is equal, well, that's not
4  enough.  The plaintiff has to prove more than equality of
08:57AM  5  evidence.  He must prove his case by a preponderance of the
6  evidence.  That is, that what he claims occurred is more likely
7  true than not true.  So keep that in mind as you listen to the
8  case and the evidence.

9        This is a case against seven defendants.  You must
08:58AM  10  consider each defendant separately.  The plaintiff must prove his
11  claim as to each defendant.  At the end of the case I'm sure you
12  will have a verdict sheet that will ask you your finding as to
13  each defendant down the list.  So you should keep that in mind.

14        And if you are inclined to use notes, you might try to
08:58AM  15  keep track as to what evidence relates to which particular
16  defendant.  Defendants must be personally involved in the activity
17  that's claimed here.

18        As I said several times, the defendants each of them
19  deny that Mr. Chambery's speech, his complaints, et cetera, that
08:59AM  20  they deny that that was a factor in their decision to take the
21  action against Beechwood.

22        The defendants also claim and raise as a defense that
23  the defendants would have taken the same actions that they did
24  even if the plaintiff had not exercised his First Amendment
08:59AM  25  rights.  In spite of his First Amendment speech, the defendants'

1   claim as a defense that they would have taken the same action that

2   they did.  To prove that defense, the defendants have the burden

3   on that score.

4           I told you yesterday that you should not be influenced

08:59AM   5   by anything outside the courtroom, and I repeat that and I tell

6   you now that you must base your decision on the evidence that you

7   hear here in court.

8           What do we mean by evidence?  Well, we mean a couple of

9   things.  First of all, we mean the sworn testimony of the

09:00AM  10   witnesses who will be here starting today to testify for you.

11   Both sides may call witnesses.  You may consider it all certainly.

12          Any exhibits that will be received into evidence may be

13   considered by you as evidence.  I think you'll find most of the

14   exhibits we have put or the lawyers have put on our computer

09:00AM  15   system so that they will be shown to you on the monitors in front

16   of you there, which I think will move things along.  There may be

17   some pieces of paper that end up getting shown to you, but most of

18   it will be done on the computers.

19          You are to consider only the evidence in this case, but

09:01AM  20   you're not limited to the bald statements of the witnesses.  In

21   other words, you're permitted to draw from the facts that you find

22   have been proved such reasonable inferences that you feel are

23   justified in light of your common sense and experience, which gets

24   us to an important concept which because there's some jargon

09:01AM  25   involved, might be a little off-putting, but it's something you're

1  familiar with.

2           And by that I'm talking about what we call "direct

3  evidence" and what we call "circumstantial evidence."  And you'll

4  be surprised to know perhaps by the time I finish, I hope you'll

09:01AM  5  agree, that in your life you consider both types of things,

6  although I'm sure you don't say now I'm relying on direct

7  evidence.

8           What do we mean by "direct evidence"?  Direct evidence

9  is where a witness comes in and testifies sort of from her senses

09:02AM  10  or his senses what he saw, what he heard or what he observed.

11          A bank teller gets robbed.  He testifies later that he

12  saw the robber, the robber had a mask on, the robber spoke certain

13  words, the robber smelled of alcohol.  Those are direct evidence,

14  sometimes called "sense evidence."  I'm sure you'll hear some of

09:02AM  15  that, that witnesses will come in and testify about what they saw,

16  heard, observed and so forth.

17          Circumstantial evidence is evidence which tends to prove

18  a disputed fact by proving other facts.  There are lots of

19  examples that I give.  I guess the classic one very *apropos* to

09:02AM  20  Rochester is the weather example.  Let's suppose this morning it

21  was nice and sunny out when you came in to court and you observed

22  that.  And if I saw you in the hall and I said to you, madam

23  juror, what's the weather like outside?  You could say to me,

24  well, Judge, I have direct evidence because I just was outside and

09:03AM  25  I saw the sun shining and it was sunny out.

1          Well, if you sat here in this room where there are no

2    windows throughout the morning and you observed folks coming in

3    the back door carrying umbrellas and with wet raincoats and damp

4    hair, even though you can't look outside, based on your knowledge

09:03AM   5    of the raincoats, the umbrellas, the damp hair and your experience

6    with that in your own life, that would be circumstantial evidence

7    that if I asked you now what the weather was like outside, you

8    would say based on all those factors, Judge, I believe it's

9    raining outside.

09:03AM   10         We can talk about a lot of different examples, there are

11   many.  I guess the famous one in literature was sort of the

12   *Robinson Crusoe* story.  You go down to the beach in the morning

13   and you see footprints.  Even though you didn't see the person

14   walking, you would be able, based on your knowledge and

09:04AM   15   experience, to say based on the existence of the footprints, I

16   believe there was a person here.

17         If you come into the kitchen and you see your grandchild

18   with his hands behind his back and little crumbs on his face and

19   the cookie jar open, you might, based on those facts, conclude

09:04AM   20   that he had borrowed or stolen a cookie .

21         You infer on the basis of reason and experience and

22   common sense from some established fact the existence or

23   non-existence of other facts.  Circumstantial evidence is of no

24   less value than direct evidence.  The law makes no distinction

09:04AM   25   about it.  A party can rely completely on circumstantial evidence

1   in establishing matters in issue.

2          You must weigh all the evidence, regardless by what name

3   we call it, in deciding the factual issues in this case.

4   Oftentimes in deciding an individual's state of mind, one has to

09:05AM   5   rely on circumstantial evidence.  So keep that in mind as well as

6   we proceed through the case.

7          I mentioned a little bit about credibility of witnesses

8   yesterday.  I tell you again that it's your job to weigh the

9   testimony of all the witnesses and decide what weight to give that

09:05AM   10   testimony.  In sum, you can accept every single thing a witness

11   says, some of it, or none of it.  It's up to you.

12          There won't be any quiz at the end of the day as to how

13   much testimony you believe -- certainly there would never be that,

14   but you have to consider every witness.  Consider the witness'

09:06AM   15   intelligence, motive for testifying, state of mind, whether the

16   witness really has a good recollection of what occurred many years

17   ago.

18          You may consider how the witness acts and performs on

19   the witness stand.  You should consider whether the witness

09:06AM   20   impresses you as someone who is telling the truth or someone who

21   is not telling the truth.  Consider the relation or the

22   relationship that a witness bears to either side in the case that

23   may effect how the witness testifies.

24          You should consider the extent to which, if at all, the

09:06AM   25   witness might be affected by your verdict.  You should consider

1    whether the witness has been supported by other witnesses and

2    evidence or contradicted.

3    Inconsistencies or discrepancies in testimony between a

4    particular witness or other witnesses may cause you to discredit

09:07AM   5    that testimony, but I also remind you that two or more persons

6    witnessing an incident or event may see or hear it differently.

7    It's not unusual.  It may simply be an innocent misrecollection or

8    a failure to recollect, and that's not uncommon.  If you find any

9    discrepancies or inconsistencies, you should first consider is it

09:07AM   10    a matter of some importance or some unimportant detail?   Does it

11    result from innocent error and mistake or intentional falsehood

12    designed to mislead you?  All of these things are things you

13    should consider in deciding the important issues that are

14    presented to you.

09:08AM   15    If Mr. Chambery proves his case by a preponderance of

16    the evidence, then he is entitled to a sum of money that will

17    fairly and justly compensate him for the losses and injuries

18    caused by the conduct of the defendants.

19    Because the way we have structured this trial, I will

09:08AM   20    not instruct you further on that at this point because we are

21    going to try what's called the "liability" part of the case first

22    to determine if Mr. Chambery has proven his case by a

23    preponderance of the evidence.

24    If your verdict is that he has proven that, then we may

09:08AM   25    take a break and we will proceed to some proceedings concerning

1    just damages, and then at that time I will instruct you more fully

2    on the law of damages.  But I think at this point I will hold that

3    until we get to that stage of the case.

4          So, again, these are preliminary instructions.  I am

09:09AM  5    sure at the end of the case my instructions may be a little more

6    expansive depending on issues that have come up, matters that are

7    raised by the lawyers, et cetera, but I think for now that's all I

8    intend to say.

9          Yesterday before you left I talked to you about several

09:09AM  10   things:  Keeping an open mind, not discussing the case, not having

11   any contact with the parties, not doing any investigation,

12   et cetera.  That's sort of -- I may repeat that in full, but I

13   also may just say to you "remember my admonition."  It's just a

14   shorthand way of saying remember all the stuff I told you on the

09:10AM  15   first day.

16         Let me say one word about notes and then we will take a

17   break and let the parties get ready for their opening statements.

18   In the past some judges would not let or they would at least frown

19   on jurors taking notes.  I don't happen to agree with that and I

09:10AM  20   let jurors take notes if they want to.

21         There's no requirement to take notes.  They're your

22   notes, they're not going to be collected or graded. We're going to

23   have several days of testimony and it might be helpful for you

24   just to try to keep track, especially because of what I said about

09:10AM  25   this being really a lawsuit against seven different people.  It's

1  going to be important for you at the end of the day to make

2  judgments as to whether the plaintiff has proven his case against

3  each of the seven.  That may be a reason why you want to take

4  notes.

09:11AM  5      A couple of cautions about note taking.  If a witness

6  gets on the stand and says A, B and C, if you're so busy writing A

7  down and you don't hear B and C, that's unfortunate.  I think

8  there's enough pauses between proceedings that you can still jot

9  notes.  But keep that in mind.

09:11AM  10      Also, you know, some people don't really need notes;

11  they have pretty good recollection.  Other people find some notes

12  helpful.  If you get in the jury room, remember that some people

13  are better note takers than others.  Just because your fellow

14  juror says I have a note here that said this witness said the moon

09:11AM  15  is made of blue cheese -- well, if your recollection is different,

16  don't be swayed necessarily because another juror claims to have

17  written something down.

18      So we'll talk more about note taking.  If you take

19  notes, they're your own notes.  You're not supposed to talk about

09:12AM  20  the case among yourselves anyway, so you can't share your notes.

21  We leave the notebooks in the jury room overnight where they're

22  secure.  And they are designed to be of assistance to you, not a

23  burden.

24      So I think we will take a little break to let the

09:12AM  25  lawyers set up.  They have some visual aids I think that are going

1   to assist them and hopefully you in their opening statements.  So

2   we'll excuse the jury at this time.  You can walk through that

3   door.  I think Ms. Rand is probably awaiting on the other side for

4   you, and we'll call you back in a few minutes.

09:12AM   5            (WHEREUPON, the jury was excused).

6            THE COURT: All right, take a few minutes to get lined

7   up.

8            MR. COOMAN: Judge, mindful of the discussion that we had

9   the other day, there is a very good breaking point about 45

09:13AM   10  minutes or so into it.  And if I may turn to you at that point and

11  say perhaps this is a good time to take a break?  I think that

12  would assist everyone.

13           THE COURT: I'm distressed about David.

14           MR. LEVINE: Yes, I'm concerned also.

09:13AM   15           THE COURT: That's too bad.  Well, we have a juror issue,

16  but why don't we go do what we have to do and I won't trouble you

17  with that at this point.

18           MR. LEVINE: I have one comment in your preliminary

19  charge --

09:13AM   20           THE COURT: Yes.

21           MR. LEVINE: -- when you were talking about motivating

22  factor, you gave what I thought was the law, but then you talked

23  about if it played some part or influences.  And I think that

24  watered down that it has to be a motivating factor or substantial

09:14AM   25  aspect of it.

1          And I know this is preliminary, but I would just ask you

2     to think about my comments with regards to your final charge to

3     the jury because I think what you said the first part was exactly

4     as I recall the law, and I think what you gave after that watered

09:14AM   5     it down some.  They're meant to be really synonyms for what I

6     think is a substantial motivating --

7          THE COURT:  What?

8          MR. LEVINE:  You said it played some part or it

9     influenced, and I think that turns away from what I read the law

09:14AM  10     as.  I'd ask you to consider that.

11          THE COURT: Will do.

12          MR. LEVINE: Thank you, Judge.

13          THE COURT: All right, let us know when you're ready.

14          (WHEREUPON, there was a pause in the proceeding.)

09:30AM  15          THE COURT: We have several easels set up, presumably to

16     assist Mr. Cooman.  Mr. Levine, have you reviewed them and --

17          MR. LEVINE: They're literally blank calendars and a

18     breakdown of some key terms.

19          THE COURT: All right.  Can I look at them?

09:30AM  20          MR. COOMAN: Yes.

21          MR. LEVINE: This is the terms.  The other ones are

22     just --

23          THE CLERK: Blank calendars.

24          MR. COOMAN: Calendars.  I put some sticky notes on key

09:30AM  25     events.

1          THE COURT: So no objection, Mr. Levine?

2          MR. LEVINE: No, sir.

3          THE COURT: Okay.  Obviously you're not going to be able

4    to see, but you can hear.

09:31AM   5          All right, bring in our jurors.  I may say something to

6    the jury not to explain completely Mr. Rothenberg's absence, but

7    just that multiple lawyers, they come and go; the parties don't

8    always have to be here, they come and go, all of which is true.

9          (WHEREUPON, the jury is present).

09:32AM   10         THE COURT: All right, ladies and gentlemen, as I said to

11   you a couple times, the next part of the trial consists of the

12   opening statements of the lawyers.  The plaintiff must go first;

13   the plaintiff in the case gets to open to you, and at the end of

14   the case the plaintiff gets the last word and, therefore, closes

09:33AM   15   last.

16         Mr. Cooman has some visual aids that are going to assist

17   him and you as well.  I thought I would just mention that

18   Mr. Rothenberg is not here this morning.  In cases like this where

19   there are multiple lawyers and multiple parties, people come and

09:33AM   20   go and perform various tasks at various times.  It's not necessary

21   that all the parties be here all the time.

22         So it's not for any lack of interest on the part of

23   Mr. Rothenberg. It's just cases like this involve different tacks

24   and people come and go.  You're not to be surprised by it.

09:33AM   25         So, Mr. Cooman, if you're ready to make your opening

1    statement to the jury, you may proceed.

2         MR. COOMAN: Thank you, Your Honor.

3         May it please the Court, ladies and gentlemen of the

4    jury, this case is about the frightening outcome for us as

5    citizens when state government runs amuck.

6         It's a case about what happened when government

7    regulators, instead of trying to protect and listen to local

8    businesses and assist in their growth and innovation development,

9    instead decided to misuse and abuse their power for their own

10   agenda.

11        We're here today because in 1999, New York State

12   Department of Health regulators deliberately set out to retaliate

13   against a pioneering healthcare professional and a preeminent

14   nursing home and they tried to justify their misconduct under the

15   guise of concern for the residents at that nursing home.

16        In this case the plaintiffs are now asking you to hold

17   those seven Department of Health officials who are seated at the

18   table over here accountable for their misconduct and for the harm

19   that they caused.

20        We want you to hold those seven people, those seven

21   governmental regulators accountable for their abuse of the trust

22   that we, as citizens, place in them as public servants to do the

23   job that they're supposed to do and that they're paid to do.

24        The evidence that you're going to hear and to read about

25   during this trial is going to demonstrate to you two things.

1    Number one, why the defendants decided to do what they did, they

2    put down Beechwood Restorative Care Center and destroyed the

3    Chamberys' business and reputation.  And, number two, how they

4    managed to accomplish that all in record time.

09:35AM    5          I would like to first take a couple of minutes to

6    summarize for you and then I will go ahead and outline in more

7    detail the evidence, the proof that you're going to hear unfold

8    over the next few weeks.

9          For 45 years, from 1955 through 1999, two generations of

09:35AM   10   the Chambery family had established and developed Beechwood

11   Restorative Care Center as a nursing home that was renown for its

12   excellent care of residents.  There was a clear history of high

13   quality care.  This was reflected in repeated inspections by the

14   Department of Health that were deficiency free.

09:36AM   15          I'll refer throughout this trial to the Department of

16   Health as "DOH."  I'm shortening it.

17          There was also secondly a culture within Beechwood and

18   among the staff of both concern for the residents and of

19   continuous improvement that mandated there be prompt correction of

09:36AM   20   any care issues or complaints that came about.

21          And, thirdly, there was objective statistical quality of

22   care measurements that placed Beechwood consistently among the

23   very top facilities in the state.

24          By the mid-1990s, under Brook Chambery's leadership,

09:37AM   25   Beechwood was at the forefront of the movement for quality care in

1   nursing homes; he was on the cutting edge of innovation for
2   short-term rehabilitation programs; and he was the recognized
3   leader in the technological revolution going on in electronic
4   medical records for nursing homes.

09:37AM  5        At the Department of Health in Albany, Laura Leeds --
6   one of the defendants in this case -- was the official in charge
7   of overseeing and regulating all of the nursing homes across
8   New York State.  Her area of responsibility you will hear is
9   referred to as "continuing care" or "long-term care."  She had
09:37AM 10  responsibility for about 650 homes from New York City to Buffalo.
11  Ms. Leeds is a defendant seated at the far right-hand end of the
12  table here.

13        Sanford "Sandy" Rubin was a regional Department of
14  Health official.  He was head of the Rochester office at DOH, and
09:38AM 15  he was also the acting head of the entire western region of
16  New York for the Department of Health.  Mr. Rubin is seated at the
17  table in the middle with the glasses.  Mr. Rubin's responsibility
18  was for about 160 nursing homes across western New York, plus all
19  the hospitals and all the other regulated healthcare facilities in
09:38AM 20  western New York.

21        Through a series of instructive letters and corrective
22  lawsuit s, Brook repeatedly and insistently pushed Rubin and Leeds
23  to bring their department and the Department of Health into
24  compliance with the mandates of federal and state law and the
09:38AM 25  emerging trends in the way care was going to be delivered in

1   nursing homes.

2          He pressed them to amend outdated regulations, to

3   recognize the value and the benefits of electronic medical records

4   instead of old paper charts, and to run the inspections of nursing

5   facilities properly and to observe the procedures that governed

6   the way the Department of Health needs to do its very important

7   job.

8          But Brook's actions in this regard made worry, work, and

9   complications for Ms. Leeds and Mr. Rubin.  And in response to the

10  actions that Brook was taking, Ms. Leeds and Mr. Rubin developed a

11  clearly documented and intense disdain for Brook and for

12  Beechwood, who they viewed as challenging their authority.

13         The evidence that you're going to hear over the course

14  of the case will demonstrate to you that Mr. Rubin and Ms. Leeds

15  decided to do exactly what the First Amendment of the Constitution

16  of the United States forbid them from doing: From retaliating

17  against the Chamberys and Beechwood for questioning state

18  government, for bringing lawsuits or for writing complaint and

19  protest letters.

20         So in 1999 the defendants conducted an unprecedented

21  retaliatory offensive against Beechwood and Brook.  By the way,

22  that term "offensive" you'll hear me use throughout this

23  discussion was not a term that we made up.  This is a term that we

24  found in the notes of the defendants referring to their conduct,

25  "the offensive."  It shows they were going on the offensive

1   against Brook and Beechwood.

2          The offensive against Beechwood involved a preplanned

3   strategy to terminate Beechwood's Medicare and Medicaid funding

4   from the federal government, and to revoke the Department of

09:40AM  5   Health's issued operating certificate to the Chamberys that

6   allowed them to run the facility.

7          Over the course of two months, from mid-April through to

8   mid-June of 1999, four of the other defendants -- Ms. Sharon

9   Carlo, Susan Baker, Elizabeth Rich and Cynthia Francis, the other

09:40AM  10  four women sitting at the table -- at the direction of Ms. Leeds

11  and Mr. Rubin, conducted a series of inspections at Beechwood.

12         They found, wrote up and trumped up what they alleged to

13  have been violations of resident care standards.  They created and

14  perpetrated the fix that Brook Chambery was a bad operator and

09:41AM  15  that Beechwood had a bad history.  They also created the fix and

16  repeated it over and over again.  You'll see in the e-mails that

17  Beechwood and Brook would not and did not correct the

18  deficiencies.

19         Then the defendants arranged for the termination of the

09:41AM  20  Medicare and Medicaid funding to the facility, and they advised

21  Beechwood's private pay residents that they should leave.  They

22  did that by a specific letter and by a public relations campaign

23  conducted in the media.

24         The defendants then arranged and conducted a hearing not

09:41AM  25  in a court, but in an in-house administrative proceeding and they

1 issued a report sharply critical of the Chamberys' operation in

2 Beechwood.

3          And, finally, the defendants' action culminated in a

4 singular, never before occurring event:  The Chamberys' state

09:42AM  5 operating license to run their nursing home was revoked.

6          The results were devastating.  Elderly residents who

7 counted Beechwood as their home, those families did not want them

8 to move, had to move out and find other places to live.  113

9 dedicated long-term care employees lost their jobs  and had to go

09:42AM 10 find and seek other employment, sometimes in other lines of work

11 completely.

12          Defendant Russell Altone, the gentleman seated in the

13 middle right here beside Ms. Leeds, was in Albany.  Mr. Altone was

14 a member of the Division of Legal Affairs in the Albany office of

09:42AM 15 the Department of Health.  He refused to allow the Chamberys to

16 sell the nursing home business to anyone else as they were on the

17 way out.

18          So the family business and reputation were ruined, and

19 the career and reputation of Brook Chambery was destroyed.  And

09:43AM 20 that, in summary, is why we're here today finally, 13 years after

21 the events in question:  To obtain justice, and to hold these

22 defendants accountable for their actions.

23          And I want to tell you in some detail about the specific

24 evidence that you're going to hear and read about over the next

09:43AM 25 several weeks.  Now, this evidence is going to come to you not

just from the Chamberys, but also from former employees of
Beechwood and others who had an in-depth knowledge of Beechwood
and the reality of the care that was being given at the facility
week in and week out, month after month, year after year.

09:43AM      You will also hear a great deal about from the
defendants themselves because each of them left a trail of e-mails
and notes that reveal their true motives and intent with respect
to what they were doing.  Those documents confirm why the
defendants singled out Beechwood for this kind of treatment and
09:44AM Brook, and they had decided what they would dish out to him which
was different from what had happened to anybody else before or
since.

      The Beechwood Restorative Care Center was located at
900 Culver Road in the City of Rochester.  Brook's father and
09:44AM mother, Herbert and Olive Chambery, had established Beechwood in
1955 as a family owned and operated nursing home.  Beechwood was
not a large and impersonal institution.

      The vision and the mission of the Chambery family from
day one was to provide excellent elder care, but in a personalized
09:44AM home like environment and treating the residents that were there
as their own family members.

      There were several key indicators of quality care at
Beechwood.  Number one, it was a facility of choice for consumers.
People were not forced to go to Beechwood; they decided to go to
09:45AM Beechwood.  If you had a family member who needed to go into a

1    nursing home for rehabilitation after surgery or an injury, or for

2    a longer term end of life type of stay, Beechwood was high on the

3    list of places that you wanted to have them go.

4         Secondly, Beechwood was known for speedy rehabilitation

5    and return to home for its residents who were able to do so with

6    confidence and preparedness when they had completed their

7    rehabilitation.

8         Thirdly, there was tremendous community recognition of

9    Beechwood's standing.  Knowledgeable people in the healthcare

10   community who supervised care and knew and recognized Beechwood to

11   be one of the very best in the region.

12        And, fourth, they employed cutting edge technology at

13   Beechwood.  They pioneered the creation and the implementation of

14   computerized electronic medical records that were networked across

15   the facility in the 1990s when the hospitals in town and most of

16   the other local facilities were still writing by hand in paper

17   charts.

18        Herbert and Olive Chambery jointly owned and operated

19   Beechwood for a period of 37 years.  It was their life, it was

20   their passion.  And when Brook's father Herbert died in 1993,

21   Brook took over the day-to-day operation, direction of the home in

22   partnership with his mother Olive.

23        Brook had grown up knowing the business over the kitchen

24   table, and I mean that literally.  Brook from childhood had

25   watched and learned how a nursing home was to be run.  When his

1    parents had opened the nursing home in the 1950s on Culver Road,

2    it was actually in their own home back at that time.  That's the

3    way nursing homes were established and operated.

4            And in the facility the Chamberys themselves lived with

09:47AM  5    the residents.  So Brook observed and internalized all of these

6    values that his parents had with respect to how you cared for and

7    concern for elderly people, vulnerable people.

8            So after he obtained his college degree in 1972, Brook

9    came back home, he obtained a nursing home license,

09:47AM 10    administrator's license and he joined his father in building and

11    opening in 1974 the new and expanded Beechwood facility, a three

12    story facility, on Culver Road.  And that new facility was able to

13    accommodate 82 residents.

14            Brook also continued his studies, he went to the

09:47AM 15    University of Rochester and obtained a master's in business

16    administration, MBA, in 1976.

17            Brook then spent a considerable portion of the next 20

18    years learning and immersing himself in every aspect of the

19    nursing home business.  He learned all the things about staffing,

09:48AM 20    about care delivery, about food service, finances, facility's

21    management, maintenance and compliance with the Department of

22    Health and federal regulations which govern how it was that a

23    nursing home had to operate.

24            The Beechwood staff members who will be here to testify

09:48AM 25    will tell you that Brook was an inspirational leader.  He was the

1    best boss that they had ever had before or since because he was

2    intent on leading them through this exciting evolution in nursing

3    home care to meet the changes that were occurring in the

4    healthcare delivery system and the patients' demands and needs as

09:48AM    5    they became consumers of healthcare services.

6         He set out to build upon, expand upon what his parents

7    had already created because Brook understood in a way that few

8    others did back in the late 1990s that nursing homes had to change

9    the way they were delivering care.

09:49AM    10        He envisioned improving quality of care and life for the

11    traditional long-term residents, making even the declining end

12    years of somebody's life as meaningful and comfortable as they

13    could possibly be.

14        In addition, Brook understood that nursing homes were no

09:49AM    15    longer going to be solely viewed as a place for end of life care

16    where you simply went and stayed and then endured until the end,

17    but they were becoming -- to the extent possible -- places for

18    rehabilitation, places that you moved through on the way to a more

19    independent living and assisted living facility or being able to

09:49AM    20    go back home.

21        How is it that Brook accomplished this?  In tremendous

22    foresight.  You're going to hear that he understood that truly

23    excellent healthcare required coordination among all the different

24    disciplines, all the different kind of caregivers that are within

09:50AM    25    a nursing home.

1           And he understood this was going to be best made

2   possible through the use of technology.  You don't replace the

3   caring people, you can't do that.  But you put in their hands

4   tools that they've never had before.

5           So Brook and his brother Dale created from scratch a

6   comprehensive electronic medical records system, what we refer to

7   by shorthand as an EMR, electronic medical record, from scratch

8   for use in the nursing home environment.  And he installed and

9   implemented it at Beechwood as the flagship site.  He developed

10  this software in a companion business to the nursing home; and

11  appropriately enough, it was named Beechwood Software.

12          The EMR software was the first system approved in the

13  United States by the federal government for use in reporting

14  patient assessment data from the database that was created with

15  respect to each of the residents.

16          Brook became a speaker at national conventions and

17  seminars.  Nursing home administrators from around the country

18  came to Beechwood to see how this was implemented and to see

19  Beechwood in action.

20          I think you can appreciate that there are many

21  advantages to implementing a network EMR across a nursing home.

22  Two of them in particular are worth mentioning now.  All the notes

23  and data about the residents are typed and they're readable.

24  Secondly, all the caregiver disciplines, including the nurses'

25  aides, have immediate and updated access to the patient's

1    condition and progress.  Teamwork is enhanced from the kitchen all

2    the way to the nurses' stations to the occupational therapy rooms.

3            So this became a critical thing in making sure that

4    everyone knew the current status and their responsibilities for

09:51AM    5    caring for the patients.

6            Brook also assembled a highly skilled staff.  High

7    standards were set for the hiring and the retention of only the

8    very best people.  They were very well compensated, and there was

9    low turnover among the staff.

09:52AM    10           He encouraged those staff to maximize their professional

11   capabilities and insisted that they have extensive training both

12   in in-service, within the facility, and outside seminars.

13           At Brook's insistence the staff learned the principles

14   of continuous improvement:  That you had to identify and correct

09:52AM    15   your inevitable mistakes quickly, and then communicate clearly

16   with one another and function together as a team for the best

17   interest of the residents.

18           Beechwood, with those circumstances, became known as the

19   place to work.  And all this was still being done in the context

09:52AM    20   of what had always been the hallmark of a Chambery run facility,

21   which is you devote personal care to each of the residents and you

22   treat them as if they're your own family members.

23           Brook also took some innovative approaches to

24   rehabilitation to address the fears of the elderly going home.

09:53AM    25   Those fears are fairly obvious.  They think to themselves can I do

 1   this?  Am I able to go home and successfully do those things that

 2   I thought I used to be able to do before I had this injury or this

 3   illness?

 4          And Brook did something that no other nursing home in

09:53AM  5   town had ever done: He bought the house next door to the nursing

 6   home and he set it up as a place for people to develop as they

 7   were ready to go home from rehabilitation, a place where they

 8   could test out their skills before they ever went home.  They

 9   could try stairs in the house, they could try to use the bathroom,

09:53AM 10   they could see if they could stand up at the sink to do the

11   dishes, all so that people would go home with confidence in what

12   had gone on.

13          Now, the state requires the collection and reporting of

14   quality of care data about facilities across the state so that

09:54AM 15   consumers and nursing homes and even the Department of Health

16   itself can evaluate and make comparisons between nursing homes.

17   And this state data showed that in 1998, there were impressive

18   results for Beechwood as compared to the state's other 650

19   facilities.

09:54AM 20          We're going to show you as proof during this case

21   statistics and charts that confirmed steady improving quality of

22   care for Beechwood throughout the 1990s.  Beechwood in those

23   measures was consistently among the very top facilities of the

24   state on those measures of quality of care.

09:54AM 25          And Beechwood was economical and efficient at doing the

1    rehabilitation.  And in an era of ever escalating healthcare

2    costs, that's good news for the patients, for the taxpayers and

3    for the insurers.  The statistics show that Beechwood had the

4    second best Medicare cost per stay rate of the top 25 facilities

09:55AM   5    in all the state.

6              I need to take a few minutes to give you some

7    understanding of how nursing homes are actually regulated in

8    New York because you need to understand how they're supposed to be

9    regulated in order for you to understand the power that was

09:55AM  10    available to the defendants and how they were then able to

11    manipulate and misuse that power to accomplish the result that

12    they intended.

13              Nursing homes like Beechwood and operators like the

14    Chamberys play a critical role in the health delivery system

09:55AM  15    because they stand in the gap between hospitals that provide acute

16    care and other facilities like assisted living facilities or going

17    home provide.

18              The nursing home is the only place where you can get

19    round-the-clock nursing care supervision except in the hospital

09:55AM  20    setting.  So the nurses and aides and administrators that work at

21    and run a nursing home have responsibility day in and day out, 24

22    hours a day, seven days a week, all year long for usually aging

23    and vulnerable people.  It is a very, very important

24    responsibility.

09:56AM  25              Nursing home regulation and oversight in New York is

1    done by the New York State Department of Health.  It's done out of
2    Albany on a statewide basis, and out of the Rochester and Buffalo
3    regional offices as well.

4          Now, a nursing home is not just an ordinary business
09:56AM  5    that you can wake up one morning and decide I would like to run a
6    nursing home because you can't just decide to do that even if you
7    have the inclination and the resources to do so.

8          Because the State Department of Health holds tremendous
9    power over that process, the Department of Health is the entity
09:56AM 10   that determines whether you can start a nursing home, where you
11   can put it, how many beds it can have in it, what the scope of its
12   services are, and whether and where and how you can ever expand
13   it.

14         And the Department of Health does a second thing, it
09:57AM 15   also issues the operating license for the facility, the license to
16   actually operate the thing that you own as a business.

17         And the third thing the Department of Health does is
18   that it periodically inspects nursing homes.  The Department of
19   Health inspector might be in each nursing home five or six times a
09:57AM 20   year over the course of a whole year's time.

21         How do these inspections work?  First of all, let me
22   give you a term of art.  Nursing home inspections are called, in
23   the parlance of DOH, "surveys."  So people that do these things
24   are call "surveyors."

09:57AM 25         Now, there are two kinds of surveys.  One is the

 1   unannounced "annual survey."  Every nursing home receives a formal

 2   survey once a year.  In addition, there are complaint

 3   investigations.

 4          Now, these can be on complaints that come in from any

 5   source -- family member, former staff member -- and many of them

 6   are even anonymous complaints that come into the Department of

 7   Health.

 8          These occur a lot.  That's sort of the nature of the

 9   nursing home business.  You're caring for people who are sick,

10   often in end of life situations and family members in that

11   situation experience a very wide range of emotions about seeing

12   their loved ones in that condition or at that stage of life.

13          Defendant Cynthia Francis was at this time in 1999 head

14   of the Complaint Investigation Unit in Rochester.  Ms. Francis is

15   the woman seated beside counsel at the table here.  She estimated

16   for us that the Department of Health received 800 to 1,000

17   complaints a year in the Rochester office for the 68 nursing homes

18   in the Rochester area.  If you do the math, that's an average of

19   about a dozen or 15 per year complaints about average nursing

20   homes.

21          As I've told you, these survey inspections that are done

22   are done by people that are called "surveyors."  In 1999 Cynthia

23   Francis and Elizabeth Rich -- Ms. Rich is the woman with the white

24   hair beside Mr. Altone for this end of the table -- I'm sorry, I

25   did that wrong.  Ms. Rich is in the corner.  Ms. Rich and Cynthia

1    Francis were both surveyors.  That was their job in the Rochester

2    office.  They were nurses by training, but they did not actually

3    provide care.

4            Rather, their job working for the Department of Health

09:59AM  5    was not to provide care, but to rather go in on these surveys or

6    in complaint investigations and to look over the shoulders of

7    nurses who were actually providing the care and the aides that are

8    actually providing the care.

9            Here's what a surveyor does: A surveyor goes into the

10:00AM  10   nursing home and looks for facts.  Let me give you a couple of

11   examples.  A resident has a temperature, a resident had

12   experienced a fall in the nursing home, a resident had a blister,

13   a resident had developed a pressure sore, a resident had died.

14   Noun of those facts would be surprising to find in a nursing home.

10:00AM  15   In fact, that's exactly what you would expect to find within a

16   nursing home.

17           But none of those facts -- although easy to find, the

18   advantage they have, of course, is that they're objective and

19   they're verifiable.  Then the surveyors' job is to take those

10:00AM  20   facts and group them into findings and to decide whether what they

21   have found as a fact amounts to a code violation of something that

22   the State requires the facility to do.

23           And if they find that that's true, it's called a

24   "deficiency."  The findings based on the facts are accumulated

10:01AM  25   into what's called a "deficiency."  And if you have a deficiency,

1  the Department of Health surveyor writes that up in a formal

2  document called a "Statement of Deficiencies."  We refer to that

3  by shorthand as an "SOD," a SOD, a Statement of Deficiencies.

4          In the Statement of Deficiencies, that code violation is

10:01AM  5  explained in terms of the facts and residents that they feel

6  justify the violation.

7          Now, findings and deficiencies are highly dependent on

8  the discretion of the surveyor.  It's an entirely subjective

9  judgment of the surveyor as to what they choose to look at and

10:01AM  10  choose to find.  For example, people often deteriorate in a

11  nursing home from infirmity of age and progressive disease.  The

12  objective finding is did their condition worsen?  Did they

13  deteriorate?  Did they die?  The subjective judgment is was there

14  anything about that event that really reflected a deficiency in

10:02AM  15  care with respect to that particular person?

16          Now, there's another layer of complexity to this and

17  subjectivity here because as a surveyor finds these deficiencies,

18  they must classify those deficiencies in two ways.  They are

19  assigned to a category of care which you'll hear referred to as a

10:02AM  20  "tag."  Tags are numbered with an F in front of them.  Let me give

21  you a couple of examples to crystallize this.

22          If a surveyor goes into a nursing home and thinks that

23  they have found an issue about the nursing home preventing or

24  healing pressure sores, blisters with respect to a person for a

10:03AM  25  particular incident, that finding or deficiency is labeled F314.

1   The number just designates the category of care into which that

2   particular deficiency is grouped.

3           If the surveyor comes in and believes that there's an

4   issue about medical records, documentation being inadequate, that

10:03AM  5   would be labeled as an F514 tag.  There are many, many of these

6   numbers all classified to particular categories of care.

7           And then the final layer of complication, each of those

8   findings and deficiencies is given a scope and severity grade, a

9   scope and severity grade.  And this grading scale works the

10:03AM  10  opposite of school.  A is the lowest, least serious grade; and L

11  is the highest, most serious grade.  A at the bottom, not a

12  tremendous concern; L a very significant concern.

13          Now, if there are deficiencies, these deficiencies are

14  written up into a Statement of Deficiencies and it's sent to the

10:04AM  15  nursing home so that the nursing home can be on notice of what the

16  Department of Health is claiming and can respond to what's being

17  said about it.

18          There are a couple key things to understand.  Statements

19  of Deficiencies, SOD's, are given out to virtually every nursing

10:04AM  20  home after a survey and often several times a year.

21          Defendant Susan Baker was the Department of Health

22  program director for nursing homes in western New York.  She's

23  testified that the average number of deficiencies per survey back

24  in 1998-1999 was six or seven.  That's the average number that are

10:04AM  25  given out in the Statement of Deficiencies.

1          So you see that a Statement of Deficiency is really a

2     routine part of the nursing home business.  You are told by the

3     Department of Health that, in their judgment, something is not up

4     to snuff, you fix it, you improve upon it and you go forward.

10:05AM  5          A nursing home, under the way the system works, has to

6     respond to a Statement of Deficiency in two separate ways and must

7     do so simultaneously.  The first -- giving you another acronym --

8     is IDR.  A facility can contest the deficiency in an IDR, which

9     stands for informal dispute resolution, IDR.

10:05AM  10          It's a process that may result in the Department of

11     Health resolving the deficiency because you convinced the

12     Department of Health that they made an error, that they missed

13     something in the medical record when they came in and the

14     Department of Health might choose to rescind the deficiency, wipe

10:05AM  15     it out; or they might rewrite it in a different way to better

16     reflect the actual facts of the care; or they might reclassify it

17     completely.  That's the first thing the facility can do is send in

18     their materials, medical records, other information, for the IDR

19     process.

10:06AM  20          The second thing it must do simultaneously is prepare a

21     Plan of Correction, and it has to be done in the same period of

22     time and you prepare and you submit it to the Department of Health

23     for scrutiny and approval.  A Plan of Correction you'll hear

24     throughout the case referred to by another acronym, "POC."  Plan

10:06AM  25     of Correction, POC.

1    The thing that you can see about this is since you have

2  to do this simultaneously, the system forces the nursing home to

3  be both argumentative and corrective at the same time and in the

4  same document that you have to submit back to the Department of

10:07AM  5  Health.

6    Now, all this process is referred to as the "survey

7  cycle."  We've done this chart here for you to sort of help you

8  understand how this survey cycle works.  The condition of a

9  nursing home with no uncorrected deficiencies is known by the term

10:07AM 10  of art "substantial compliance."  If a nursing home is in

11  substantial compliance, it means that it has no deficiencies or

12  it's corrected all the deficiencies that it has.  This is the "at

13  rest state" you might say with respect to a nursing home.

14    Now, I told you about the fact that annually there is a

10:07AM 15  survey, and sometimes very often complaint investigations all year

16  long.  The surveyors come in and those surveys and complaint

17  investigations, two things could happen to it.  They might decide

18  that what they've looked at is unsubstantiated, there's nothing to

19  it, it doesn't have merit and it would simply go off the chart and

10:08AM 20  you're in the same substantial compliance that you started with.

21    Of course, it could be, too, that the surveyors come in

22  and they say we've looked around, we've looked at medical records

23  and we believe that there is a deficiency and so we write one or

24  more of those up into this SOD, the Statement of Deficiencies.

10:08AM 25    Then within a short period of time, ten days, the

1   facility has to review that Statement of Deficiencies and do two

2   things:  Engage in the IDR process, sending in the materials to

3   show where the Department of Health may be in error and submit a

4   Plan of Correction on the assumption that the Department of Health

10:08AM  5   is right and hears what you would do differently if it turns out

6   that what they're saying is really true.

7        Once the Plan of Correction has been reviewed and

8   accepted and put into operation, you return to the state of

9   substantial compliance and you're sort of back where you started

10:09AM  10  in the survey cycle.

11        Let me tell you about Beechwood's survey cycle.  It had

12  a very good survey cycle history under Brook's leadership for

13  three years after Brook assumed leadership of Beechwood.  The

14  Department of Health surveyors alleged no deficiencies at

10:09AM  15  Beechwood -- zero -- through either complaint investigations or

16  the annual survey.

17        Now, in the course of Mr. Chambery's pioneering work, he

18  ran into multiple issues.  Brook discovered major flaws in the

19  regulatory system in the way the Department of Health was carrying

10:09AM  20  out its responsibilities in this emerging new era.  I want to

21  discuss two of them now, although during the testimony you're

22  going to hear of several others.

23        The first big issue he ran into was with respect to

24  discharge planning for residents.  The federal rules require that

10:10AM  25  nursing homes bring residents to their highest possible level of

1    functioning and, when possible and as soon as possible, put them

2    in a situation where they could be discharged from the nursing

3    home to a more independent level of care, whatever level they were

4    capable of handling: Assisted living or going home.

5            Of course, that makes sense because government taxpayers

6    or insurance companies are often paying the bills in the nursing

7    home and you want to be able to move the patient to the most

8    independent level in setting that is possible for them to handle.

9            And just as the hospitals over time have shortened their

10   stays for inpatient admissions, so too this is what nursing homes

11   needed to do.  This is what the federal law required.  It required

12   that when there was a dispute about whether a resident was indeed

13   ready and able to leave the facility and go home or go to another

14   independent living sort of situation, the issue about how that

15   would be decided was to occur in an independent hearing.  But

16   Ms. Leeds and Mr. Rubin didn't like that federal law or want to

17   implement it in New York State.

18           Secondly, with the advent of electronic medical records

19   at Beechwood, the Department of Health surveyors in Rochester,

20   like Ms. Rich and Ms. Francis, periodically -- in fact, quite

21   frequently -- did their surveys at Beechwood poorly and often

22   inaccurately.

23           Brook and Beechwood, who by the nature of their use of

24   the computers were detail oriented, repeatedly found mistakes in

25   the few deficiencies that were alleged at Beechwood in 1996 and

1   1997.  Beechwood found that the surveyors overlooked things in the

2   electronic medical records; that things were left out of the

3   Statements of Deficiency so that there wasn't a complete clinical

4   picture given with respect to a resident.

10:12AM   5        That's understandable in computer medical records that

6   were cutting edge, they were new, they were efficient.  And

7   surveyors like Ms. Rich and Ms. Francis, who had never used

8   electronic records many years before when they had been actual

9   practicing nurses in the field and not inspectors, had difficulty

10:12AM  10  understanding and accepting them.

11        Beechwood was sensitive to that concern and understood

12  from its own process of implementing it in the nursing home there

13  was a learning curve to learning some new technology like that, so

14  they went out of their way to try to have the Department of Health

10:12AM  15  understand it.

16        Brook and Beechwood ran seminars at the facility for the

17  Department of Health surveyors to show them how these records

18  worked.  These seminars that were held included Ms. Rich and

19  Ms. Francis.  Beechwood did this several times; they tried to

10:12AM  20  teach the surveyors how to use this new technology.

21        But it didn't seem to take.  The surveyors repeatedly

22  overlooked things in the medical records or misunderstood the way

23  the care was being delivered at Beechwood and they wrote up

24  improper deficiencies.

10:13AM  25        This prompted Brook and the staff members to use the IDR

1    system that we've talked about in 1996 and 1997 in order to

2    resolve the errors that the DOH had made in those SOD's.  This, as

3    you can probably imagine, gave rise to an increasing tension in

4    the relationship between the surveyors and Beechwood, and

10:13AM  5    particularly between Mr. Rubin and Beechwood.

6          So Brook turned to letter writing and a lawsuit in order

7    to try to get the Department of Health to address these two major

8    issues that I've just told you about.  Brook used the courts when

9    it was finally necessary as a last resort to force the Department

10:13AM  10   of Health to correct regulatory problems or faulty procedures that

11   impacted his ability at Beechwood to deliver adequate care to the

12   residents.

13         At the end of 1996, Brook commenced what you will hear

14   described as the "Langeveld lawsuit."  Beechwood had a long-term

10:14AM  15   care resident by the name of Edith Langeveld who had actually come

16   in as a long-term care resident, but had been successfully

17   rehabilitated such that she was ready to be discharged to a more

18   independent level of care in the judgment of her physician.

19         Mr. Rubin didn't want to follow the rules which required

10:14AM  20   the Department of Health to hold an independent hearing about was

21   she ready to go home or go to assisted living or not.

22         Mr. Rubin, you will hear, had no medical training at

23   all, wanted to do this procedure simply by coming in to the

24   nursing home, looking around himself and making a decision about

10:14AM  25   whether Mrs. Langeveld was medically ready to move or not, all

1    without a hearing that was required by federal law.

2          So Beechwood, as a last resort, named Mr. Rubin

3    personally in a lawsuit to stop the illegal procedure that

4    Mr. Rubin was employing.  What was the outcome of the lawsuit?

10:15AM  5    Mr. Rubin and the Department of Health was forced to concede that

6    they were wrong.  The Court ordered the Department of Health to

7    change the state regulations and procedures to comply with the

8    federal regulations to hold an independent hearing to make that

9    judgment about resident discharge.

10:15AM  10         So Brook's willingness to use the courts if need be to

11   make the Department of Health responsive whenever necessary was

12   clear.  The Department of Health, and as you will see their

13   e-mails reveal, was feared by Leeds and by Rubin.

14         Brook also found it necessary to write letters, a lot of

10:15AM  15   them over two or three years from 1996 through 1998, he sent

16   letter after letter to Albany higher and higher up the chain of

17   command, ultimately to what was known as the Office of Regulatory

18   Reform in Albany and to the Governor's office.  Mr. Chambery in

19   these letters pointed out precisely the flaws in the system and he

10:16AM  20   demanded correction and change.

21         These multiple repeated letters wind up on Ms. Leeds',

22   Laura Leeds', desk to deal with.  And during the trial you're

23   going to have the opportunity to see a number of these.

24         Let me give you one example.  In May of 1997 Brook sent

10:16AM  25   a detailed letter to the Commissioner of Health carefully

1   outlining what the Department of Health needed to do with its

2   regulations in order to fix the Langeveld problem, the thing that

3   had given rise to the Langeveld lawsuit.

4         Brook's letter, you will see, were not whining in

10:16AM   5   protest about something.  These were constructive.  These often

6   included elaborate citations to the law and to the regulations,

7   laying out the problems and constructively offering solutions as

8   to how it should be fixed to move forward in a better way.

9         And he warned the Department of Health that if they

10:17AM   10   didn't do this and bring their regulations into compliance with

11   federal law, they were in danger of losing New York's federal

12   financial funding to the state with respect to these procedures.

13        Now, it was Ms. Leeds' job, because she was the head of

14   the Office of Continuing Care, to respond to that letter from

10:17AM   15   Brook as well as the many others that he sent.

16        And two months later, after he sent the May letter, in

17   August of 1997 Ms. Leeds got the task -- and you will see the

18   embarrassment of writing to all the other nursing homes in the

19   state explaining that the Department of Health had lost the

10:17AM   20   Langeveld lawsuit and that the Department of Health was going to

21   have to change the way it was handling resident discharge disputes

22   in order to comply with the federal law mandates.

23        In 1997 and 1998 the Department of Health surveys at

24   Beechwood resulted in a few deficiencies.  Beechwood utilized the

10:18AM   25   IDR process to discuss and try to resolve these.  Several were

1  rescinded by the Department as invalid and improper; they

2  recognized they didn't have it right when they made the

3  allegations.

4          But increasingly you will see that Mr. Rubin dug in his

10:18AM  5  heels and refused to listen to what Beechwood or the medical

6  professionals who cared for the residents at Beechwood had to say

7  in the IDR submissions that were made.

8          Brook, tired of butting heads with Mr. Rubin, he decided

9  to go over the head of the Department of Health to the federal

10:18AM  10  government in order to try to get Mr. Rubin's western New York

11  surveyors to do their job properly.

12          The state is, in turn, regulated by a federal government

13  agency called the Healthcare Financing Administration.  Another

14  acronym, "HCFA."  HCFA for short.  HCFA was responsible for

10:19AM  15  overseeing the proper administration and performance of the

16  surveys by the Department of Health personnel.

17          So Brook made a series of calls to the HCFA Region II

18  supervisors in New York City, and in January of 1999 Brook sent a

19  letter to HCFA protesting surveyor performance in western New York

10:19AM  20  and asking for a full investigation of the survey process that had

21  taken place at Beechwood over the last couple of years.

22          Now, you're going to see from the e-mail trail that will

23  be shown to you that the Department of Health personnel viewed

24  anything other than a very submissive response to an SOD as a

10:19AM  25  challenge to their authority and, hence, a serious threat.

1          Mr. Rubin, who was head of the Rochester office,

2     developed a clearly articulated resentment and anger against

3     Beechwood and against Brook in particular.  Rubin had been named,

4     as I told you, personally in that Langeveld lawsuit and his

5     e-mails revealed that he hated it.

6          In addition to the embarrassment of losing that case, he

7     looked to his Albany superiors as if he couldn't get control of

8     the nursing home operator in Rochester who was bombarding Albany

9     with letters.

10         Rubin also hated the fact that Brook utilized the IDR

11    process provided by law to contest the deficiencies that the

12    Department was alleging.  You will hear that in Mr. Rubin's view,

13    Brook and Beechwood were simply supposed to take their lumps, just

14    decide to acquiesce to whatever the Department of Health said to

15    them.

16         It was an IDR session led by Mr. Rubin on April 7th,

17    1998, over a Beechwood deficiency that the Department of Health

18    had alleged, in that session Mr. Chambery brought documents,

19    statements from the physicians for the resident involved saying

20    that there were no issues of care with respect to the resident.

21         Mr. Rubin refused to budge on the deficiency despite the

22    clear physician statements refuting the legitimacy of them.

23    Mr. Chambery was very frustrated with the way Mr. Rubin had

24    conducted himself, but it was Mr. Rubin who also walked out of

25    that meeting, as you will hear one of his surveyors testify,

1  walked down the stairs gloating to his staff about how he had

2  bested Brook in the IDR session.

3         Most significantly, though, Mr. Rubin went to his

4  computer and he banged out an e-mail to Ms. Leeds in Albany.

10:22AM  5  You'll have a chance to read that e-mail, because that e-mail

6  reveals and confirms several things about Mr. Rubin's attitudes

7  and approach and what he had in store for Beechwood and Brook.

8         First of all, he told Ms. Leeds that he was writing to

9  her about, quote, the notorious Brook Chambery.  Number two,

10:22AM 10  Mr. Rubin out of the blue in this e-mail, three years

11  after-the-fact, brought up the Langeveld lawsuit and Brook's use

12  of the IDR process and protest to HCFA, and he labeled these and

13  characterized them as improper challenges to our authority.

14         And Mr. Rubin in this e-mail began to perpetrate to

10:22AM 15  Ms. Leeds what would become his cover story, saying that he had

16  concerns about the quality of care at Beechwood.

17         You will see that this, of course, was the perfect cover

18  for Mr. Rubin because he knew no one would question him if he said

19  there are care concerns at this facility.  Mr. Rubin also told

10:23AM 20  Ms. Leeds he wanted something done about Brook, that he wanted to

21  stop what he labeled as Brook's unacceptable behavior.

22         He used the words "cease and desist."  I want

23  Mr. Chambery to cease and desist.  From what?  From his

24  constitutionally First Amendment protected right that guaranteed

10:23AM 25  the right the judge told you about to petition state government

1  for the redress of grievances for the improvement of systems being

2  regulated by the State.

3         But Mr. Rubin said I need a remedy, I need something to

4  be done to stop Brook.  The developments at the end of 1998 and

10:23AM  5  the first part of 1999 set the stage for what was to become the

6  1999 offensive.

7         Ms. Baker had become the long-term care program director

8  in western New York in the spring of 1998.  And although she was

9  certified as a surveyor, she was a dietician by training and was

10:24AM  10  not a nurse.  But she was now made supervisor of all the surveyors

11  doing all the nursing home inspection work in western New York.

12         Ms. Baker's boss was Sharon Carlo, the person I

13  mistakenly pointed out to you before as -- Ms. Carlo is the woman

14  with the glasses here in the center.  Ms. Carlo was Ms. Baker's

10:24AM  15  boss.

16         She was newly hired at the Department of Health in

17  November of 1998, and she was hired to oversee continuing care in

18  western New York.  She was a nurse and a licensed nursing home

19  administrator.  She and Ms. Baker operated primarily out of the

10:24AM  20  Buffalo office, coming to Rochester perhaps a day or two a week.

21         And, finally, Ms. Carlo's boss was Sandy Rubin.  Sandy

22  Rubin was head of the Rochester office.  But in November of 1998,

23  Mr. Rubin was elevated to the area administrator for all of

24  western New York with responsibility for the Buffalo and Rochester

10:25AM  25  regions.

1          Beechwood had its annual survey in the late fall of

2     1998.  The Department of Health alleged several deficiencies

3     against Beechwood in that survey.  Beechwood contested the

4     deficiencies with an IDR written submission and an in-person

5     conference.

6          The Department of Health wound up rescinding one of

7     those deficiencies, but you also will see the evidence that will

8     be presented to you that the memos and e-mails surrounding that

9     survey before and after reveal that the defendants, Ms. Baker and

10    Ms. Carlo, had been brought into the anti-Chambery camp by

11    Mr. Rubin.

12         Beechwood submitted a Plan of Correction, which the

13    Department of Health ultimately accepted after some calls that

14    Brook made to HCFA in New York City.  Another survey cycle had

15    been completed at the end of December.

16         Beechwood had, once again, shown its ability to do the

17    two things it was permitted to do, which was contest the things

18    that were alleged by way of an IDR submission; or at the same time

19    to be able to submit a Plan of Correction.

20         And on January 11th, 1999, as we begin 1999, the

21    Department of Health in a letter signed by Ms. Baker, pronounced

22    Beechwood to be in substantial compliance.

23         Your Honor, I think this is a good moment for a break if

24    we may?

25         THE COURT: All right, ladies and gentlemen, Mr. Cooman

1   has more, but I think we've gone on for almost an hour, so why

2   don't we let you stretch your legs and take our morning -- one of

3   our morning breaks?  The jury can step outside.

4            (WHEREUPON, there was a pause in the proceeding.)

10:45AM  5           (WHEREUPON, the jury is present).

6            THE COURT: All right, Mr. Cooman, you may continue and

7   conclude your statement.

8            MR. COOMAN: Thank you, Your Honor.

9            The amazing story of what happened at Beechwood over a

10:45AM  10  period of less than 60 days from mid-April through mid-June of

11  1999 is probably best told to you so that you can understand it

12  from two perspectives:  What appeared to be happening from

13  Beechwood's perspective and what was actually taking place.

14           From where Beechwood sat, it appeared on the surface of

10:45AM  15  things here was the chronology of events: At the end of March

16  surveyor Liz Rich came to Beechwood on a routine complaint

17  investigation about a former resident, a man by the name of David

18  Moore, who had lived at Beechwood for several months in 1998 and

19  again in early 1999 in between his multiple hospital stays and

10:46AM  20  prior to his passing away at the hospital.

21           Ms. Rich's investigation of the Moore complaint was

22  concluded in early April and it was closed as an unsubstantiated

23  complaint.  As I described to you before, it can be substantiated

24  or unsubstantiated.  It was determined to be unsubstantiated.

10:46AM  25           If the complaint is determined to be without merit, it

1    would be so marked in the official Department of Health records,

2    and it was in this case.

3          On April 15th Ms. Rich came back to Beechwood again.

4    This time she came in tandem with her supervisor Ms. Francis, who

10:46AM   5    at that time was head of the Complaint Investigation Unit.

6    Supposedly they were back to investigate another complaint that

7    had come in in the meantime about a former resident's lost

8    property.

9          Ms. Rich and Ms. Francis spent several hours at

10:47AM   10   Beechwood.  They looked at a number of records, they met with

11   Donna Richardson, the Director of Nursing at Beechwood, and also

12   with Mr. Chambery.  They demanded copies of voluminous procedures

13   and policies related to the nursing home.

14         And when Ms. Rich and Ms. Francis left, they told Brook

10:47AM   15   and Donna that they thought there might be potential deficiencies,

16   but they would have to go back to the office to talk it over.  No

17   specific concern was mentioned, nor any current residents

18   mentioned in that discussion.

19         On Monday morning April 19th something out of the

10:47AM   20   ordinary and very strange happened.  Susan Baker, the head of

21   nursing homes for all of western New York, showed up along with

22   Liz Rich and Cindy Francis at Beechwood.  Ms. Baker had never been

23   there before.  A couple hours later Ms. Carlo, Ms. Baker's boss,

24   head of continuing care for all of western New York, also came to

10:48AM   25   Beechwood.  She had never been there before.

1    They called it a survey.  To Beechwood personnel it

2    looked like a raid.  For no apparent reason, the two highest

3    ranking nursing home regulators in New York state office, in

4    Buffalo, were both in the facility along with two Rochester

10:48AM  5    surveyors.

6    Ms. Baker and Ms. Carlo began making never before heard

7    demands.  They ordered Beechwood staff to stop what they were

8    doing and to print out and photocopy entire copies of closed

9    medical records for numerous residents who were no longer at the

10:48AM  10    facility.  Closed medical records, a term that refers to the fact

11    for that particular resident, they're no longer at the facility

12    and so the record is closed.  There was some discussion about

13    whose responsibility it was to do all that copying.

14    And then on April 20th the surveyors completed the

10:49AM  15    on-site survey.  They say the survey took place on the 18th -- I'm

16    sorry, the 19th and the 20th of April.

17    The next day, at the end of the second day of the survey

18    on the 20th, they completed the on-site portion, they conducted

19    what's known in the business as an "exit conference."  The purpose

10:49AM  20    of the exit conference is to convey to the facility what they

21    found, what's wrong, what should the facility be starting to

22    understand.

23    But at this exit conference they gave Beechwood no

24    specific information at all.  They simply said they had to go back

10:49AM  25    to the office to discuss things and that there might be potential

1   deficiencies.

2          Two days later, on April 22nd, five of the defendants --

3   Ms. Baker, Ms. Carlo, Ms. Francis, Ms. Rich, and Mr. Rubin -- came

4   to Beechwood and conducted another exit conference.  To Beechwood

10:49AM  5   the conference seemed irregular and unusual.  Mr. Rubin was the

6   head of the Department of Health for the region; there was no

7   reason or need for him to be there.  Exit conferences are usually

8   handled by the surveyors, not by regional level administrators.

9          Indeed, Mr. Rubin had never been at an exit conference

10:50AM  10   before.  To Beechwood it looked way over the top.  The defendants

11   advised Beechwood they intended to cite deficiencies against

12   Beechwood, and they said that those deficiencies when they were

13   finally cited, would be at the highest possible level of severity:

14   Immediate jeopardy citations, sometimes referred to as "IJ,"

10:50AM  15   immediate jeopardy under DOH lexicon; and at the K grade level,

16   not A or B or C or D or E or F or G, but K level.

17          Another five days went by.  And on Tuesday, April 27th,

18   Mr. Rubin and Ms. Baker again showed up at Beechwood with three

19   other surveyors simply to drop off the Statement of Deficiencies.

10:51AM  20   Once again, there was no apparent reason for Mr. Rubin to be

21   there.

22          When Beechwood reviewed the Statement of Deficiencies

23   that they were handed, Brook found indeed it claimed that there

24   was immediate jeopardy for residents of a facility.  And that was

10:51AM  25   handed to Beechwood by Mr. Rubin on the 27th.  The Statement of

1   Deficiencies alleged IJ.

2        Ms. Baker supplied a cover letter along with the SOD.

3   It advised Beechwood that they had been put on the fast track for

4   termination, meaning that the federal funding for Medicare and

10:51AM   5   Medicaid was going to be cut off to the facility on May 15th if

6   the IJ was not resolved.  The 15th of May was designated as the

7   funding termination date if the IJ was not resolved.

8        The IJ allegations, the fast track, the termination

9   consequences of the IJ were the most serious that Beechwood had

10:52AM   10   ever been given.

11        Brook and his staff members went immediately to work on

12   the Statement of Deficiency allegations that had now been laid out

13   for them doing the two things that every facility's entitled to do

14   and which they had done consistently in all the prior survey

10:52AM   15   cycles after receiving a SOD:  They went and they extensively

16   researched the medical records to determine where the SOD

17   allegations might be mistaken or in error for purposes of

18   submitting the IDR.

19        They prepared a Plan of Correction as if the SOD

10:52AM   20   allegations were true, and the IDR materials and the POC were

21   preliminarily due in just ten days from receiving the document .

22        Brook, the Director of Nursing who I said was Donna

23   Richardson, and others, they worked enormous hours, they scanned

24   the records, reviewed and checked the allegations that were made

10:53AM   25   and they designed the POC.

1    And on Friday afternoon, May 7th, they faxed

2    preliminarily Beechwood's IDR materials and the complete Plan of

3    Correction, and the rest of the IDR materials on Monday, May 10th.

4    This included statements from the doctors who had cared for each

10:53AM   5    one of the residents that was named and alleged to have been in

6    immediate jeopardy.  The doctors said that they had found no

7    significant issues or adverse outcomes related to any of these

8    cared deficiencies that had been alleged.

9    Beechwood, having submitted its Plan of Correction and

10:53AM   10   IDR materials, waited for what they thought was the normal

11   sequence of events:  Scheduling of an IDR conference to sit down

12   and discuss the situation, and so they began implementing their

13   Plan of Correction.

14   On Wednesday, May 12th Ms. Baker, Ms. Francis and

10:54AM   15   Ms. Rich, along with others, returned back to Beechwood for what's

16   known as a "revisit survey."  They spent all day at Beechwood

17   observing patient care and looking at the medical records on

18   May 12th, which we've labeled as survey.  They spent all day

19   there.

10:54AM   20   And they returned the next morning, Ms. Baker and

21   Ms. Francis, on the 13th and they advised Beechwood that , in

22   fact, there was no longer any immediate jeopardy at Beechwood and

23   that the federal funding termination that was scheduled for

24   Saturday the 15th was now off.  But they told Brook that they were

10:54AM   25   going to write up a second Statement of Deficiencies, and that

1    this second Statement of Deficiencies -- although they could no

2    longer allege immediate jeopardy -- would be labeled substandard

3    quality of care still in play at Beechwood.

4           And sure enough on Friday the 21st of May, Beechwood was

10:55AM  5    delivered a new May Statement of Deficiencies, this time alleging

6    SQC, substandard quality of care, in replacement for the higher IJ

7    label that had been alleged in the April SOD.

8           And they issued a new funding termination date not

9    several months out, but only a month further on for June 17th.  So

10:55AM  10   it had been moved now from May 15th to June 17th as the funding

11   cutoff termination date.

12          Once again, having received that second SOD, they spent

13   exhaustive hours reviewing this 33 page document.  There was no

14   allegation of immediate jeopardy replaced by this lower

10:55AM  15   designation of substandard quality of care.  Beechwood and its

16   staff checked the medical records and they submitted new IDR

17   materials to the Department of Health on June 1st.  So the second

18   set of IDR materials and POC went in to the Department of Health

19   on June 1st.

10:56AM  20          Once again, they awaited the revisit survey from the

21   Department of Health as they came back to reinspect.  But before

22   that event ever occurred, the most unusual of all possible events

23   happened.  In early June the Department of Health served Beechwood

24   with two sets of formal legal papers.  The Department of Health

10:56AM  25   commenced two enforcement proceedings against Beechwood,

1  disciplinary punishment proceedings.

2          The first was they started a court action to throw the

3  Chamberys out of the management of Beechwood and to install what's

4  called an "involuntary caretaker," sometimes called a "receiver,"

10:57AM  5  but the technical name is a caretaker, somebody to operate the

6  facility in place of the Chamberys.

7          The second set of legal papers started an in-house

8  Department of Health administrative proceeding.  And those set of

9  papers requested that there be a revocation of the Chamberys'

10:57AM  10  operating certificate, their license to do business in the

11  facility.

12          The rest of June was an absolute and unprecedented

13  whirlwind.  On June 10 and 11 Ms. Baker and a team of surveyors

14  came back to Beechwood to conduct more surveying activities, 10th

10:57AM  15  and 11th of June.  But by that time the formal legal papers had

16  already been served on Beechwood.

17          And on June 16th, based on the survey activities on the

18  10th and 11th, the Department of Health actually issued a third

19  Statement of Deficiencies.  This time they could not find any

10:58AM  20  immediate jeopardy, they couldn't even find any substandard

21  quality of care.  But, nevertheless, they alleged a number of

22  deficiencies, and that Statement of Deficiencies was served on the

23  16th.

24          June 17th, the funding termination date that had been

10:58AM  25  recommended by Ms. Baker came to pass, it wasn't moved, funding

1    was cut off, the Department of Health conducted an immediate

2    campaign with adverse publicity against the home.  The Department

3    of Health orchestrated a move-out of all the Beechwood residents

4    at the end of June and early July.

10:58AM   5        Ms. Carlo wrote a letter that went not only to the

6    Medicare and Medicaid recipients, but to all the private pay

7    patients telling them they ought to get out because a formal legal

8    hearing was being started against Beechwood, and the Department of

9    Health hearing indeed began on June 23rd.

10:59AM   10        The families of the residents you will hear were

11   incensed:  They wrote letters, they called their assemblymen.  But

12   the hearing was scheduled to begin on the 23rd.  Family protests

13   were to no avail, and the Department of Health ultimately revoked

14   the operating certificate of the facility.  Beechwood was closed

10:59AM   15   and all the residents moved by mid-July.

16        What on earth had happened to the preeminent nursing

17   home in the area, one of the best in the state within less than

18   two months' time?  It's taken the plaintiffs 13 years, but now the

19   real behind the scenes of what happened can now be told to you in

10:59AM   20   this case because the defendants' e-mails and their notes and

21   their admissions have been uncovered, and they allow plaintiffs to

22   demonstrate to you that what the defendants did was done with

23   clear retaliatory motive for their actions.

24        There are several key pieces of evidence I want to

11:00AM   25   highlight for you.  This evidence is going to demonstrate to you

1    the defendants were not just doing their job, as they will claim,

2    but rather they were taking actions that they would not have

3    otherwise done but for the fact that Mr. Chambery was their most

4    vocal, vigorous and successful critic.

11:00AM   5            Item number one, the evidence shows that the defendants

6    predetermined the punitive outcome, those enforcement actions,

7    that they were going to take before the survey and SOD were even

8    done.

9            A recommendation to terminate federal funding or the

11:00AM   10   recommendation to revoke a facility's operating certificate are

11   obviously the most severe possible punishments you can impose on a

12   facility, way more than a fine or a suspension.  But defendants

13   committed to recommending termination and license revocation

14   before the survey and the SOD.  They put the cart before the

11:01AM   15   horse.

16            Several Department of Health witnesses will describe for

17   you what the normal enforcement process is.  Ordinarily, once

18   there is no immediate jeopardy in a facility, 180 days or six

19   months is given to a facility to bring the facility back into

11:01AM   20   substantial compliance,and only at the end of that time does the

21   Department of Health then consider what enforcement seems

22   appropriate for the facility:  A fine, suspension, or even in a

23   severe case, I suppose, a revocation.

24            I'm going to walk you through this calender of events

11:01AM   25   one more time, but this time show you the evidence that you're

1   going to hear about what the Department of Health was doing behind

2   the scenes.

3          The survey was done on the 19th and 20th, but that

4   Statement of Deficiencies telling Beechwood what they thought was

11:02AM   5   wrong and what they needed to correct was not served until the

6   27th.  And Beechwood then after that had another ten days before

7   it needed to send the Department of Health its IDR materials and

8   its Plan of Correction.

9          But before Beechwood had even been given this Statement

11:02AM   10  of Deficiencies, Ms. Leeds, Ms. Carlo, Mr. Rubin had enlisted the

11  help of Department of Health attorney Russell Altone in Albany to

12  help them plan and carry out the offensive.

13          Because in Albany on Friday the 16th of April,

14  Ms. Leeds' staff members and Mr. Altone were planning the

11:02AM   15  enforcement actions against Beechwood even though the April survey

16  in Rochester had not even taken place yet.  No Statement of

17  Deficiency had even been issued.

18          On April 21st Mr. Altone confirmed that April 16th

19  meeting in his e-mail.  He talked about the unsubstantiated April

11:03AM   20  complaint at Beechwood, the one that had launched the

21  investigation.  And he asked in his e-mail, how does an

22  unsubstantiated complaint fit into the bigger picture and the

23  potential termination that had been discussed on the prior Friday?

24  Mr. Altone's e-mail on the 21st confirmed the meeting of the 16th

11:03AM   25  and a discussion about a bigger picture and termination.

1       On the same day that Mr. Altone was writing his e-mail

2   in Albany, and before a Statement of Deficiencies had ever been

3   issued, Ms. Carlo in Buffalo was writing notes about the

4   conversation with her boss Mr. Rubin.  You'll have an opportunity

11:03AM   5   to actually read Ms. Carlo's notes.  She wrote on that same day

6   Altone involved, termination, new global picture.  The 21st of

7   April.

8       So you see at both ends of the Thruway, Albany to

9   Buffalo, there was preplanning of the most severe possible

11:04AM   10  enforcement already under way before the surveyors had even done

11  their work or certainly written up and delivered the facility the

12  Statement of Deficiencies or Beechwood even had a chance to

13  respond.

14      On April 23rd, which is still four days ahead of the

11:04AM   15  SOD, and two weeks ahead of Beechwood's response being due,

16  Mr. Altone wrote another e-mail.  And he said that to his legal

17  staff subordinates and to Ms. Leeds' staff in that e-mail, he said

18  that Beechwood was, quote, on a collision course for termination

19  and revocation.

11:04AM   20      On April 26th Ms. Leeds e-mailed her boss, who at that

21  time was the number two man in the Department of Health and was

22  actually the act ing Commissioner of Health, an extraordinary

23  e-mail that you all will have an opportunity to read.  In that

24  e-mail she said to the second highest ranking person in the

11:05AM   25  department:  Brook, first name basis, is not doing anything to

1    correct and his time is running out.  She added, the closure is

2    going to be tough.

3          On the 26th the Statement of Deficiencies had not even

4    been given to Beechwood, but Ms. Leeds was already telling

11:05AM  5    everyone in Albany that Brook's time was running out and the

6    closure of the facility was going to be tough.  The time hadn't

7    even started to run yet.  Beechwood had not even received the SOD

8    or had a chance to respond to it.

9          On April 29th Ms. Leeds and Mr. Rubin have another one

11:05AM  10   of their extraordinary e-mail exchanges that you'll have a chance

11   to read, an e-mail they never intended to come to light because in

12   this e-mail exchange these ring leaders not only confirmed their

13   intent to revoke the Chamberys' operating certificate, they

14   candidly admitted to one another the illegal retaliatory motive

11:06AM  15   they were seeking for this unprecedented sanction.

16         Ms. Leeds' e-mail complained to Mr. Rubin that Brook's

17   Langeveld lawsuit three years before had, quote, changed the whole

18   way we do discharge planning.  Three years after the Langeveld

19   lawsuit she was still fuming about the loss in the lawsuit.  She

11:06AM  20   told Rubin we have to be prepared to revocate.

21         Mr. Rubin responded.  Now, he didn't just agree with

22   Ms. Leeds, he added a confirmation that the revocation was going

23   to happen and that this would be specifically in retaliation

24   against Brook for his challenges.  Here's what Mr. Rubin wrote,

11:06AM  25   quote, another advantage on our side is that HCFA will back us all

the way.  They, too, have been harassed by Chambery.  Harassment

being Mr. Rubin's way of referring to Mr. Chambery's protected

exercise of his constitutional rights.  Mr. Rubin concluded his

e-mail with the most memorable line in the case, the chickens are

coming home to roost.

Item two, the defendants' Statements of Deficiencies

were deliberately trumped up and overstated in order to support

over the top and preplanned enforcement.  You're going to see from

the evidence that the defendants took the unsubstantiated April

complaint and inflated it into this allegation of immediate

jeopardy.

They alleged immediate jeopardy based on residents who

weren't even at the nursing home, a violation of rules which

Ms. Baker ultimately conceded if you're going to allege immediate

jeopardy to residents, it's going to have to be alleged in the SOD

about residents that are actually residing at the facility.

The defendants abandoned their usual process for

evaluating and grading the deficiencies by the surveyors in the

office, and you're going to see their notes showing they upcoded

deficiencies for what they thought were lower deficiencies into

higher deficiencies and that they did this on instructions from

the staff in Albany to reach higher levels, people in Albany who

had never observed the care of the residents and never actually

seen the medical records at the facility.

All this was done to escalate the severity of the issues

1    and, of course, to accelerate the timetable for what the

2    defendants wanted to accomplish.

3              Item number three, the evidence is going to show the

4    defendants predetermined they would reject categorically and in

11:08AM    5    total everything that Brook and Beechwood submitted in its IDR and

6    in its Plan of Correction.

7              Ms. Leeds and Ms. Baker predetermined that when

8    Beechwood's inevitable IDR materials and the POC came into the

9    office, they would not put it through the usual review process,

11:09AM   10    but rather it would be rejected.

11             The IDR and the POC review process were fundamental due

12    process rights, and they admit that.  But the evidence confirms

13    that at this point there was the perpetration of the central

14    falsehood that supported the offensive, the falsehood of the

11:09AM   15    Department of Health's claim that Beechwood and Brook would not

16    and could not correct deficiencies.

17             Yet in the past Beechwood had always gone through a

18    systematic review of the POC, and in every case Beechwood's Plan

19    of Correction had always been accepted.

11:09AM   20             But June -- I'm sorry, spring of 1999 was entirely

21    different.  And the evidence reveals that Ms. Baker decided in

22    advance to break the rules about the IDR and the POC because,

23    again, Ms. Baker's notes -- and you will have an opportunity to

24    read what she wrote on April 29th before Mr. Chambery's IDR and

11:10AM   25    POC had even come in.  It's two days, only two days after the SOD

1    had even been reviewed and more than a week prior to Beechwood

2    submitting its materials, her notes record how she intends to

3    handle the IDR.  She wrote, don't weaken the case, don't give in

4    at all.

11:10AM  5          So for Ms. Baker, there was going to be no give in.  For

6    Mr. Rubin, the chickens were coming home to roost.

7          True to her advanced determination, Ms. Baker carried

8    out the plan not to give in at all, not a single deficiency in the

9    April, May or June SOD's were rewritten or rescinded to the

11:10AM  10   slightest degree.

11         The Beechwood submissions, including all those

12   physicians' pronouncements, there were no adverse outcomes caused

13   by any failures of care or care concerns were simply ignored.  No

14   POC review in the normal systematic fashion was ever carried out

11:11AM  15   in the Rochester office.  Rather, on May 18th Ms. Baker and

16   Ms. Carlo simply checked all the boxes on the rejection form and

17   sent it out to Beechwood.  The 18th Beechwood's Plan of Correction

18   was rejected completely.

19         Ms. Baker and Ms. Carlo refused to discuss any aspect of

11:11AM  20   the POC's, taking the position it was not their job to tell the

21   facility how to correct or what to do or to understand what the

22   Department of Health was saying.

23         Item four, three separate times the defendants faced

24   clear roadblocks, stop signs, signals to stop what they were

11:11AM  25   doing, to reconsider this precipitous path that they were on.

1    On May 11th an extraordinary telephone conference took

2  place among a dozen Department of Health officials in Albany and

3  in Rochester that was led by Ms. Leeds.  You'll have an

4  opportunity to see the notes of the defendants that were taken at

11:12AM  5  that meeting.  Ms. Leeds confirmed to everyone in the call that

6  her plan was to revoke the Chamberys' operating certificate.  This

7  was in the May 11th conference call.

8    Ms. Baker's notes of the conversation that day were that

9  Ms. Leeds had announced the plans to revoke were continuing.  So

11:12AM  10  armed with these instructions, Ms. Carlo and Ms. Baker,

11  Ms. Francis and Ms. Rich went back to Beechwood the next day on

12  the 12th after the telephone conference for a survey.  They spent

13  a full day at the nursing home, but they discovered or

14  acknowledged for the first time a glitch in the plan to terminate

11:12AM  15  and revoke.

16    Because no one was in immediate jeopardy at Beechwood,

17  there was no possible justification for severe enforcement action,

18  revocation or termination on an accelerated timetable.  They

19  reported this to Leeds on Wednesday night or early on Thursday

11:13AM  20  morning.

21    On the 13th there's an acknowledgment in the e-mails and

22  the notes that there is no IJ at Beechwood.  But although the

23  defendants had encountered an important roadblock to signal the

24  stop retaliation plan, they didn't do that.  At 9 o'clock on the

11:13AM  25  morning of the 13th Ms. Leeds had already devised a modified plan

1    and e-mailed it to all the people involved.  You'll read that

2    e-mail, it was a 9:09 a.m. that morning.  The recipients of the

3    e-mail were told we're going to see if we can continue to make the

4    case for a caretaker.

11:13AM  5          A caretaker, as I explained to you, is the person that

6    goes in and substitutes.  You pull the Chamberys, kick them out of

7    the home in terms of operating it and instead you replace somebody

8    else in there.  And after Ms. Leeds said this in her e-mail, at

9    the very end of the e-mail she also said this is the only part of

11:14AM  10   the plan that I want not made public.

11          There was not a moment's pause or reflection about what

12   was going on.  Rather, the plan she announced was that there would

13   be a write-up of that second Statement of Deficiencies.  And even

14   though there was no IJ anymore, the defendants were told that if

11:14AM  15   they piled up a whole lot of lesser deficiencies, the sheer weight

16   of those things would be enough to carry the day and justify the

17   revocation.

18          Ms. Carlo and Ms. Baker were in charge of the

19   on-the-ground survey efforts at Beechwood and they got the message

11:14AM  20   and they sprung to action to see that the plan was carried out and

21   they pulled together a set of new allegations into the May SOD

22   that was delivered to Beechwood soon thereafter.

23          But a second clear signal to stop was ignored by the

24   defendants.  In another e-mail on the night of May 20th at

11:15AM  25   6:09 p.m., the day before the SOD for May was going to be

1   delivered, Ms. Carlo wrote what she intended to be a secret e-mail

2   to Ms. Leeds' chief deputy, a woman by the name of Anna Colello,

3   whose testimony you will hear about in the case.

4           She told Ms. Colello that this message, this e-mail

11:15AM   5   message was shhhhhh, for her eyes only or for Ms. Leeds if she

6   wanted to share it.  Carlo said she had reviewed the May Statement

7   of Deficiencies that was about to be delivered the next day and,

8   quote, it really has a lot of holes in it.

9           It didn't matter.  On May 21st the new Statement of

11:16AM   10   Deficiencies was simply delivered to Beechwood, and Ms. Baker's

11   letter with that May SOD advised the termination of funding was

12   now scheduled for June 17th.  Still on a fast track, just a month

13   away.

14           The third and most definitive roadblock and signal to

11:16AM   15   stop came just a few weeks later.  On June 7th Ms. Leeds signed a

16   court petition asking for the ouster of the Chamberys and the

17   installation of a caretaker.  She claimed that the residents at

18   Beechwood were in imminent danger, despite the fact that there

19   were no longer, by their own admission, any immediate jeopardy

11:16AM   20   conditions at Beechwood.

21           She claimed in those papers that the residents were at

22   the mercy of Brook Chambery, and she asked that the Chamberys be

23   thrown out and that a caretaker be installed.  Ms. Rich and

24   Ms. Francis signed an affidavit in support of that application to

11:17AM   25   the Court making the same claims.  Those Department of Health

1    claims and Beechwood's vehement opposition set forth in extensive

2    papers and medical records were reviewed and heard by New York's

3    Supreme Court Judge Francis Affronti on June 21st.  A real judge,

4    in a real court.

11:17AM  5          The staff at Beechwood were incensed with what the

6    Department was trying to do, and a display of tremendous support

7    for their leader and in testimony to what they knew to be the

8    falsehoods of the Leeds and Rich and Baker claims, all the

9    off-duty staff members of the facility organized a rally in front

11:17AM 10   of the courthouse.

11          Judge Affronti's conclusion after reviewing all the

12   papers was that the Department of Health's request for the

13   installation of a caretaker and removal of the Chamberys was

14   unjustified and he denied it.  The judge found no imminent danger

11:18AM 15   to the residents at Beechwood to justify a caretaker, and he

16   labeled the claims of Ms. Leeds and Ms. Rich and Ms. Francis that

17   had been made in the sworn affidavits as inconsistent findings.

18   The judge on the 21st denied the Department's caretaker

19   application.

11:18AM 20          Under any circumstances other than Beechwood, this kind

21   of rebuff from a court would be cause for pause, for reflection,

22   for reconsideration of the merits of your case as to whether you

23   should go forward or do something else.  Not so for Mr. Rubin or

24   for Ms. Leeds and the defendants.  And in a telling e-mail written

11:18AM 25   the afternoon of June 21st after receiving Judge Affronti's

11:19AM

1    decision, Mr. Rubin wrote to Ms. Carlo and to the DOH press team.

2    He did not suggest that the Department of Health reconsider its

3    intentions, but rather he provided sound bites on how the decision

4    should be ignored and spun.  Said Mr. Rubin, the Affronti decision

5    was merely a technical determination.  They told the Department of

6    Health team to press forward.

7            Three clear roadblocks.  Three stop signs.  All ignored

8    in the headlong rush to retaliate.

9            Now, while the caretaker piece of the offensive had

10   failed, what about the main event?  What about the revocation

11   proceeding that had been started against the Chamberys?  Remember

12   that the defendants had preplanned to do the revocation back in

13   April, and that Leeds had reaffirmed it in the telephone

14   conference on the 11th.

15           Well, that part of the preplanning went flawlessly

16   because the defendants had figured out a way to keep the entire

17   revocation proceeding in-house at the Department of Health.

18           The Department of Health set up its own internal

19   administrative hearing process against Beechwood to obtain the

20   revocation.  Ms. Baker had sent to Altone all the information that

21   had been accumulated for the SOD's, and Mr. Altone and his lawyers

22   drafted up a statement of charges against Beechwood that

23   essentially recycled all the same deficiencies that had been

24   alleged in the April and May SOD's.

25           And they served that statement of charges on Beechwood

1  on June 7th, setting the hearing date for the 23rd of June, just

2  15 days away, making the highest possible sanction request against

3  Beechwood:  To revoke the operating certificate.

4       Beechwood mounted a vigorous defense to the charges in

5  the same way that it had worked tirelessly to convince the

6  Department of Health that it was wrong about the April and May

7  deficiency allegations.  Beechwood nurses came to testify about

8  the good care that they had rendered to particular residents; the

9  doctors for all of those residents came and testified about the

10  good care that had been rendered and the lack of adverse outcomes

11  tied to any of the supposed violations asserted by the Department.

12       But the peculiar circumstances of this Department of

13  Health administrative hearing guaranteed that the outcome was

14  going to be in the Department's favor.  The hearing was held over

15  a series of days in June, July and August.

16       There was no courtroom.  The Department of Health rented

17  a conference room in a downtown building, and a man by the name of

18  Mark Zylberberg was selected by the Department of Health to hear

19  the case.  He was not a judge in the judicial system, but rather a

20  fellow Department of Health employee classified as an

21  administrative law judge.  He was a man on the Department of

22  Health payroll in the same Division of Legal Affairs as

23  Mr. Altone.

24       Judge Zylberberg was given the job of hearing the

25  evidence that was presented with the goal of making not a judicial

1    decision, not a judicial judgment, but rather an administrative

2    Report and Recommendation to his ultimate superior, the

3    Commissioner of Health.

4              The hearing you will hear was unprecedented in two ways.

11:22AM  5    The revocation proceeding was singular and unique.  In all of

6    their collective years with the Department of Health, none of

7    those defendants in Rochester or Albany had ever done this before.

8              On the face of it, it was a unique proceeding to obtain

9    a never-before-employed remedy and it made no sense.  Beechwood

11:22AM  10   had a compliance history that was as good or significantly better

11   than other nursing homes.  There had been no major change in

12   Beechwood's staffing or personnel or their approach to care in

13   1999.  It was the same people delivering the care.

14             And the Chamberys and the Beechwood staff had been

11:22AM  15   delivering long-term care for 40 years and rehabilitation care for

16   over 55 years.

17             THE COURT: Mr. Cooman, it sounds like we're getting more

18   into argument here than indicating what you expect to show.  So

19   let's try to bring this to a conclusion and avoid what sounds like

11:23AM  20   closing argument.

21             MR. COOMAN: Very well, Your Honor.

22             The ultimate Report and Recommendation from

23   Mr. Zylberberg was forwarded to the Commissioner of Health, who

24   was Antonia Novello.  It was her job to make the ultimate

11:23AM  25   decision.  Beechwood submitted hundreds of pages of factual

1    materials and legal arguments.  The details of how the Zylberberg

2    report got to Novello will be part of the proof in this case.

3          Suffice it to say that Commissioner Novello rubber

4    stamped the report, signed the order that had been put in front of

11:23AM  5    her and permanently revoked the Chamberys' license to operate.

6          Beechwood was out of business, Brook was out of

7    business, and Brook's challenges to the authority of the

8    Department of Health had been successfully suppressed and

9    punished.

11:23AM  10          Now, all these irregularities and misuses that the

11    evidence shows you about the regulators' power and procedure --

12    the preplanning of the offensive, the predetermination of the

13    outcome before there was even a Statement of Deficiencies, the

14    upcoding of the allegations to justify the fast track, a refusal

11:24AM  15    to review in any systematic way Beechwood's Plan of Correction or

16    the IDR materials, the Department's refusal to stop the revocation

17    even after Judge Affronti made his ruling and the in-house hearing

18    and the unprecedented remedy -- all of those constitute evidence

19    that the defendants were not merely doing their job, but rather

11:24AM  20    they were retaliating against Beechwood.

21          But plaintiffs' proof in this trial is not confined

22    solely to those items.  Rather, there are three more key pieces of

23    evidence that provide explicit confirmation that the defendants'

24    actions were actually motivated by retaliation.  The first was

11:24AM  25    this: After the Department of Health revoked Beechwood's license,

1    the defendants referred the case to the New York Attorney

2    General's Office, to Mr. Solomon.

3           Mr. Solomon works at the branch of the Attorney

4    General's Office called the Medicaid Fraud Control Unit, MFCU.

11:25AM  5    They asked that there be additional civil or criminal sanctions

6    given to Beechwood.

7           The Attorney General, after conducting an extensive

8    three year investigation that you will hear about, it was

9    wide-ranging in scope and methodology, you'll hear from

11:25AM  10    Mr. Solomon that he used trained investigators, auditors,

11    attorneys; they reviewed all the claims being made by the

12    Department of Health and all the items listed in Mr. Zylberberg's

13    report, they scoured all the medical records, did scores of

14    witness interviews with families of the former residents, with the

11:25AM  15    residents themselves, the former employees.

16           You'll see that this process that the Attorney General

17    used was far more extensive and exhaustive than the 56 day survey

18    process that the Department of Health had used to result in the

19    Department of Health hearing.

11:26AM  20           And at the conclusion of that three year investigation,

21    the conclusion of the Attorney General was the opposite of what

22    the Department of Health had claimed.  The report had claimed that

23    there were inadequate staffing at Beechwood; the Attorney

24    General's auditors found the staffing at Beechwood exceeded all

11:26AM  25    applicable standards and guidelines.  That there was no cutting of

1    corners at Beechwood to save costs.

2          And while the defendants claim that the care at

3    Beechwood was so poor that the revocation sanction had to be

4    imposed for the first time in history, the Attorney General closed

11:26AM  5    the case.  And his final report was that the care at Beechwood

6    was, quote, very good to excellent.

7          Unfortunately, the Attorney General's report came out in

8    2003, too late to save Beechwood or its displaced staff and

9    residents.  There were other explicit confirmations about the

11:27AM  10    defendants and what they were doing publicly.  You will hear that

11    the defendants were telling families and the media that they felt

12    bad, that they were just doing their jobs, that they did not want

13    to see Beechwood closed.  You'll hear them say those things to

14    you; or they didn't want to see the residents moved.  But, in

11:27AM  15    reality, the defendants were exalting in the demise of Beechwood.

16          Another deleted e-mail -- we obtained Department of

17    Health backup tapes -- revealed this exchange between Ms. Carlo,

18    Ms. Baker and one of their colleagues in Albany.  On June 16th,

19    1999, the day before the HCFA funding was terminated, with the

11:27AM  20    knowledge that their recommendation to terminate the funding had

21    been approved, one of Ms. Leeds' central office managers wrote to

22    Ms. Carlo, quote, amen and hallelujah.

23          Ms. Carlo shared the exaltation back with Ms. Baker and

24    responded hot diggitty dog, and added 57 exclamation points.

11:28AM  25          Defendant Cynthia Francis was a close confidant of

1   Mr. Rubin in the Rochester office.  You'll see that, you'll hear

2   from the proof in the case very often she would be blind copied on

3   e-mails that he sent.  She spilled the beans about the intent that

4   she had and that her boss had with respect to the offensive.

5           On April 20th, 1999, the second day of the initial

6   survey, Ms. Francis pulled aside one of the relatively new

7   Beechwood nurses, whose name was Gwen Westbrook.  Ms. Westbrook

8   will be here to testify.

9           MR. LEVINE: Objection, Judge.  May we approach?

10          (WHEREUPON, a discussion was held at side bar outside

11  the hearing of the jury).

12          MR. LEVINE:  She's not on my witness list.  I talked to

13  her and she said she wasn't advised she was testifying.  She's not

14  on the list they gave us.

15          MR. COOMAN: She's been on the list forever.  She was

16  deposed --

17          THE COURT: She's on my list.

18          MR. LEVINE: You have her on your list?  The list of the

19  witnesses that was given to me by letter outlining the 24

20  witnesses?

21          MR. COOMAN: You deposed her.

22          MR. LEVINE: That's not the point.  There's 24 witnesses

23  on there and she's not on there.  I called her and she said she

24  wasn't even advised she's testifying.  He's now talking about her

25  being a witness.

1        THE COURT: I don't have the list in front of me.  I

2   think I identified her yesterday as a witness.

3        MR. LEVINE: You read all sorts of names, people that

4   aren't necessarily going to testify.  She's not on the list of 24.

11:29AM   5        THE COURT: I don't have the list in front of me.  I'm

6   not going to delay this, but --

7        MR. COOMAN: She's a key witness.  She's been disclosed

8   in the case from the beginning.  She was deposed.  She's going to

9   testify.

11:29AM   10        THE COURT: I guess the proof will be whether we see her.

11   I believe it's on my list, so overruled.

12        (WHEREUPON, side bar discussion concluded.)

13        THE COURT:  You may continue.

14        MR. COOMAN: Ms. Westbrook will be here to testify.  She

11:30AM   15   will tell you that Ms. Francis threatened her license and tried to

16   turn her against Beechwood.  She will tell you what Ms. Francis

17   said to her, and which Ms. Westbrook duly recorded in an affidavit

18   while it was still fresh and vivid in her memory.

19        Ms. Westbrook will testify to you that Cindy told me

11:30AM   20   there's been a problem between Brook and Sandy Rubin, that Brook

21   had sued Sandy and the Department of Health, and that they were

22   going to get Brook for it.

23        Ms. Francis, you will hear, was commended and rewarded

24   for her role in the offensive.  The Department of Health hearing

11:30AM   25   ended in August of 1999.  She was promoted by Mr. Rubin to become

1    program manager for long-term care in Rochester.

2             Like Ms. Francis slipped revealing her true motive,

3    Ms. Leeds too made a very public mistake that you will hear about.

4    September 1999, three months after Beechwood was closed, Ms. Leeds

11:31AM  5    was the head of continuing care, was the main speaker at a

6    statewide conference of nursing home administrators.  Unbeknownst

7    to Ms. Leeds, one of attendees sitting in the conference was Paul

8    Kesselring; Mr. Kesselring was Beechwood's former assistant

9    administrator.

11:31AM  10            Mr. Kesselring immediately reported what he had heard

11   Ms. Leeds say.  He will be here to tell you about the admission

12   that he heard.  He will tell you that Ms. Leeds got up and was

13   answering questions at the meeting and began discussing the

14   situation at Beechwood earlier in the summer.  He will tell you

11:31AM  15   that, as best he can recall, her statement said, listen, I'm going

16   to tell you something, we had to close a facility this year, the

17   staff at that facility were excellent, it was a horrible situation

18   that I hope to never go through again.  We had to close the

19   facility for all the wrong reasons and, you know, the staff there

11:32AM  20   cared unbelievably for those residents.  Our surveyors were there

21   monitoring the whole time.  Even though they knew they were losing

22   their jobs, they continued to provide care right up until the time

23   the residents left.

24            Mr. Kesselring will tell you there was a break in the

11:32AM  25   proceedings.  Ms. Leeds seemed to be in conversation with her

1    deputy, Anna Colello, at the table.  Sometime later in the

2    conference that afternoon, Mr. Kesselring -- seemingly out of the

3    blue Laura Leeds returned to the Beechwood subject and she said,

4    when we closed Beechwood, all the staff weren't really terrific.

11:32AM    5    There were a lot of very serious care concerns and problems that

6    were legitimate.  The administration refused to cooperate.

7         But even the revocation was not enough for Mr. Altone

8    and Ms. Leeds, and the evidence will show you they decided in the

9    summer of 1999 to impose the economic death penalty on Beechwood

11:33AM   10    and the Chamberys as well.  With the Department of Health hearing

11    under way, it became increasingly clear to Brook in his mind the

12    fix was in.

13         Brook found a buyer for the Beechwood facility, another

14    respected nursing home operator from the Buffalo area.  Meetings

11:33AM   15    began with the Department of Health about selling the operation.

16    Mr. Altone refused to allow him the sale unless Beechwood and

17    Brook would release the Department of Health personnel from

18    anything that they were doing.  There was no authority to impose

19    that condition, and Mr. Chambery refused to bow to the illegal

11:33AM   20    request.

21         After the license had been formally revoked later in

22    1999, Brook tried again.  He asked Mr. Altone if he could sell and

23    transfer the business entity, the establishment of approval that

24    the Chamberys had held for 45 years.  Mr. Altone again said no.

11:34AM   25    He found a sticky note in his file where he confirmed his view.

1   Beechwood has only bricks and mortar to sell.

2          So this is why Beechwood and Brook and Olive Chambery

3   have brought this claim seeking justice.  45 years of hard work

4   and economic value were vaporized, the building is foreclosed and

11:34AM  5   empty.  113 dedicated healthcare workers had to look for new jobs.

6   And the residents of Beechwood, against their will, were forced to

7   find new places to live.

8          The adverse publicity in the media shut down the

9   facility.  It did not just devastate the business, they destroyed

11:34AM  10   the reputation and career of Brook.  He was 47 years old.  He was

11   just embarking on the peak years of a promising entrepreneurial

12   career, but the defendants stopped him dead in his tracks exactly

13   as they had planned.

14          The only thing that defendants had not been able to

11:35AM  15   predetermine, you will see, is that Brook would work tirelessly

16   for 13 years to finally have this day in court, in a real court

17   with a real jury to expose the defendants' misconduct and obtain

18   restitution for the losses.

19          Thank you for your time and attention this morning.

11:35AM  20          THE COURT: Thank you.  Ladies and gentlemen, I think

21   we'll let you step out, stretch your legs before we proceed with

22   our next matter.  The jury can step out at this time.

23          (WHEREUPON, the jury was excused).

24          MR. LEVINE: I have a couple of requests, Judge.  Number

11:36AM  25   one, I would ask that you charge the jury on collateral estoppel

 1  with regards to the ALJ decision.

 2          And, number two, I would ask the Court to reconsider

 3  your ruling regarding not allowing the federal ALJ decision in.

 4  It's clear they're attempting to cast light that that decision is

 5  not worthy of belief.

 6          The ALJ decision and the federal system used the exact

 7  same evidence and came up with, as the Court knows, significant

 8  conclusions of problems at Beechwood.  They're attempting to cast

 9  light that decision is not worthy of following.

10          My two requests, respectfully, should be granted.

11          THE COURT: Well, I think we better proceed with our

12  openings.  I'm not going to charge the jury on anything in the

13  middle of opening statements.

14          About the witness, I have document 286, plaintiffs' --

15          MR. LEVINE: There was a letter that was provided to me

16  by counsel where it listed 24 names on it.  I don't have it -- I

17  don't think I have it with me.  I will certainly obtain it.  The

18  24 witnesses that were listed did not have Ms. Westbrook on it.

19          THE COURT: How about the formal filing that I got that

20  has Ms. Westbrook listed -- let me finish.  Has her listed as the

21  third witness.  She's not listed for this week, but I read it

22  yesterday that she was.

23          MR. LEVINE: There are numerous witnesses or names that

24  are listed on there that aren't necessarily going to be called.

25          THE COURT: Explain to me why I should react to document

1   286, which lists in detail all the witnesses?  We'll take a few

2   minutes, and then -- I assume you want the easels down,

3   Mr. Levine?

4          MR. LEVINE: Yes, thank you, Judge.

11:54AM  5          (WHEREUPON, there was a pause in the proceeding.)

6          THE COURT: Ready for jury Mr. Levine?

7          MR. LEVINE: Yes, sir.  Thank you.

8          THE COURT: All right, bring in the jury.

9          (WHEREUPON, the jury is present).

11:55AM  10         THE COURT: All right.  Ladies and gentlemen of the jury,

11  as Mr. Cooman did on behalf of the plaintiffs, Mr. Levine also has

12  this opportunity to make his opening statement to you about the

13  case and what he expects the proof to show here.

14         Mr. Levine, you may proceed.

11:55AM  15         MR. LEVINE: May it please the Court, it's still good

16  morning, members of the jury, my name is Gary Levine, I'm an

17  Assistant Attorney General for the State of New York.  The judge

18  told you during *voir dire* my boss is a man named Eric

19  Schneiderman.

11:56AM  20         A new assistant attorney general in our office, that's

21  Mr. Sheehan, Bernie Sheehan.  And Mr. Sheehan and I have the honor

22  of representing seven people, seven different people, that they

23  all worked for the Department of Health, they are state employees.

24  The judge talked to you about under color of law, what they did

11:56AM  25  was as a state employee.

1          They are accused, and it's an accusation, of violating

2     the Constitution of the United States.  There are lots of

3     different ways you can be accused under the Constitution:  Eighth

4     Amendment, First Amendment, Fifth Amendment.  They're accused of

11:56AM   5     violating the plaintiffs' right of free speech.  Pretty serious

6     allegations.  And over the next several weeks, you're going to

7     hear evidence as to whether or not my clients should be liable to

8     the plaintiffs of money damages.

9          If you decide liability, as the judge said, there will

11:57AM  10     be a second part of the trial regarding damages.  But I'm going to

11     submit to you right now that the evidence will not support a

12     finding that any of my seven different clients are liable, and the

13     plaintiffs are not entitled to money damages.

14          I want to introduce to you for the third time -- you've

11:57AM  15     heard it in *voir dire*, Mr. Cooman referred to them, but I want to

16     introduce each of my seven clients.  And I just have to emphasize

17     the proof will show although there is some connection because

18     they're under the Department of Health umbrella, each of the seven

19     different people have seven different unique facts.  One person

11:57AM  20     doesn't necessarily talk to another person.  They're under the

21     umbrella of the Department of Health, but the Department of Health

22     and the State of New York are not defendants in this case.  Seven

23     different individual people.

24          You will hear also about other Department of Health

11:58AM  25     employees that took part in the issues that you're going to hear

1    regarding Beechwood.  As the evidence is presented, listen to what

2    my client, each individual person, said or did.  If you're taking

3    notes, that's where you should make the notes because there's

4    already things that Mr. Cooman told you about that my clients

11:58AM   5    didn't say or do.  But it's what my clients said or did.

6            So let me introduce to you my clients.  Ms. Leeds, right

7    there on the right, she's the highest ranging DOH official in this

8    trial.  She worked from 1979 to 2000 for the Department of Health.

9    In -- excuse me, in 1998, it's long ago, so I'll trip sometimes on

11:59AM   10   the 2000s back to 1990s.  But in 1999 -- excuse me, 1998, the

11   Department of Health reorganized and created the Office of

12   Continuing Care and Ms. Leeds was appointed second in command of

13   that.  The initials go by OCC, Office of Continuing Care.  Leeds'

14   responsibility included oversight of many of the departments in

11:59AM   15   OCC.  There's a man that she reported to named Barnett, and

16   another man above him called Whalen.

17           There is my client Mr. Altone.  Mr. Altone's a lawyer.

18   He worked as a lawyer for the New York State Department of Health

19   from 1977 to 2010.  In 1998 to 2000 Mr. Altone was the Director of

12:00PM   20   the Bureau of Administrative Hearings for the Department of

21   Health, Department of Legal Affairs.

22           Now, Mr. Cooman refers to this as not really being a

23   legitimate legal authority.  The evidence will show you that this

24   is an area called "administrative law."  It is a legitimate area

12:00PM   25   of legal authority.

           And Mr. Altone's specific job within the Department of

Health is like a prosecutor's office:  He has 25 attorneys and

they prosecute the cases in these administrative proceedings.  Now

he's not in front of Judge Larimer or he's not in front of

Judge Affronti.  That's not his job, that's not his area of

expertise.  His area of expertise is administrative law and his

attorneys prosecuted cases within the administrative law system.

           You may hear Hank Greenberg.  Mr. Altone reported to

Hank Greenberg.  He was the general counsel for the Department of

Health.

           Sharon Carlo, Ms. Carlo.  Ms. Carlo is a nurse by

training.  You'll hear about her incredible resume and the work

she's done before both and after.  What you're also going to hear

about is in November of 1998, just before everything started

happening at Beechwood, she came to the job.

           She was the Continuing Care Program Director for the

western region of New York.  That was an agency of the Department

of Health that oversaw both Rochester and Buffalo.  She was

responsible for 161 nursing facilities, as well as all the home

care agencies, assisted living programs, hospice programs and

adult homes in the region.  Not just nursing homes, not just

Rochester, she has a broad scope of duties.

           When you think of Ms. Carlo's role, it's everything in

the medical care outside of hospitals and primary care facilities,

and her job included oversight of surveys and surveillance of

1  nursing homes in western New York.

2        Where she fits in this, Carlo reported to Laura Leeds on

3  matters regarding nursing homes, as well as Robert Barnett in

4  DOH's Central Office -- you'll hear the phrase "Central Office"

12:02PM  5  used, that was in Albany -- and with regards to other matters to

6  Sanford Rubin in the Rochester office.

7        Reporting to her on the chart, reporting to her would be

8  Cindy Francis and Susan Baker regarding specifically nursing home

9  issues.

12:02PM  10       Mr. Rubin, the gentleman over there, worked at the

11  Department of Health from 1974 to 2000.  In 1985 Mr. Rubin became

12  the head of the Rochester regional office.  In 1999 he was the

13  acting head of the western region for the Department of Health,

14  and his duties as the DOH head of the Rochester office included

12:03PM  15  interacting with the Albany officials that link from the surveyors

16  and the other officials in Rochester and Buffalo with the people

17  in Albany.

18       Now, just an idea of what was on his plate, it wasn't

19  just nursing homes.  He had an Office of Public Health that did a

12:03PM  20  pure water program and environmental services, sexually

21  transmitted diseases, maternal and child care.  There was another

22  department called Office of Health Systems Management, sometimes

23  you'll see in some of the e-mails OHSM.  They did professional

24  medical conduct programs and reviewed physician complaints.

12:03PM  25       There was the Medicaid Management Info Systems, MMIS.

1  Home health services, emergency medical services, and there was

2  long-term care.  You'll hear about before Ms. Carlo, you'll hear

3  about a person by the name of Cantaben.  Under the program

4  directors, there's the team leaders and the surveyors.

12:04PM  5       Now, it's important to remember Mr. Rubin is not a

6  nurse.  He's a social worker by training.  He doesn't know the

7  nursing area.  They will try to pin it on him.  The proof will

8  show he doesn't know about how nursing works other than a

9  functional working knowledge based upon his experience.

12:04PM  10       Ms. Baker, Susan Baker.  She's not a nurse.  In the

11  previous opening that's almost like a negative.  But she's a

12  certified surveyor.  She's a registered dietician.  She has

13  experience working in hospitals and with consulting and consulting

14  with nursing homes.  And she has a bachelor's degree in nutrition,

12:05PM  15  and a master's degree in education and food and nutrition.

16       And the feds certified her as a surveyor.  She's well

17  qualified to do her job.  She conducted nursing homes surveys and

18  complaint investigations predominantly in the Buffalo area.  She's

19  a Buffalo person, as is Ms. Carlo.

12:05PM  20       And she became a survey team leader.  In 1995 she worked

21  in Quality Assurance.  You're going to hear about quality

22  assurance issues in this trial.  And in April 1998, Baker was

23  promoted to the Long-Term Care Program Director for the Western

24  Regional Office, and assumed survey and complaint responsibility

12:05PM  25  for the 161 nursing homes in western New York.  Baker's duties

1  included assigning people on regular surveys as opposed to

2  complaint surveys.

3          Just so you can follow who goes where, Ms. Baker

4  reported to Ms. Carlo.  Notice I'm sort of going top down.

12:06PM  5          Cynthia Francis, Ms. Francis.  Cindy is a nurse.  Back

6  then she had 27 years of experience.  She was a federal and is a

7  federal certified surveyor.  Before joining the Department of

8  Health, Ms. Francis worked as a nurse in long-term care facilities

9  and in the hospital.  She was the person in charge of the

12:06PM  10  Complaint Unit in the Rochester office and she reported to

11  Ms. Baker.

12          Ms. Francis, her job would be to take in the complaints

13  that come into the Department of Health in Rochester.  She would

14  schedule the surveys, and she would bring the serious complaints

12:06PM  15  to her superiors' attention, that is, Ms. Baker.

16          In the spring of '99, Francis was in her 12th year as

17  the Department of Health -- as the coordinator of Patient Care

18  Investigation Unit responsible for investigating complaints of 68

19  nursing home facilities in the greater Rochester, Monroe County

12:07PM  20  area.

21          And last, but certainly not least, Mary Elizabeth Rich.

22  Ms. Rich.  Ms. Rich is a registered nurse, nurse practitioner, she

23  worked in the Department of Health from 1985 until 2000.

24          In addition to her bachelor's degree in nursing, Rich

12:07PM  25  has a master's in nursing from the University of Rochester, and

post-master's certification as an adult nurse practitioner from
the University of Buffalo.  In 1999 Ms. Rich had 35 years of
nursing experience when she went to Beechwood and found the
problems that we're going to talk about in a minute.

12:07PM         Now, as the judge told you, Mr. Cooman's opening and my
opening are not evidence.  It might come across as evidence, and
if you take a couple hours and talk about something and speak
loudly and forcefully, it might sound like evidence.  But none of
it's evidence.  There might be kernels of truth in things you
12:08PM hear, but an argument is not evidence.

        And some statements you heard of in the opening are just
plain wrong.  For example, you heard about an e-mail on April 14th
where one DOH person sends a question to Mr. Altone -- not one of
my clients, somebody else.  Mr. Cooman refers to that as like it's
12:08PM an official document of the Department of Health finding that on
April 14th an April survey is unfounded.  You will hear evidence
how that is not true.

        On May 11th there was a telephone conference and
Mr. Cooman said at that point there was already a plan in effect.

12:09PM         The lawyers in this case have these iPads and we keep
600 plus exhibits on here.  And there was a reference to this
conference and what Laura Leeds said.  And I submit to you when
you get this document, what you're going to see is Sue Kelly, a
federal official, asks what's New York State's plan for
12:09PM revocation?  According to Ms. Carlo's notes, she takes a lot of

1   notes, and her detailed notes -- this was some other people are

2   just jotting things down kind of like what the judge referred to

3   earlier.  The question was asked by Sue Kelly, what's

4   New York State's plan for revocation?  LL:  Trying to decide

12:10PM  5   regarding New York State's plan for revocation.

6          So you might hear in an opening statement this is what

7   happened, but it's not going to be so clear this is what happened

8   because there's evidence that totally contradicts what Mr. Cooman

9   said earlier.

12:10PM  10          You heard about Judge Affronti's decision.  There was a

11   caretaker application.  You heard evidence that Judge Affronti

12   ridiculed the conflicting evidence presented, but when you read

13   the exhibit and see Judge Affronti's decision, what he said was --

14   and I think the proof will show this -- in a day or so there's

12:10PM  15   going to be the Department of Health proceeding and I defer to the

16   expertise of the Department of Health administrative law judge

17   that will be hearing this case.  Therefore, I'm not going to take

18   any action.  I'm summarizing, but read the exhibit when it's your

19   turn to read the exhibit.

12:11PM  20          There was a reference to an Assistant Attorney General

21   Jerry Solomon, and the words that were used -- I wrote them down

22   -- was it was referred to them for a criminal investigation.

23   Mr. Solomon's going to come in, Mr. Solomon's going to tell you

24   there was no referral.  He initiated this because he wanted to

12:11PM  25   look at facilities that were in an IJ situation to see if there

1    was a fraud.

2         And he looked at that case not as presented a few

3    minutes ago, but he looked at it because he wanted to know if

4    there was a criminal charge he could bring.  And you'll find out

12:11PM   5    he read the transcript from the administrative hearing, and he did

6    talk to people, and he decided he didn't want to bring a criminal

7    investigation.

8         Plaintiffs' counsel may pick apart and put a spin, but

9    what's ultimately going to bear out in this case is the evidence

12:12PM   10   you hear, from what you determine is valid and how it fits in.

11        This is going to be a long trial.  There is going to be

12   many witnesses over several weeks.  We may be calling 24, maybe 25

13   witnesses, including all of my clients.

14        Now, I just want to tell you it's not necessarily who

12:12PM   15   goes the longest, who calls the most witnesses, who shouts the

16   loudest.  It's the quality of the evidence.

17        I may not be calling one additional witness.  At the end

18   of the case, I may just rest.  Not because I don't have things

19   that I want you to hear and see and read and understand, but

12:12PM   20   because plaintiffs' case, the way they're going to present it,

21   will include calling all of my clients.  And rather than calling

22   them back at another time, we'll deal with them all at once.

23        The history of this case goes back many years, almost

24   like a history analysis when you read documents and piece things

12:13PM   25   together and come to a full understanding about what happened back

1    in the nineties.

2           In 1955 Mr. Chambery, Senior, Herb Chambery, and his

3    wife, who is here today, formed a nursing home.  It later was

4    rebuilt, redone, and I just want you to understand there were

12:13PM  5    three floors.  The first floor, what I call "operational," that's

6    where laundry and the offices were, but the residents didn't live

7    on the first floor.  There was a second and third floor where the

8    residents lived.

9           The Chamberys had a son -- you've heard his name, Brook.

12:14PM 10    Mr. Chambery's to my right.  Through most of the trial when you

11    hear Mr. Chambery, the reference will be to Mr. Brook Chambery.

12    There's also a son Dale; there may be some references to him.

13           Mr. Brook Chambery, the son, MBA graduate that studied

14    finance and monetary economics, he will be as much focus of this

12:14PM 15    case as my clients.

16           In 1992 when the senior Mr. Chambery became ill, his son

17    Brook started to take control of the business.  When Mr. Chambery

18    died the next year, although Mrs. Chambery is the owner of the

19    facility and has the largest share of the partnership,

12:14PM 20    Mr. Chambery, the son, took control of the family business.

21           Like some family businesses, certainly not all, but like

22    some, Beechwood went in a different direction under the leadership

23    of Mr. Chambery.  He changed the way Beechwood did business from a

24    nursing home that just dealt with the elderly to one that took in

12:15PM 25    rehab, rehabilitation people; seriously ill people coming from a

1  hospital that didn't need full hospital care, but weren't ready to

2  go home.

3         Over the 1990s Beechwood evolved to having an entire

4  floor of just rehabilitation patients.  So the third floor would

12:15PM  5  be your -- what I call "elder care;" the second floor would be

6  your rehab care.

7         That didn't happen overnight.  It was a transition.  As

8  people died, their beds were now used for rehab.  Sometimes they

9  would move people out for other reasons, but the point was

12:15PM  10  eventually by 1999 the second floor was a rehab floor.

11         With the change in the business model came more

12  complaints.  Mr. Cooman alluded to that.  There were complaints,

13  and that's going to be the crux of what happens.

14         Now, you're going to hear about the Department of Health

12:16PM  15  and the nursing home and the relationship.  First off, there's the

16  federal government that contracts with the state government, the

17  Department of Health, to do certain things.  The federal

18  government doesn't have enough people to go in and inspect every

19  nursing home throughout the country.  They work with state

12:16PM  20  governments, and the people at the Department of Health wear two

21  different hats:  A federal hat and a state hat.

22         It may get a little confusing.  I'm going to try with my

23  witnesses to explain the differences, and sometimes there's

24  different terminologies for similar things.  Termination rather

12:16PM  25  than revocation.  Termination would be a federal action;

1   revocation would be a state action.

2          So when you see and hear how does this effect

3   termination, just understand that there's two different parallel

4   entities:  The state, the feds.  The federal government you'll

12:17PM   5   hear often referred to the agency called "HCFA," HCFA.  You will

6   learn that there's a relationship between the regulated and the

7   regulators.  One, that the regulators in this case, the surveyors,

8   go to facilities and point out problems.

9          Nobody likes driving down the road back to Elmira and

12:17PM   10  getting pulled over by an officer who wants to give you a ticket

11  because we don't like being pointed out, we don't like the

12  problems that come with the ticket.  But the point is that's the

13  job of the surveyors, and you will learn how there's a certain

14  tension inherent in that relationship -- not just at Beechwood,

12:17PM   15  but that's the way the business is.

16          You will learn, and Mr. Cooman had his board up there,

17  about words like "surveys" and "deficiencies" and "Plans of

18  Correction" and so on.  I don't want to take up an hour and a half

19  or more of your time going through all that, but we'll work with

12:18PM   20  our witnesses to explain the different terms so you're comfortable

21  at the end of this six weeks that you'll know what these terms

22  mean and you'll be able to use them when it's your turn to

23  deliberate.

24          You will hear about the relationship not just generally

12:18PM   25  between the DOH and nursing homes, but specifically as it relates

1    to Beechwood Nursing Home -- 1995, 1996, 1997, 1998 -- the four

2    years leading up to the 1999 events.

3         You will hear that there was friction, and we'll discuss

4    that with the witnesses about the issues between the Department of

12:18PM  5    Health and the nursing home.  Just keep this in mind:  What's

6    happening in 1995, 1996, 1997, 1998 is that business model is

7    changing.  It's not just elder care; it's one floor of elder care

8    and soon to become a whole floor of rehabilitation care.

9         You will see the workings, the evidence will show

12:19PM  10   workings of a group of people with regards to actions taken

11   against Beechwood.  The witnesses will tell you about events that

12   happened more than a decade ago -- 1996, 1997, 1998, 1999 -- guess

13   what?  Memories fade over time.  You'll hear witnesses say "I

14   don't recall."

12:19PM  15        But what will be clear is that my clients were

16   hard-working public servants, working to protect the people in

17   nursing homes in general and at Beechwood in particular.  A

18   difficult, tough job.

19        Now, much of the evidence you're going to see we're

12:20PM  20   going to show you on the screens off our iPads are e-mails and

21   letters.  Now, just a note.  Think back, put yourself in the

22   perspective back in 1999, 1998.  E-mails were a relatively new

23   communication tool.  But we're going to have the records of their

24   e-mails and we'll know what was said.

12:20PM  25        But as you're hearing e-mails, seeing e-mails, reading

1   e-mails and memos, you have to take the bits and pieces of what

2   they say with the events that are happening at the time.  You have

3   to put it in the timeline and understand the chronology how things

4   fit.  What happened in 1998, what happened in 1999, what happened

5   April 1998, what happened April 1999.  And when you piece it

6   together, they don't necessarily form a link that plaintiff wants

7   to make you think here's a straight line to the demise of

8   Beechwood.

9            And, uniquely, one of my clients is a lawyer.  He is a

10  lawyer for the Department of Health.  He is called up for advice.

11  You will see e-mails that a lawyer's giving legal advice,

12  sometimes talking with other lawyers and coming up with legal

13  theories, plans, responses to the things they want responded to.

14            You will learn that before -- I'm not sure.  In 1995, I

15  believe it was, there was a letter written by Mr. Chambery

16  complaining about the surveyors.  And Ms. Leeds, this person who

17  is so bad according to the opening of Mr. Cooman, but Ms. Leeds

18  said you know what?  There's some tension going on here.  Let's

19  send a Buffalo survey crew out.  I have my dates wrong, it was

20  1996 was the letter, 1997 at the annual survey was when the

21  Buffalo survey team went to Beechwood.  Totally different crew.

22  Not affiliated with the Rochester office.   You will hear about

23  how well -- I'm using that term facetiously -- how well that

24  survey went and the problems with that survey.

25            The next year, 1998, April of 1998, not your annual

survey, there was a complaint survey.  You will hear about what

happened in 1998 when there was an IDR.  You've heard a little bit

about it, informal dispute resolution.  Mr. Chambery shows up,

Janet Engasser, to discuss whether there was a problem -- excuse

12:22PM me, whether they should change the deficiencies that were cited.

And Mr. Rubin, prophetically in April of 1998, one year before the

problems at Beechwood in 1999, warned Mr. Chambery we have a

problem with your skin care at Beechwood.  You'll understand in a

minute how that connects.

12:23PM       A man's trying to close them down, but they're giving

him a warning?  We got a problem with this, you might want to

address it.

             Then in the fall of 1998 there's the annual survey.

Wasn't as smooth as plaintiffs' would like you to think, but we'll

12:23PM hear the evidence from the witnesses.  I don't have to go through

it now.  But you'll hear the evidence about what happened there,

how it came to a head, and how it was concluded.

             I just mention that because there's backgrounds, little

slices of history that we have to put together to get to where

12:24PM we're going.

             In 1999 the Department of Health closed Beechwood down.

The process started in March 1999 when complaints from family

members of residents and patients about Beechwood called to the

DOH. There were numerous different complaints.

12:24PM       Ms. Francis, the head of the Complaint Unit, took one of

1    those complaints -- Mr. Cooman mentioned the man's name, I refer

2    to him as David M or the initials DM, trying not to use his name,

3    he's deceased -- but so David M was dead.

4         And Ms. Rich, who is now assigned by Ms. Francis, goes

12:24PM   5    and looks at the medical records.  Ms. Rich determined there was a

6    problem at Beechwood.  She determined there should be an expanded

7    sample.  That is, she wanted to look at other residents that left

8    Beechwood and had to go back to the hospitals.

9         Remember, the idea is they come from the hospital, they

12:25PM  10    go to Beechwood and then they hopefully go home.  She wanted to

11    see the people that went back to hospitals.

12         Now, just to tie in with something I mentioned earlier,

13    there's this supposedly April 15th e-mail documenting how it was

14    unsubstantiated.  Yet on April 15th -- that's an important day in

12:25PM  15    history, the day the Titanic sunk, an important date in history --

16    Liz Rich and Cindy Francis are back at the facility and looking

17    through records.

18         This wasn't unfounded or unsubstantiated because on

19    April 15th they were mentioned -- excuse me.  On April 15th they

12:25PM  20    were back at the facility and they were looking through records

21    and spent the day there doing their jobs.

22         At the end of the day they go in and talk with Donna

23    Richardson, the Director of Nursing.  And it's a small room and

24    they have Mr. Chambery join them.  Now, what wasn't mentioned in

12:26PM  25    their opening was on that date Mr. Chambery again loses his cool.

1       We know a year earlier in 1998 he storms out of the IDR

2   because he was upset with Mr. Rubin saying he supports his nursing

3   staff's conclusions.  A year later there's an argument, a book

4   slammed, fingers pointed, fists clenched, voices raised.  By the

12:26PM   5   way, that was all done by Mr. Chambery.  And he didn't like what

6   he was being told and he let the two nurses, the surveyors, know

7   about that.

8       Now, one of the reasons that's important is because you

9   can think oh, my gosh, the next -- that was a Thursday.  The next

12:26PM   10   week, on Monday, in comes Baker and Carlo.  They must have it out

11   for him.  Well, that's an argument, it's not the facts.

12       The proof's going to show that the next week, Monday,

13   April 19th, 1999, Elizabeth, Ms. Rich and Cindy, Ms. Francis,

14   returned again to get more medical records from Beechwood.  As a

12:27PM   15   result of the outburst by Mr. Chambery, Ms. Francis' boss

16   Ms. Baker comes in from Buffalo to show support and be there

17   because she had it reported to her of this outburst.

18       While at Beechwood on that next day, April 19th, there's

19   a new confrontation.  The surveyors demanding medical records and

12:27PM   20   there's a dispute, phone calls are made to the federal government,

21   to HCFA.  Mr. Chambery goes and researches the regulations.

22   Finally, at the end of -- in the afternoon Ms. Carlo arrives from

23   Buffalo because of this dispute, and the two surveyors are

24   obtaining the records and giving it to Ms. Baker and Ms. Carlo or

12:28PM   25   making copies that afternoon, hundreds of pages of medical records

1    that they wanted to review because they expanded the sample to

2    look at other people that left Beechwood to go back to the

3    hospital.  They go back to the office, records are reviewed.  They

4    find serious problems.

12:28PM   5        On April 22nd there was an exit conference.  Baker,

6    Carlo, Rich, Francis were now joined by Sanford Rubin, the head of

7    the Western Regional Office.  Beechwood was told at that time --

8    and we'll hear some details of the detailed explanation -- that

9    they, the Department of Health, found serious problems at

12:28PM  10   Beechwood.  They were told the problems were going to be

11   classified as immediate jeopardy.  Serious stuff.

12        According to Mr. Chambery's testimony, I anticipate

13   you're going to hear that Rubin, the man who wants to close them

14   down if you would believe the arguments made earlier, but I think

12:29PM  15   the proof will show Mr. Chambery was told by Mr. Rubin I don't

16   believe you can take care of these problems yourself, you might

17   need some outside help, you might need a consultant.

18        Now, is that advice that you give somebody you want to

19   close down, or is that advice you want to give somebody to correct

12:29PM  20   a problem?

21        Remember, a year earlier Rubin is warning we have

22   serious concerns about your skin care.  You're going to see skin

23   care come up.

24        April 27th the Statement of Deficiencies is delivered,

12:29PM  25   it's the formal document outlining what on April 22nd was

1    informally told to the Beechwood people.

2            Now, after this conference Rubin, as he did back in

3    1998 -- let me just back up.  April 1998 after Mr. Chambery storms

4    out of the conference where they're having the IDR, Rubin takes

12:30PM  5    not pen to paper, but fingers to keyboard and writes to people

6    about his observations based upon Mr. Chambery.

7            You're going to look closely at what he said, you're

8    going to look at Ms. Leeds' question that she poses to Mr. Rubin

9    and you'll be able to analyze that dialogue.

12:30PM  10           Here's a second time now a year later, after Mr. Rubin

11   has interaction with Mr. Chambery for the second time, where he

12   writes his thoughts down about what he observed from Mr. Chambery.

13           One of the recipients is Laura Leeds.  You'll hear Laura

14   Leeds gets a lot of e-mails.  She's up on the top of the chain,

12:31PM  15   lots of people copy her in.  But she was sent an e-mail, there's a

16   back and forth dialogue by e-mail, which we're all accustomed to

17   now, back in 1999 something unique.  You will hear on May 7th and

18   10th Beechwood submits a Plan of Correction.

19           Folks, this is critical.  A Plan of Correction, you're

12:31PM  20   going to hear testimony about what it is and what it should be,

21   what it should say, and you're going to hear about what this one

22   didn't say.  It's often referred to as a "rebuttal" rather than a

23   statement as to how they're going to correct.

24           Now, there's a rule, Mr. Cooman alluded to it, the

12:31PM  25   federal government says you don't have to agree with the

1    deficiencies, but you have to acknowledge how you're going to

2    correct them.  So even if you disagree, you still have to correct

3    it.

4              And just think about this, folks.  It's about nursing

12:32PM  5    care and taking care of the people.  So the federal rule that the

6    State was honoring is you may disagree with us, but you have to

7    fix it.

8              Now, as a result of the fact that there were (A) serious

9    problems and (B) uncorrected problems, the surveyors were now

12:32PM 10    going back to monitor the facility.  They're doing that because

11    there's real live people living there and they want to make sure

12    they're well-taken care of.  The monitoring is finding (A) the

13    problems that were originally detected are still there, they're

14    finding new people with the same problems; and (B) they're finding

12:32PM 15    new problems.

16             But as a result of the fact that Beechwood would be

17    losing their federal funding on May 15th, there was a meeting held

18    and it was decided to take them out of what's called the IJ

19    status, immediate jeopardy status, and they were put into a

12:33PM 20    different status, SQC.  And the ramifications of that change is it

21    gave Beechwood another month to correct their problems.

22             So the fact that they were no longer IJ, but they were

23    now in substandard quality of care gave them until June 17th to

24    correct the problems.  Remember, they were first told about the

12:33PM 25    serious problems April 22nd at the exit conference.

1          So now there's further deficiencies, there's the same

2    ones, there's more of the same.  And now in the May Statement of

3    Deficiencies it's not suggested that you get a consultant, it's

4    directed you get a consultant.

12:34PM 5          You will see evidence that Mr. Chambery was frustrated,

6    he didn't know how to correct the problems.  Another federal rule

7    is the surveys and the Department of Health can't tell them how to

8    correct.  They can point out this is a problem and that's a

9    problem, but they can't say here's how we want you to correct it.

12:34PM 10   That's up to the nursing home operator.

11         But what they did say is we hear you, you're frustrated,

12   you don't know how to correct it, get a consultant that will help

13   you fix the problem.

14         And despite the suggestions and despite the order,

12:34PM 15   Beechwood never got a consultant to help them fix their problems.

16   The facts are going to show Beechwood was given time and then

17   given more time.  Beechwood was advised and then ordered.  They

18   did not get a consultant, and they did not fix their problems.  So

19   May and June more citations, more deficiencies.

12:35PM 20         Now, before the June 17th deadline there were two court

21   proceedings.  The first one is the State tried to get a caretaker

22   appointed.  This is where someone comes in and runs the facility

23   and corrects the problems.  Interestingly enough, Beechwood

24   opposed that.  Interestingly enough, if the Department of Health

12:35PM 25   got their way, Beechwood would still be open because now somebody

1    else would be operating it and making sure that it doesn't close

2    down.

3          But the judge said no to the request for the caretaker,

4    and I mentioned to you before there's a decision -- I believe

12:35PM 5    you're going to get to look at it and you'll see the full scope of

6    what the judge decided and didn't decide.

7          I will submit the evidence is going to show that that

8    judge deferred to the expertise of another judge, that's the

9    administrative law judge.

12:36PM 10         There was a second proceeding Beechwood started, a

11   federal lawsuit against some of my clients.  That lawsuit also

12   sought to get an injunction; the injunction was denied.

13         You hear about roadblocks from Mr. Cooman.  There was a

14   roadblock there that nobody responded to on the plaintiffs' side.

12:36PM 15   Things were allowed to proceed to the Department of Health's

16   hearing.

17         On June 23rd, 1999, the administrative hearing started.

18   There was a judge by the name of Zylberberg who was appointed and

19   presided.  He heard over 30 witnesses, there were 19 days of

12:36PM 20   testimony, there was about 4,000 pages of transcript, there were

21   thousands of pages of exhibits.

22         Now, the interesting thing is back then and in this

23   trial you will hear about two totally different Beechwoods.  You

24   heard about this wonderful place -- I just wrote down some buzz

12:37PM 25   words -- innovative, successful, I can't read my own writing --

1    economical, efficient.  You'll hear, I think, some witnesses will

2    talk about it being nice and clean.  The ultimate conclusion from

3    all of these wonderful sounding words is this was a place without

4    problems ,they took perfectly good care of their residents and

12:37PM    5    their patients.

6              There's another Beechwood, and that's not one you might

7    see when you walk in back in 1999 and look around and say this is

8    a nice clean place, it smells good, the staff seems happy.  And

9    the proof of these problems will come from Judge Zylberberg's 1999

12:38PM   10    decision where he issues a 96 page report, and I am not going

11    through 96 pages with you folks, but I just want to pull out a

12    couple of examples so you understand what I believe the proof will

13    show so you can see the roadmap and the bigger picture.

14              Resident number 1, David M, the one that caused the

12:38PM   15    initial Ms. Rich going to the Beechwood facility.  Resident number

16    1, this is from the administrative law judge's decision, was an 86

17    year old male admitted to Beechwood 9/15/98.  He was discharged to

18    the hospital on 10/1/98 and readmitted to Beechwood on 10/26/98

19    with Stage IV sacral pressure sores.  You're going to hear a lot

12:39PM   20    about pressure sores.  I'm not a doctor, I'm not a nurse, I've

21    learned a little bit of this term.  I think the testimony you're

22    going to hear about it is it's also known as a bed sore or a

23    pressure sore, something you get when you're older and you're in a

24    facility and you're not moved often.

12:39PM   25              That same resident on his return to Beechwood on 2/9/99

1    until 2/16/99 was not seen by a physician, yet he was given a

2    rectal tube and the administration of oxygen by the nursing staff

3    without doctor's orders.

4         The judge wrote in his notes, in his decision -- it's

12:39PM  5    called a Report and Recommendation.  He writes this Report and

6    Recommendation and then it goes to the Commissioner.  He wrote

7    before DM's admission to Beechwood, his family was able to keep

8    the size of the decubitus ulcers relatively constant, under some

9    control and clean.  After readmission to Beechwood on 10/26/98,

12:40PM 10    DM's decubitus continued to worsen and increase in size.  DM's

11    medical records do not contain regular consistent monitoring of

12    this condition of his Stage IV sacral decubitus.  DM's decubitus

13    was frequently soiled and infected.

14         I'll give you another example.  Resident 16A was a

12:40PM 15    stroke victim.  On June 10th, 1999, a surveyor heard a resident

16    calling for assistance, asked to be removed from the Century tub,

17    which is like a standup tub, where the stroke victim was being

18    bathed.  And the judge wrote, having been in the tub for

19    approximately ten minutes and having been in the tub unattended

12:40PM 20    for approximately six or seven minutes, and the judge concluded

21    regarding Century tubs and the possibility of injury occurring to

22    residents -- plural, more than one -- who are left alone, the

23    Department has shown the elderly, debilitative residents listed --

24    excuse me.  In relation to this charge did not receive proper

12:41PM 25    supervision to prevent accidents.  Both Nurse Richardson and Nurse

1  O'Connor agreed that the Department's surveyor -- agreed with the

2  Department surveyor that the resident should not have been left

3  alone and said so to the surveyor at the facility.

4        At the hearing, however, Beechwood insisted on disputing

12:41PM  5  this common sense requirement.  This is one example of Beechwood's

6  unnecessary and counterproductive stubbornness.

7        Resident 7, an 80 year old female admitted to the

8  facility on 12/18/98 for rehabilitation following repair of a

9  right hip sustained from a fall.  The resident -- this is the

12:42PM 10  judge writing, the resident fell a total of four times after

11  admission to the facility.  As a direct result of those falls, her

12  right hip fracture repair had collapsed and she sustained a new

13  fracture on her left hip.  Beechwood failed to conduct an

14  appropriate falls risk assessment of this resident despite her

12:42PM 15  prior history of falls.  Beechwood also failed to change DW's care

16  plan to include appropriate intervention to prevent future falls.

17        Just a couple more.  Resident 7A had medical orders for

18  phenobarbital three times a day in order to treat her seizure

19  disorder.  The resident did not receive five doses of

12:42PM 20  phenobarbital from 5/2/99 to 5/3/99.  The judge concluded

21  Beechwood failed to provide this resident with the proper

22  pharmaceutical services.

23        Resident 9, different than resident 1, nursing staff

24  placed a rectal tube without a physician order.  The judge

12:43PM 25  concluded this is a violation of generally accepted standards of

1    nursing practice.

2         Resident 3, a 74 year old male, vomited a large amount

3    of clear yellow liquid, developed a fever of 103.4, was noted to

4    have excessive nasal mucous.  The resident expired on April 4th,

12:43PM 5    1999.  Based upon the above temperatures and symptoms recorded in

6    WW's chart, the nursing staff should have notified WW's physician

7    on the evening of March 30th, 1999 or by the morning of March

8    31st, 1999.  The physician was not notified of WW's elevated

9    temperatures until 4/2/99.  Resident 3's physician should have

12:43PM 10   been notified at the first sign of the significant temperature,

11   that's 103.4, and the fact that the physician or the physician's

12   assistant wasn't notified for three days after this resident

13   developed this fever was distressing.  If the septic syndrome had

14   been treated earlier in the process, there would have been a

12:44PM 15   greater chance for effective treatment.  Thus, the resident's

16   health was put in jeopardy by Beechwood's failure to notify the

17   physician so that medical evaluation treatment would be initiated.

18         The last resident, 3A, 3A fell and hit her head .  The

19   next day the resident was seen by a physician's assistant and sent

12:44PM 20   to the hospital.  Two days later a family member, the designated

21   representative, arrived at the facility and found an empty bed.

22   Beechwood violated more than one subsection of the rules.

23   Envisioning arriving at a nursing home to visit a loved one and

24   finding an empty bed is sufficient for me to agree with the

12:44PM 25   Department that a violation of this section is not just a mere

1    technicality.

2            I can go on.  I believe you'll have an opportunity to

3    read the 96 pages.  There are many more examples like the ones I

4    read.  So decubitus, the bed sores, more than one; there's more

12:45PM  5    than one fall, there's more than one medication.

6            The plaintiffs will attempt to prove it's my clients'

7    malicious intent that led to the closure of Beechwood.  The proof

8    will show -- the proof will show it will rest solely on Beechwood

9    and Mr. Chambery.

12:45PM 10            The last charge, charge 13, the judge wrote about the

11    opportunity to correct.  The Department has established that the

12    facility failed to comply with this regulation.  The administrator

13    did not take the necessary action to correct the deficiencies and

14    bring the facility back into compliance.  The Plans of Correction

12:46PM 15    submitted were not acceptable, and the monitoring visits revealed

16    that changes needed had not been made to correct the deficiencies

17    cited by the Department.  The Plans of Correction submitted by the

18    respondent were denied as events that were found, attacks on the

19    messengers, parens surveyors, and a barrage of information not

12:46PM 20    relevant or consequential to the cited deficiencies.

21            The judge continued, the major problem however lies in

22    Beechwood's management philosophy which appears to be more

23    interested in arguing and fighting all attempts for compliance

24    than in actually correcting deficiencies.

12:46PM 25            The charge the nursing home failed to administer in a

1  manner that enabled it to use its resources effectively and

2  efficiently to attain or maintain the highest practical physical,

3  mental, psychological well-being of each resident is sustained.

4  The judge concluded the Department of Health has proven

12:46PM  5  by a preponderance of the evidence that Beechwood has committed

6  multiple and serious violations of the cited New York State

7  regulations and the various standards of practice.  The violations

8  committed by Beechwood were not singular incidents, and when taken

9  together form a pattern of inadequate care to its residents.  I

12:47PM  10  also considered the respondent showed a clear lack of awareness of

11  the seriousness of the violations and demonstrated an

12  unwillingness to correct them.

13  Mr. Chambery refused to understand, admit and recognize

14  that his change in facility operations from a traditional

12:47PM  15  long-term nursing home to a facility providing both long-term and

16  rehabilitation short-term care involved different levels of

17  intervention and monitoring.

18  The population previously served by Beechwood was

19  comprised of traditional long-term residents with slow

12:47PM  20  deterioration and chronic illnesses.  Now the population included

21  residents with more acute, rapidly changing conditions.

22  This change in type of resident was financially driven,

23  and Beechwood received a higher reimbursement rate for the higher

24  acuity level resident.  While Beechwood accepted the higher acuity

12:48PM  25  level residents, they did not change their methods of operation,

1  including operation policies, staff, recordkeeping methods and

2  modes of assessment to reflect the needs of those residents.

3          The sole responsibility for the closure of the facility

4  rests with its administrator, Mr. Brook Chambery.  I do not

12:48PM  5  believe there was any cited deficiency which was uncorrectable.  A

6  number of actions and omissions committed by Beechwood were

7  dangerous to life, health, safety, and its resident population.

8  The Department has shown that there exists operational

9  deficiencies in Beechwood which form a pattern of violations of

12:48PM  10  the standards of state regulations.

11          Forgive me for taking that much time, but it's important

12  for you to understand that the proof is not going to show that

13  Beechwood was necessarily this wonderful perfect place.

14          As a result of the violations found by Judge Zylberberg,

12:49PM  15  he recommended that Beechwood should be fined $54,000 and its

16  New York State operating privileges should be revoked.

17          His Report and Recommendation goes to the head of the

18  Department of Health, Dr. Antonia Novello.  She reviewed it, she

19  said she relied on the expertise of the administrative law judge,

12:49PM  20  and she signed it, adopted that decision and that decision closed

21  down Beechwood.

22          That's important to note.  That has never been reversed

23  by any court.  That is the decision.

24          You're going to hear about uniqueness, and I am here to

12:49PM  25  tell you this case is unique, that much I agree with Mr. Cooman.

1    You will hear evidence that it's not often nursing homes get

2    closed, and I agree.  It is not very often.

3         But I think what you're going to hear from my clients is

4    the fact that any other situation they faced, the nursing home

12:50PM  5  operator fixed it or got a consultant to fix it.

6         Not in this case.  You want to know what's unique about

7    it?  That the serious deficiencies which other places do get cited

8    for, the serious deficiencies were not corrected.

9         Interesting in this trial the majority of the facts are

12:50PM  10  not going to be disputed.  The events are what they are.

11    Mr. Cooman had his calender, he can point to dates on this date

12    this happened, on that date that happened.  There will be

13    e-mails -- I'm almost finished, there will be e-mails.  They say

14    what they say.  It's not like there's facts in contradiction.

12:51PM  15       This trial is different than most because I'll

16    guesstimate 90 some odd percent of the facts you will hear you

17    don't have to figure out what happened.  It was written, the

18    Statements of Deficiencies were delivered.  There will be some

19    things that there will be some differences, but the bulk of this

12:51PM  20  trial is not about factual disagreement.

21         What you have to assess, and the judge alluded to this

22    in *voir dire* in his opening comments, is you're going to have to

23    work on the operation of my clients' state of mind, what motivated

24    them.  Were they motivated because they wanted to go out and get

12:51PM  25  Mr. Chambery for something that happened two and a half years

1  earlier?  Or were they motivated by the fact that some of those
2  problems and more that they found at Beechwood caused them to do
3  their job?
4          The trial is about retaliation.  It's not about the
12:52PM  5  quality of care, but the quality of care that I just spent some
6  time talking about fits in because it is our defense.  (A) we
7  didn't retaliate, we didn't formulate the intent to retaliate.
8  And (B) our actions were driven, motivated by the things they saw
9  in that nursing home.
12:52PM  10          Plaintiff is not looking in the mirror.  Plaintiff is
11  arguing we're at fault and that's why they were closed, so enraged
12  by events two, two and a half years ago.
13          So let's just focus for a minute on what those events
14  are -- I'm winding down.  The first was a 1996 complaint made to
12:53PM  15  the Department of Health because Beechwood was trying to evict
16  Mrs. Langeveld from their nursing home.
17          Now, piece this in with the other things you've learned.
18  They're trying to free beds up to use for rehab, and they felt
19  Mrs. Langeveld was ready to leave.
12:53PM  20          Mr. Rubin and two other Department of Health officials
21  in 1996 show up at the facility to investigate whether she should
22  be sent to another type of facility.  Now, the two other people
23  that went with Mr. Rubin are not any of my clients.  On November
24  26th, 1996 -- and I think that's the same day they filed their
12:53PM  25  lawsuit -- Mr. Rubin sends a letter to Mrs. Langeveld agreeing,

 1    agreeing with Beechwood that she should be moved to a different

 2    facility, a lesser care type of facility.

 3          Mr. Rubin wasn't opposed to what they wanted, what

 4    Beechwood wanted.  But Beechwood and Mr. Chambery didn't like the

12:54PM  5    process of how we got there.  So he brought an Article 78 lawsuit.

 6    You'll hear a little bit about an Article 78 lawsuit.  The proof

 7    will show an Article 78 is where you complain about something that

 8    the government does.  It's a way to appeal to a judge when you

 9    don't like something the government does.

12:54PM 10          It's not like this lawsuit where you say give me money

11    damages.  It would be like the Langeveld lawsuit where you say

12    they didn't follow the procedure.

13          Now, the Langeveld lawsuit brought by Beechwood did not

14    say that Rubin was wrong in his conclusion.  They said we don't

12:54PM 15    like how we got there.  It's an important distinction.  Get really

16    upset about being sued, you might be told you're wrong in your

17    conclusion, but they told him he was wrong how he got there.

18          Now, on January 3rd, 1997, a Supreme Court justice in

19    the state system agreed with the Attorney General's Office and

12:55PM 20    dismissed Beechwood out of the lawsuit.  He said you shouldn't be

21    part of this.

22          But by that time Mrs. Langeveld is now in this lawsuit,

23    and the Attorney General's Office and the Department of Health

24    reviewed the procedure and they found out Beechwood was correct,

12:55PM 25    they weren't following the federal procedure.

1          So what they did was they now gave Mrs. Langeveld a

2    hearing in front of an administrative law judge, which is what the

3    federal rules require.  The irony of this part of the case is the

4    administrative law judge disagreed with Mr. Rubin and disagreed

12:56PM  5    with Mr. Chambery and directed that Mrs. Langeveld can stay at

6    Beechwood.  And the ultimate irony is she stayed at Beechwood

7    until the closure in 1999, so they couldn't evict her.

8          Now, when we're talking about this lawsuit listen for

9    evidence connecting my clients with the Langeveld lawsuit, because

12:56PM  10   in order for there to be a retaliation claim, you got to connect

11   them with the things that they're supposedly retaliating.

12         I'll submit to you that the evidence is going to show

13   five of my clients never knew a thing about the Langeveld lawsuit.

14   They weren't motivated by it, they didn't know about it.

12:56PM  15         Two of them did:  Leeds, Rubin.  And we'll get into and

16   the evidence will show how, although they may have discussed the

17   litigation, it wasn't for the purposes of retaliation or more

18   preparation, planning, being ready.

19         There's a second action that they claim caused

12:57PM  20   retaliation.  In 1996 and 1997 Mr. Chambery sent letters, mostly

21   to the Commissioner, but not just to the Commissioner.  At that

22   time the Commissioner's name was De Buono -- you'll see the

23   letters.  One he entitles Report Card on the Healthcare Industry

24   in New York State.  The process with the Department of Health is

12:57PM  25   when you get these letters -- and it's similar with other

1    departments -- when somebody complains about something, the letter

2    gets assigned to an appropriate person within the Department of

3    Health to respond to.  Ms. Leeds had the honor of responding on

4    behalf of the Department on some of the letters.

12:58PM   5         Now, just as only two people knew about the Langeveld

6    lawsuit out of my seven clients, one knew about the letters:

7    Ms. Leeds.  I don't think the evidence you're going to see over

8    the next six weeks will connect any of my clients to those

9    letters.

12:58PM   10        So as you sit here over the next six weeks, think about

11   the judge's preliminary charge, think about some of the critical

12   pieces of evidence.  Did my clients retaliate?  What evidence

13   supports that?

14        You got to keep an open mind until you go back in the

12:58PM   15   room and deliberate, but you can start piecing things together in

16   your mind how they fit and you can think about it.

17        So the question is did Beechwood get closed down because

18   my seven clients were so angry and so upset over the events that

19   occurred two, two and a half years earlier that most of them

12:59PM   20   didn't even know about?  Were they part of some grand conspiracy

21   where Laura Leeds is talking to Liz Rich, the top of the -- no

22   disrespect to Ms. Rich -- top of the food chain and the lower end

23   of the food chain of the Department of Health?  Were they

24   conspiring let's go out and get them?  Or did Liz Rich get

12:59PM   25   assigned to do a complaint, go out to the facility, the evidence

1  will show she saw things, she acted on them and that's what -- is

2  that what led to the demise of Beechwood?

3         Now, at the end of the trial I'll be before you and

4  Mr. Cooman after me will give our closings and there will be

01:00PM  5  arguments at that point.  And at the end of this trial I'm going

6  to ask that for each of my clients on that verdict sheet that the

7  judge mentioned to you, you check off the box for my seven clients

8  indicating that they are not liable in this lawsuit and should be

9  dismissed.

01:00PM  10        Thank you all for your attention.  Thank you, Judge.

11        THE COURT: Thank you.  Let me ask the jury to step out

12  for just a second and we'll decide what we do next and when we do

13  it.  So step out for a few minutes, folks, and I'll talk to the

14  lawyers.

01:00PM  15        (WHEREUPON, the jury was excused).

16        THE COURT: The jury's been excused.  It's now 1 o'clock.

17  My preference is maybe we finish for the day, but I'll hear

18  counsel.

19        MR. COOMAN: Your Honor, if I may?  I'd call to your

01:01PM  20  attention two objections I have in the closing which I did not

21  feel were appropriate to object to, but rather at the appropriate

22  time we'll be asking the Court for a curative instruction.  That

23  is, Mr. Levine said two things that I believe are, one, against

24  the law and, one, sort of against the facts.

01:01PM  25        One is his recitation near the end of his opening about

01:01PM

01:02PM

01:02PM

01:02PM

01:03PM

1  conspiracy and somehow Beechwood was claiming conspiracy among

2  people and people needed to talk together.  We've talked about

3  this before in chambers, and I'm assuming and hoping that there

4  will be a curative instruction that says conspiracy is not

5  something plaintiffs claim.  They claim there was joint action,

6  that there was communication among people.  But the notion of

7  conspiracy does not need to be proved as an element of this case.

8       So I think a curative instruction on that probably

9  resolves that concern.

10       THE COURT: Well, we will talk about that, but -- I know

11 we have discussed it, but it's sort of a fine line between

12 establishing joint action and conspiracy.  To me it's synonymous.

13 Joint action, you take some illegal act.

14       I mean, I think if one person is aware of the improper

15 motive of another and assists in that, that person can also be

16 liable.  So I don't intend to do anything at this point, I've

17 noted it and we'll talk about it and see if a cautionary

18 instruction is appropriate.

19       I actually had it on my list to talk to you about what,

20 if anything, I should say to the jury about what I just said, that

21 is, joint action, people joining together to do something.  So

22 something to be discussed.

23       MR. COOMAN: The Court alludes to an important point

24 there which is I believe Mr. Levine's presentation to the jury

25 assumed that the law is that each of the defendants must know of a

1  specific retaliatory item by Mr. Chambery, and unless they're

2  reacting to that specific item, that somehow exculpates them and I

3  do not believe that's the law and we'll need the right instruction

4  for them to understand that it could be that various of their

01:03PM  5  compatriots know about those things, but if they then know that

6  that actor has retaliated and they're joining in that retaliation,

7  they don't need to have ever read the letters or have been a party

8  to the lawsuit.  There's an implied element of extra knowledge

9  there that I believe Mr. Levine was suggesting.

01:03PM  10      One last --

11      THE COURT: As always, if you all suggest cautionary

12  instructions, it's helpful to the Court if you give me one.

13      MR. COOMAN: Very good.

14      One last thing, Judge, and I guess I'll make the

01:04PM  15  objection and then perhaps it's really in the nature of a

16  motion *in limine*.  Mr. Levine alluded to this Court's review of an

17  application in the first 1983 case involving Beechwood back in

18  June of 1999, and he specifically referred to the fact this Court

19  denied an injunction and that he made a lot of statements about

01:04PM  20  that which I do not believe is factually relevant to the case at

21  all, it should not be alluded to and something needs to be told to

22  the jury if that were to come up again.  I don't even think it

23  should come up as a matter of proof or factual information.

24      THE COURT: I didn't think we talked about this in our

01:04PM  25  motions *in limine*, and I don't think -- although my ears perked

1    and I think Mr. Levine said "a federal lawsuit," I don't think

2    he -- I know he didn't identify me, which is good.

3            MR. LEVINE: Judge, if I may?  The facts in the e-mails

4    that are all intended to show is that there was an application for

01:05PM  5    federal injunction and the federal injunction was denied.  That

6    was what led supposedly to the e-mails amen, hallelujah, hot

7    digitty dog.  That was the e-mails that precipitated that.  That's

8    why I included it.  It was part of the events.

9            THE COURT: Federal lawsuit or --

01:05PM  10           MR. LEVINE: Federal lawsuit.  I mean, I can show the

11   Court.  I didn't just make this up and stick it in to cause any

12   prejudice.  It's part of the facts and the continuum of this case.

13           THE COURT: Well, I don't know if we want to litigate

14   again why the Court denied the motion for temporary relief.  But I

01:05PM  15   have noted it, let me take a look at it and -- I mean, do either

16   of you think, Mr. Levine, you're going to go more down that road

17   in terms of what was petitioned and what --

18           MR. LEVINE: No.  The point is that there was the series

19   of e-mails.  There was an e-mail, I think by Mr. Rosenthal,

01:06PM  20   indicating that the injunction was denied and that was passed on

21   to different people.  And, I mean, that's just part of the facts

22   of this case.

23           THE COURT: Well, to that extent, I guess we can leave it

24   where it is.  And, Mr. Cooman, if you have some language -- or

01:06PM  25   either of you have some language you think that's appropriate for

1   me to tell the jury about that, so be it.  I'll take a look at it,

2   all right?

3         MR. COOMAN: Thank you.

4         MR. LEVINE: Do we want to just go over what we're doing

01:06PM  5   tomorrow?

6         THE COURT: Or today.  I mean, I think the jury's had a

7   lot of talking at them, and I think maybe it's getting close to

8   our break time.  Have we heard anything about Brother Rothenberg?

9         MR. COOMAN: I have not.  That will obviously be one of

01:07PM  10   my first calls back at the office.

11         MR. LEVINE: Would you mind e-mailing or letting us know?

12         THE COURT: Hear me out.  I don't know if we need

13   Rothenberg tomorrow --

14         MR. COOMAN: We do not.  So let me assure the Court we

01:07PM  15   have a full day of witnesses that are my responsibility, so we've

16   got some time.

17         THE COURT: I was going to have the jury call in tonight

18   or tomorrow morning on the chance that Rothenberg would not be

19   available and that would disrupt our witnesses --

01:07PM  20         MR. COOMAN: The first three witnesses are all the

21   Beechwood former employees.  The line-up for tomorrow would be

22   Ms. O'Connor, and then Mrs. Chambery, and Mary Wenderlich and I

23   have responsibility for all of those and I suspect that's probably

24   a full day of testimony.

01:07PM  25         THE COURT:  Well, all right.  Why don't we then have

1  Ms. Rand tell the jurors that we're breaking for the evening, they

2  should come back at 8:30 in the morning?

3           MR. LEVINE: Thank you, Judge.

4           THE COURT: Then I want to see counsel in chambers about

01:08PM  5  a matter when the jury is gone, but otherwise we'll resume

6  tomorrow with the identified witnesses at 8:30.

7           MR. COOMAN: Thank you, Judge.

8           THE COURT: Thank you.

9           (WHEREUPON, the proceedings adjourned at 1:07 p.m.)

10                        *    *    *

11                 CERTIFICATE OF REPORTER

12

13      I certify that the foregoing is a correct transcript to the

14  best of my ability of the record of proceedings in the

15  above-entitled matter.

16

17  S/ Christi A. Macri

18  Christi A. Macri, FAPR-RMR-CRR-CRI
    Official Court Reporter

19

20

21

22

23

24

25