1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5

6

- - - - - - - - - - - - - - - X
7  BEECHWOOD RESTORATIVE CARE        )     02-CV-6235(L)
   CENTER, BROOK CHAMBERY AND        )
8  OLIVE CHAMBERY,                   )
                 Plaintiffs          )
9  vs.                               )
                                     )     Rochester, New York
10 LAURA E. LEEDS, EDMUND RUSSELL    )     June 20, 2012
   ALTONE, SANFORD RUBIN,            )     1:10 p.m.
11 SUSAN T. BAKER, SHARON A. CARLO,  )
   CYNTHIA T. FRANCIS and ELIZABETH  )
12 RICH,                             )
                 Defendants.         )
13 - - - - - - - - - - - - - - - X

14

15

16

17                   TRANSCRIPT OF PROCEEDINGS
18            BEFORE THE HONORABLE DAVID G. LARIMER
                 UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24 COURT REPORTER:     Christi A. Macri, FAPR, RMR, CRR, CRI
                       Kenneth B. Keating Federal Building
25                     100 State Street
                       Rochester, New York 14614-0222

```
 1                    A P P E A R A N C E S

 2                         *     *     *

 3

 4   GEIGER & ROTHENBERG, LLP
     BY:  DAVID ROTHENBERG, ESQ.
 5   45 Exchange Boulevard
     Suite 800
 6   Rochester, New York 14614
              - and -
 7   MCCONVILLE CONSIDINE COOMAN & MORIN, P.C.
     BY: KEVIN S. COOMAN, ESQ.
 8   25 East Main Street
     Suite 400
 9   Rochester, New York 14614
     Appearing on behalf of the Plaintiffs
10

11

12

13   ERIC T. SCHNEIDERMAN, ESQ.
     Attorney General of the State of New York
14   BY: GARY M. LEVINE, ESQ.
         BERNARD SHEEHAN, ESQ.
15   Assistant Attorneys General
     144 Exchange Boulevard
16   Suite 200
     Rochester, New York 14614
17   Appearing on behalf of the Defendants

18

19

20

21

22

23

24

25
```

1                        <u>I N D E X</u>

2   <u>WITNESS FOR</u>
    <u>THE PLAINTIFF</u>          <u>DX</u>   <u>CX</u>   <u>RDX</u>   <u>RCX</u>

3   Russell Altone                 4

4

5

6
    <u>EXHIBIT          RECEIVED</u>

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2                    *         *         *

3          (WHEREUPON, the jury is present; the direct examination

4  of Russell Altone was previously reported, but not transcribed).

01:09PM  5                    CROSS-EXAMINATION

6  BY MR. LEVINE:

7  Q.    Whereabouts do you live?

8  A.    In the Albany area.

9  Q.    And let's describe for the jury your educational background.

01:10PM 10  You have a bachelor's degree?

11  A.    I do.

12  Q.    From?

13  A.    Bachelor of Arts from the University of Buffalo.

14  Q.    What year?

01:10PM 15  A.    In 1968.

16  Q.    And from there did you go to law school?

17  A.    To the John Marshall Law School in Chicago, graduated in

18  1976.

19  Q.    Do you have any other degrees?

01:10PM 20  A.    Yes, I do.  A master of arts in history from the University

21  at Albany 1980; and then in 2011, after I retired from the

22  New York State Department of Health, I completed a master's in

23  public health.

24  Q.    Where did you get that master's?

01:10PM 25  A.    University at Albany School of Public Health.

1  Q.   Now, you were admitted to practice law starting in 1977?

2  A.   That's correct.

3  Q.   Are you currently licensed to practice law in New York State?

4  A.   Yes, I am.

01:10PM 5  Q.   You're a member in good standing?

6  A.   Yes, I am.

7  Q.   Have you ever had any attack to your license in any form?

8  A.   None whatsoever.

9  Q.   Now, what are you currently doing?  You said you retired in

01:11PM 10  2010.  What are you doing since then?

11  A.   Well, I completed the master's in public health.  And I teach

12  a course in Public Health Law to master's and doctoral students at

13  the University at Albany School of Public Health.

14         Most of my time is spent in community public health and

01:11PM 15  pro bono legal work involving refugees who are being resettled in

16  the Albany area.  I volunteer with my wife, and I volunteer with

17  the U.S. Committee For Refugees and Immigrants.

18  Q.   Pro bono means?

19  A.   For free.

01:11PM 20  Q.   You were an attorney with the Department of Health from 1977

21  to 2010?

22  A.   Except for 1979 through 1982 when I was with the Office of

23  Counsel, Legal Department of the former Department of Social

24  Services.

01:11PM 25  Q.   Which is another -- a different state agency?

6

1   A.   It was.

2   Q.   It was.   And now?

3   A.   It no longer exists.

4   Q.   Because it's part of the DOH?

01:12PM   5   A.   Yes.

6   Q.   Now, you talked about your supervisory role with the BAH,

7   correct?

8   A.   Yes.

9   Q.   And what is -- BAH stands for?

01:12PM   10   A.   The Bureau of Administrative Hearings.

11   Q.   So the attorneys that you supervised, is the sole forum that

12   they appear in is administrative hearings?

13   A.   That's correct.

14   Q.   So if there was an action in a federal court, they wouldn't

01:12PM   15   go there?

16   A.   They would not.

17   Q.   If there was an action in state court, they wouldn't go

18   there?

19   A.   No, they would not.   The Attorney General probably would.

01:12PM   20   Q.   And what type of issues did your staff work on?   I'm just

21   looking for the broadest categories.

22   A.   About 30 different ones.

23   Q.   Just name a few big ones.

24   A.   Nursing home operators, hospital operators, managed care,

01:13PM   25   funeral directing, clinical laboratories.

1   Q.    Okay.

2   A.    Nutrition program.  Many others.

3   Q.    Each of these issues, if there were problems, they're brought

4   before an administrative hearing; is that correct?

01:13PM   5   A.    Most of the time we attempt in every way possible to settle

6   these, but when we could not, we would bring them to hearings

7   before administrative law judges.

8   Q.    What is an administrative law judge?

9   A.    An administrative law judge is an attorney specially trained

01:13PM   10   in the law.  They receive special continuing legal education --

11          MR. ROTHENBERG: Objection.  I'm not sure this is fact

12   testimony, Your Honor.  It sounds to me like it's either the

13   Court's prerogative or expert testimony.

14          MR. LEVINE: It's the area of expertise that he works in,

01:13PM   15   the Administrative Bureau.  It explains who they bring their cases

16   in front of.

17          THE COURT: I will allow him to testify.  The Court may

18   give an instruction on this or may not.

19          MR. LEVINE: Thank you, Judge.

01:14PM   20   BY MR. LEVINE:

21   Q.    I forgot where you were, so if you can just explain what are

22   administrative law judges?

23   A.    Administrative law judges are impartial triers of fact.  They

24   are -- they are bound to be impartial, and they hear cases, due

01:14PM   25   process cases, in which the Department presents its case.

1        Department prosecutors, such as myself and the attorneys

2   I work with, present cases to those administrative law judges; and

3   respondents, such as nursing home operators and others, are given

4   full due process opportunity to present their cases in trial

01:14PM 5   type --

6        THE COURT: That's a little broader definition of an

7   administrative law judge, so I'll strike that.

8        MR. LEVINE: Yes, sir.

9        MR. ROTHENBERG:  Thank you, Your Honor.

01:14PM 10  BY MR. LEVINE:

11  Q.   Let's try to stick with the question and the answer.

12  A.   All right.

13  Q.   With regards to who you reported to, you reported to Hank

14  Greenberg?

01:15PM 15  A.   Yes.

16  Q.   And I think you said about 25 attorneys reporting to you?

17  A.   The numbers varied during the period in question, but I think

18  it was 17 to 21, perhaps more.

19  Q.   But all of those attorneys that you supervised, their role

01:15PM 20  was as prosecutors?

21  A.   Yes.

22  Q.   Now, if you estimated how many -- what percentage of the

23  cases actually settled of the cases that were prosecuted?

24  A.   More than 90%.

01:15PM 25  Q.   And generally your role as an attorney for the Department of

1  Health, who were your clients?

2  A.   Various programs within the New York State Department of

3  Health.

4  Q.   And what about the employees of the Department of Health?

01:16PM  5  A.   I never regarded our role as being personal attorneys for any

6  employee.  It was for the Commissioner of Health and the

7  Department of -- Department programs.

8  Q.   So what was -- as a DOH attorney, what was your job broadly

9  as an attorney?

01:16PM  10  A.   To represent the Department's case and to try to resolve

11  cases whenever possible, but otherwise to represent the

12  Department's position in administrative hearings before

13  administrative law judges.

14  Q.   Are you familiar with the concept for an attorney to

01:16PM  15  vigorously, aggressively and ethically represent their clients?

16  A.   Yes, I am.

17  Q.   Now, does that hold true for you as an agency attorney?

18  A.   Yes, it does.

19  Q.   And do you have the same ethical obligation to represent your

01:16PM  20  client as, say, Mr. Rothenberg?

21  A.   Yes, I do.

22  Q.   I want to just -- once the case moves outside the

23  administrative proceeding, are there other parts the attorneys for

24  the DOH that have different roles?

01:17PM  25  A.   Within the Division of Legal Affairs, there were a number of

1  different bureaus.  I think there were six at the time.

2  Q.    So, for example, who was Joe Biermann?

3  A.    Joe Biermann was the Director of the Bureau of Litigation,

4  the bureau that liaisons with the Attorney General's Office on

01:17PM  5  specific litigation cases in court.

6  Q.    And another name we heard mentioned was Hal Rosenthal?

7  A.    He was an attorney who worked for Joe Biermann in the Bureau

8  of Litigation.

9  Q.    And did you have any supervisory role outside of the

01:18PM  10  attorneys that were in the Administrative Unit?

11  A.    No.

12  Q.    Now, your function *vis-à-vis* the 25 or so attorneys that you

13  supervised, what would be your role with regards to those people?

14  A.    I would assign them cases, and we had about 1,000 cases at

01:18PM  15  any one time.  I would assign cases in various subject areas; I

16  would work with them to resolve those cases; if there were any

17  impediments, any difficulties, they would bring them to my

18  attention; we would try to meet with program staff if it was

19  regarding difficulties regarding evidence, regarding various

01:18PM  20  issues.

21        I would work with them if there were changes in the law

22  that affected the operations of the Bureau.  I would ensure that

23  the Bureau attorneys knew about them, knew what to do.

24        I would evaluate the cycle time of the cases.  We wanted

01:19PM  25  to resolve our cases expeditiously and avoid backlog, so we would

1  continuously try to meet-and-confer and move the cases along.

2  Q.   I'm going to cut you off.

3  A.   Okay.

4  Q.   Okay?

01:19PM  5  A.   Okay.

6  Q.   Did you do actual legal work for these pieces of litigation?

7  A.   Not litigation.

8  Q.   For these administrative proceedings?

9  A.   Yes.

01:19PM  10  Q.   What type of legal work did you do?

11  A.   I assigned myself cases from time to time.  I worked for many

12  years handling cases and appearing before administrative law

13  judges in various kinds of cases.

14  Q.   Now, there were some names mentioned and I just want to place

01:19PM  15  them.  Who is Marie Shea?

16  A.   Marie Shea was one of the attorneys in the Bureau of

17  Administrative Hearings.  She was based physically in the Western

18  Region, Buffalo.

19  Q.   How much experience did she have?

01:20PM  20  A.   In 1999 she had only been with the Bureau for a few months.

21  Q.   Do you know if she ever litigated a particular case before?

22  A.   Prior to Beechwood I had assigned her a number of small cases

23  involving controlled substances and patient protection, individual

24  cases, and she had demonstrated her capabilities to my

01:20PM  25  satisfaction.

1    Q.    Okay. And I think you mentioned Steve Steinhardt was not one

2    of your attorneys?

3    A.    No, he was in the Bureau of House Counsel.

4    Q.    How about John Darling?

01:20PM   5    A.    John Darling was in the Bureau of Administrative Hearings.

6    He was based in Rochester, his specialty was Medicaid.

7    Q.    And how about David Abel?

8    A.    David Abel was an attorney in the Bureau of Administrative

9    Hearings with a wealth of experience.

01:20PM   10    Q.    Okay. Now, did the attorneys go out and conduct the actual

11    investigations?

12    A.    Never.

13    Q.    What did they rely on?

14    A.    The information from the surveys, witnesses, documents that

01:21PM   15    were shown to them.

16    Q.    And with regards to Beechwood, did you ever conduct any

17    investigation?

18    A.    None.

19    Q.    Any of the information that you got -- strike that.

01:21PM   20          Where did you get your information?

21    A.    From Marie Shea, and from the surveyors, and from the

22    Statements of Deficiencies that were shown to me.

23    Q.    And did you rely on the information you got from those

24    people?

01:21PM   25    A.    Yes.

1    Q.    Now, just generally, in addition to the state procedure,

2    there's also a federal procedure?

3    A.    Yes.

4    Q.    And does your area of expertise have anything to do with the

01:21PM    5    federal side of things?

6    A.    No, it does not.

7    Q.    Your litigation was strictly state procedures?

8    A.    Yes.

9    Q.    Okay. Now, was there a time where federal actions or

01:21PM    10    termination actions have some impact on what you do on the state

11    side?

12    A.    Yes.

13    Q.    Could you just explain briefly about that?

14    A.    Whenever a nursing home that had a Medicare/Medicaid provider

01:22PM    15    agreement was at risk for losing its provider agreement and being

16    faced with a possible termination, the Bureau of Administrative

17    Hearings always needed to consider and be prepared for the

18    possibility that some administrative action, state action, might

19    have to take place.

01:22PM    20         It's a little complicated, but I'll try to make it

21    simple --

22              MR. ROTHENBERG: Objection, non-responsive.

23              MR. LEVINE: I think you explained it.

24              THE COURT: I think he did.

01:22PM    25    BY MR. LEVINE:

14

1  Q.    Now, before the spring of 1999, did you know anything about

2  Beechwood?

3  A.    No, I did not.

4  Q.    We heard that there was litigation that we referred to as the

01:22PM  5  *Langeveld* litigation?

6  A.    Yes, in this trial.

7  Q.    Okay. If an Article 78 was brought in the mid-1990s and it

8  involves the Department of Health, would the Bureau of

9  Administrative Hearings staff get involved with that?

01:23PM  10  A.    No, it would not.

11  Q.    Do you know which part of DLA would be involved with that?

12  A.    That would be the Bureau of Litigation.

13  Q.    And you were not involved with that?

14  A.    No.

01:23PM  15  Q.    Did you know anything about the *Langeveld* litigation?

16  A.    I did not.

17  Q.    Did you know anything about the change of -- let me ask it

18  this way -- strike that.

19         You heard there was some discussion about changing

01:23PM  20  regulations.  Do you remember that testimony?

21  A.    I heard that here.

22  Q.    Were you involved at all with that?

23  A.    Not at all.

24  Q.    Did you know anything about Chambery's letters to the

01:23PM  25  Department of Health?

1   A.   Nothing whatsoever.

2   Q.   Did you know anything about Chambery's letters to HCFA?

3   A.   I did not.

4   Q.   Did you know anything about Mr. Chambery's complaints orally

5   to HCFA?

6   A.   I did not.

7   Q.   Would you agree before the spring of 1999 the names Beechwood

8   or Chambery meant little to you?

9   A.   I would agree.

10  Q.   We looked at -- I think it was Exhibit 118, your e-mail.  Do

11  you recall that?

12  A.   I do.

13  Q.   That's the one of April 15th, 1999?

14  A.   Yes.

15  Q.   And I just want -- we can put it on the screen if you need to

16  look at it, but was there a question posed to you by that e-mail?

17  A.   Yes, there was.

18  Q.   Do you remember what the question was?

19  A.   Yes, basically what information can be disclosed to HCFA

20  regarding a patient neglect case.

21  Q.   Now, you use the words "patient neglect," correct?

22  A.   Correct.

23  Q.   Why is the words "patient neglect" important to your answer?

24  A.   Because those are usually individual cases, cases against a

25  particular individual, like a nurse aide, somebody working in a

1  nursing home.

2  Q.   So it wouldn't have to do with --

3          MR. ROTHENBERG: Objection to the leading.  If we're

4  going to talk about --

01:25PM  5          THE COURT: Sustained.

6          MR. LEVINE: I didn't get a question out, though.

7          THE COURT: It sounded like it might be leading.

8  BY MR. LEVINE:

9  Q.   Would a patient neglect case have any connection to an action

01:25PM  10  brought against a nursing home?

11  A.   A state action?

12  Q.   Yes, sir.

13  A.   Not against the operator necessarily.  Perhaps the facts

14  would be -- would connect to a violation or to a regulation that a

01:25PM  15  nursing home operator would be bound to comply with.

16  Q.   Now, you gave a responsive e-mail dated a few days later.  Do

17  you recall that?

18  A.   To Arlene Gray?

19  Q.   Yes, sir.

01:26PM  20  A.   I don't believe I responded to Arlene Gray.

21  Q.   Not to Arlene Gray, but you sent an e-mail out on April 21,

22  1999?

23  A.   I sent that to Anna Colello.

24  Q.   Okay.

01:26PM  25  A.   Yes.

1  Q.    You used in that e-mail a phrase "terminating the provider

2  agreement"?

3  A.    Yes.

4  Q.    And what's that phrase mean?

01:26PM  5  A.    Terminating the provider agreement has to do with federal

6  action to terminate a federal Medicare provider agreement.  Not my

7  area.

8  Q.    And that e-mail -- I can put it back on the screen if you

9  need to -- that had nothing to do with -- it didn't use the word

01:26PM  10  revocation, did it?

11            MR. ROTHENBERG: Objection, leading.

12            THE COURT: Overruled.

13            THE WITNESS: Would you put it back up on the screen,

14  please?

01:27PM  15  BY MR. LEVINE:

16  Q.    Yes, sir.

17  A.    Are you waiting for my answer?

18  Q.    Just look at it, then I want to know if you're mentioning the

19  word revocation in there?

01:27PM  20  A.    No, I'm not.

21  Q.    So the next e-mail chronologically, do you remember the

22  April 23rd e-mail you sent to various attorneys?

23  A.    Yes, I do.

24  Q.    And do you know what you were doing in that e-mail?

01:28PM  25  A.    I was giving the prosecuting attorneys in the Bureau of

1    Administrative Hearings a heads-up that a case might be coming

2    down the pike; it looked like it probably wouldn't settle, we

3    might have to go to hearing, depending upon what the surveyors

4    found.

01:28PM  5    Q.   Why would you possibly want to let your staff know about

6    that?

7    A.   Because we have a very busy staff, we always need to plan.

8    If an attorney is -- has too many cases he or she is already

9    committed to, it would make it very difficult to assign the case

01:28PM  10   to that attorney.

11            So this was my way of saying this might be coming, are

12   you available?  Are you able?  It looks like it might not settle,

13   be prepared, I'll let you know what I find out.

14   Q.   Now, you used the phrase "OCC may refer it for

01:29PM  15   revocation/fine/receivership."  Do you see that?

16   A.   Yes.

17   Q.   OCC --

18   A.   Well, I don't see it anymore, but I remember it.

19   Q.   You remember it?

01:29PM  20   A.   Yes.

21   Q.   OCC meaning what?

22   A.   The Office of Continuing Care, one of the programs of the

23   Department.

24   Q.   And as of that date, does that indicate to you there was not

01:29PM  25   a referral?

1   A.   No, there was no referral as of that date.

2        THE COURT: Are you getting into another document or

3   other area?

4        MR. LEVINE: I've got a little more on this, just a

01:29PM 5   couple more questions on this document, then --

6        THE COURT: All right.

7        MR. LEVINE: -- probably a good time to stop.

8   BY MR. LEVINE:

9   Q.   You used the phrase "collision course."  Do you recall that?

01:29PM 10  A.   Yes.

11  Q.   What's that mean and why is it important to explain to the

12  staff?

13  A.   Well, when a nursing home is -- when serious violations have

14  been found in a nursing home and it's being reported to HCFA by

01:30PM 15  the surveyors, there is the possibility of a termination of that

16  provider agreement.

17        If that were to be the case, then the Department needs

18  to be prepared legally and throughout its staff to deal with

19  patients who need to be cared for.  Otherwise, there would be

01:30PM 20  transfer trauma and chaos.

21  Q.   Let me just keep us moving.  Would there be anything to do

22  with the timing of procedures?

23  A.   Yes.  In order to safeguard the residents, one of the major

24  options is to petition the Court to appoint a caretaker, but the

01:30PM 25  only legal way that you can do that is to commence a revocation

1    action against the operating certificate.  It's right in the

2    Public Health Law.

3    Q.    Okay. You used the phrase to describe Mr. Chambery as

4    "threatening and obstructive."  Do you recall that?

01:31PM  5    A.    That's what I was told.

6    Q.    And why is it important to advise staff of that?

7    A.    Well, I think that it was tied into that this case might

8    not -- if we get a referral, it might not settle.  So be prepared,

9    you know, whatever we need to do to go to hearing.

01:31PM  10    Q.    And then at the end you write:  It appears that, in general,

11    the facility tends to take in residents for short-term

12    rehabilitation and proceeds to ignore emergent problems or else

13    provides inappropriate treatment that results in harm while

14    failing to document.  Do you recall that?

01:31PM  15    A.    Yes.

16            MR. ROTHENBERG: May I have a reference from what are we

17    reading?

18            MR. LEVINE: It's all the same exhibit.

19            MR. ROTHENBERG: 118?

01:31PM  20            MR. LEVINE: No, it's his e-mail that you examined him

21    about.

22            MR. ROTHENBERG: Oh, 119?  Sorry about that.

23            MR. LEVINE: No problem.

24    BY MR. LEVINE:

01:31PM  25    Q.    Why is it important to go through that summary with your

1   staff?

2   A.   I wanted them to be aware of what I had learned from whatever

3   source I had spoken with immediately prior to my writing them.  I

4   was passing along the information.

01:32PM   5   Q.   And this memo, in your opinion, is this an appropriate memo

6   or e-mail to be passing on to your subordinates?

7   A.   Yes.

8           MR. LEVINE: Judge --

9           THE COURT: All right, let me see counsel for a second.

10          (WHEREUPON, the end of cross-examination).

11                        *    *    *

12                  CERTIFICATE OF REPORTER

13

14      I certify that the foregoing is a correct transcript to the

15   best of my ability of the record of proceedings in the

16   above-entitled matter.

17

18   S/ Christi A. Macri

19   Christi A. Macri, FAPR-RMR-CRR-CRI
     Official Court Reporter
20

21

22

23

24

25