1

1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5

6
- - - - - - - - - - - - - - X
7  BEECHWOOD RESTORATIVE CARE      )     02-CV-6235(L)
   CENTER, BROOK CHAMBERY AND      )
8  OLIVE CHAMBERY,                 )
                Plaintiffs         )
9  vs.                             )
                                   )     Rochester, New York
10 LAURA E. LEEDS, EDMUND RUSSELL  )     June 20, 2012
   ALTONE, SANFORD RUBIN,          )     8:30 a.m.
11 SUSAN T. BAKER, SHARON A. CARLO,)
   CYNTHIA T. FRANCIS and ELIZABETH)
12 RICH,                           )
                Defendants.        )
13 - - - - - - - - - - - - - - X

14

15

16

17
                    TRANSCRIPT OF PROCEEDINGS
18        BEFORE THE HONORABLE DAVID G. LARIMER
                UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24 COURT REPORTER:     Christi A. Macri, FAPR, RMR, CRR, CRI
                       Kenneth B. Keating Federal Building
25                     100 State Street
                       Rochester, New York 14614-0222

2

```
 1                  A P P E A R A N C E S

 2                      *     *     *

 3

 4  GEIGER & ROTHENBERG, LLP
     BY:  DAVID ROTHENBERG, ESQ.
 5  45 Exchange Boulevard
     Suite 800
 6  Rochester, New York 14614
              - and -
 7  MCCONVILLE CONSIDINE COOMAN & MORIN, P.C.
     BY: KEVIN S. COOMAN, ESQ.
 8  25 East Main Street
     Suite 400
 9  Rochester, New York 14614
     Appearing on behalf of the Plaintiffs
10

11

12

13  ERIC T. SCHNEIDERMAN, ESQ.
     Attorney General of the State of New York
14  BY: GARY M. LEVINE, ESQ.
          BERNARD SHEEHAN, ESQ.
15  Assistant Attorneys General
     144 Exchange Boulevard
16  Suite 200
     Rochester, New York 14614
17  Appearing on behalf of the Defendants

18

19

20

21

22

23

24

25
```

3

1                    I N D E X

2   WITNESS FOR
    THE PLAINTIFF        DX    CX    RDX   RCX

3   Paul Kesselring       4

4

5

6

7
    EXHIBIT          RECEIVED
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    P R O C E E D I N G S
 2                    *         *         *
 3              (WHEREUPON, the jury is not present).
 4              THE COURT: Good morning, all.
 5              MR. COOMAN: Good morning, Your Honor.
 6              MR. ROTHENBERG: Good morning.
 7              MR. LEVINE: Good morning.
 8              THE COURT: When this is over I'm going to miss starting
 9    my day with not having you guys here.
10              Are we ready?
11              MR. COOMAN: We are, Your Honor.
12              THE COURT: All right, the jurors are here.
13              Is Mr. Kesselring this morning?
14              MR. COOMAN: Yes, he is here and ready to testify.
15              THE COURT: All right, bring in the jury.
16              (WHEREUPON, the jury is present).
17              THE COURT: All right, good morning, ladies and
18    gentlemen.  We're ready to continue.  We have two witnesses, we'll
19    start first with Mr. Kesselring.
20              PLAINTIFFS' WITNESS, PAUL KESSELRING, SWORN
21                        DIRECT EXAMINATION
22              THE COURT: Tell us your name and spell it for the
23    record.
24              THE WITNESS: Paul Kesselring; K-E-S-S-E-L-R-I-N-G.
25              THE COURT: Thank you.  You may proceed.
```

08:33AM (line 5)
08:33AM (line 10)
08:34AM (line 15)
08:36AM (line 20)
08:36AM (line 25)

BY MR. COOMAN:

Q.   Mr. Kesselring, where do you reside?

A.   Canandaigua, New York.

Q.   And do you have a family?

08:36AM   A.   I do.  I have a wife Peggy, and a 17-year-old-son Brad.  I also have a 28-year-old stepdaughter Tiffany, who is a physician's assistant up in Loudonville, New York.

Q.   And by whom are you employed now?

A.   The company name is Cognisight; C-O-G-N-I-S-I-G-H-T.

08:37AM   Q.   How long have you employed by Cognisight?

A.   Three and a half years; since November of 2008.

Q.   And could you just briefly describe for us what Cognisight's business is?

A.   Cognisight's a company that works primarily with Medicare

08:37AM   Advantage insurance plans and PACE plans for risk adjustment, revenue maximization.

Q.   And do you serve in a particular capacity with Cognisight?

A.   I'm an account manager with them.  I have three or four clients and I'm basically the liaison with the clients.  It

08:37AM   involves a lot of customer service, communication with physicians' offices, coordination of review activities.

Q.   And are you --

A.   A lot of customer service and communication focus.

Q.   And the work you and the company are doing is, in effect,

08:38AM   Medicare auditing with respect to those practices?

1  A.   It's related specifically to Medicare Advantage plans and

2  working with the insurance companies to have complete diagnostic

3  profiles to make sure everything that's been reported from a

4  billing point of view, from an ICD 9 point of view, is complete.

08:38AM  5  Q.   What is your educational background?

6  A.   I have a BS in business administration from St. John Fisher.

7  Q.   And what year did you obtain that?

8  A.   1978.

9  Q.   Okay. Do you hold any New York State licensures in the

08:38AM  10  long-term care area?

11  A.   I was licensed as a New York State administrator in late '96.

12  I had that license certainly in full effect through work at

13  another facility in the state, and I basically let the license

14  slide because I was no longer working in that capacity.

08:39AM  15  Q.   Okay. And did you have employment during your college years

16  at St. John Fisher?

17  A.   I started a couple weeks before my college education at

18  Beechwood; I started in maintenance and worked part time.  It was

19  a great job because it allowed me the flexibility to flex my hours

08:39AM  20  around my college schedule.  So it was really tailor made for my

21  student requirements.

22  Q.   And when you finished your degree at Fisher, did you take a

23  full-time job?

24  A.   I remained at Beechwood in a full time capacity -- with a

08:39AM  25  slight change in my duties -- and basically worked full time from

1    then on out.

2    Q.    And how long did you work at Beechwood?  From the time you

3    started part time in college, how long did your employment last?

4    A.    The part time college start was August of 1974, and I was at

08:39AM    5    Beechwood through its closure, and then another year plus

6    afterwards.

7    Q.    In 1999 what position did you hold at the time of its

8    closure?

9    A.    Assistant administrator.

08:40AM   10    Q.    Would it be -- who was your direct report in that position?

11    A.    Brook Chambery.

12    Q.    Would it be fair to say that effectively you were second in

13    command of the facility?

14    A.    Yes.

08:40AM   15    Q.    Now, after Beechwood was closed did you take other employment

16    in the long-term care sector?

17    A.    Not immediately, but in October of 2000 I did start work for

18    Livingston County.  They had two skilled nursing facilities and I

19    worked for the one in Mt. Morris.  I was administrator there for

08:40AM   20    five years until they moved into a new facility in -- the new

21    facility in December of 2005.  And I was --

22    Q.    Let me ask you a question about that first stint.  You had

23    about five years running that facility?

24    A.    Yes.

08:40AM   25    Q.    In Mt. Morris?

1  A.    Yes.  It was a 142 bed facility in Mt. Morris.

2  Q.    And were you the administrator of record for that facility?

3  A.    Yes, I was.

4  Q.    So you were the number one person at that facility; is that

08:41AM  5  right?

6  A.    Yes, although we did have a director of long-term care that

7  also oversaw each facility.

8  Q.    And about how many employees did you supervise in that

9  capacity at the Mt. Morris facility?

08:41AM  10  A.    About 200.

11  Q.    And then in 2005 or 6 did there come a time when you had

12  additional responsibilities for the County with respect to the

13  project that they were undertaking?

14  A.    Well, the project you're referring to is the new facility,

08:41AM  15  which I was actually involved in throughout my entire time with

16  the County.  It had been on paper for a year or two prior to my

17  start, and in 2000 -- and I was involved with it all the way

18  through the planning and the construction process.  You know, the

19  dream, the envisionment for the facility was already pretty well

08:42AM  20  in place; we just carried it all forward.

21  Q.    And so were you involved in the supervision of the

22  construction operation in getting it up and running?

23  A.    The supervision of the construction, obviously we had a

24  management team for that, but we did have routine meetings

08:42AM  25  relative to the construction.  I worked right next door, so I had

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | a hard hat right in my office and it wasn't uncommon to have to       |
|        | 2  | grab the hard hat and run over there to check on this, that or the   |
|        | 3  | other thing or discuss things with different construction teams      |
|        | 4  | over there.  So it was -- it was rewarding.                          |
| 08:42AM | 5  | Q.   When this facility opened, did you then take a management       |
|        | 6  | position with the new facility?                                      |
|        | 7  | A.   I was --                                                        |
|        | 8  | THE COURT: Mr. Cooman, it's certainly appropriate to                 |
|        | 9  | have some background information about the witness, but I think in   |
| 08:42AM | 10 | terms of the issues in this trial, we're getting a little far        |
|        | 11 | afield.                                                              |
|        | 12 | MR. COOMAN: We're almost through this part, Your Honor.              |
|        | 13 | I think it's important.                                              |
|        | 14 | THE COURT: Let's speed through it.                                   |
| 08:43AM | 15 | MR. COOMAN: Very good.                                                |
|        | 16 | BY MR. COOMAN:                                                       |
|        | 17 | Q.   How many people did you supervise at that location?            |
|        | 18 | A.   The new facility, about 375.                                   |
|        | 19 | Q.   Now, in order to take that position at the Livingston County   |
| 08:43AM | 20 | facility, did you receive any recommendations from anyone at the    |
|        | 21 | New York State Department of Health?                                 |
|        | 22 | A.   Yes, I did.  When I was originally hired --                    |
|        | 23 | Q.   And who did you receive that recommendation from at the        |
|        | 24 | Department of Health?                                                |
| 08:43AM | 25 | A.   Cindy Francis.                                                  |

1   Q.    What position did Ms. Francis hold at the time she gave you

2   the recommendation for that job?

3   A.    The Director of Long-Term Care Services, I believe.

4   Q.    Let's talk about your Beechwood employment now,

08:43AM  5   Mr. Kesselring.  You started during college.  Let's focus on the

6   time when you finished college and now you had full-time

7   employment.

8           Did you gain additional responsibilities beyond the

9   maintenance work as time went on at Beechwood?

08:44AM  10   A.    Yes.  From 1980 onwards I was in basically business manager

11   capacity being involved with the day-to-day operations, which only

12   increased as time went by.

13           As we got into computerized operations and different

14   things came about reporting-wise, whether it was regs, MDS, there

08:44AM  15   was always greater reporting needs as time went on and basically I

16   became involved in all aspects of the operation.

17   Q.    During the period of time of the transition of leadership to

18   Brook Chambery then, were you working with the elder Chambery in

19   the management of the business?

08:44AM  20   A.    Yes, Herbert Chambery.

21   Q.    And can you give us just a brief list of the duties that you

22   wound up assuming as you moved into the position of number two in

23   the organization there?

24   A.    Basically all facility-type operations, whether it was

08:45AM  25   contracting, third-party services, oversight of all the office

1  operations, oversight of the various departments, coordination of

2  things with the Nursing Department, involvement in any kind of

3  regulatory activities, procurement, just day-to-day operations, a

4  lot of benefits-related or HR-related things.  Basically whatever

08:45AM 5  needed to be done.

6       I would point out that we were a fairly small facility,

7  you know, we generally had about 95 employees and, you know, a lot

8  of times in a small facility you've got to wear a lot of hats, and

9  that was always me.

08:45AM 10 Q.   Did you have any survey interaction experience prior to 1999?

11 A.   Yes.

12 Q.   And what, in general terms, was the role that you played with

13 respect to any of the surveys that happened, either the annual

14 survey or any complaints?

08:46AM 15 A.   Well, it varied from year to year.  I could be involved with

16 doing the whole Plan of Correction; I might have been involved

17 with part of the Plan of Correction; I might have been a

18 contributor to it.

19      But I was always trying to be involved with the

08:46AM 20 surveyors themselves.  Upon entry into the facility, I would try

21 and help coordinate things, try and help -- just make the whole

22 process flow as easily as possible, just to try and facilitate the

23 survey and make it go smoothly from a facility's point of view.

24 And it did vary a lot from year to year.

08:46AM 25 Q.   What position did you hold when Brook Chambery assumed

1  leadership in 1993?

2  A.   I believe I was considered assistant administrator then.   I

3  know my duties never really changed, whether it was business

4  manager or assistant administrator; it was basically a matter of

08:46AM   5  semantics from a title point of view.

6        The duties from 1980 onward, they gradually changed, but

7  the title, you know, there was never a change where, okay, you're

8  now assistant administrator and these are your additional duties.

9  It just kind of was a metamorphosis, so to speak.

08:47AM   10  Q.   Okay. And could you just briefly summarize for us,

11  Mr. Kesselring, what you saw to be -- let me ask you this first:

12  Was your office near Mr. Brook Chambery's office?

13  A.   It was right next door.

14  Q.   Okay. So could you briefly summarize for us what you saw to

08:47AM   15  be from your perspective the characteristics of Mr. Chambery's

16  leadership of Beechwood?

17  A.   He was -- he was certainly well liked by all the staff.   We

18  had a staff with just tremendous longevity.

19        He was very visionary, so if he had an idea for how he

08:47AM   20  was going to go forward with some mode of improvement or some new

21  idea, he had the ability to really excite staff by just the way he

22  would convey it.   The door was always open to any staff; he

23  actively solicited input from anyone, whether it was a

24  housekeeper, a nurse's aide, an LPN.   He definitely valued

08:48AM   25  everyone's input.

1          And, you know, he was certainly 100% vested in trying to

2     make the facility as good as it could possibly be and just always

3     wanting to be on the leading edge.

4     Q.   What accomplishments did you see take place at the Beechwood

5     facility under Mr. Chambery's leadership from 1993 forward, again,

6     briefly?

7     A.   Well, there was a move towards heavy, heavy rehabilitation.

8     We basically converted one floor to rehab use.  The other floor

9     was basically long-term care use.

10         We tried to really push the rehab and try to make us a

11    premier rehab facility.  A lot of computerization during that

12    time, just incorporating computerization into every aspect of the

13    facility, including medical records.

14         You know, that involved a lot of work in and of itself

15    to implement that, but we were always kind of on the leading edge

16    trying to -- from a technology point of view -- take advantage of

17    all the technology that was out there and incorporate that into

18    the facility to make it the best facility possible.

19    Q.   In your view, what were the chief hallmarks of the resident

20    experience at Beechwood after Mr. Chambery took over?

21    A.   Basically trying to make it a home-like environment, trying

22    to make it as pleasant an environment as possible.  We did

23    incorporate a respite program to try and solve the needs of those

24    people in the industry or out in the community.

25         We just tried to make it -- we stressed everyone being

1    very involved with your patients, your families, first name basis,

2    get to know the relatives, get to know their background, you know.

3          In later years, in the nineties when we had our

4    long-term care unit, we tried to incorporate a lot of the

08:50AM  5    knowledge about the patients into activities to try and tailor it

6    to an individual's likes and dislikes.  Just tried to make it as

7    comfortable a home-like environment as possible.

8    Q.   Mr. Kesselring, turning to the April through June 1999 time

9    period, did you have specific interactions with any individual

08:50AM  10   surveyors that you can recall and relate to us?

11   A.   I did.  There's only a couple things I can really

12   specifically remember.  It was kind of a whirlwind time, you know.

13   I've been through, you know, all told, it was 20 or more years of

14   survey-type action, sometimes it's hard to remember what fell when

08:50AM  15   and where, but I do specifically remember it at that time --

16          MR. LEVINE: Objection as to the narrative.

17          MR. COOMAN: He is about to specifically answer the

18   question.

19          THE COURT: Focus on, if you can, and give us a date; an

08:51AM  20   individual, if you can.

21   BY MR. COOMAN:

22   Q.   Can you name a particular individual?

23   A.   Yes.  Cindy Francis was in the facility one day and I

24   remember her getting very, very upset basically over computer

08:51AM  25   access or wanting computer access, which was sometimes difficult

08:51AM
08:52AM
08:52AM
08:52AM
08:53AM

1   because we had computers on the floor for the staff to use for the

2   care planning, for daily activities.  And, you know, I remember

3   her certainly getting more upset than I had ever seen her before,

4   and I just tried to work through it as best we could, smooth

5   things over and get past it.

6   Q.    Had you worked with Ms. Francis in prior surveys and

7   investigations that she had performed over the years?

8   A.    On occasion.

9   Q.    Okay. Did you observe or think that her demeanor and attitude

10  were different on this occasion than what you had observed

11  generally about her on surveys in the past?

12  A.    Very much so.

13  Q.    In what way?

14  A.    She seemed to be on edge more, more easily bothered if

15  something wasn't, like, being able to be given right away.  It was

16  just different, just a totally different demeanor, a totally

17  different outlook, totally different communication.  And, you

18  know, that wasn't just with her, it was with everyone.

19  Q.    Okay. Do you have a recollection of other particular people

20  of having interaction with in that timeframe?

21  A.    The only other person I specifically remember spending a

22  specific amount or a significant amount of time in the facility

23  was Liz Rich, who had been there on occasional surveys in the

24  past, and her demeanor was similarly out of character or certainly

25  different than, you know, prior recollections.

1   Q.   Mr. Kesselring, after the residents had left the facility in

2   the summer of 1999, did you have occasion to attend a continuing

3   education conference for administrators in the fall of 1999?

4   A.   Yes, I did.  It was actually September 22nd of 1999.

08:53AM  5   Q.   And this was at a point in time when you were still employed

6   at Beechwood in post-closure operations?

7   A.   Yes, I was still employed there, still looking towards

8   administrative work in the future.  You know, I would be the first

9   to say that, like many employees --

08:53AM  10         MR. LEVINE: Judge, objection.  His answer --

11         THE COURT: I think you've answered the question.

12         THE WITNESS: Okay.

13   BY MR. COOMAN:

14   Q.   And when you went to this conference, who were the speakers

08:54AM  15   at this conference?

16   A.   I remember specifically Anna Colello and Laura Leeds.  It was

17   a DOH-based presentation.  There might have been others, but those

18   are the two that I specifically remember.

19   Q.   Was there a particular set of comments made by Ms. Leeds that

08:54AM  20   caught your attention?

21   A.   Yes, there was.

22   Q.   And would you please describe for the jury what you heard

23   Ms. Leeds -- well, let me go back and paint the picture a little

24   bit.  Was this in a conference room sort of setting?

08:54AM  25   A.   It was in a fairly large party conference type room with

1    maybe 150 people in attendance.

2    Q.    And who were the attendees of this particular conference in

3    terms of -- not names, but who they were?

4    A.    It was put on by the New York State Long-Term Care

08:54AM    5    Administrators Association or something along that line, so

6    primarily administrators.  But it could also have involved key

7    staff from facilities -- directors and nurses, maybe even

8    directors of social work and such.

9    Q.    Okay. And could you please describe for the jury the comments

08:55AM    10    that you heard Ms. Leeds make publicly?

11    A.    What was mentioned -- I'll lead into it by saying that an

12    administrator had asked a question about a deficiency that they

13    received as a result of a resident complaint, and I think it came

14    to resident counsel.  And they received a deficiency and the

08:55AM    15    administrator felt they were having trouble answering it because

16    they had no idea where it came from.  And he tried to explain

17    that, you know, some of our residents are confused, sometimes they

18    get angry; it would be very helpful to know the background behind

19    it to better address it.

08:55AM    20          And confidentiality was brought up, that you, you know,

21    this applies.  We're very strongly concerned about

22    confidentiality, whether it's with a patient complaint or whether

23    it's with a staff complaint because anonymous complaints could

24    certainly be submitted.

08:56AM    25          And the administrator was kind of pressing forward

1    asking additional questions, and Ms. Leeds basically stopped and

2    she said, "Listen, I'm going to tell you something.  This year we

3    had to close a facility, a facility that -- or the staff at that

4    facility were excellent.  It was a horrible experience.  I hope to

08:56AM  5    never go through it again.  We had to close that facility for all

6    the wrong reasons.  And, you know, that staff continued to provide

7    care all the way through to the end for those residents even

8    though they were losing their jobs and they knew they were losing

9    their jobs.  We were there monitoring every day."

08:56AM  10   Q.    And --

11   A.    And at that point she seemed to get nervous, she --

12         MR. LEVINE: Objection.

13         THE COURT: You can describe her appearance.

14   BY MR. COOMAN:

08:57AM  15   Q.    What did you perceive as she concluded those remarks?  What

16   did you see her do?

17   A.    I saw her lean against the podium with both hands, she took a

18   big breath and she said, "With that, let's go to break."

19   Q.    And was there then a break in the proceedings?

08:57AM  20   A.    Yes, there was, for approximately 15 minutes.

21   Q.    All right.  Did you observe -- did you stay in the room

22   during the break?

23   A.    I did.

24   Q.    All right.  And did you perceive or did you see any

08:57AM  25   interaction between Ms. Leeds and anyone else during that break?

1    A.    I did.   Ms. Leeds and Ms. Colello had a conversation.

2    Q.    You saw them talking to one another?

3    A.    Yes.

4    Q.    Would you describe the interaction as you saw it and

08:57AM    5    perceived it?

6    A.    Well, it looked to be a very animated conversation.   There

7    was a lot of hand gestures, there was finger pointing.   It was the

8    kind of conversation that anyone with common sense would know to

9    never approach.

08:58AM    10             MR. LEVINE: Judge, objection.

11             THE COURT: I think you can describe what you observed

12    from your personal observation.   Anything else to add to what you

13    already said as to the animated nature of it?

14    BY MR. COOMAN:

08:58AM    15    Q.    That's what you observed going on between the two of them?

16    A.    Yes.

17    Q.    Okay. Were you close enough to hear any of the words or

18    remarks?

19    A.    No, I was not.   I was towards the back of the room.

08:58AM    20    Q.    All right.   Now, during that first segment of the

21    conversation that you've relayed, was the name Beechwood ever

22    explicitly mentioned?

23    A.    No, it was not.

24    Q.    Were there additional comments by Ms. Leeds related to the

08:58AM    25    same topic later in the session?

1    A.    Yes, there was later on in the session after the break.

2    Q.    And tell us just briefly the circumstances leading up to it

3    and then what was said by Ms. Leeds.

4    A.    She was in the middle of talking about a topic, that I do not

08:59AM    5    recall at all, and all of a sudden she just said, "When we closed

6    Beechwood, the staff was not really terrific.  That facility had a

7    lot of serious care issues and they were legitimate issues; the

8    administration refused to cooperate."  And then she just jumped

9    back onto whatever she was talking about.

08:59AM    10    Q.    To your knowledge, did she know that you were in the room?

11                MR. LEVINE: Objection.

12                MR. COOMAN: I asked to his knowledge, Your Honor.

13                MR. LEVINE: He's asking for somebody else's state of

14    mind.

08:59AM    15                THE COURT: Well, I'll sustain as to that, but -- I mean,

16    perhaps the witness introduced himself or --

17    BY MR. COOMAN:

18    Q.    Did you make any effort to go up and introduce yourself to

19    Ms. Leeds or communicate who you were?

08:59AM    20    A.    No, I did not.

21                THE COURT: Had you met Ms. Leeds previously?

22                THE WITNESS: Not that I recall, no.

23    BY MR. COOMAN:

24    Q.    Now, after you attended this conference, did you report what

09:00AM    25    you had heard back to Mr. Chambery?

1   A.   I did, the first time I saw him.

2   Q.   All right.  And while this was still fresh in your mind, did

3   you also memorialize those things that you had heard into an

4   affidavit?

09:00AM   5                MR. LEVINE: Objection.

6                THE COURT: Well, I'll allow this question, but I'm not

7   sure beyond this.

8   BY MR. COOMAN:

9   Q.   Did you memorialize this in an affidavit?

09:00AM   10   A.   Yes, I did.

11                MR. COOMAN: That's all I have for Mr. Kesselring.  Thank

12   you, Your Honor.

13                (WHEREUPON, the direct examination concluded).

14                        *    *    *

15                    CERTIFICATE OF REPORTER

16

17        I certify that the foregoing is a correct transcript to the

18   best of my ability of the record of proceedings in the

19   above-entitled matter.

20

21   S/ Christi A. Macri

22   Christi A. Macri, FAPR-RMR-CRR-CRI
     Official Court Reporter

23

24

25