1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5

6
   - - - - - - - - - - - - - - - X
7  BEECHWOOD RESTORATIVE CARE      )    02-CV-6235(L)
   CENTER, BROOK CHAMBERY AND      )
8  OLIVE CHAMBERY,                 )
                  Plaintiffs       )
9  vs.                             )
                                   )    Rochester, New York
10 LAURA E. LEEDS, SANFORD RUBIN,  )    August 20, 2012
   SUSAN T. BAKER, SHARON A. CARLO,)    9:00 a.m.
11 CYNTHIA T. FRANCIS,             )
                  Defendants.      )
12 - - - - - - - - - - - - - - - X

13

14

15

16
                     TRANSCRIPT OF PROCEEDINGS
17            BEFORE THE HONORABLE DAVID G. LARIMER
                  UNITED STATES DISTRICT JUDGE
18

19

20

21

22

23

24 COURT REPORTER:      Christi A. Macri, FAPR, RMR, CRR, CRI
                        Kenneth B. Keating Federal Building
25                      100 State Street
                        Rochester, New York 14614-0222

2

1                    A P P E A R A N C E S

2                          *     *     *

3

4  GEIGER & ROTHENBERG, LLP
   BY:  DAVID ROTHENBERG, ESQ.
5  45 Exchange Boulevard
   Suite 800
6  Rochester, New York 14614
                - and -
7  MCCONVILLE CONSIDINE COOMAN & MORIN, P.C.
   BY: KEVIN S. COOMAN, ESQ.
8  25 East Main Street
   Suite 400
9  Rochester, New York 14614
   Appearing on behalf of the Plaintiffs
10

11

12

13  ERIC T. SCHNEIDERMAN, ESQ.
   Attorney General of the State of New York
14  BY: GARY M. LEVINE, ESQ.
        BERNARD SHEEHAN, ESQ.
15  Assistant Attorneys General
   144 Exchange Boulevard
16  Suite 200
   Rochester, New York 14614
17  Appearing on behalf of the Defendants

18

19

20

21

22

23

24

25

1                               I N D E X

2

3

Preliminary charge by Judge Larimer          Page    7

4

Opening statement by Mr. Cooman              Page   14

5

Opening statement by Mr. Sheehan            Page   33

6

7

WITNESS FOR THE PLAINTIFFS

8

Olive Chambery

9       Direct Examination by Mr. Cooman      Page   38
        Cross-Examination by Mr. Sheehan      Page   41

10

Brook Chambery

11      Direct Examination by Mr. Rothenberg  Page   42
        Cross-Examination by Mr. Sheehan      Page  110

12      Redirect Examination by Mr. Rothenberg  Page  128

13

14   EXHIBITS        PAGE

15   803             48
     806             57
16   668             61

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2                    *        *        *

3          (WHEREUPON, the jury is not present).

4          THE COURT: Good morning, all.

09:11AM  5          MR. COOMAN: Good morning, Your Honor.

6          THE COURT: I guess our jurors have arrived, so we are

7    pretty much ready to go.

8          MR. SHEEHAN: Your Honor?

9          THE COURT: Well, maybe not good morning.  Mr. Sheehan?

09:12AM 10          MR. SHEEHAN: I just had a couple of issues.

11          THE COURT: Are these things we need to do before we have

12    our openings?

13          MR. SHEEHAN: Something you may want to consider about --

14    you may want to consider polling the jury because there have been

09:12AM 15    a couple articles in the newspaper, just to make sure they haven't

16    seen --

17          THE COURT: I don't know why you wait --

18          MR. SHEEHAN: I'm sorry.

19          THE COURT: I don't know why you wait until now to do

09:12AM 20    that when the jurors are here and we're ready to go.

21          MR. SHEEHAN: It was something we did before the last

22    part of the trial.  I figured it wasn't going to be that much of

23    an issue.  I apologize, Your Honor.

24          THE COURT: You didn't think what was going to be an

09:12AM 25    issue?

5

1        MR. SHEEHAN: The polling of the jury.  Because we did it

2   before the beginning of the first six-week part of this trial.

3        THE COURT: And this relates to what?

4        MR. SHEEHAN: At least two articles that were in the

09:13AM   5   *Democrat & Chronicle* concerning proceedings in this case that

6   contain some of the facts.

7        THE COURT: Well, I did read the articles.  I thought the

8   facts were all matters that had been presented to the jury.  I

9   don't think there was anything in there that was startling or

09:13AM  10   unusual or --

11        MR. SHEEHAN: There was one statement about -- that I

12   recall, there was a statement of -- that said there had been an

13   offer of $8.1 million.  I do not believe that the evidence is that

14   there was an offer.

09:13AM  15        It certainly hasn't been talked about yet, and it's

16   definitely an issue in dispute going forward, but --

17        THE COURT: Well, I'm not sure the article was that

18   precise.  In my review of the experts' reports, my recollection is

19   there was a letter of intent that was offered about that sum.

09:13AM  20   Actually, it was seven point some million, but I think the expert

21   said in terms of equity, it was 8.1 million.

22        So, I mean, I don't know, but perhaps plaintiffs can

23   assist me.  I assume that may be one of the matters that the

24   expert will discuss is, in part, something he relied on in coming

09:14AM  25   to his value estimations?

1          MR. COOMAN: That's correct, Your Honor.  I don't think

2   we see any need to poll the jury on this.

3          THE COURT: Yeah, I mean, I did review the articles.  I

4   think there was one that sort of related perhaps to some of the

09:14AM   5   motion arguments, but I didn't think there was anything in there

6   (A) that the jurors hadn't already heard or that they're about to

7   hear.  So I see no need to poll the jury.

8          MR. SHEEHAN: Thank you, Your Honor.

9          THE COURT: Anything else?

09:15AM  10          MR. SHEEHAN: Not at this time, Your Honor.

11          THE COURT: All right.  And are you going to make the

12   openings, Mr. Sheehan?

13          MR. SHEEHAN: Yes, I am, Your Honor.

14          THE COURT: Who is for the plaintiffs?

09:15AM  15          MR. COOMAN: I'm doing the opening, Your Honor.

16          THE COURT: Okay.  I have a few things to say just to

17   kind of *segue* as to where we've been and where we are, and then I

18   guess we're ready for the openings.

19          I guess Mr. Cooman could go first.

09:15AM  20          MR. COOMAN: Correct.

21          THE COURT: I think you both told me you had 20 minutes

22   or so-ish?

23          MR. COOMAN: 26 minutes and 20 seconds, Your Honor, if I

24   pause in the right spots.

09:15AM  25          THE COURT: 26.

1        Mr. Sheehan, are you about the same?

2        MR. SHEEHAN: No, Your Honor.  I'm more like 10 or 12

3   minutes, Your Honor.

4        THE COURT: Okay, that's fine.  Then I guess we have two

09:15AM   5   witnesses today, Mr. Chambery and Mrs. Chambery?

6        MR. COOMAN: Correct.

7        THE COURT:  Not in that order?

8        MR. COOMAN: Correct.

9        THE COURT: All right, let's bring in our jurors and have

09:15AM  10   them in their proper seats.  I don't see any of them, so I inquire

11   as to whether either side were going to use charts in the

12   openings?

13        MR. COOMAN: I am not, Your Honor.

14        MR. SHEEHAN: No, Your Honor.

09:16AM  15        THE COURT: Okay.

16        (WHEREUPON, the jury is present).

17        THE COURT: Familiar faces, one and all.  Good morning,

18   ladies and gentlemen again.  I hope you had a pleasant break.

19        Let me say a few things about our present proceedings in

09:18AM  20   this case.  In a word, this case involves your determination about

21   what damages plaintiff, plaintiffs are entitled to recover based

22   on your verdict of June 26th.

23        That certain defendants -- Laura Leeds, Sanford Rubin,

24   Sue Baker, Sharon Carlo and Cynthia Francis -- did retaliate

09:19AM  25   against the plaintiffs for Brook Chambery's exercising his rights

1   under the First Amendment.  You made that determination

2   unanimously after about seven weeks of testimony, argument of

3   counsel, and after considering the Court's instructions to you on

4   the elements necessary to prove a civil rights violation.  That

09:19AM   5   is, that Mr. Chambery's rights were violated for his legitimate

6   exercise of his First Amendment rights.

7            This trial has been what's called a "bifurcated" trial.

8   That means it was divided in half.  That is, we tried the issue of

9   liability or fault first.  And now since you found liability and

09:19AM   10   fault, you are now required to consider in this second phase of

11   the trial based on the evidence that will be presented to you what

12   fair and reasonable damages should be for the violation of

13   plaintiffs' constitutional rights.

14           Many trials are not bifurcated.  They go from beginning

09:20AM   15   to end, but some are separated for a variety of reasons.  Those

16   reasons are of no concern of yours.

17           When I discussed this case with you back in May and

18   June, and certainly just before you began your deliberations, I

19   described the elements of a civil rights case or the elements of

09:20AM   20   this particular civil rights violation, and I'm recapping here

21   just to kind of bring us all back up to speed, as it were.

22           The first element -- and I guess I would say what we're

23   dealing with today and in the next couple of days is sort of the

24   last element that a plaintiff has to establish by a preponderance

09:21AM   25   of the evidence, that is, damages.

1           So just reviewing, the first element that plaintiff had

2    to prove was that he engaged in speech and/or acts that were

3    protected by the First Amendment.  In other words, that

4    Mr. Chambery engaged in protected speech under the First

5    Amendment.

6           As I'm sure you recall, you heard much evidence

7    concerning the complaints, the letters, the use of the informal

8    dispute or IDR process by Mr. Chambery.

9           And as I recall in the closing arguments of counsel,

10   there really wasn't much dispute that Mr. Chambery did engage in

11   protected First Amendment activity.

12          The second element that plaintiff in any civil rights

13   case has to establish is that the defendants acted under color of

14   state law.  That is, that they were acting pursuant to the

15   authority given to them as state officials.

16          In this case, there was no dispute that the acts of the

17   defendants were in their official capacities.  They were not

18   acting as private citizens.

19          Next, the plaintiff was required to show that the

20   defendants took some adverse action against them or him for

21   engaging in protected speech.  The defendants must have taken some

22   adverse action, that is, adverse to plaintiff and Beechwood.

23          And it was undisputed that the defendants, as members of

24   the Department of Health, sought and ultimately succeeded in

25   obtaining the revocation of Beechwood's operating certificate

1    which prevented Beechwood from continuing to operate.  Without

2    such an operating certificate, one may not operate in the State of

3    New York.

4              Beechwood closed in the summer of 1999.  I think the

09:23AM  5    pertinent date you'll probably hear more testimony about, which is

6    July 17, 1999.

7              The final element that you considered back in May and

8    June was whether Mr. Chambery's protected speech was a substantial

9    or motivating factor in the defendants' decision to take adverse

09:23AM 10    action against him.

11             If plaintiff's free speech and the exercise of his

12    rights under the First Amendment played a substantial or

13    motivating part in the defendants' decision, then plaintiff would

14    have made out his case.

09:23AM 15             And by your verdict of June 26th, you found that

16    plaintiffs had proven all the elements that I've just recited to

17    you by a preponderance of the evidence.

18             Now we get to the issue at hand today.  Had we tried

19    this case in one sitting, the fifth or the final element would

09:23AM 20    have been damages.  It's now incumbent upon you to consider

21    whether Mr. Chambery has suffered damages and the extent of those

22    losses and damages.

23             Losses and damages that were proximately caused by the

24    defendants' unconstitutional retaliatory acts.  You'll hear much

09:24AM 25    more from me, and perhaps by the lawyers later as to this concept

1    of proximate cause.  We're not retrying this case.  I just

2    recounted, I guess, where we've been over the past six and a half

3    or seven weeks.

4         We are focusing on the fifth and final element of

09:24AM    5    plaintiffs' lawsuit, that is, the allegation that Mr. Chambery has

6    made that he and Beechwood suffered damages because of the acts of

7    the defendants essentially related to the closing of the business.

8         Plaintiff has the burden on this element as he did with

9    the other elements, that is, he must establish by a preponderance

09:25AM    10   of the evidence that it's more likely than not that he suffered

11   the injuries that he complains of, and that the defendants'

12   retaliatory conduct, which you've already found, was the proximate

13   cause of the loss and the damages sustained.

14        In other words, as I will explain to you in more detail

09:25AM    15   as we proceed, the plaintiff must establish that the impermissible

16   acts, if you will, were a substantial factor in causing the damage

17   complained of.  It must be a factor.  May not be the only factor,

18   and I'll instruct you more on this aspect as we hear the proof and

19   at the conclusion of the case.

09:26AM    20        What we're going to do first this morning is the lawyers

21   are going to present an opening statement to you about this part

22   of the case.  That is, they're going to advise you what they

23   expect the proof to be over the next couple of days.

24        I think today we will only have two witnesses that will

09:26AM    25   be presented to you.  The proof here, I expect, will involve both

economic losses and non-economic losses.  I suspect plaintiff in
his opening, and I believe Mr. Cooman will present the opening
this morning, may well list the types of damages that they seek to
recover.  There's four or five different types of damages, I
believe, which the plaintiffs claim were proximately caused by the
unconstitutional acts that you found of the defendants.

I anticipate that you'll hear from Mr. Chambery, his
mother Olive, and a principal in the business called "forensic
economics," who will testify, I believe tomorrow, and present to
you his opinion about the lost value, business value, of the
business that was closed.

You'll also hear witnesses presented by the defendants
from a CPA and perhaps another witness giving their opinion as to
the market value of the business and the loss suffered by
Beechwood.

I think we've talked a little bit about expert witnesses
in the first phase of the trial.  Expert witnesses are individuals
who by virtue of experience, training and education in some
particular field are allowed to come in and give opinions to you.
That's something a lay witness is not ordinarily allowed to do,
that is, give opinions.

But these experts have extensive experience in terms of
evaluating businesses, and they will present testimony to you and
at the end of the day it's up to you to decide, like you do any
witness, what weight to give to the testimony of these witnesses.

1        I will instruct you further on things you can consider

2   in evaluating the experts' testimony.  I don't think I'm giving

3   away any secrets here by telling you that witnesses testifying for

4   the plaintiff as to the lost value is, I expect, will be many

5   times higher than the value that the defendants' expert places on

6   the business.

7        It will be up to you to carefully consider the testimony

8   given, the circumstances under which it's given, the basis for the

9   experts coming to the conclusions they do -- or they will make and

10  render your verdict.

11       It's not uncommon that in various types of cases there

12  is expert testimony presented about a variety of things.  We have

13  medical experts that come in all the time; in patent cases experts

14  come in and talk about pretty sophisticated machines and so forth.

15       Jurors have to carefully listen and make judgments based

16  on the testimony presented, and assisted by the arguments of the

17  lawyers as to what they think is helpful and important to you.

18       You have note pads.  Some of you used them pretty

19  extensively during the liability phase.  Certainly you may use

20  notebooks in the damage phase.  I guess when the experts come to

21  testify they will be talking numbers.  So if you're disposed to

22  use note pads and things that might be a time to do it.

23       Of course, all the testimony is taken down carefully by

24  Ms. Macri, so that if any time in your deliberations you need some

25  testimony read back, we can certainly consider that.

1        I suspect there will also be documentary evidence

2    presented to you like there was in the last trial.  Certainly not

3    as much or as many exhibits as before.  There may be some charts

4    that the experts may use to assist in their presentation to you.

09:30AM    5        At the end of the day or the end of the case you'll have

6    a verdict sheet.  It might be a little longer than the one you

7    used back in June, and I suspect it will have lines for you, blank

8    lines, to put in should you find damages to have been proven, each

9    particular type of damage.  And we will certainly discuss the

09:31AM   10    verdict form when we get to that phase of the case.

11        After we've heard all the proof, the Court will give you

12    its final instructions on the law, which I hope will -- not only

13    hope, but it's expected will guide you in the deliberations and

14    present the law to you on the entire aspect of damages, what's

09:31AM   15    required, who has the burden, things you may consider and so

16    forth.

17        So that concludes my opening remarks.  This is sort of a

18    mini-trial, but it's really just part of the first trial and I am

19    allowing counsel to make openings.  We will have proof; at the end

09:32AM   20    of that the lawyers will make closings; and I'll give you my

21    charge and then you'll deliberate.

22        So without further adieu, I believe we're ready for

23    Mr. Cooman, your opening.  You may present your opening remarks to

24    our ladies and gentlemen of the jury.

09:32AM   25        MR. COOMAN: May it please the Court, welcome back,

1   ladies and gentlemen, and thank you for your willingness to give

2   us another few days of your valuable summertime to complete your

3   responsibilities as --

4           THE COURT: They had no choice, but they did so

09:32AM   5   graciously.

6           MR. COOMAN: They did, indeed.  I guess justice is not

7   yet complete.

8           If you break something, you have to pay for it.  This is

9   one of the basic principles of responsible behavior that we learn

09:32AM   10   from the time that we are children.  A parent takes us into a gift

11   shop where beautiful merchandise is displayed and they say to us,

12   "Be careful.  If you break something, you have to pay for it."

13           And that is what this phase of the trial is all about.

14   Because the defendants broke things, valuable things, important

09:33AM   15   things, irreplaceable things, that belonged to Beechwood and the

16   Chamberys, a 45-year-old family business, a pioneer business, a

17   woman's heart and emotions, an entrepreneur's career, and a

18   family's hard earned reputation and good name.

19           Since the defendants would not, will not and cannot

09:33AM   20   restore or replace what they broke, they have to pay for it.

21           So your main responsibility during this phase of the

22   trial is to give to Beechwood and to Olive and to Brook complete

23   justice by valuing those things that were broken by the

24   defendants.

09:33AM   25           And it's not as simple as the gift shop breakage,

1   because there you simply look at the price tag that's on the

2   bottom of the broken thing and that's what's owed.  Rather here in

3   this case, each item that was broken by the defendants has got to

4   be valued in a little different way.

09:34AM   5        How was it that the defendants went about breaking

6   things?  We spent six and a half weeks together revealing the

7   pieces of the Department of Health offensive and how each of those

8   pieces was crafted together not really to fix or correct issues at

9   Beechwood, but as you determined by your verdict, to retaliate

09:34AM   10  against Brook and Beechwood.

11        And the defendants, because of their positions and the

12  unrestrained arbitrary power that they had, were able to put

13  together that offensive and to mobilize the weapons necessary to

14  accomplish it.

09:34AM   15       You recall that they resurrected unsubstantiated

16  complaints to kick off what became an abuse of the typical survey

17  and enforcement process.

18        You recall from the secret e-mails between Ms. Leeds and

19  Mr. Rubin that if Beechwood's Medicare and Medicaid funding were

09:35AM   20  curtailed, the Chamberys might try to survive in the business with

21  their substantial private pay resident business.

22        They developed a piece of the offensive to deal with

23  that, and that plan was panic the private pay residents and the

24  potential residents and the insurance companies with adverse

09:35AM   25  publicity.  They ordered their Public Affairs Group to issue press

releases and website bulletins like Exhibit 37.  They made sure
that the newspaper headlines and the 6 o'clock news screamed that
Beechwood was a bad place and the Chamberys were terrible
operators.

09:35AM    Then the defendants announced to the world that their
intention was to do what they had never done before, let alone to
a financially stable and quality nursing home, revoke the
operating license in their own hearing in order to accomplish and
ensure not just a temporary funding suspension, but a permanent
09:36AM  closure of the facility.

So what were the intended consequences that the proof
will show of the defendants' retaliation?  The Chamberys were
publicly humiliated, Beechwood was put out of business, all done
to crush Brook and his mother financially so that they could never
09:36AM  survive economically to ever come to court to bring this to light.

And so it happened.  Each of the defendants took their
actions, made their recommendations, got the Medicare and Medicaid
funding cut off, revoked the operating license, and then the final
crushing blow: The Chamberys were told that there would be no sale
09:36AM  of the business.  It wouldn't be approved unless Brook and Olive
put up the white flag of surrender, released all the defendants
that are sitting over at that table from all their misdeeds, a
release that would have given up the plaintiffs' right to come to
court and to prove their case.

09:37AM    After the Chamberys' operating certificate was revoked,

1    they were told that the Department of Health was then taking the

2    position that even the Certificate of Need was gone, too.  That

3    now the Chamberys only had bricks and mortar to sell.

4           Well, in reality, as you will hear, not even sell.

09:37AM  5    Rather, the building was foreclosed, boarded up, still boarded up

6    unoccupied.

7           MR. SHEEHAN: Your Honor, objection.  May we approach?

8           (WHEREUPON, a discussion was held at side bar out of the

9    hearing of the jury.)

09:37AM  10          MR. SHEEHAN: Your Honor, I'm objecting because it seems

11   like we're getting into argument here.  Based on everything we've

12   already heard, admittedly, I was going --

13          THE COURT: What?

14          MR. SHEEHAN: -- I was going to go back and talk about

09:38AM  15   some of what happened before, but not like this.

16          THE COURT: I don't think it's gotten into argument yet.

17   Counsel, both counsel, need to keep in mind it is opening

18   statements and present what you expect to prove.  So be careful,

19   both of you, as to that.

09:38AM  20          (WHEREUPON, side bar discussion concluded.)

21          THE COURT:  You may continue --

22          MR. COOMAN: Thank you, Your Honor.

23          THE COURT: -- with the Court's direction.

24          MR. COOMAN: A valuable community resource was lost that

09:38AM  25   was an anchor of a city neighborhood with constant activity,

1   employment, and visitors.  And so now it is time for the

2   defendants to pay up.

3          You, as jurors, get to finish the job you started and

4   determine the value of each of those losses that the plaintiffs

5   suffered.  Let me tell you what the evidence you will hear will

6   show about each of those things the defendants broke and how you

7   will go about determining the value of each of those items.

8          Your first task is to essentially put on your business

9   person or investor's hat and determine a reasonable value for the

10  Beechwood business as of 1999 based on the profitability of that

11  business prior to the Department of Health offensive.

12         Mr. Chambery, Mr. Rothenberg and I retained a firm whose

13  every day job is to value businesses, Forensic Economics,

14  established by Rochester Business -- University of Rochester

15  Business School professors located right here in Rochester.

16         James Canessa, who is a forensic economist with many

17  years of experience, in doing this task of valuing, which he is

18  going to be here and will describe for you the methodology that he

19  used to determine what Beechwood was worth in the summer of 1999

20  using the actual audited financial statements of Beechwood.

21         The proof will show that the quality, reputation and the

22  innovations at Beechwood had enabled the partnership to become a

23  very profitable business.

24         That is the financial incentive we have in the American

25  economy for those with the best ideas and who are able to

1  implement them, create jobs, at the same time provide for

2  consumers something that we want.

3          So in Brook's case he is the entrepreneur who was in the

4  forefront of the healthcare industry, much like Henry Ford making

09:40AM  5  cars, or George Eastman creating photography, or Steve Jobs

6  creating the iPad, Mr. Chambery created electronic medical records

7  for nursing homes, how to implement them and how to deliver

8  cutting edge quality care in skilled nursing homes.

9          You will learn that Olive and Brook shared the business

09:41AM  10  profits with their employees through a salary scale that was by

11  far the best in the area, and a performance bonus program that was

12  unheard of.  That is one of the ways that they encouraged and

13  rewarded and ensured quality care.

14          Then you'll hear from Mr. Canessa and from Brook the

09:41AM  15  profit of the Beechwood business was comprised of two items:

16  Family salaries; plus the bottom line earnings of the partnership

17  after payment of the expenses.

18          For the calender year 1998, the year before the

19  Department of Health bomb went off, the profit of the Beechwood

09:41AM  20  business was $1.6 million.  Canessa's job and your job is

21  essentially saying if a business -- if an investment produces

22  $1.6 million a year in profit, what is that investment worth?

23  Where would an investor go and what amount of money would you have

24  to invest in order to get an annual return of $1.6 million?

09:42AM  25          To answer that question, an evaluation expert looks at

several different ways of valuing the business, but the primary

proper tool to use is what's called a "discounted cash flow

analysis."  A DCF analysis of the actual Beechwood business, not

some other nursing home business or other healthcare business of a

09:42AM  very different size or another state.

Mr. Canessa will explain to you the DCF methodology,

what it involves.  In simplest terms, here's what you will hear:

You take the annual revenue of Beechwood, you subtract the expense

of the business, things like salary and wages to staff other than

09:42AM  family members, equipment costs, the mortgage and the rent,

utilities, the insurance, all the expenses, and then the

difference between the revenue and the expenses was Beechwood's

profit and establishes a profit margin.

Any business that's producing a profit has a value, and

09:43AM  the value of the business is commensurate with the amount of the

profit of that particular business.

The more profitable the business is, the higher its

value.  This is very logical and understandable.  Mr. Canessa will

tell you because if you're going to buy a business, one of the

09:43AM  first questions you want to know in order to decide how much

you're willing to pay for that business is how much can I make if

I own this business?

Mr. Canessa will tell you that the middle of the value

range that he calculated for Beechwood was $17.8 million.  In

09:43AM  arriving at that number he made several conservative choices to

1    guard against an overvaluation of the facility.  And given

2    Beechwood's preeminent position in healthcare, the value could

3    well have been higher.

4           After you've heard all the evidence, we will ask you to

09:44AM    5    determine that the lost value of Beechwood in 1999 was a very

6    substantial figure, and not less than the $17.8 million.

7           The second component of damages that you will need to

8    determine is this: The non-economic personal loss to Olive

9    Chambery.  Mrs. Chambery did not suffer any broken bones when the

09:44AM    10   defendants destroyed Beechwood.  But the kind of pain she did

11   experience was worse than if she had:  The defendants ruined her

12   life's work.

13          This had been a classic American success story.  The

14   evidence you have heard showed their hard work, tremendous

09:45AM    15   financial risk, dedication to serving others, and insistence on

16   high standards and doing a good job, all resulting in a business

17   that had a sterling reputation.  And it was a place to work that

18   attracted and paid the very best people as employees and treated

19   those employees just like the residents:  As if they were family

09:45AM    20   members.

21          In 1999 Mrs. Chambery was 73 years old.  As many seniors

22   now do, she still enjoyed going into work and overseeing aspects

23   of the Beechwood business.  She was officially still the

24   administrator and watched with pride as Brook took the facility to

09:45AM    25   even higher levels of quality and community recognition.

1          But then instead of happily stepping into her true

2     retirement years with satisfaction, she watched in horror as the

3     regulators systematically destroyed everything that she and Herb

4     had created from scratch and created so hard to build.

09:46AM   5          I'm going to have Mrs. Chambery take a few minutes later

6     this morning to tell what you she felt and experienced during

7     those terrible months of 1999 and thereafter.  She will describe

8     for you what the law calls "emotional distress," a special kind of

9     pain and suffering.

09:46AM   10          And your responsibility will be to simply use your good

11    common sense and principles of justice to place a monetary value

12    on what Olive Chambery experienced.

13          A third component of the plaintiffs' damages for you to

14    determine is Brook's lost wages as a result of the defendants

09:46AM   15    taking away his job and taking away his ability and any realistic

16    opportunity he had to obtain employment in healthcare in the years

17    after the offensive.

18          In the several years before the closure of the facility,

19    Brook took a salary from Beechwood as an employee.  It was a

09:47AM   20    substantial salary, several hundred thousand dollars a year.

21    Because this was a family owned business, Brook's salary was

22    largely comprised of the business profits taken home in the form

23    of salary.

24          So in this case, you will hear Brook's damages for lost

09:47AM   25    income are not the profit portion of his salary since that's

already figured in to the business value, but rather a more typical nursing home administrator's salary for someone who is not a family member owner of that business.

Mr. Canessa is going to explain to you his research and his conclusion that the figure to use for Brook's lost wage computation should be a minimum of $125,000 a year trended forward over the years with an inflation factor.  And the math on that works out to be about $2 million over the 13 years from 1999 through 2012.

"Too bad" the defendants are going to tell you.  Their evidence and claim is that you should not award any lost income to Brook because he did not take another job and should have.  The defendants' defense is a peculiar one in view of the evidence that you have heard and will hear since it was the defendants' actions which prevented Brook from ever working in healthcare in New York State, which is all he had ever done from the time that he was a teenager.

Indeed, the evidence that you have heard and will hear is that that was the very goal of the offensive:  Get rid of Brook from healthcare.

So since the defendants have raised this as a defense, we need to show you what Brook has had to do for the last 13 years since 1999 as a result of the defendants' actions against him. Brook spent all of his time during what should have been the most productive and rewarding years of his career working on cleaning

1   up and then seeking justice for the devastation that the

2   defendants had created for Beechwood and its employees and for

3   Brook's own career.

4          He was occupied more than full time with non-income

09:49AM   5   earning responsibilities.  He only took four weeks of vacation

6   over those 13 years.  It was only because of the past success of

7   the Beechwood business, his careful savings and the fortuity Brook

8   and his brother had sold the Beechwood Software business in 1998

9   that Brook was in a position to undertake those unpaid

09:50AM   10   responsibilities and still maintain his family.

11          Brook's unpaid labor can be summarized in three

12   categories.  First, from 1999 through 2002, he had full

13   responsibility for systematically wrapping up the Beechwood

14   business.  The defendants would not allow it to be sold, so it had

09:50AM   15   to be wrapped up.  You can't just close the door and walk away

16   when you've been running a multi-million dollar healthcare

17   business in New York.

18          All the suppliers had to be paid, and they were in full.

19   He kept a skeleton crew of six or eight people to help with the

09:50AM   20   process, a couple of them staying on through the end of the year,

21   late in 2000.  And by then his brother Dale came alongside and

22   continued to help Brook all the way through this lawsuit.

23          All the post-employment concerns for the employees had

24   to be taken care of:  Benefits, retirement and insurance plans,

09:51AM   25   employment verifications to new employers.  And instead of just

1    abandoning the building, Brook in a responsible manner closed it

2    up and put it in a condition for any new owner who might obtain it

3    in a foreclosure.

4            Every piece of equipment and supply had to be

09:51AM  5    inventoried and then sold as salvage.  Years of medical records

6    had to be organized, filed, preserved for future access.  Normal

7    cost reports to the State were completed and audits by various

8    government agencies and the insurers had to be handled.

9            And then during those same years and for the next few

09:51AM  10   years Brook had to deal with the defense and prosecution of

11   closure-related proceedings, responses to the Medicaid Fraud

12   Control Unit subpoenas and the three year long criminal

13   investigation.

14           That investigation that not only exonerated Beechwood

09:52AM  15   and Brook, but pronounced the care at Beechwood to have been very

16   good to excellent and found that Beechwood's staffing levels were

17   above even those of the proposed federal guidelines for nursing

18   homes.

19           And, finally, over the ensuing years Brook's time was

09:52AM  20   spent preparing and supporting the prosecution of this case until

21   we were finally able to get it to trial.  Brook was determined

22   that the defendants would not get away with what they had done to

23   the careers of the Beechwood employees who had served so well and

24   to his own career and livelihood.

09:52AM  25           So Brook, working with his brother Dale and with

counsel, painstakingly discovered and put together the pieces of
proof that have allowed us to reconstruct the activities of the
defendants in 1998 and 1999.

This involved repeated Freedom of Information requests
to the government agencies, the litigation in state court all the
way to the New York Court of Appeals to obtain the documents, then
there was the review and the indexing and the cataloguing of all
those thousands of pages of documents that had been forcibly
obtained from the Department of Health, the federal government and
the MFCU.

He spent innumerable hours over the years just in the
preparation of key spreadsheets that contained 9,000 lines,
300,000 cells filling multiple computer screens detailing each and
every action of each defendant and the other people who had been
involved in the events of this case.

This was a Herculean task.  In other circumstances it
might have been accomplished by an army of young lawyers and
paralegals had Beechwood been able to hire such an army.  But
Beechwood could not afford to do that, so Brook did.

Full justice requires that Brook be compensated by the
defendants for this very real economic loss of a paycheck in his
chosen field.

Fourth and finally, what is the smearing of a good name
and reputation worth?  Brook's loss in this regard was no less
than his mother's, though it came with different impacts because

1  of the stage of his career that he was at when this hit.  You

2  heard during phase one of the trial that Brook had taken a very

3  good family business and made it into one of the premier nursing

4  homes in the state.

09:54AM  5       You'll hear more particular details about that in this

6  phase of the trial.  People wanted to go to Beechwood, Beechwood's

7  quality statistics were among the very best in the state and

8  continuing to rise.  Brook had found ways to deliver quality care

9  efficiently by utilizing those EMR's before others, including the

09:54AM  10  regulators, even understood their value or how to use them.

11       And he had solidified the Beechwood name in the

12  forefront of the rehabilitation business that you will learn

13  mushroomed regionally and across the state in the following years.

14       Under Brook's inspirational leadership, Beechwood had

09:55AM  15  driven down the cost of rehab, shortened stays, gotten people home

16  happier and healthier.

17       The Chamberys had assembled a talented team of leaders

18  and staff:  Paul Kesselring, Donna Richardson, Gwen Westbrook just

19  to name a few of those dedicated 100, all committed to the same

09:55AM  20  vision:  To be simply the best and fully intending to make

21  Beechwood their careers until that was derailed by the deliberate

22  actions of the defendants.

23       As healthcare consumers we needed Brook in New York, but

24  having been deprived of his visionary ideas for healthcare

09:56AM  25  delivery, as we seek to figure out the statewide and national

1    challenges --

2            THE COURT: Mr. Cooman, don't get too much into argument

3    here.  Don't get into argument at all.

4            MR. COOMAN: Very well, Your Honor.

09:56AM  5            THE COURT: That's for a later date.

6            MR. COOMAN: What might the care have looked like in New

7    York State had Brook been able to continue?  Think of that deal

8    with Preferred Care in June of 1999.

9            Brook's healthcare career in a matter of weeks in the

09:56AM  10   spring of 1999 was ended.  He was 49 years old.  He is now 62.

11   Brook and Peg's son Nathan and their daughter Lea were 12 and 6 in

12   1999.  While they grew up, graduated high school, went off to

13   college and grad school, Brook labored to expose the offensive and

14   the destruction that it caused.

09:56AM  15           It's pretty tough to lose those 13 years of your life,

16   to see people have to change careers, to see valued long-term

17   colleagues and employees forced to find new jobs or to find a

18   place to work that was as financially or personally rewarding as

19   Beechwood had been.

09:57AM  20           Brook spent his entire career in healthcare in the

21   skilled nursing home family business.  The defendants had very

22   publicly and intentionally ruined his reputation and the Chambery

23   name.  What possible similar job could he have found and been

24   hired for?

09:57AM  25           After what the defendants did, you will learn Brook was

1   not going to be able to design and sell any more EMR systems.  He

2   was not going to be invited to be a guest speaker any more to talk

3   about the implementation of the EMR's.  He was not invited to

4   share his insights into the way that healthcare reform should take

09:57AM  5   place.

6          What do you suppose people came up with when people

7   Googled Brook Chambery or Beechwood after the adverse media

8   campaign that you will hear the defendants conducted?

9          At the close of the case later this week we will ask you

09:58AM  10   to fairly and adequately compensate Brook in what Judge Larimer

11   will tell you are called "general compensatory damages" for the

12   injury to his reputation, and the other non-economic losses that

13   he experienced.

14          Your assessment of the credibility of witnesses, you

09:58AM  15   will hear, will be an important consideration, as it was during

16   the first phase of the trial, since the defendants dispute the

17   plaintiffs' claims of damages.

18          During the first phase of the trial the defendants asked

19   you to consider two things: They told you that every one of the

09:58AM  20   defendants did not retaliate against Beechwood and the Chamberys,

21   despite what their own memos and e-mails said.

22          And then as a fallback, the defendants told you that

23   even if they did retaliate, it didn't matter because they would

24   have done the same thing anyway.

09:59AM  25          In this part of the trial the defendants are, once

1   again, claiming two things that they would ask you to believe.

2   First, that they did not cause the damages to Beechwood, that it

3   was someone else's fault, like HCFA or Commissioner Novello or

4   Brook himself.

09:59AM   5          And, second, if they did cause the damage, that

6   Beechwood's claim of value is too high.

7          As to the first point, the defendants, the proof will

8   show, did cause the damage as the evidence you've heard and seen

9   confirms.  It was Baker and Francis' trumped up surveys and false

09:59AM   10  memos to Central Office at HCFA; it was Baker and Leeds'

11  recommendation for early termination to HCFA; it was Carlo and

12  Baker's announcement of the Medicaid and Medicare termination to

13  the Chamberys and then to the residents; and it was the press

14  releases to the media, the legislators and to the public that was

10:00AM   15  arranged by Leeds and Rubin.

16         It was Leeds and Rubin who, as they confirmed in their

17  e-mails, got HCFA to back us all the way and to initiate that

18  in-house Department of Health proceeding against Beechwood to

19  revoke the operating license about which there was no doubt as to

10:00AM   20  the outcome.

21         And can we possibly forget the defendants' explicit

22  celebratory e-mails about taking Beechwood down?  The chickens are

23  coming home to roost, amen and hallelujah, hot diggity dawg.

24         On the second point related to valuation, consider

10:00AM   25  carefully what the defendants' witnesses will tell you was the

1    value of the Beechwood business.  Consider whether the value for

2    the business the defense witnesses suggest to you aligns at all

3    with the facts of what you will hear Beechwood, not some other

4    facility, actually was.

10:01AM    5         Listen carefully as to how the defense witnesses

6    calculate their number.  Consider what they took into account and

7    what they decided to ignore.  Ask yourself whether the number they

8    suggest to you is a reasonable value for a business that was

9    producing $1.6 million in annual owner profits.

10:01AM   10         Later this week after a couple of witnesses,

11   Mr. Rothenberg will be back to summarize for you the proof about

12   plaintiffs' damages and to discuss with you the verdict sheet that

13   Judge Larimer will have prepared for you on which to give your

14   answers.

10:01AM   15         We simply ask based on the evidence that you hear, not

16   for some outlandish figures, but rather just for adequate, fair

17   and reasonable compensation for Beechwood and the Chamberys

18   consistent with the magnitude of the damage and losses that

19   they've suffered.

10:02AM   20         And remember that basic principle of responsibility and

21   a just outcome: If you break it, you have to pay for it.

22         Thank you very much for your attention and for your

23   service.

24         THE COURT: Thank you.

10:02AM   25         Mr. Sheehan, I understand you will be making the opening

1    statement for the defendants.  If you're ready, you may proceed.

2              MR. SHEEHAN: Thank you, Your Honor.

3              May it please the Court, ladies and gentlemen of the

4    jury, good morning.

10:02AM  5              My name is Bernie Sheehan.  I've been sitting at that

6    table for the first six weeks while Gary Levine was trying this.

7    I'm also an Assistant Attorney General for the New York State

8    Office of Attorney General.

9              During those first six weeks you heard Mr. Levine

10:03AM 10   present evidence about Beechwood and about the care and the

11   conditions at Beechwood, and you saw that the care there was not

12   up to par and that there were deficiencies and violations.

13             I'm not going to redo all that testimony.  But some of

14   what you heard then is relevant now to your consideration of

10:03AM 15   damages.

16             For example, the state administrative law judge Mark

17   Zylberberg, his Report and Recommendation that was Exhibit 1000

18   that you heard a lot about the first time.  I'm not going to go

19   through it again, but there were findings and deficiencies in that

10:03AM 20   report that are binding on you.

21             You heard Judge Larimer indicate the Findings of Fact,

22   the deficiencies, the violations that the administrative law judge

23   Zylberberg true -- are to be taken as true.

24             We know there were residents who needed care, but didn't

10:04AM 25   get it.  We know there were residents who needed medication and

1    pain medicine, but didn't get it.  People suffered, people were

2    put at risk.

3             But there were no corrections.  Mr. Chambery and

4    Beechwood didn't correct.  Despite the lapses in care --

10:04AM  5             THE COURT: Mr. Sheehan, we're not retrying that part of

6    the case.  We're focusing only on damages, the jury having

7    returned the verdict that they have.  So I think you're best to

8    focus on that.

9             MR. SHEEHAN: Yes, Your Honor.  And because of that, the

10:04AM  10   federal agency HCFA terminated Beechwood, and that happened in

11   June of 1999 and Beechwood closed in July of 1999 because of it.

12            You heard Mr. Chambery testify that they could not

13   survive without Medicare payments, so they had to close if there

14   was no Medicare paying for the treatment at Beechwood.

10:05AM  15            You saw that they had the chance to correct.  You saw

16   Mr. Chambery could have hired a consultant.  And even as

17   Mr. Cooman (sic) testified, there was plenty of money to do so.

18   He could have easily afforded a consultant, but they chose not to.

19   They chose not to address the problems.  They chose instead to

10:05AM  20   fight and contest the problems.

21            Even though you heard that's exactly what other

22   facilities did, other facilities would hire a consultant when they

23   were dealing with the short timeframe that Mr. Cooman was

24   describing earlier.

10:05AM  25            It's the defendants' position that -- the reason I'm

1    telling you all this is because it's defendants' position that

2    just because there was retaliation does not necessarily mean

3    Mr. Chambery's entitled to damages if he didn't take

4    responsibility for his actions, which is something that we --

10:05AM    5    that's something that we've been arguing all along.

6            However, having said that, it's my job to deal with

7    plaintiffs' arguments concerning damages.  I have to present

8    evidence to deal with their arguments about the value of Beechwood

9    and the damages that they're claiming.

10:06AM    10           And so you're going to hear from Ms. Maureen Rutecki and

11    Mr. James Canessa.  They're sitting behind us in the first row.

12           Ms. Rutecki, someone who has a lot of experience in

13    valuing businesses; she's even valued several nursing homes.

14    Mr. Marasco has a lot of experience doing economic analysis and

10:06AM    15    assessing damages, just like we're going to hear about from the

16    plaintiffs, from their expert, from Mr. Canessa.

17           You're going to see that Ms. Rutecki and Mr. Marasco's

18    value for Beechwood is fair market value.  Something -- it's a

19    price that someone would actually purchase Beechwood for as

10:06AM    20    opposed to what you'll hear from Mr. Canessa.

21           It's a price that's based on price per bed and common

22    sense.  Plaintiffs' expert did not do this.  Plaintiffs' expert,

23    as Mr. Cooman intimated, will give you a much, much higher value.

24    A value three or four times higher than what we would expect

10:07AM    25    actually to pay for Beechwood.

1          Ms. Rutecki will show you by comparing Beechwood to

2     other facilities and transactions of other facilities similar to

3     Beechwood, same age, same size, that you get a value that's more

4     in line with what Ms. Rutecki will say.

10:07AM  5          You're going to hear about some complicated methods to

6     calculate a value for Beechwood from all the experts.  Valuing of

7     business is a complicated thing.

8          Ms. Rutecki will testify that she examined Beechwood's

9     financial data and the actual sales of other nursing facilities to

10:07AM 10     generate her value, and then she applied several different methods

11     to confirm that value.  And that at each step Ms. Rutecki asked

12     herself, does this make sense?

13          You'll hear from Mr. Marasco.  He'll testify as to the

14     overall methodology, the way Ms. Rutecki looked at the value and

10:08AM 15     the way the plaintiffs' expert Mr. Canessa looked at damages.

16          He's going to testify that a lot of that doesn't make

17     sense, the way they value Beechwood doesn't make sense.  In

18     particular, you'll hear about some of the categories that they're

19     going to testify to, including the lost wages, that they don't

10:08AM 20     make sense.

21          Mr. Cooman mentioned 1998, and that 1998 was a banner

22     year for Beechwood, that the profits there were greater.  1998 was

23     an anomaly, and there's reason to believe, as the proof will show,

24     that profits would not continue that way.  For example, they had

10:09AM 25     not taken into account violations and the deficiencies; there were

1  changes that would have needed to have been made to address that

2  going forward, especially as the entire facility was moved to

3  rehabilitation instead of long-term residential care.

4         At the end of this trial, after you've heard a few days

10:09AM  5  of testimony from, I think, about five witnesses, I'm going to be

6  up here again and I'm going to ask you to award the plaintiffs $1

7  because they had the chance to avoid all this, they had the chance

8  to hire a consultant and avoid all these problems, but they chose

9  not to.

10:09AM  10        Thank you.

11        THE COURT: Thank you.  Ladies and gentlemen, I think

12  before we begin the proof I'll let you take our first break this

13  morning.  The jury can step outside before we have our witness.

14        (WHEREUPON, the jury was excused).

10:10AM  15        THE COURT: Ten or 15 minutes.

16        (WHEREUPON, there was a pause in the proceeding.)

17        THE COURT: We're ready for the witness and our jury?

18        MR. COOMAN: We are, Your Honor.

19        THE COURT: Bring in the jurors and start with

10:35AM  20  Mrs. Chambery.

21        (WHEREUPON, the jury is present).

22        THE COURT: Mr. Cooman, you may call your witness.

23        MR. COOMAN: Thank you, Your Honor.  We call Olive

24  Chambery.

10:36AM  25

1          PLAINTIFFS' WITNESS, OLIVE CHAMBERY, SWORN

2                      DIRECT EXAMINATION

3          THE COURT: Thank you.  You can have a seat there for us.

4  Watch your step as you climb into the witness chair.

10:38AM  5          Mrs. Chambery, hello.  How are you?

6          THE WITNESS: Okay, thank you.

7          THE COURT: Try to keep your voice up so that all the

8  jurors and the parties in court can hear what you have to say,

9  okay?

10:38AM 10          THE WITNESS: All right.

11          THE COURT: That sounds good.

12          Mr. Cooman?

13          MR. COOMAN:  Thank you, Your Honor.

14  BY MR. COOMAN:

10:38AM 15  Q.  Mrs. Chambery, at the time that the Department of Health took

16  action against Beechwood, were you still active at the business?

17  A.  Yes, I was.

18  Q.  What were your first thoughts when the Department of Health

19  started to make the claims that they did about Beechwood?

10:38AM 20  A.  My first thoughts were just, I guess, I was just surprised,

21  devastated.  What can they be doing to us?  We've been running

22  such an excellent place.  We've always had -- when they would do a

23  survey, it always turned out wonderful.

24  Q.  Did you believe that the claims the Department of Health was

10:39AM 25  making were true?

1   A.   No, I didn't.

2   Q.   Were you concerned at all about the residents at Beechwood

3   having to move?

4   A.   Oh, I just felt awful because we -- it was like a home for

5   them and they were taken into our facility to help them.

6   Q.   What fears did you have as these things started to happen?

7   A.   I was just --

8         THE COURT: Fears for the patients or --

9         MR. COOMAN: Her personal fears.

10        THE WITNESS: My personal fears?

11  BY MR. COOMAN:

12  Q.   Right.

13  A.   I just -- I just thought what was going to happen to us?  How

14  could they do this?  My fear was just what's going to happen to me

15  after all these years?

16  Q.   Were you embarrassed at all by what was being said about

17  Beechwood?

18  A.   Oh, yes, because we had such a good reputation up until then.

19  Q.   Did you curtail your activities at all as a result of what

20  happened?

21  A.   Oh, yes.  I didn't want to go out into public.  I didn't -- I

22  didn't -- I didn't want to sign my name somewhere because people

23  would see Chambery, and I even -- I was always very active in

24  church and church activities, and I didn't want to do it.

25  Q.   Why didn't you want to do it?

1  A.    Because of my name.  They thought Chambery was -- we run such

2  an awful place, we could have hurt patients.

3  Q.    How did the actions that the defendants were taking affect

4  you physically?

10:41AM  5  A.    Physically, I don't know if depleted is a good word, but I

6  was just -- it just took me over so that I just felt -- I felt

7  very weak.  And my health, I thought what is going to happen to me

8  with my health?  I just -- I couldn't seem to accept it.  I didn't

9  know what to do.

10:41AM  10  Q.    After these things began to happen, what did you think and

11  feel when you saw the American flag?

12  A.    Oh, I just -- I could never even look at it.  This is

13  America, this is where --

14         MR. SHEEHAN: Your Honor, objection.

10:41AM  15         THE COURT: Overruled.

16  BY MR. COOMAN:

17  Q.    You may go ahead.

18  A.    Oh, when I looked -- I looked at the flag, I thought this is

19  happening here in America where you have freedom of speech and

10:42AM  20  that somebody could do something to me like this, to us.

21  Q.    Were you able to get over any of these hurts and feelings

22  that you were experiencing?

23  A.    Well, slowly on, but it took a few years.  Even now when I

24  think about it, it still bothers me that this could have happened.

10:42AM  25  Q.    In what way did this whole experience change you?

```
 1   A.    It changed my physical being, it changed my actions, it
 2   changed -- that I just didn't -- I didn't feel that I could do
 3   things like I did.
 4         It just -- I was -- even physically, I just -- I felt
 5   not strong anymore.  That it was just -- I don't know, it just --
 6   it had me -- it had me just so devastated.  It just...
 7         MR. COOMAN: That's all the questions I have.  Thank you.
 8   Mr. Sheehan may have a few.
 9         THE WITNESS: All right.
10                    CROSS-EXAMINATION
11   BY MR. SHEEHAN:
12   Q.    Good morning, Mrs. Chambery.
13   A.    Good morning.
14   Q.    I just have a couple of questions.  How old were you when
15   Beechwood closed?
16   A.    In 1999?
17   Q.    Yes, ma'am.
18   A.    That was six years -- well, 12 years.  How old was I?  78?
19   75.
20   Q.    Were you 75?
21   A.    I think so.
22   Q.    Okay.
23         MR. SHEEHAN: No further questions, Your Honor.  Thank
24   you.
25         THE COURT: Thank you.
```

1        MR. COOMAN: That's all.  Thank you, Mrs. Chambery, you

2   may go back to your seat.

3        THE COURT: Watch your step.

4        (WHEREUPON, the witness was excused).

10:44AM   5        MR. ROTHENBERG: Your Honor, the plaintiffs call Brook

6   Chambery.

7        THE COURT: Brook Chambery.

8        MR. ROTHENBERG: In the meantime, are we working here?

9        THE CLERK: Yes.

10:45AM  10        PLAINTIFFS' WITNESS, BROOK CHAMBERY, SWORN

11                        DIRECT EXAMINATION

12        THE COURT: Have a seat there for us.

13        MR. ROTHENBERG:  Ready to go, Your Honor?

14        THE COURT: Yes, thank you.  You may proceed.

10:45AM  15        MR. ROTHENBERG: Thank you.

16   BY MR. ROTHENBERG:

17   Q.   Good morning, Mr. Chambery.

18   A.   Good morning.

19   Q.   I want to begin by backing up to 1993 when you assumed the

10:46AM  20   leadership of Beechwood.  And when exactly did that occur?

21   A.   After my father's death in March of 1993.

22   Q.   Okay. And as of that date, was the computerized medical

23   records system operational -- strike that.

24        Was the software system for the books and records, was

10:46AM  25   that operational at Beechwood?

1  A.    Yes, it was fully networked.

2  Q.    Okay. And how about the computerized medical records system,

3  was that operational at Beechwood?

4  A.    I'm sorry, I thought that's what I --

10:46AM  5  Q.    Well, my first question was just about the, you know, the

6  books and records, the financial piece of the software.

7  A.    Oh, yeah, that had been up for many years.

8  Q.    Okay. And the computerized medical records, was that up and

9  running in March of 1993?

10:47AM  10  A.    Yes, in a fully networked environment.

11  Q.    What do you mean by "fully networked" again?

12  A.    Multiple stations or multiple computers at the

13  nurses' stations, as well as through the facility.

14  Q.    Okay. And I don't want to repeat all of this again, but what

10:47AM  15  were the benefits of the computerized medical records system?

16  A.    Well, in short, it would -- it allowed people to have their

17  hands-on information a lot faster than they would otherwise, which

18  increased teamwork.

19          That, in turn, led to quality improvements.  That led to

10:47AM  20  a lot shorter time that the nurses had to spend or all the staff

21  had to spend doing their paperwork, which then allowed them to

22  have more time in their patient care activities.

23  Q.    In March of 1993 was Beechwood still a long-term care

24  facility?

10:48AM  25  A.    Yes, it was.

44

1    Q.    Were there any rehabilitation beds in the facility in March

2    of 1993?

3    A.    No.

4    Q.    Okay, let's move forward to the end of 1998.  What was the

10:48AM   5    size -- strike that.

6          Was Beechwood in the rehab business at the end of 1998?

7    A.    Yes, it was.

8    Q.    And what was the size of the rehab unit at Beechwood as of

9    the end of 1998?

10:48AM   10   A.    By the end of 1998 we had 40 beds dedicated -- or 41 beds

11   actually dedicated to rehab; and the size of our program put us in

12   the top 5% in the state.

13   Q.    And when you say "size," how do you measure size there?

14   A.    Measure size by the number of people going home or to local

10:48AM   15   care, discharges going through that unit.

16   Q.    Okay. So the number of discharges measured what over the

17   course of a year or a month or how did you measure it?

18   A.    Well, over the course of the year.  We had the statistics to

19   show that.

10:49AM   20   Q.    Okay. And what was the state ranking -- I'm sorry, not the

21   number, but what did you just say?

22   A.    The top 5%.  I think we were number 19 in the state.

23   Q.    Okay. And at that time Beechwood was independent, correct?

24   A.    Correct.

10:49AM   25   Q.    Were you owned and operated by any big hospital facility?

1  A.   No, we weren't.

2  Q.   Were there some rehab units that were, in fact, owned and

3  operated by hospital systems?

4  A.   Yes.

10:49AM  5  Q.   And even -- did this rank that you just described, did that

6  compare Beechwood to all rehab units, even the ones that were

7  owned and operated by hospital systems?

8  A.   Yes.

9  Q.   Okay, let's focus then on some trends during the years 1993

10:50AM  10  to 1998 under your leadership.  And what happened in terms of the

11  size of Beechwood's rehab unit during that period of time?

12  A.   Well, we started implementing the rehab unit or the rehab

13  program probably late 1993 into 1994.  And it just gradually grew

14  until 1998, we had the full unit going.

10:50AM  15  Q.   Okay. Now, during this same timeframe under your leadership,

16  did Beechwood begin implementing performance bonuses for its

17  employees?

18  A.   Yes, I did.

19  Q.   Had there all -- strike that.

10:51AM  20       Had there previously been a program for end of year or

21  Christmas bonuses?

22  A.   There was historically a Christmas bonus, yes.

23  Q.   Okay.  Did something new or different happen under your

24  leadership?

10:51AM  25  A.   Well, first of all, I started increasing those Christmas

1  bonuses, but eventually I split it out and made it performance and

2  a Christmas bonus.

3  Q.    Okay. And --

4  A.    I believe that was around 1996.

10:51AM  5  Q.    Did Beechwood pay its employees a performance bonus in

6  calender year 1998?

7  A.    Yes, it did.

8  Q.    Do you know what the size of that was in terms of percentage

9  of pay or anything like that?

10:51AM  10  A.    The total bonuses were approximately $200,000, which came to

11  about 11 and a half, 11.6 percent of pay.

12  Q.    And what part of that was the performance bonus, either in

13  raw dollars or in percentage?

14  A.    $172,000 was the performance bonus.

10:52AM  15  Q.    Okay. Did Beechwood implement any other dollars and cents

16  benefits for its employees under your leadership?

17  A.    I started a 401(k) program for them.  I think that was in

18  1994 and 1995.

19  Q.    And a 401(k) program is a form of a retirement program?

10:52AM  20  A.    Their retirement plans, and we contributed to that.

21  Q.    "We" being who?

22  A.    The nursing home.

23  Q.    Now, as Beechwood moved from long-term care into the rehab

24  care, did Beechwood's expenses increase or decrease or remain the

10:53AM  25  same?

1   A.   Well, as you're doing rehab, your expenses are going to

2   increase.

3   Q.   Okay.  Throughout the 1990's, particularly in the years under

4   your leadership, Mr. Chambery, what change, if any, occurred in

10:53AM  5   Beechwood's annual revenues?

6   A.   They went up accordingly.  The rates for rehab are higher

7   than just ordinary nursing home care.

8   Q.   I'm going to show you a exhibit, an exhibit, excuse me.  I'd

9   like to show it to Mr. Chambery first.  Okay, thank you.

10:53AM  10       THE CLERK: Hold on a second.

11  BY MR. ROTHENBERG:

12  Q.   Do you have Exhibit 803 on your screen there?

13  A.   Not quite yet.

14  Q.   No?  We don't have it.  It's my fault.

10:54AM  15       Now do you have it on your screen?

16  A.   Yes, I do.

17  Q.   Okay, sorry about that.  What's 803?

18  A.   803 is a bar chart showing revenues from 1980 to 1998.

19  Q.   And there are some other numbers on there.  There's some

10:54AM  20  numbers on those diagonal lines.  Don't tell me what the numbers

21  are, but what do those numbers show?

22  A.   Showing the rate of growth over those years.

23  Q.   Okay. And does Exhibit 803 fairly and accurately describe the

24  annual revenue for Beechwood Restorative Care in the years 1980

10:55AM  25  through 1998?

1  A.    Yes, those were taken off of our financial statements.

2  Q.    Okay.

3          MR. ROTHENBERG: Offer Exhibit 803, Your Honor.

4          MR. SHEEHAN: No objection, Your Honor.

10:55AM  5          THE COURT: Without objection, 803 is received and may be

6  published to the jury if you wish.

7          (WHEREUPON, Exhibit 803 was received into evidence).

8  BY MR. ROTHENBERG:

9  Q.    Just to go over this again since the jury wasn't seeing it

10:55AM  10  the first time you talked about it, there's a bar for each year

11  1980 through 1998, correct?

12  A.    Yes.

13  Q.    And at the top of the bar there's a number, right?

14  A.    Yes.

10:55AM  15  Q.    Okay. What does that number represent with respect to each

16  year?

17  A.    That number represents gross revenue.

18  Q.    So that's not profit, that's just the total amount of revenue

19  that Beechwood received, correct?

10:56AM  20  A.    Correct.

21  Q.    Okay. Now, let's focus on the period of 1993 to 1998, which

22  would be the right-hand side of the chart.  Do you see that?

23  A.    Yes, I do.

24  Q.    And does Exhibit 803 indicate what was the average annual

10:56AM  25  growth in revenue for Beechwood under your leadership?

1   A.   9.3% a year.

2   Q.   Now, you were affiliated with Beechwood for many, many years

3   before 1993 when your father passed away, correct?

4   A.   Yes, I was.  From 1972 on.

10:56AM  5   Q.   You were employed from 1972 on after college, correct?

6   A.   Correct.

7        THE COURT: Could I just interrupt?  On the chart there's

8   a abbreviation CAGR.

9        MR. ROTHENBERG: I'm sorry.  Sure, I'll go over all of

10:57AM  10   that stuff.  Let's do that.

11   BY MR. ROTHENBERG:

12   Q.   First of all, you testified there was 9.3% growth under your

13   leadership.  There's another line that says 1980 to 1998, and then

14   there's the number 7.1%, correct?

10:57AM  15   A.   Yes.

16   Q.   And what does that represent?

17   A.   That represents the growth rate from 1980 to 1998.

18   Q.   By the way, what does CAGR mean exactly?

19   A.   I can only guess.  Continuing advancement and gross revenue.

10:58AM  20   Q.   And in the little box there, there is two other numbers.  Do

21   you see those numbers?

22   A.   Yes.

23   Q.   And one is an inflation number and one is the nominal GDP; is

24   that correct?

10:58AM  25   A.   Yes, gross domestic product.

1   Q.   Did you actually figure those numbers out or did Mr. Canessa,

2   to your knowledge, figure those numbers out?

3   A.   Mr. Canessa did that.

4   Q.   Okay, so we'll straighten that out with Mr. Canessa.

10:58AM  5        And, I'm sorry, Judge, that's why I skipped over those

6   other numbers.

7        So let's go back.  You worked at Beechwood from 1972 to

8   1999, correct?

9   A.   Yes.

10:58AM  10  Q.   And do you recall during your entire tenure at Beechwood,

11  Mr. Chambery, do you recall was there ever a time when the gross

12  revenues declined from one year to the next?

13  A.   I don't recall it, no.

14  Q.   And according to Exhibit 803, was there ever an occasion

10:59AM  15  between 1980 and 1998 when the gross revenues declined from one

16  year to the next?

17  A.   No.

18  Q.   So we just all watched the Olympics and everybody was talking

19  about records during the Olympics.  I'm guessing you watched the

10:59AM  20  Olympics.  Did you watch the Olympics?

21  A.   Yeah, a little bit.

22  Q.   Is it fair to say that Beechwood set a record for earnings

23  every single year from 1980 through 1998?

24  A.   Yes.

10:59AM  25  Q.   For revenues rather?  Record for revenues?

1   A.    Record for revenues, yes.

2   Q.    Now, the pace of growth, did the pace of growth change once

3   you transitioned into the rehab business?

4   A.    Yes, it did.  From that average of 7.1 to 9.3%.

11:00AM   5   Q.    Now, I want to talk to you about a different number, I want

6   to talk to you about the profit margin number.  And, first of all,

7   do you understand what the term means, "profit margin"?

8   A.    Yes.

9   Q.    And what's it mean?

11:00AM   10   A.    Difference between gross revenues and expenses.

11   Q.    Isn't profit margin --

12   A.    That would be the profit if -- the margin would be the

13   percentage.

14   Q.    All right, all right.  So just in general, so let's do that

11:00AM   15   again.  In general terms, "profit" means what?

16   A.    Profit is the difference in the gross revenues minus

17   expenses.

18   Q.    Okay. And the "profit margin" then is?

19   A.    Profit divided by gross revenues would give you the margin.

11:00AM   20   Q.    And that's expressed as a percentage, is it not?

21   A.    Correct.

22   Q.    So I would like to show you another exhibit.  May we turn

23   this off for the jury, please?

24         I'm going to show you what is marked as Exhibit 806.  Do

11:01AM   25   you have 806 on your screen?

1  A.    Yes, I do.

2  Q.    Okay. And just without telling us its content, this is

3  another bar chart, correct?

4  A.    Yes.

11:01AM  5  Q.    And what does it depict?

6  A.    It is labeled adjusted profit margins.  So it is depicting

7  the profit margins as calculated from 1998 to -- from 1989, I'm

8  sorry, to 1998.

9  Q.    Okay. And does that include the entire period under your

11:01AM  10  leadership?

11  A.    Yes.

12  Q.    And some bars are gray and some bars are green, correct?

13  A.    Yes.

14  Q.    And do you know what the difference in gray and green is on

11:02AM  15  this chart?

16  A.    Yes, it's labeled as rehabilitation, but it's also got a box

17  next to that that describes it as also due to where I took over

18  management.

19  Q.    To your knowledge, Mr. Chambery, are the profit margins

11:02AM  20  reflected on Exhibit 806 -- strike that.  I'll rephrase that.

21        Does 806, to your knowledge, fairly and accurately

22  reflect the profit margins at Beechwood during the years 1989

23  through 1998?

24        MR. SHEEHAN: Objection, Your Honor.  Exhibit 806 refers

11:02AM  25  to adjusted profit margins.

1           THE COURT: I'm sorry, I didn't hear you.

2           MR. SHEEHAN: Exhibit 806 refers to adjusted profit

3  margins.

4           THE COURT: All right.  Well, is that a fair difference?

11:03AM   5  Can you answer that question?  Does it show adjusted profit

6  margins?

7           THE WITNESS: I was about to explain that.  Yes, this is

8  called adjusted profit margins, but it is not taking into account

9  all the revenue that the nursing home had.

11:03AM  10           MR. ROTHENBERG: Hold on a second, we'll get to that in

11  one second.

12  BY MR. ROTHENBERG:

13  Q.   When it says "adjusted profit margins," do you know what the

14  essential adjustment is that's reflected on this exhibit?

11:03AM  15  A.   This exhibit would reflect revenues minus some -- the typical

16  things that we would have every year, what we would call

17  "retroactive revenues."

18  Q.   Here, let me do this a different way.  You have a -- there's

19  reference on Exhibit 806 to a term called EBITDA, E-B-I-T-D-A,

11:04AM  20  which is the thing that accountants talk about all the time?

21  A.   Yes.

22  Q.   Do you know what EBITDA stands for?

23  A.   Yes, earnings before interest, taxes, depreciation and

24  amortization.

11:04AM  25  Q.   Okay. If you looked at Beechwood's -- strike that.

1          To get to Exhibit 806, do you know whether there was any

2    sum that was added to the EBITDA on Beechwood's financial

3    statements to reach the margins that are reflected on 806?

4    A.    In order to get to the EBITDA, the forensic economist that

11:04AM 5    prepared this chart would have to add back in to the bottom line

6    of the, you know, the facility, the profits, would have to add

7    back in depreciation, amortization, any taxes and --

8    Q.    How about family salaries?

9    A.    And family salaries.

11:05AM 10   Q.    Okay. And so the  --

11   A.    So this figure would be typically greater than the reported

12   profits.  But to make it easier on everybody, this is the typical

13   way operations are compared on a financial basis.  So we just kind

14   of wrap it into what we call "profits."

11:05AM 15   Q.    Okay. So with that understanding, to your knowledge,

16   Mr. Chambery, does Exhibit 806 fairly and accurately reflect the

17   adjusted profit margins for Beechwood in the years 1989 through

18   1998?

19          MR. SHEEHAN: Objection, Your Honor, foundation.  He

11:05AM 20   didn't prepare the chart.

21          THE COURT: Could you speak a little louder?

22          MR. SHEEHAN: I'm sorry, Your Honor.  Objection,

23   foundation.  He didn't prepare the chart.

24          THE COURT: Well --

11:06AM 25          MR. ROTHENBERG: He doesn't have to.

1       THE COURT: Doesn't mean he can't answer it.  Have you

2   reviewed the material upon which this chart was made and --

3       THE WITNESS: Yes, I did.

4       THE COURT: -- does it accurately reflect the adjusted

11:06AM  5   profit margins for the years in question?

6       THE WITNESS: Yes, with an exception that when it was

7   prepared, the consultant or the expert witness that did this left

8   out a sizeable chunk of revenue every year because he didn't

9   consider it operating revenue for that year.

11:06AM  10  BY MR. ROTHENBERG:

11  Q.   Are you talking -- well, what kind of revenue are you talking

12  about there?

13  A.   Well, for instance, every year after doing Medicaid and

14  Medicare cost reports, which are done after the annual statements,

11:06AM  15  there may be adjustments that the third-party payors owe us.  And

16  so that may come in in the next year, but it's really due to the

17  year before.

18       If that was -- and when this chart was prepared, they're

19  leaving out those revenues every year.

11:07AM  20  Q.   By leaving them out, did they make the profit margins bigger

21  or smaller?

22  A.   They made the profit margins smaller.

23  Q.   Okay. Now, assuming that we're going to disregard those kind

24  of revenues there, but in terms of the annual revenues each year,

11:07AM  25  does 806 fairly and accurately depict the adjusted profit margins

56

1    for Beechwood in those years?

2    A.    Yes.

3              THE COURT: Are these the profit margins before the

4    interest, taxes, depreciation, amortization were --

11:07AM    5              THE WITNESS: No, that's after.  That's all added back in

6    to the -- what would be the financial statement bottom line.

7              You have family salaries, you take the audited financial

8    statements, you add back in the family salaries, you add back in

9    the depreciation, amortization, interest and you come to this

11:08AM    10   figure.

11             THE COURT: You say "add back in."  You subtract it from

12   the revenues?

13             THE WITNESS: Yeah.  Well, those are subtracted from the

14   revenues to begin with to get your net profits.  So now we add

11:08AM    15   them back in to get earnings before those items.

16             So these figures here are going to be greater than what

17   would show on a financial statement except for the retroactive

18   revenues that are collected every year.  He didn't include those

19   here.

11:08AM    20             THE COURT: Well, I assume we're going to have another

21   witness that's going to talk about this?

22             MR. ROTHENBERG: Yes, we are, Your Honor.

23             THE COURT: Are you moving this?

24             MR. ROTHENBERG: I am, Your Honor.

11:08AM    25             THE COURT: Okay.  Any objection?

1       MR. SHEEHAN: Your Honor, we do object just because we

2  don't think there was a sufficient foundation.  We think

3  Mr. Canessa, who prepared this document, would be the better

4  witness to offer it because of the calculations.

11:09AM  5       THE COURT: Well, I think this witness has sufficiently

6  indicated he's familiar with the figures, although he did not make

7  the chart.  I think it's sufficiently identified and authenticated

8  to allow it to be received.   I do understand we probably will

9  have another witness who will testify further about it.

11:09AM 10       So I'll receive 806.

11       (WHEREUPON, Exhibit 806 was received into evidence).

12       MR. ROTHENBERG: Thank you. We need Ms. Rand to publish

13  it, Your Honor.

14       THE COURT: What do you want?

11:09AM 15       MR. ROTHENBERG: We need to publish it to the jury.  I

16  said we need Ms. Rand, but maybe I was presumptuous.  I guess we

17  don't need Ms. Rand.  Thank you, Your Honor.

18       THE COURT: We need Ms. Rand.  Sometimes an old judge can

19  figure it out.

11:09AM 20  BY MR. ROTHENBERG:

21  Q.   Okay.  So you have 806 in front of you?

22  A.   Yes, I do.

23  Q.   All right.  And I just want to focus on the last couple years

24  there.  The margin that's depicted here for 1997, the profit

11:10AM 25  margin was what?

1    A.    For 1997 it was 23.4%.

2    Q.    And for 1999 the profit margin was what?

3    A.    For 1998?

4    Q.    Excuse me, 1998.  The profit margin?

11:10AM  5    A.    29.9%.

6    Q.    And there are some ups and downs as we proceed from left to

7    right, correct?

8    A.    Yes.

9    Q.    But in general, from left to right, what is the trend,

11:10AM  10   Mr. Chambery?

11   A.    Upward.

12   Q.    And in terms of rehab vs. the long-term care, were the profit

13   margins greater or less when you were doing the rehab business?

14   A.    Well, the profit margins were greater.  I would not attribute

11:11AM  15   that all to rehab.  That's due to efficiencies that I put -- I

16   instituted in the facility.

17   Q.    Okay, fair enough.  And let's just spend one more second on

18   this retroactive revenue.  The retroactive revenue appears on

19   Beechwood's financial statements I take it, correct?

11:11AM  20   A.    Yes.

21   Q.    But when Exhibit 806 was prepared, was retroactive revenue

22   counted in figuring out what the profit margin was for each year?

23   A.    No.  If it had been, 1997 would have been about 5% higher.

24   Q.    Okay. Where did Beechwood's profit margins stack up in terms

11:11AM  25   of other facilities in New York State in 1998?

1    A.    Two and a half times higher.

2          MR. SHEEHAN: Objection, foundation.

3          MR. ROTHENBERG: Okay, I'll rephrase.

4    BY MR. ROTHENBERG:

11:12AM  5    Q.    Are you familiar with statistics that are maintained by any

6    government body regarding the profit margin at facilities

7    throughout New York State?

8    A.    Yes, I am.

9    Q.    And have you reviewed those statistics -- let's focus on

11:12AM  10   1998.  Have you reviewed those statistics for 1998?

11   A.    Yes, I have.

12   Q.    Okay. And based on your review of those statistics, where did

13   Beechwood profit margins stack up in terms of all the facilities

14   in New York State?

11:12AM  15         MR. SHEEHAN: Objection, Your Honor.  Is there a

16   document?  I'm not sure exactly what -- I'm not sure what

17   Mr. Chambery's referring to and so I don't know if the foundation

18   has been laid.

19         THE COURT: Well, do you want to question him, *voir dire*

11:12AM  20   here as to the basis for his knowledge?

21         MR. ROTHENBERG: Well, here, maybe I can answer this for

22   Mr. Sheehan.  Let's do it a different way.

23   BY MR. ROTHENBERG:

24   Q.    I need to turn the screen off for the jurors, Your Honor.

11:14AM  25         I'm showing you what we've marked as Exhibit 668.  Do

1   you have 668 in front of you?

2   A.    Yes, I do.

3   Q.    And what is 668?

4   A.    That 668 represents data that came from New York State cost

5   reports.

6   Q.    And is this data that's maintained by -- when you say "New

7   York State," who maintains this data?

8   A.    The Department of Health does.  Annually the facilities turn

9   in cost reports, and that is compiled by the Department of Health

10  and we filed under the Freedom of Information for that data and we

11  compiled the EBITDA for all the facilities in the state.

12  Q.    And at the bottom of this page it says 1 of 14; is that

13  correct, Mr. Chambery?

14  A.    Correct.

15  Q.    And is the entire table, in fact, 14 pages long?

16  A.    Yes.

17  Q.    Okay. But this particular exhibit is what portion of that

18  table?

19  A.    The first page.

20  Q.    Okay. And does this contain statistical data maintained by

21  the State of New York regarding financial information relating to

22  skilled nursing facilities throughout the State of New York in

23  1998?

24  A.    Yes.

25          MR. ROTHENBERG:  Okay. So I'm going to offer 668, Your

1    Honor.

2            MR. SHEEHAN: Your Honor, what's the -- we object on the

3    grounds of relevance.  What's the relevance of this document?

4            THE COURT: Well, I think the witness was testifying

11:16AM  5    about profit margins and where Beechwood fit in the scheme of

6    things, so --

7            MR. ROTHENBERG: Exactly, Your Honor.

8            THE COURT: If that's the objection, I'll overrule it and

9    receive the exhibit principally for that purpose --

11:16AM  10           MR. ROTHENBERG: Thank you.

11           THE COURT: -- alone.

12           MR. ROTHENBERG: Thank you, Your Honor.

13           (WHEREUPON, Exhibit 668 was received into evidence).

14           MR. ROTHENBERG: Can we publish 668 to the jury?

11:16AM  15   BY MR. ROTHENBERG:

16   Q.    So is there a column on here that's profit margins?

17   A.    Yes, it's labeled adjusted EBITDA.

18   Q.    Well, adjusted EBITDA, that's --

19   A.    I'm sorry, the dollars are there; and then the margins are

11:16AM  20   over on the most -- on the right-hand side.

21   Q.    Yeah.  Be not the far right column, but the second from the

22   right, correct?

23   A.    The far right gives you the ranking of those margins.

24   Q.    Okay. And so this shows Beechwood ranking at what number?

11:17AM  25   A.    Number 23.

1   Q.   Okay. And this is only one page though.  Do you know that's
2   23 out of how many?
3   A.   23 out of -- at the top of the report it says 571 facilities.
4   Q.   Oh, I see.  That's under facility number?
11:17AM  5   A.   Correct.
6   Q.   Let's do this, if I could remember how to do this stuff.  So
7   how many facilities again?
8   A.   That were used for this report, which means they had valid
9   data, that's all that were on the -- oftentimes facilities don't
11:17AM  10   turn in cost reports on time or whatever.  At the point in time we
11   got this data, there were 571 facilities on it.
12   Q.   Okay. And Beechwood was 23rd out of 571 in terms of profit
13   margin for 1998; is that correct?
14   A.   Correct.
11:18AM  15   Q.   Now, do you know of your own knowledge, Mr. Chambery, how
16   Beechwood's private pay rates related to the statewide average for
17   private pay rates in 1998?
18   A.   The private pay rates were less than average.
19   Q.   Beechwood's private pay rates were less than average?
11:18AM  20   A.   Correct.
21   Q.   And how about Medicaid reimbursement rates?  Not Medicare,
22   but Medicaid.  Was Beechwood's Medicaid reimbursement rate
23   average, below average, above average in 1998?
24   A.   Lower than average.
11:18AM  25   Q.   Let's talk about Medicare reimbursement in 1998.  How was

1 Medicare reimbursement determined in 1998?

2 A.    In 1998 we were under a prospective payment system with

3 Medicare, which meant there was a projected -- or they set the

4 rates in advance, and we got paid per day based on patients'

11:19AM 5 assessment categories, how much they're -- how much nursing they

6 needed.

7 Q.    Okay, hang on.  Let's break this apart.  Is the prospective

8 pay system, is that sometimes called the PPS system?

9 A.    Yes.

11:19AM 10 Q.    When you say you got paid, how -- was the reimbursement rate

11 at Beechwood the same as other facilities or different from other

12 facilities?

13 A.    The same.

14 Q.    Now, as between different patients, as between Mr. Smith and

11:19AM 15 Mrs. Jones, would the reimbursement rate necessarily be exactly

16 the same?

17 A.    No.  That would be dependent on their nursing needs, their --

18 and their therapy needs principally.

19 Q.    You used the term "assessment."  And kind of sort of in lay

11:20AM 20 terms, what's that mean?  Some of us know what it means, but tell

21 everybody else what it means.

22 A.    Medicare set up an assessment, how many hours of nursing

23 care, how many hours of PT or OT that a patient needed in a day or

24 in a week.  And there were about 32 categories alone in nursing --

11:20AM 25 categories of patients with various nursing and therapy needs.

1  Q.   Okay.  And so the patient, they would figure out which

2  category Mrs. Jones or Mr. Smith fit in and then you would get

3  reimbursed based on that category?

4  A.   Correct.  The nurses and the therapists had to do assessments

11:20AM  5  of those patients.

6  Q.   And if a patient was in that category, is it true that they

7  would get the same reimbursement no matter what facility in the

8  state they were at?

9  A.   By 1998, yes.

11:21AM  10  Q.   Okay. Now, talking again about Medicare, though, what was

11  going on with the length -- strike that.

12       Are rehab patients compensated by private pay?

13  Medicare?  How are rehab patients typically reimbursed?  Under

14  what program?

11:21AM  15  A.   At that time most of them were Medicare, but you could --

16  there were a good share of insurance patients and some privates.

17  Q.   So would it depend in part on age?

18  A.   Yes.

19  Q.   Okay. Because not everybody is covered by Medicare, right?

11:21AM  20  A.   There's a demo program with Preferred Care, too, so -- but

21  basically it's by age, yes.

22  Q.   Okay. And what was happening with the length of stay for

23  Beechwood's rehab patients during the years leading up to 1998?

24  A.   It was declining every year.

11:22AM  25  Q.   Do you remember what the average length of stay was for 1998

1   for the rehab patients?

2   A.    24 days.

3   Q.    Now, the reimbursement system was a per diem system, meaning

4   so much per day; is that correct?

11:22AM   5   A.    Yes.

6   Q.    If we want to look, though, at the overall amount, the total

7   amount that the Medicare system would pay to Beechwood for each

8   rehab patient in the years leading up to 1998, was that total

9   amount changing?

11:22AM   10   A.    It was decreasing.

11   Q.    And was it decreasing because the length of stay was

12   decreasing?

13   A.    Yes.

14          MR. SHEEHAN: Objection, Your Honor, leading.

11:23AM   15          THE COURT: Overruled.

16   BY MR. ROTHENBERG:

17   Q.    Now, from these various cost reports, were you able to

18   determine where Beechwood ranked among rehab programs in the State

19   of New York in terms of reimbursement per patient?

11:23AM   20          Were you able to make that determination?

21   A.    Yes.  We were the fourth lowest in reimbursement.

22   Q.    Was that for 1998?

23   A.    Yes.

24   Q.    Okay. But despite lower than average reimbursement rate for

11:23AM   25   private pay and for Medicaid, and despite the short length of

1   stay, is it your testimony that the profit margins were increasing

2   through the end of the 1990's?

3            MR. SHEEHAN: Objection, leading.

4            THE COURT: Overruled.

11:24AM   5            THE WITNESS: Yes, the profit margins were increasing.

6   BY MR. ROTHENBERG:

7   Q.   Let's just go back to this business about PPS for one second.

8   Had the PPS system been implemented nationwide in the 1990's?

9   A.   No.  The PPS system came into effect probably around 1995 or

11:24AM   10  1996, and New York State was one of five states that were called

11  to demo projects before -- before they released it nationally.

12  Q.   Was it released nationally in 1995 or 1996 or was that the

13  time that the demo project came into being?

14  A.   No, the demo project started in New York.  It was released

11:24AM   15  nationally in 1999.

16  Q.   Okay.  Was the Medicare reimbursement at Beechwood under the

17  PPS system in the years 1996, 1997 and 1998?

18  A.   Yes.

19  Q.   I want to show you an exhibit that was introduced in evidence

11:25AM   20  during the first part of the trial, and I'm showing you

21  Exhibit 658A.

22            And I know we showed this to the jury before and so I

23  won't spend a lot of time on it, but can you quickly tell the jury

24  what 658A depicts, please?

11:25AM   25  A.   Exhibit 658A is a bar chart showing OSCAR scores.  And the

1    OSCAR, for the jury, is the quality -- it's -- OSCAR data is what

2    we turn over to the surveyors when they come into the facility,

3    and it's entered into DOH's -- actually, the federal database, but

4    the State of New York keys it in.

11:26AM    5              This is depicting, as we talked about in the previous

6    trial, about 21 data elements that we figured that we can -- that

7    the outcomes would be due to how the facility delivered care.

8              And this shows these scores for the relative ranking

9    above or below norm for the Rochester, Monroe County area

11:26AM   10   facilities.

11   Q.   Okay. 658A, all those numbers at the bottom, they talk

12   about -- those numbers correspond to other facilities, correct?

13   A.   Correct.

14   Q.   And the geographic extent of those facilities is reflected in

11:27AM   15   this exhibit is what?

16   A.   It says Rochester area.  Whether it's all Monroe County, I

17   don't know.

18   Q.   Did you -- aside from the data that's reflected on 658, did

19   you obtain statewide OSCAR data for all the facilities that were

11:27AM   20   reporting in the State of New York?

21   A.   Yes, we did.

22   Q.   And what mechanism did you use to get that OSCAR data?

23   A.   FOIA request from the federal government.

24   Q.   And I have a chart here, but do you know without looking at

11:28AM   25   the chart where Beechwood ranked statewide in terms of these OSCAR

1   data points for the year 1998?

2   A.   Yes, fourth in the state.

3   Q.   Now, let's talk about Beechwood's financial performance.   In

4   the calender year 1998, do you know what the total earnings of

5   Beechwood were, including amounts paid to family members?

6   A.   $1.6 million.

7   Q.   And did you, Brook Chambery, did you take a salary that was

8   in part a distribution of the facility's profits?

9   A.   Yes, I did.

10  Q.   And do you know what your salary was for the calender year

11  1998?

12  A.   It was over $900,000.

13  Q.   And do you know on the financial statements whether Beechwood

14  declared a profit for the year even after paying that big salary

15  to you?

16  A.   Yes, it did.

17  Q.   And approximately do you know what those profit figures were

18  that are reflected on the financial statements?

19  A.   Approximately $550,000.

20  Q.   Let me switch topics here and ask you about the negotiations

21  with Preferred Care in the spring of 1999.   Do you recall Molly

22  Komer testifying in the first part of the trial, correct?

23            MR. SHEEHAN: Objection, Your Honor, relevance.

24            MR. ROTHENBERG: We're going to talk about profit margin

25  here, that's the purpose of this.

1    THE COURT: All right, with that understanding I'll

2 overrule.

3 BY MR. ROTHENBERG:

4 Q.    Do you remember her testimony?

11:30AM 5 A.    Yes.

6 Q.    And did you enter into actual negotiations with Preferred

7 Care about the Subacute Care Program?

8 A.    Yes, we did.

9 Q.    And how were you on behalf of Beechwood when you were

11:30AM 10 negotiating, how were you pricing subacute care for the facility?

11 And I don't mean in exact dollars, but comparatively how were you

12 pricing?

13 A.    As competitively as I could.

14 Q.    At that point in time who was the competition for subacute

11:30AM 15 care?

16 A.    Theoretically, all the nursing homes.  But as she testified,

17 we were the only ones that they were dealing with.

18 Q.    Okay. But, I mean, somebody was providing this care.  If

19 somebody went to an Emergency Department, where would you get this

11:31AM 20 care?

21 A.    Oh, the way the care was being delivered is -- all this was

22 being done in the hospitals.

23 Q.    All right.  And were your negotiations with Preferred Care

24 for an exclusive or non-exclusive program?

11:31AM 25 A.    Non-exclusive.

1   Q.    Did that have anything to do with how you were intending to

2   price the program?

3   A.    That's why I was pricing it competitively.  I wanted to be

4   out in the lead of the rest of the facilities, and you want to do

11:31AM   5   the best job you can at the lowest rate.

6   Q.    Now, did there come a time when the rate had been reduced to

7   writing even though there was no signed contract?

8           MR. SHEEHAN: Objection, Your Honor, its relevance.

9           And may we approach?

11:31AM   10           THE COURT: We are focusing on damages here.

11           MR. ROTHENBERG: Yes, I'm coming back to profit margin,

12   but we can approach if counsel wishes to.

13           (WHEREUPON, a discussion was held at side bar out of the

14   hearing of the jury.)

11:32AM   15           THE COURT: I just want to keep us focused on damages.

16           MR. ROTHENBERG: Yes, I know.

17           THE COURT: These OSCAR figures sort of, we dealt with

18   that in the liability phase.

19           MR. ROTHENBERG: Here's the issue:  Their expert in

11:32AM   20   looking or in projecting the income in future years, their expert

21   makes various assumptions about what's going to happen to

22   Beechwood's margins.

23           For example, he makes the assumption that Beechwood's

24   margins are going to decline.  In fact, counsel in his opening

11:32AM   25   said that 1998 was an anomaly.

1        So I'm going to cross him about those assumptions based

2    on what was actually going on at Beechwood.  But I have to have,

3    you know, a foundation in the record in terms of what was going

4    on.

11:32AM    5        So all I'm going to do with him on this topic is ask him

6    if he made a determination where the margins would be for subacute

7    care:  Higher or lower.  That's all I'm doing here.

8        MR. SHEEHAN: Your Honor, we view this as speculative.

9    Even their own expert doesn't rely on this.  He mentions the

11:33AM   10    Preferred Care agreement and possible agreement, but he does not

11    rely on it and he doesn't take it into account in his analysis.

12        MR. ROTHENBERG: I'm not using it for my expert.  I'm

13    using it for yours.

14        MR. SHEEHAN: You can cross-examine ours if you wish.

11:33AM   15    The rest is speculative and not relevant.

16        THE COURT: Well, I think it is.  I'll allow it.

17    Overruled.

18        MR. LEVINE: You said may proceed, but you said two

19    different things.  So he can continue the line of questioning?

11:33AM   20        THE COURT: Yes.

21        (WHEREUPON, side bar discussion concluded.)

22    BY MR. ROTHENBERG:

23    Q.   My question, Mr. Chambery, is did you make a determination of

24    what the price would be?  I know there was no signed contract, but

11:34AM   25    did you make a determination about what the price would be?

1            I'm not asking you for the number, but just yes or no.

2    A.    Yes.

3    Q.    Okay.  And did you also determine what Beechwood's profit

4    margin would be for the Subacute Care Program should Preferred

11:34AM 5    Care enter into the contract with Beechwood?

6    A.    It would have been higher.

7    Q.    Let me direct your attention to July 17 of 1999.  And what

8    happened on July 17, 1999?

9    A.    The facility was closed.  We were in a hearing that day.  I

11:34AM 10   got out of the hearing and walked through the empty hallways.

11   Q.    When was the last day in which a resident was within the

12   Beechwood facility?

13   A.    I believe it was that day.

14   Q.    What did Beechwood do -- strike that.

11:35AM 15           Had the staff -- had any of the staff remained employed

16   at Beechwood in the days leading up to July 17?

17   A.    I think 82 of them.

18   Q.    And after July 17, what happened to Beechwood's staff?

19   A.    They were all let go.  They had nothing to do, except for a

11:35AM 20   about eight people that were -- we needed to help wind up

21   activities.

22   Q.    Now, had you been able as of that date, had you been granted

23   permission to sell the facility to any third-party buyer?

24   A.    No, we had not.

11:35AM 25   Q.    Had any third-party buyer as of that date expressed an

1    interest in purchasing the facility?

2    A.   Yes, within days.

3    Q.   And if that facility -- if Beechwood -- if you had been

4    permitted to sell the Beechwood facility to the third-party buyer

5    prior to July 17, what would the purchaser have acquired at that

6    period of time?

7    A.   They would have acquired the building, the whole operation,

8    the staff, the receivables, the payables, everything.

9    Q.   Okay. So if that had happened, would it have been necessary

10   for you to do all these wind-up activities?

11   A.   No.

12   Q.   Now, were there further discussions in the fall of 1999 about

13   potential sale of the facility?

14   A.   Yes.

15   Q.   And in the fall of 1999, if a third-party had purchased the

16   facility, what would the third-party have acquired at that period

17   of time?

18   A.   They would have acquired the building, the equipment and the

19   Certificate of Need to start up again.

20   Q.   And so would that -- would you still have had some wind-up

21   activities if that had happened?

22   A.   Yes.

23   Q.   But would it have been necessary for you to do all of the

24   wind-up stuff that you eventually ended up doing?

25   A.   No, I wouldn't have had to take care of an auction or take,

1  you know, to do an equipment auction or to take care of the

2  building.

3  Q.   We'll get to all those activities in one minute, but is it

4  fair to say that if you had sold the facility even after closure,

11:37AM  5  that the wind-up activities would have been minimized?

6  A.   Yes.

7  Q.   Okay. So let me ask you in terms of the things you had to do

8  after July 17 of 1999, what things needed to be done?

9           And I'll go category by category.   What, if anything,

11:37AM  10  was done with Beechwood's suppliers or accounts payable as the

11  accountants call it?

12  A.   Well, when -- as of July 17 we had about $200,000 worth of

13  payables and, you know, for the vendors, for all the supplies that

14  we were purchasing month by month, and we paid off those

11:38AM  15  suppliers.

16  Q.   What, if anything, did Beechwood have to do about its staff

17  after letting the staff go?

18  A.   The staff, we had to take care of all their accrued vacation

19  time, sick time, 401(k) benefits, help them find new jobs,

11:38AM  20  et cetera.

21  Q.   What, if anything, did Beechwood do about its accounts

22  receivable or money that was owed to the facility?

23  A.   We went about trying to collect those.   Normally they would

24  flow in any way, but there were some that because of all the bad

11:39AM  25  publicity and everything dragged things out, but we worked as hard

1  as we could to collect those receivables.

2  Q.   What is a PRI audit?

3  A.   A PRI audit is the state -- PRI's are the state assessment

4  system, patient review instruments.  And that is used for

11:39AM  5  categorizing Medicaid patients into a certain payment category,

6  and retroactively they will -- and it could be even years later

7  they will do an audit of those PRI forms that we turn in.

8  Q.   Did Beechwood have PRI audits that it had to deal with after

9  July 17, 1999?

11:40AM  10  A.   Yes.

11  Q.   And what, if anything, happened as a result of the PRI audits

12  after July 17 of 1999?

13  A.   We paid back monies to Medicaid.

14  Q.   And how or why did -- can you just explain that in general

11:40AM  15  terms?  Can you explain what happened there?

16  A.   I believe the only problem in those assessments was the --

17  who they would account for assessments would be those that are

18  over a 30 day stay.

19       And since all our Medicare or rehab patients had a

11:40AM  20  length of stay that was less than 30 days, they basically threw

21  those patients out of the whole assessment calculation and said we

22  had a, you know, typically the private patients, Medicare,

23  everybody aggregated together for an assessment of your facility.

24  Q.   What's that term called for when they count everybody

11:40AM  25  together, this aggregate term?  Is that -- do you use the term

1   "census" to describe the population of a facility?

2   A.    They take the census on that day and, you know, when we

3   submit all the PRI's for that day, they do an average for your

4   facility.

11:41AM   5          And in this case, because a lot of them were Medicare or

6   insurance patients that didn't even stay 30 days, they took those

7   out of the calculations.  And as a result, they said the

8   assessment of our house was lower and we owed them money back.

9   Q.    And "they" in this instance was the State of New York; is

11:41AM   10   that correct?

11   A.    Yes, DOH.

12   Q.    And the DOH claimed that you owed them money back because

13   your Medicare patients were being treated so quickly and

14   efficiently that they didn't stay for 30 days?

11:41AM   15   A.    Yes.

16   Q.    So, in essence, Beechwood got a penalty because of that?

17   A.    Yes.

18   Q.    Were there any other audits of the facility after July 17,

19   1999, other than the PRI audits?

11:42AM   20   A.    Well, we had our typical financial, and the accountants would

21   come in and do their thing.

22   Q.    The accountants would come in and do their thing.  Explain

23   what you mean by that.

24   A.    Well, typically the accountants come in and do an audited

11:42AM   25   statement for Medicare because Medicaid and Medicare require it,

quite frankly.

In this case, in 1999 we didn't do that, we didn't do an audited statement, but the accountant was doing audits of the books.  It wasn't a certified audit, but they were still auditing things.

But the main thing is we had a Medicare audit of 1997 and 1998 and that dragged on for quite a while.

Q.   Okay.

A.   I think that wasn't settled for two, three, four years down the road.

Q.   You mentioned earlier that there was an auction of equipment, correct?

A.   Yes.

Q.   Tell the jury what happened with respect to Beechwood's equipment.

A.   When it became obvious that we would not be allowed to sell the facility, we quit paying the mortgage on the building and we --

Q.   Hold on, I'll get to the mortgage in five minutes.  Just tell me about the equipment.

A.   The equipment was basically our equipment, we owned the equipment and we had to get rid of that.  So we had an auction.

Q.   And what was necessary -- what needed to be done in order to have an auction?  Could you invite everybody in or was there some preparation that needed to be done?

1  A.   Every piece of equipment, every nut and bolt, you name it had

2  to be cataloged and put together in lots for the auction.

3  Q.   Okay. What are Medicare cost reports?

4  A.   At the end of the year we do what's called a "cost report"

11:44AM  5  for Medicare and Medicaid.  It's simply reporting all our expenses

6  for operations that year, whether it's used for reimbursement

7  directly, they still use it just to keep track of what all the

8  costs are in the state or the nation.

9  Q.   Okay. And what, if anything, happened with respect to

11:44AM  10  Medicare cost reports after July 17 of 1999?

11  A.   We had a dispute over 1999 that didn't get settled until way

12  into 2006, I believe.  But -- and then there was the basic audit

13  of -- I had never had an audit before, but since we were closed

14  down, they came in and did an audit of 1997 and 1998, which held

11:45AM  15  up our retroactive collection.

16  Q.   "They" in that case being the federal authorities?

17  A.   Yes.  Well, it was their intermediary that actually does the

18  audit.

19  Q.   Okay.  They hire somebody to do it on their behalf?

11:45AM  20  A.   Correct.

21  Q.   Okay. What, if anything, did Beechwood have to do about its

22  medical records after closure?

23  A.   Medical records, we had to go through the facility, every

24  department and pull everybody's records together, if there were

11:45AM  25  any physical records.

1        We had to go to a back room where we kept all the

2    historical records, go through the ones that were old enough that

3    we could throw them out.  Catalogue the ones that we still had,

4    index them, put them in and then we actually stored them off-site

11:45AM  5    eventually.

6    Q.    Is there a time period for which a facility is required to

7    keep medical records?

8    A.    Yes.  I believe it was seven years.

9    Q.    Okay. And did you, in fact, do that after closure, maintain

11:46AM 10    those medical records for that period of time?

11    A.    Yes, we put them in the off-site storage bins and any time

12    they were needed from a PRI audit to attorneys, you know, wanting

13    data for certain patients that had been there, we would have to go

14    back to those storage bins and find the particular records.

11:46AM 15    Q.    So were there, in fact, occasions during the seven years when

16    you were required to go and retrieve closed medical records?

17    A.    Yes.  We also did that for the Attorney General's Office.

18    Q.    You're talking about the Medicaid fraud investigation?

19    A.    Medicaid fraud investigation, yes.

11:46AM 20    Q.    What, if anything, did you do with respect to the physical

21    building at 900 Culver Road after closure?

22    A.    We kept two maintenance people on the payroll and we worked

23    as hard as we could to try and sell the building.  But, you know,

24    DOH wouldn't let us go there.

11:47AM 25        But in the meantime we maintained the place, we painted

1  it, we repaved the driveways, striped it, you know, did everything

2  we could to keep the place looking proper.

3  Q.   I want to show you -- this is not yet in evidence -- so I

4  want to show you a photograph -- actually, let me show you this

11:47AM  5  photograph.  I'm showing you what has been marked as Exhibit 698.

6  And what is 698?

7  A.   That is a picture of the building, Beechwood.

8  Q.   Before or after closure?

9  A.   That's after closure.

11:48AM  10  Q.   And what's the condition of the parking lot -- strike that.

11          Is the parking lot depicted in the photo?

12  A.   Yes, it is.  And that shows the new paving and the striping.

13  Q.   And now 697, what is 697?

14  A.   Just another view of the building.

11:48AM  15  Q.   Is this after closure?

16  A.   Yes.

17          MR. ROTHENBERG: We offer 697 and 698, Your Honor.

18          MR. SHEEHAN: Your Honor, I believe 697 and 698 are

19  already in evidence.

11:48AM  20          THE COURT: They're already what?

21          MR. SHEEHAN: I believe they're already in evidence.

22          MR. ROTHENBERG: We'll check Mr. Cooman's comprehensive

23  chart.

24          THE COURT: Otherwise any objection?

11:48AM  25          MR. SHEEHAN: No, Your Honor.

1    THE COURT: We'll check and see if they're received, but

2    if not --

3        MR. ROTHENBERG: They are in, I'm sorry, my mistake.  So

4    let's -- can we publish these two to the jury?

11:49AM  5  BY MR. ROTHENBERG:

6    Q.   So 697, this is a picture of the exterior of the facility; is

7    that correct?

8    A.   Yes.

9    Q.   And 698 is, again, the exterior of the facility, correct?

11:49AM 10  A.   Yes.  And showing the rehab house that we had next door.

11   It's the white house in the far right of the picture.

12   Q.   And the parking lot that's depicted here, does this show the

13   new parking lot with the new striping and stuff?

14   A.   Yes.

11:49AM 15  Q.   Now, you mentioned the mortgage earlier.  Did Beechwood

16   continue paying the mortgage after July 17 of 1999?

17   A.   Yes, we did well into the next year.

18   Q.   Okay. Even though there was no residents at the facility

19   anymore?

11:49AM 20  A.   Yes.  Like I said earlier, we were hoping to sell the

21   building, so we didn't want to lose everything we had in it.  So

22   we were paying the mortgage.

23   Q.   Okay. And was Beechwood able to sell the building and recover

24   anything from it?

11:50AM 25  A.   No.

1  Q.   Did the building -- strike that.

2        What eventually -- well, we'll catch up to that later.

3  You told us that approximately eight people stayed on after the

4  closure in July of 1999, correct?

11:50AM  5  A.   Yes.

6  Q.   And for how long did those individuals keep working at the

7  facility?

8  A.   I think the last person was there -- or left in November of

9  2000; and they just -- after they were finished with their tasks

11:50AM  10  or oftentimes even if they weren't, I would allow them to get

11  paid.  It was basically when they found new jobs, they left.

12  Q.   Okay. Who was the last person to stay on at Beechwood?

13  A.   Paul Kesselring.

14  Q.   When did Paul leave?

11:51AM  15  A.   I think it was November of 2000.

16  Q.   After Mr. Kesselring left, were there still wind-up

17  activities that needed to be done?

18  A.   A lot of them, yes.

19  Q.   On whose shoulders did they fall?

11:51AM  20  A.   Mine.

21  Q.   Now, let me just ask you a couple questions about the

22  termination notice because counsel brought up termination in his

23  opening.  At any time did you take any action at all in response

24  to the termination notice that Beechwood had received?

11:51AM  25  A.   I sent a letter to -- that summer, I think the first one

1    might have even been while the hearing was going on, there was
2    another one later in August asking about recertification.
3    Q.    Now, as it turns out, who controls reinstatement after
4    termination, the feds or the state?
11:52AM  5    A.    I found out that the state does.
6    Q.    And to whom is a facility required to submit its request for
7    reinstatement?
8    A.    The request has to go to the Department of Health.  They are
9    the agent for the federal government.
11:52AM 10    Q.    And did either the DOH or the federal HCFA take any action in
11    response to any letter you wrote requesting reinstatement?
12    A.    No.
13    Q.    Now, after December of 1999 when the operating certificate
14    was revoked, was reinstatement even possible after that date?
11:53AM 15    A.    No.  Without an operating certificate, you don't get
16    recertified into Medicare or Medicaid programs.
17    Q.    Okay. I want to ask you some questions about some categories
18    of expenses Beechwood incurred after closure.  You told us earlier
19    that Beechwood paid its suppliers' accounts payable; is that
11:53AM 20    correct?
21    A.    Yes.
22    Q.    And you told us earlier that Beechwood took care of various
23    payroll obligations with respect to sick time, vacation time and
24    so forth?
11:53AM 25    A.    Yes.

1    Q.    And the mortgage, do you remember how long Beechwood

2    continued paying the mortgage after July of 1999?

3    A.    I think it was into August of 2000.

4    Q.    What, if anything, happened after Beechwood stopped paying

11:53AM    5    the mortgage?

6    A.    It went into foreclosure.

7    Q.    And was the facility eventually sold at foreclosure?

8    A.    Yes, in March or April of 2002.

9    Q.    Did Beechwood realize any money as a result of that

11:54AM    10    foreclosure sale?

11    A.    No.  We lost everything.

12    Q.    Now, was there a dispute -- strike that.

13          Who guaranteed -- who, if anyone, guaranteed the

14    mortgage on the building?

11:54AM    15    A.    HUD.

16    Q.    HUD is a federal agency?

17    A.    Right.

18    Q.    Did Beechwood have a dispute with HUD about any financial

19    matter?

11:54AM    20    A.    We had a dispute over the reserve account.  We felt that it

21    was ours and they felt they should put it against the mortgage.

22    Q.    Not in excruciating detail, but as simple as possible tell

23    the jury, please, what we're talking about here with the reserve

24    account.

11:54AM    25    A.    A reserve account was something that was -- it was required

1    by the HUD agreement, Department of Housing and Urban Development,

2    who was insuring the mortgage.  They want everybody that has such

3    a mortgage to put a certain amount into a reserve for

4    depreciation, or in case you don't have the money to make some

11:55AM    5    repairs.

6           We were not really -- we never drew from it because we

7    needed it.  Sometimes I would argue with them that it was getting

8    too big and we would draw it down, but at the close of the

9    facility, I think there was $160,000 in that account.

11:55AM    10    Q.    And so there was a dispute about who had the right to get

11    that reserve account?

12    A.    Correct.

13    Q.    And do you know how long that dispute -- strike that.

14           Do you know, was that dispute eventually resolved?

11:55AM    15    A.    Yes.

16    Q.    And do you know approximately when that was eventually

17    resolved?

18    A.    Probably in 2002 somewhere.

19    Q.    Now, after Beechwood stopped paying the mortgage, but prior

11:56AM    20    to the foreclosure, did you continue to undertake any

21    responsibilities at all for the building?

22    A.    Yes.

23    Q.    And what responsibilities did Beechwood continue to undertake

24    in that time period?

11:56AM    25    A.    We had to maintain the building so that if a new operator

1    took it over, they didn't have a ruined building.  So, you know,

2    we had to -- we were constantly over there.

3            If there was a problem with the alarm system, I would be

4    over there in the middle of the night taking care of it; cut the

11:56AM    5    lawn.  My brother helped me with a lot of that stuff.  There was a

6    lot of maintenance work to be done around there.  If somebody

7    broke a window, we had to replace the window.  We had to winterize

8    the place so that in the winter, you know, the cold temperatures

9    didn't ruin the walls and that sort of thing.

11:56AM   10    Q.    And this was undertaken by Beechwood even though you had

11    stopped paying the mortgage and the building was in foreclosure?

12    A.    Yes.

13    Q.    Now, did there come a time when you vacated the facility at

14    900 Culver Road?

11:57AM   15    A.    Yes.

16    Q.    And do you remember when that occurred?

17    A.    We vacated it in -- I believe it was November of 2000.

18    Q.    Okay. And where -- strike that.

19            At the time you vacated it, were there still financial

11:57AM   20    records and medical records and all that kind of stuff?

21    A.    Yes.

22    Q.    Okay. And so did you need to find a new place to operate out

23    of?

24    A.    Yeah, we put a lot of the records in storage; we kept some of

11:57AM   25    them ourselves; and we basically moved the whole office, you know,

1   the accounting records and whatever, patient care records we

2   needed, and a couple -- a few desks and that sort of thing, we

3   took the whole office environment and moved it to another office

4   we had in Webster.

11:58AM   5   Q.   Who is the "we" there?  What office did "we" have in Webster?

6   A.   There was an office that my mother actually owned.  It was

7   what we had used for the software business.  And we purchased --

8   she purchased that in 1980.

9   Q.   And after the sale of the software business, was the software

11:58AM   10   business still operated out of that building?

11   A.   It was there until March of 2000 when the company took it out

12   of town.

13   Q.   Now, there's -- do you have a way of referring to this

14   Webster building?  What do you call that building?

11:58AM   15   A.   We just called it the "software building."

16   Q.   How about the -- Ebner Road is it?

17   A.   Otherwise, Ebner Drive.

18   Q.   Ebner Drive, okay.  And did you continue to work out of the

19   Ebner Drive facility after you left the 900 Culver Road address?

11:59AM   20   A.   Yes.  My brother and myself physically moved all the stuff

21   over there and we continued to operate out of there.

22   Q.   Now, did Beechwood pay Olive any rent for that building?

23   A.   No.  It would have been just one hand paying the other.

24   Q.   Did Beechwood, however, keep track of rent that was owed to

11:59AM   25   Olive for this period of time?

1  A.    Yes.  For the amount of the physical space that we were using

2  in the building.

3  Q.    Okay. Now, after July of 1999 and up until today, has

4  Beechwood incurred legal expenses for any reason other than this

12:00PM  5  particular lawsuit?

6          I'm not asking you about this lawsuit, but for any other

7  reason did Beechwood incur legal expenses?

8  A.    Yes.

9  Q.    And for what kinds of matters did Beechwood incur legal

12:00PM  10  expenses?

11  A.    Everything from the HUD -- the depreciation reserve that we

12  just talked about; collections on accounts receivable; disputes

13  with Medicare over reimbursement for 1999; there was the -- the

14  hearing back in 1999; an appeal of that hearing decision.

12:00PM  15  Q.    How about the Medicaid fraud matter?

16  A.    The Medicaid fraud, yes.  There were numerous, numerous legal

17  proceedings.

18  Q.    Okay. I want to switch topics now and I want to --

19          THE COURT: Mr. Rothenberg, we need to take a break for

12:01PM  20  lunch.  This might be a good time.

21          MR. ROTHENBERG: Okay, Your Honor.

22          THE COURT: We're a little early here, but I think let's

23  do it.  Ladies and gentlemen, we'll break for lunch at this time.

24  I'd like to get back in about an hour and 15 minutes if we could.

12:01PM  25  So about 1:15, okay?  1:15.

1          MR. ROTHENBERG: Yes, Your Honor.

2          THE COURT: Ms. Rand will help you with the various

3    restaurant locations, although I think there's another jury that's

4    being picked today so it might be crowded down there.  Let's try

12:01PM  5    to get back at 1:15.  The jury's excused.  See you this afternoon.

6          (WHEREUPON, the jury was excused).

7          THE COURT: Mr. Rothenberg, in terms of our schedule,

8    Mr. Canessa, as far as you know, will be available tomorrow?

9          MR. ROTHENBERG: Yes, yes, Your Honor.  And I probably

12:02PM  10   have another 45 minutes or so here.

11         THE COURT: I hope we can finish Mr. Chambery today then.

12         MR. ROTHENBERG: I would hope so, too.

13         THE COURT: All right, 1:15-ish.

14         MR. SHEEHAN: Yes, Your Honor.

12:02PM  15        MR. ROTHENBERG: Okay.

16         (WHEREUPON, there was a pause in the proceeding.)

17         THE COURT: I guess we have our jury and we should

18   accommodate them, so we'll continue.

19         MR. ROTHENBERG: Yes, Your Honor.  Mr. Chambery.

01:21PM  20        THE COURT: Assemble our jurors, please.

21         (WHEREUPON, the jury is present).

22         THE COURT: I guess we're ready to continue,

23   Mr. Rothenberg.

24         MR. ROTHENBERG: Yes, Your Honor.

01:23PM  25   BY MR. ROTHENBERG:

1  Q.   I was going to ask Ms. Rand for assistance in displaying a

2  document.   I'll wait one second.

3         THE CLERK: Sorry.

4  BY MR. ROTHENBERG:

01:23PM  5  Q.   Well, it's not in evidence yet, so...okay, are we good?

6         Mr. Chambery, I'm showing you on your monitor there a

7  copy of a photograph which has been marked Exhibit 731.  Can you

8  identify that, sir?

9  A.   Yes.  That is the front door of the nursing home.

01:23PM  10  Q.   And is that -- to your knowledge, when was that photograph

11  taken?

12  A.   Just recently.

13  Q.   Does that photograph 731 fairly and accurately depict the

14  condition of the entrance to the Beechwood facility as of the

01:24PM  15  spring of 2012?

16  A.   Yes, it does.

17         MR. ROTHENBERG: Offer 731, Your Honor.

18         MR. SHEEHAN: Objection, Your Honor.  This isn't relevant

19  to damages.

01:24PM  20         THE COURT: Well, when was this boarded up?

21         THE WITNESS: It's been boarded up in various stages

22  through the years.  I think every window is now boarded up.

23         THE COURT: So this was sort of the final boarding up as

24  of this past spring?

01:24PM  25         THE WITNESS: Well, we're not in control of it.  The

1  City, I think, is taking care of it, but that's the condition at

2  this point, yes.

3          THE COURT: But certainly the spring of 2012 it wasn't

4  your building and you had no control over it?

5          THE WITNESS: Correct.

6          THE COURT: What's the relevance?

7          MR. ROTHENBERG: Depicting the current condition of it,

8  Your Honor.

9          THE COURT: Well, I'll sustain the objection.  They had

10  no control over the building.  If he wants to testify how it

11  looked back in 2000 or 2001, but...

12          MR. ROTHENBERG: Okay, very well.

13  BY MR. ROTHENBERG:

14  Q.   Mr. Chambery, you told us about all the wind-up activities

15  that occurred in 1999 and 2000, and I'm going to do the subsequent

16  chronology shortly.  But what percentage of your time was occupied

17  with these wind-up activities in the second half of 1999 and all

18  of 2000?

19  A.   Full time.

20  Q.   Did there come a time when your brother Dale began helping

21  you with any of the wind-up activities?

22  A.   Yes, he began in March of 2000.

23  Q.   And why did Dale start helping you out?

24  A.   Because we needed the help.  There was just too much for me

25  or the others helping me to do by ourselves.

1   Q.    Do you remember what Dale's first job was?

2   A.    His first job was cataloguing all the equipment for auction.

3   Q.    And did Dale continue after the auction?  Did he continue to

4   help you out with further activities at the facility?

01:26PM   5   A.    Yes, from -- everything from building maintenance to helping

6   with computer functions for the Medicaid fraud investigation to

7   all the things we had to do for electronic -- keeping track of all

8   the documents we were collecting after that and putting

9   spreadsheets together, that sort of thing.

01:27PM   10   Q.    Now, did Beechwood pay your brother Dale a salary for any of

11   the time that he assisted you?

12   A.    No, it did not.  Couldn't afford to.

13   Q.    Okay. Did you, however, keep track of monies owed to Dale?

14   A.    Yes.

01:27PM   15   Q.    And how did you attempt to calculate how much money was owed

16   to Dale?

17   A.    We just kept a record of what time.  He did not spend

18   full time on the project.

19   Q.    Okay.

01:27PM   20   A.    So we allocated his time accordingly.

21   Q.    Now, have you, Brook Chambery, have you drawn a salary from

22   Beechwood since early 1999?

23   A.    No, I haven't.

24   Q.    Did you draw a salary from any third-party?

01:27PM   25   A.    No.

1  Q.    How did you manage to support your family for the past 12, 13

2  years?

3  A.    Through savings, and I guess I would say I was fortunate

4  enough to get some money from selling our software company and

01:28PM  5  that -- probably those two are the main things.  I guess you could

6  call it retirement savings.

7  Q.    Retirement savings.  So are you saying that it was like a

8  nest egg; is that correct?

9  A.    Yes.

01:28PM  10  Q.    Now, I want to change topics here, I want to ask you about

11  the time that was involved in connection with the MFCU

12  investigation.  First of all, let's put a timeframe on this.  When

13  were the first subpoenas issued in the MFCU investigation?

14  A.    I believe around the same time that Dale came on board to

01:29PM  15  help me out.  I think it was around March of 2000.

16  Q.    And just in general terms -- strike that.

17       Was there one subpoena from MFCU or more than one

18  subpoena?

19  A.    There were five.

01:29PM  20  Q.    And just in general terms tell the jury, please, what was the

21  volume of documents that you had to produce in response to those

22  various subpoenas?

23  A.    Car loads.  Just, for instance, Dale had an SUV -- and

24  whether it was the first or second subpoena was for timecards and

01:29PM  25  temporary staffing records and all that -- and they filled up his

1  whole SUV.  And that was just one of them, one time.

2         What we would do is deliver them to Mr. Cooman's office

3  and he would turn it over to the Attorney General's Office.

4  Q.   And for how long did that investigation continue,

01:30PM  5  Mr. Chambery, the MFCU investigation?

6  A.   Three years.

7  Q.   Now, let's talk about what, if anything, you had to do

8  yourself in connection with this particular lawsuit.  We've seen a

9  lot of exhibits in this case, correct?

01:30PM  10  A.   Correct.

11  Q.   And was there a procedure that you were involved with in

12  terms of obtaining documents from the Department of Health or from

13  other agencies?

14  A.   Beginning after the hearing ended in the summer of 1999, I

01:30PM  15  began using the Freedom of Information process to get at records

16  both from the state and the federal government, but that process

17  alone lasted about five and a half years.

18  Q.   That "process alone" meaning what?  The FOIA process?

19  A.   Right.

01:31PM  20  Q.   Now, was it necessary on any occasion using the FOIA system

21  to go to court?

22  A.   We had to go to court -- there were about 198 separate FOIA

23  requests, comprised about 36 letters.  And after a certain number

24  of those, you know, we knew we weren't getting any answers at all,

01:31PM  25  and so I think it was in 2001 we began a court action and there

1  were three court orders to turn over documents.

2  Q.   Now, after this litigation got under way, did there come a

3  time when instead of using FOIA, you used some other mechanism for

4  obtaining documents?

01:31PM 5  A.   Yes.  In 2006 we began to use a discovery process, which is,

6  you know, part of the -- we would turn to using subpoenas and

7  other court-ordered searches for documents.

8  Q.   Now, was it possible to obtain all the documents that -- let

9  me phrase that a different way.

01:32PM 10      All the documents that we've seen here as exhibits and

11  other documents, were they obtained all at once or in some other

12  fashion?

13  A.   All the documents we have -- the process began in the summer

14  of 1999, and the last set of documents that we obtained was in

01:32PM 15  2010.

16  Q.   And do you have a count for -- or an approximate count for

17  the number of pages of documents that were obtained?

18      MR. SHEEHAN: Objection, Your Honor.  The amount of

19  documents is not relevant.

01:32PM 20      THE COURT: Well --

21      MR. ROTHENBERG:  I disagree, Your Honor.  We've got this

22  mitigation issue.

23      MR. SHEEHAN: I believe --

24      THE COURT: It shows the efforts Mr. Chambery -- pages

01:33PM 25  may not equate to hours worked, but it's not totally afield.  So

1  I'll allow it.

2         Any idea?

3         THE WITNESS: Roughly 45 to 50,000 documents.

4  BY MR. ROTHENBERG:

01:33PM  5  Q.   Now, did you, Brook Chambery, read any of those 45 to 50,000

6  pages of documents?

7  A.   About every page.

8  Q.   Now what, if anything, did you do after you read a document?

9  A.   What we did is -- and I say "we" because my brother was

01:33PM  10  helping me -- we created very elaborate spreadsheets to sort this

11  out.

12         And I actually had other word processing documents on

13  the side.  It was a very complex process, but every piece of

14  paper, every e-mail, whatever, had to get sorted out by author,

01:34PM  15  recipient, who got copied in, who got blind copied, what it was

16  about, what time of day, timecards.

17         We had things that were directly related, you know,

18  other things that were indirectly related, like timecards and work

19  histories.  All that had to be cataloged and put together.

01:34PM  20  Q.   Did somebody use a database for any of this?

21  A.   We had databases of not only things from -- that may have

22  come out of -- directly out of requests that we had made, but we

23  also scanned all the exhibits -- I should say a lot of documents,

24  maybe 15% of them we scanned.  And those had all to be cataloged

01:34PM  25  in.

1    We -- my brother was the one who set up the spreadsheets

2 behind the scenes, you know, to do the automatic functions.  Like

3 we -- if we had a document number and a cell of a spreadsheet, and

4 we clicked on that cell, up would come the document.  He was the

01:35PM 5 one that programmed all that stuff behind the scenes.

6 Q.    Okay. So you said you created spreadsheets; is that correct?

7 A.    There are many, many spreadsheets.

8 Q.    Give us an idea of the magnitude of these spreadsheets.

9 A.    That would be hard, but I'd say the two main sheets that we

01:35PM 10 were using, there are multi-page spreadsheets and those two

11 sheets, I call one the "proofs" and the other the "chronology."

12 And that the chronology puts everything in date and time sequence

13 and by author and you name it.

14    Those two spreadsheets alone probably comprise 9,000

01:36PM 15 lines and 300,000 cells.

16 Q.    Now, I think you told me earlier that after the closing,

17 Beechwood incurred legal expenses for various proceedings that

18 continued on after closure, correct?

19 A.    Yes.

01:36PM 20 Q.    And in addition, there's been legal expense in connection

21 with this particular lawsuit, correct?

22 A.    Yes.

23 Q.    And can you tell us -- and I'm not asking for dollars here,

24 I'm asking for hours -- can you tell us the approximate number of

01:36PM 25 lawyer hours that have been involved with all of these various

1   proceedings since the summer of 1999?

2          MR. SHEEHAN: Objection, hearsay.

3          THE COURT: Counsel approach for a minute.

4          (WHEREUPON, a discussion was held at side bar out of the

01:37PM   5   hearing of the jury.)

6          THE COURT: Where we headed here with lawyer hours in

7   this case?  I mean --

8          MR. ROTHENBERG: I'm getting -- I'm just -- I just want a

9   number, and then I'm going to ask him how much time he has spent

01:37PM  10   since then.  It's a reference point, that's all.

11          THE COURT: I can see the hours he spent, but, I mean,

12   part of my charge to this jury is that, you know, attorney's fees

13   spent on this case is not applicable.

14          MR. ROTHENBERG: I'm not asking for that.  But see --

01:37PM  15          THE COURT: If you say how many hours, that's --

16          MR. ROTHENBERG:  I mean, that's -- and I didn't

17   distinguish this case.  But he knows how many hours he's been

18   billed for, he gets a number.  He doesn't write down how many

19   hours he spends.

01:37PM  20          So it's hard for him -- I mean, I can ask him, you know,

21   per week, per, you know, period how much time have you spent on

22   this.  But I'm only soliciting one number, and I can tell you he's

23   going to say over the 12 years it's been about 12,000 hours,

24   period.

01:38PM  25          THE COURT: For him working?

1       MR. LEVINE: He didn't keep contemporaneous notes of his

2  own time?

3       MR. ROTHENBERG: For the lawyers.

4       THE COURT: I don't see the relevance of the lawyer time.

01:38PM  5  His time, I guess it relates to the mitigation issues.

6       MR. ROTHENBERG: I was going to relate them.  Did you

7  spend more time than the lawyers or less time than the lawyers.

8       MR. SHEEHAN: It's hearsay, too, because it's not his

9  direct knowledge.

01:38PM  10       THE COURT: I think you'll have to rephrase and ask him

11  how much time he thinks he spent monthly, weekly, yearly.

12       (WHEREUPON, side bar discussion concluded.)

13       THE COURT:  All right.  Rephrase, if you will.

14       MR. ROTHENBERG: I will, Your Honor.  Thank you.

01:38PM  15  BY MR. ROTHENBERG:

16  Q.   Let focus on your own time, which is where we were going on

17  this in any event.  On a weekly basis, Mr. Chambery, on average

18  how many hours have you spent on these various Beechwood related

19  matters since the summer of 1999?

01:39PM  20  A.   Typically 50, 60 hour weeks.

21  Q.   And how often has that involved either weekend or holiday

22  work for you personally?

23  A.   Almost always.

24  Q.   Have you and your wife Peg had occasion to take any vacations

01:39PM  25  since 1999?

1   A.   Two weeks and a few long weekends.

2   Q.   And in terms of the total number of days, if we added all of

3   this up, approximately how much vacation time have you taken since

4   the summer of 1999?

01:39PM  5   A.   I'd say four to five weeks.

6   Q.   Now, prior to 1999 had you ever worked in any field other

7   than the healthcare field?

8   A.   No.

9   Q.   Do you have a license anymore to work in the healthcare

01:40PM  10   field?

11   A.   No.   My administrator's license was turned in.

12   Q.   The software company, what industry did the software company

13   serve?

14   A.   Principally the nursing home market rehab, but also you can

01:40PM  15   say healthcare in general.

16   Q.   But was the work of the software company confined to the

17   healthcare field?

18   A.   Yes.

19   Q.   And have you been invited to -- strike that.

01:40PM  20        I think in your direct examination back in the first

21   phase of the trial you testified that you had spoken to

22   professional associations regarding Beechwood's computerized

23   medical records; is that correct?

24   A.   Computerized medical records and financials.  I would

01:41PM  25   typically be out there running seminars for the college of

1   administrators and the nursing home associations.

2   Q.   Have they invited you back since the summer of 1999?

3   A.   No.

4   Q.   Have you had occasion, Mr. Chambery, since the summer of 1999

01:41PM   5   to Google your own name?  Do you know what I mean by that?

6   A.   Yes.

7   Q.   Have you done that?

8   A.   Yes.

9   Q.   What comes up when you Google your own name?

01:41PM   10   A.   The first thing that comes up is the Department of Health

11   news releases.

12           MR. SHEEHAN: Objection.

13           THE COURT: I'm sorry?

14           MR. SHEEHAN: Objection.

01:41PM   15           THE COURT: Overruled.

16           MR. SHEEHAN: Hearsay.

17           THE COURT: Well, I think it relates, I assume, to the

18   effect on this witness in terms of his reputation.  Overruled.

19           MR. ROTHENBERG: Thank you, Your Honor.

01:41PM   20           THE WITNESS: The first thing that comes up are the news

21   releases from 1999 that the Health Department placed on the

22   internet talking about abusing patients and the conditions were so

23   bad that they had to move them.

24   BY MR. ROTHENBERG:

01:42PM   25   Q.   Have you ever been contacted since 1999 by anyone in the

1  healthcare field about working for their organization or working

2  in any other facility?

3  A.   No.  I think you can say I was black listed.

4  Q.   Let's talk about your mom Olive for a few minutes here.

01:42PM  5  After the summer of 1999 or, actually, starting in the summer of

6  1999, did you make any personal observations about Olive's

7  physical condition?  Things you saw?

8  A.   She would shake, her knees would literally shake together.

9  Q.   Okay. Can you tell the jury more about that?

01:42PM 10  A.   She was just distraught.  She didn't want to sign her name to

11  anything.  Her knees, every time -- this went on for years.  She

12  sat in a chair and you could just watch her legs shake.

13  Q.   Did you ever see that happen with Olive before the summer of

14  1999?

01:43PM 15  A.   No.

16  Q.   Did you notice anything about her weight?

17  A.   Yeah, she lost weight, quite a bit.

18  Q.   Mr. Chambery, what percentage of your career was spent

19  working at the Beechwood facility?

01:43PM 20  A.   My whole career.

21  Q.   And were there systems or procedures that you developed when

22  you were at Beechwood that, to your knowledge, were innovative for

23  the skilled nursing facility industry?

24  A.   I would say both the financial systems and the medical

01:44PM 25  records system were innovative.

1  Q.   And this move, the decision to move into the rehab business,

2  at the time Beechwood began that, was that common in skilled

3  nursing facilities in the Monroe County area?

4  A.   No, it was just beginning.  It was just beginning nationally.

01:44PM  5  Q.   And how about this discussion with Preferred Care about

6  subacute care patients?  At the time you were having those

7  discussions, were there any other nursing homes or facilities

8  other than hospitals treating subacute patients in this region?

9         MR. SHEEHAN: Objection.

01:44PM  10         THE WITNESS: No.

11  BY MR. ROTHENBERG:

12  Q.   And to your knowledge --

13         MR. SHEEHAN: Your Honor, objection.  Foundation for the

14  last question.

01:45PM  15         THE COURT: Overruled.

16  BY MR. ROTHENBERG:

17  Q.   To your knowledge, Mr. Chambery, is there anyone in Monroe

18  County -- strike that.  Not anyone.

19         Are there any nursing facilities in Monroe County today

01:45PM  20  handling the subacute patient population that you were talking to

21  Preferred Care about?

22  A.   No.

23  Q.   When Beechwood Software was sold, I think you told the jury

24  that you realized some money as a result of that sale, correct?

01:45PM  25  A.   Yes.

1    Q.    Did you get anything else of value when that business was

2    sold?

3    A.    I got the right -- I maintained the rights, I should say my

4    brother and I did, to use that software, the software that we had

01:46PM    5    created for up to 25 facilities.

6    Q.    And why did you retain that?  Why was that -- strike that.

7           Did you negotiate in that transaction to retain those

8    licenses?

9    A.    Yes, I did.

01:46PM    10    Q.    Why did you do that?

11    A.    Because it was my intention to expand.  We had such a good

12    operations model going, it was a very unique thing and we intended

13    to expand that in New York and outside of New York.

14    Q.    And were you able to do that?

01:46PM    15    A.    No.   The DOH ended that in 1999.

16    Q.    To your knowledge, Mr. Chambery, what kind of a reputation in

17    the healthcare industry did you enjoy after 1999?

18           MR. SHEEHAN: Objection, hearsay.

19           THE COURT: Well, the witness needs to be specific as

01:46PM    20    to --

21           THE WITNESS: Well, my reputation was destroyed.  There

22    was no reputation.

23           THE COURT: Well, do you have any specific instances

24    where you inquired or people advised you about your reputation?

01:47PM    25           THE WITNESS: No, I don't.

1          THE COURT: Okay.  Well, I'll sustain the objection then.

2     BY MR. ROTHENBERG:

3     Q.   Have you operated Beechwood Restorative Care at any time

4     since July 17 of 1999?

01:47PM  5     A.   No.

6     Q.   Have you opened any other healthcare facilities since July of

7     1999?

8     A.   No.

9     Q.   Have you hired anybody to work at any facility you own since

01:47PM 10     July 17 of 1999?

11     A.   No.

12     Q.   Have you brought any further innovations to the healthcare

13     industry since July of 1999?

14          MR. SHEEHAN: Objection, Your Honor, further innovations.

01:48PM 15          THE COURT: I'm sorry?

16          MR. SHEEHAN: Further innovations is suggestive and

17     vague.

18          THE COURT: Overruled.

19          THE WITNESS: No.

01:48PM 20          MR. ROTHENBERG: That's all I have, Mr. Chambery.  Thank

21     you very much.

22          THE COURT: Let's have the jury step out for a second.  I

23     need to see counsel.

24          MR. ROTHENBERG: Yes, Your Honor.

01:48PM 25          (WHEREUPON, the jury is not present).

1          THE COURT: I'll retrieve these documents if necessary,

2     but some reason I lost my voice, but the Court a week or so ago

3     ruled on some of the *in limine* motions; and also asked plaintiff

4     to provide copies of Mr. Chambery's income tax returns for 1989 to

01:49PM 5     2011.

6          There was a subpoena that was directed at Mr. Chambery

7     for those items.  We had argument a week or so ago.  And I think

8     the Court at that time indicated that after years of discovery,

9     this seemed to be very late in coming.

01:49PM 10          And I think in our discussion, Mr. Sheehan, the request

11    was to, I guess, determine from the tax returns if, in fact,

12    Mr. Chambery had received any wages, income, et cetera.

13          Am I correct that that's --

14          MR. SHEEHAN: It was beyond just wages and salary income,

01:50PM 15    Your Honor.  It was also things like day trading, managing rental

16    properties, consulting through an S corporation, things that

17    wouldn't necessarily appear on a Schedule C or on a W-2.

18          It was just a way to verify that Mr. Chambery hadn't

19    been engaged in some other activity during this time.

01:50PM 20          THE COURT: Well, I have received the tax returns as

21    indicated.  I've reviewed them.  They show nothing on line 7,

22    which is where income, wages, et cetera, no indications of any

23    1040 applications or -- I'm sorry, 1099 forms that were submitted.

24          They show, you know, income from investments and

01:51PM 25    dividends, but nothing on the tax returns that indicate any income

1   from any other source.  So that's based on my review.

2          I thought the thrust was primarily to verify or check

3   whether Mr. Chambery had received any income.  Mr. Cooman, I

4   think, also pointed out in argument that Mr. Chambery was deposed

01:51PM   5   and there was no inquiry made at that time about his tax returns,

6   although there may have been some questions about it.

7          So I've reviewed over ten years of tax returns and

8   there's nothing on them that indicate any other income other than

9   investment income, sale of stocks, interest, dividends.  So I see

01:52PM   10   no basis to turn them over.  There's nothing in there.

11          I think we agreed -- or at least whether Mr. Chambery

12   had income from investments and so forth I don't think is a valid

13   consideration for diminishing the sums he might recover should the

14   jury find he's entitled to recover for lost wages.

01:52PM   15          Agree?

16          MR. SHEEHAN: Well, there is an issue.  Mr. Chambery did

17   put his net worth at issue when he testified about paying down his

18   nest egg, his retirement fund.

19          Now, to the extent that he does have other income that

01:52PM   20   he's relying on, he's created the impression that he's gone

21   through a hardship, that paying down the retirement has visions of

22   well, we won't be able to live for the future to it.

23          And so I would ask the Court for leave to ask

24   Mr. Chambery about his other assets at this point and other income

01:53PM   25   derived from it to eliminate that appearance of hardship.

1          THE COURT: Well, Mr. Cooman, any --

2          MR. COOMAN: We strongly disagree, Your Honor, that would

3     be highly prejudicial and unnecessary.  Mr. Chambery's net worth

4     is not an issue in the case.

01:53PM  5          We simply had to go into the issue of how did he sustain

6     himself because the allegation here is he somehow should have gone

7     out and worked, and we needed to explain what's been going on for

8     a decade.

9          THE COURT: Well, mitigation is certainly an issue.  The

01:53PM 10     jury may well have to determine that, but I don't see,

11     Mr. Sheehan, that he's opened up an entire review of his personal

12     assets, finances, stock and so forth.

13          The issue is did he work or not, and was it reasonable

14     for him not to?  And I don't think the jury fairly should consider

01:54PM 15     the fact that he may have other investment monies as any kind of a

16     factor that they can consider as to whether or not they should

17     award him money for lost wages.

18          MR. SHEEHAN: But, Your Honor, our argument would be that

19     they should consider it to the extent that there's the impression

01:54PM 20     he's paid down his retirement and won't be able to live in the

21     future.

22          MR. COOMAN: There's no request for that as an item of

23     damage, Your Honor.  There's no claim for future wages or anything

24     other than those specific categories of damage that we have talked

01:54PM 25     about before.

1          THE COURT: Wages from 1999 to 2012?

2          MR. COOMAN: Correct.

3          THE COURT: But not future?

4          MR. COOMAN: That's correct.  It's only non-economic loss

01:54PM   5 as to reputation and that sort of thing.

6          THE COURT: All right.  I don't see it, Mr. Sheehan.  So

7 I don't think the modest reference that Mr. Chambery made here, I

8 don't think opens the door to a full exploration of his personal

9 wealth.  I don't think it's something that's before this jury.

01:55PM  10        The jury should focus on the loss and the damages and

11 not other matters.  For instance, they shouldn't focus on your

12 clients.  It's just focused on the plaintiff and what the

13 plaintiff suffered and lost because of the activities here.

14        So whether he's a pauper or millionaire, I don't think

01:55PM  15 effects his entitlement should the jury find entitlement for the

16 wages that he used to take out of the business, but no longer does

17 so.

18        So I just wanted to let you know what I had found

19 relative to the *in camera* examination of the tax returns.  I think

01:55PM  20 I've stated that.

21          MR. COOMAN: Thank you, Your Honor.

22          THE COURT: Otherwise -- and I know I did indicate that I

23 made a couple of rulings and I was going to advise you the basis

24 for those reasons.  I don't want to delay matters now to do that,

01:56PM  25 but they will either be put on the record or I'll do a writing.

1          Otherwise, you have some cross I assume, Mr. Sheehan?

2          MR. SHEEHAN: Yes, Your Honor.

3          THE COURT: All right, take a few minutes then.

4          MR. SHEEHAN: Yes, Your Honor.

01:56PM  5          THE COURT: Okay, about ten minutes.

6          MR. ROTHENBERG: Yes, Your Honor.

7          (WHEREUPON, there was a pause in the proceeding.)

8          THE COURT: Bring in the jury, please.

9          (WHEREUPON, the jury is present).

02:13PM  10          THE COURT: All right, Mr. Sheehan, if you have some

11  questions, you may proceed.

12          MR. SHEEHAN: Thank you, Your Honor.

13                      CROSS-EXAMINATION

14  BY MR. SHEEHAN:

02:15PM  15  Q.    Good afternoon, Mr. Chambery.

16  A.    Good afternoon.

17  Q.    I want to ask you a couple of just quick questions.  First,

18  you testified earlier about Exhibit 668, which I think I would

19  like to show.

02:15PM  20          I think it's in evidence, Your Honor.  I think we

21  admitted it previously.

22          THE COURT: Do you want it shown?

23          MR. SHEEHAN: I've got it on.  Is it not coming through?

24  BY MR. SHEEHAN:

02:16PM  25  Q.    Do you remember testifying about this document, Mr. Chambery?

1  A.    Yes.

2  Q.    Is the data in this document self-reported by the nursing

3  facilities?

4  A.    Yes, it is.

02:16PM  5  Q.    Thank you.  I would also like to ask you, you spoke earlier

6  in your testimony about a $1.6 million number for profit.

7          Do you recall that?

8  A.    Yes.

9  Q.    That number is not on Beechwood's financial statements, is

02:16PM  10  it?

11  A.    The numbers that make it up are on the financial statement,

12  yes.

13  Q.    Understood.  But the $1.6 million number that -- actually,

14  the $1.6 million number you discussed, that doesn't appear

02:16PM  15  anywhere on any of your financial statements?

16  A.    No, it does not.

17  Q.    That's a number your expert created, correct?

18  A.    It's a standard EBITDA formula.

19  Q.    Your expert came up with that number?

02:17PM  20  A.    It's also on the exhibit we just showed.  It's a standard

21  formula.

22  Q.    But you didn't come up --

23  A.    It's not the net profit, no.

24  Q.    You didn't come up with that number, did you?  I'm trying to

02:17PM  25  get you to -- your expert is the one who derived that number?  Who

1  came up with that number?

2  A.   Correct, but the data we just looked at has the same thing.

3  Q.   Understood.  I believe you were talking about subacute care

4  at the end, and is doing subacute care related to rehabilitation?

02:17PM  5  A.   Subacute care might have some rehabilitation in it, but

6  that's not what we were pricing it -- that's not what we were

7  doing with Preferred Care.

8  Q.   Well, let's talk about what Beechwood was transitioning to.

9  Beechwood was transitioning to 82 beds of rehabilitation; is that

02:17PM  10  correct?

11  A.   We would have, yes.  We had completed one unit, we would have

12  been going on to do another unit.

13  Q.   There were 41 rehab beds and -- 41 rehabilitation beds in

14  1999; is that right?

02:18PM  15  A.   Yes.

16  Q.   Okay. Is there -- are there any other facilities in Monroe

17  County that are currently doing rehabilitation?  Nursing

18  facilities I mean.

19  A.   Yes.

02:18PM  20  Q.   And isn't it true that in 1999 you expected more nursing

21  facilities to go into rehabilitation?

22  A.   Yes, it's a growing field.

23  Q.   The trend generally was moving towards rehabilitation; isn't

24  that correct?

02:18PM  25  A.   Correct.

1  Q.   And there was nothing keeping your competitors, your -- the

2  other nursing homes that were your competitors from entering the

3  rehabilitation field, was there?

4  A.   No.

02:18PM  5  Q.   And once those nursing facilities entered the rehabilitation

6  field, they would have been direct competitors with Beechwood for

7  that rehabilitation business; isn't that right?

8  A.   They could have tried to.

9  Q.   I believe you talked about selling the equipment.  Do you

02:19PM  10  recall that?

11  A.   Yes.

12  Q.   As part of -- that's part of the wrap-up of the Beechwood

13  facility; is that right?

14  A.   Yes.

02:19PM  15  Q.   When did the sale of equipment occur?

16  A.   I cannot remember.  Let's see, it would have -- would have

17  been after we had stopped paying the mortgage, which was August of

18  2000.  So sometime after that.  It might have been October or

19  November of that year.

02:19PM  20  Q.   Approximately October or November of 2000?

21  A.   Correct.

22  Q.   Okay. What did you sell?  What equipment was sold?

23  A.   Everything that wasn't tied to the building.

24  Q.   So would that include the beds?

02:20PM  25  A.   The beds were not -- the beds did not go at auction.  Nobody

1  bought them.

2  Q.   The rehabilitation equipment?

3  A.   Rehab equipment, all the turning mattresses, wheelchairs,

4  parts for wheelchairs.  You name it, it was all in the auction,

02:20PM  5  forks and spoons.

6  Q.   What were the bigger pieces of equipment?

7  A.   We've got lifts, automated lifts, you know, that take

8  somebody out of bed.  Turning mattresses, those are bigger pieces

9  of equipment.

02:20PM  10  Q.   You sold turning mattresses as part of the salvage effort?

11  A.   Yes.

12  Q.   And you sold lifts?

13  A.   Yes.

14  Q.   Were there multiple lifts and multiple turning mattresses?

02:21PM  15  A.   Yes.

16  Q.   Were there any other large pieces of equipment that were

17  sold?

18  A.   I don't think -- no, you're talking about movable equipment,

19  you know, they're not huge items.

02:21PM  20  Q.   Besides --

21  A.   Lawn mowers, you know, tractors, you name it.

22  Q.   Tractors?  Did you say tractors?

23  A.   Yeah, we had a tractor to mow and to remove snow.

24  Q.   How big was the tractor?

02:21PM  25  A.   Just your typical garden tractor.

1  Q.   To whom did you sell all this equipment?

2  A.   To whoever bid on it.

3  Q.   So was it different people?

4  A.   Yes, it was a big auction.  There was a lot of people there.

02:21PM   5  Q.   And the total sum amount you got for all of the equipment for

6  Beechwood was $43,000?

7  A.   Yes.  Pennies on the dollar.

8  Q.   You discussed a lot of litigation activity that you were

9  engaged in.  Are you aware of litigation activity back to

02:22PM   10  January 1999?

11  A.   Yes.

12  Q.   And the reason I ask is you're claiming pre-closure amounts

13  for legal fees back to January 1999; isn't that right?

14  A.   Oh, January of 1999?

02:22PM   15  Q.   1999, yes, sir.

16  A.   I have no idea what that might have been, if there were any

17  legal fees in January of 1999.

18  Q.   Are you aware that you're claiming as an element of your

19  damages legal fees that go back to January of 1999?

02:22PM   20  A.   In that -- from January 1999 to the closing date, in that

21  period, those were due to the hearing.

22  Q.   So you are aware of that?  You're aware of the damages

23  component?

24  A.   For the part of the hearing that is before the closing date,

02:23PM   25  yes.  The hearing began June 23.  We closed July 17th.  So the

1  hearing -- the hearing -- the legal fees for that hearing are in

2  that period.

3  Q.   That's in June of 1999?

4  A.   Correct.

02:23PM  5  Q.   I'm talking about legal fees from January of 1999.  Are you

6  aware you're seeking those fees as an element of your damages?

7  A.   That's all part of that period, January to July of --

8  January 1 to July 17 is the reporting period.

9  Q.   So you are seeking -- just answer the question.  You are

02:23PM  10  seeking compensation for, say, legal fees in January, the month of

11  January 1999?

12  A.   No.

13  Q.   No?

14  A.   No.

02:23PM  15  Q.   How about February of 1999?

16  A.   Not that -- I do not recall any legal actions back then.

17  Q.   March of 1999?

18  A.   I don't believe so.

19  Q.   How about April of 1999?

02:24PM  20  A.   I cannot tell you when the attorneys first got involved.

21  Q.   So as far as you're aware sitting here, the legal fees that

22  you're seeking as part of your damages start in June of 1999?

23  A.   No.  It would have been before then, before the hearing took

24  place.  The attorneys were still in gear, they were on board

02:24PM  25  fighting the various actions the Department of Health was taking.

1  Q.    So there wouldn't be anything before April 15th, 1999, for

2  example?

3  A.    I doubt there was anything in that period.

4  Q.    I think you testified that Dale Chambery previously worked --

02:24PM  5  Dale Chambery is your brother, right?

6  A.    Yes.

7  Q.    He previously worked for Beechwood?

8  A.    Dale principally worked for Beechwood Software.

9  Q.    Beechwood Software, that's the company you sold?

02:25PM  10  A.    Correct.

11  Q.    Did he do any work for Beechwood Nursing Home?  For the

12  nursing facility, I mean?

13  A.    Yes, he did some work.

14  Q.    What did he do?

02:25PM  15  A.    He was pretty much our computer consultant.

16  Q.    Do you know when he started?  Did he start in 1994?

17  A.    Did he start?

18  Q.    Doing computer consulting for Beechwood?

19  A.    No.  Before that.

02:25PM  20  Q.    And he was paid for that?  For the computer consulting?

21  A.    Yeah, he was.

22  Q.    You paid him a salary?

23  A.    No, he was not on the books on a salary basis.

24  Q.    How did you pay him?

02:25PM  25  A.    He would get a 1099.

1   Q.   Do you recall the amounts that were paid to Dale Chambery?

2   A.   Not off the top of my head, no.

3   Q.   Would $35,000 be at about the right amount as far as you can

4   remember?

02:26PM   5   A.   For what year?

6   Q.   I'm thinking 1995 -- 1994, 1995, somewhere in that range?

7   A.   Could be.

8   Q.   How about $195,000?

9   A.   Yes, I remember that figure.

02:26PM   10   Q.   What's the $195,000 figure?

11   A.   That was not -- that was one of those family type things that

12   we were talking about earlier.

13   Q.   I'm sorry?

14   A.   That's not for computer consulting.

02:26PM   15   Q.   Was any of that amount for computer consulting?

16   A.   Might have been in there, yes.

17   Q.   Do you know how much was in there for computer consulting?

18   A.   No, I don't.

19   Q.   When you say it was "one of those family things," what do you

02:26PM   20   mean?

21   A.   He was getting paid maybe more than the market salary because

22   he was a family member.

23   Q.   So could it have been something like -- instead of $35,000,

24   he got $195,000?

02:27PM   25   A.   Yes.

```
 1  Q.    After Beechwood closed, Dale worked with you to help wind up
 2  the business?
 3  A.    Yes.
 4  Q.    But he wasn't paid for that?
 5  A.    Correct.
 6  Q.    Was Dale paid for any work by Beechwood after it closed?
 7  A.    No.
 8  Q.    Do you know if Dale worked anywhere else between 1999 and
 9  2012?
10  A.    Yes, he was working for the company we sold to, Shared
11  Medical Systems, SMS.
12  Q.    And when did Mr. Dale Chambery, when did he work for Shared
13  Medical Systems?
14  A.    From March of -- or February 1998, when we sold the company,
15  until March of 2000.
16  Q.    After March of 2000 did Mr. Dale Chambery work anywhere else?
17  A.    No.
18  Q.    So your brother hasn't worked anywhere since March of 2000?
19  A.    Correct.
20  Q.    Mr. Chambery, you have an MBA; is that right?
21  A.    Yes.
22  Q.    Do you feel proficient in accounting?
23  A.    Yes.
24  Q.    And you're proficient with computers?  You developed a
25  software company; is that right?
```

A.    Computers is not my proficiency.  It's my brother's

proficiency.

Q.    What was your part with the software company?

A.    I did the systems design, both financials and patient care.

02:28PM   Q.    So you have some expertise with systems design?

A.    Correct.

Q.    And you sold that software company to Shared Medical Systems?

A.    Yes.

Q.    Did you have a non-compete as part of that sale?

02:28PM   A.    I did not, no.

Q.    Did Dale?

A.    His might have had a -- was it a non-compete?  There was

probably something in there about non-compete, yes.

Q.    When was the last paycheck that you received from Beechwood?

02:29PM   A.    Would be December of 1998 -- no, take that back.  There might

have been some minor stuff on payroll in the spring of 1999.

Q.    And since Beechwood closed, you worked up on -- you've worked

on wind-up activities and litigation related activities; is that

right?

02:29PM   A.    Yes.

Q.    Anything else?

A.    Nope.

Q.    And you were engaged in these litigation related activities

full time; is that right?

02:29PM   A.    More than full time, yes.

```
 1   Q.   For the last 13 years?
 2   A.   Yes.
 3   Q.   You also hired two law firms to work on this litigation;
 4   isn't that right?
 5   A.   Yes.
 6   Q.   And that would be Mr. Cooman's law firm and Mr. Rothenberg's
 7   law firm; is that right?
 8   A.   And others.
 9   Q.   On this particular litigation?
10   A.   There's been others.
11   Q.   How many other law firms?
12             MR. ROTHENBERG: Objection, relevance.  I thought we
13   weren't going to get into this?  Wasn't that the objection we had?
14             MR. SHEEHAN: I'm not clear what the objection is, Your
15   Honor.
16             MR. ROTHENBERG: The objection is relevance.
17             MR. SHEEHAN: Relevance.  This goes to his activities and
18   the necessity of them, Your Honor.
19             THE COURT: You can ask him about what he did.  He's
20   indicated there were two law firms that you mentioned and perhaps
21   some others.  I think we'll leave it at that.
22             MR. SHEEHAN: Yes, Your Honor.
23   BY MR. SHEEHAN:
24   Q.   At some point you began working -- began doing the wind-up
25   activities and the litigation related activities at 945 Ebner; is
```

1  that right?

2  A.    Yes.

3  Q.    I'm sorry, when was that approximately?

4  A.    Probably August, September of 2000.

02:30PM  5  Q.    And when you went to 945 Ebner, you brought all the medical

6  records and a lot of other paper from Beechwood; is that right?

7  A.    Not all the medical records.  We put a lot of the medical

8  records in storage.

9  Q.    So what medical records -- excuse me.  What documents, what

02:31PM  10  files or other material did you bring to 945 Ebner from Beechwood?

11  A.    975 Ebner.

12  Q.    I'm sorry, 975 Ebner.

13  A.    We would have taken the medical records that we -- that were

14  involved in the hearing, and maybe some that were involved from

02:31PM  15  the Attorney General's fraud investigation.

16  Q.    So it was just litigation related material that you brought?

17  A.    For medical records, yes.

18  Q.    Was there any other material that you brought from

19  Beechwood's files?

02:31PM  20  A.    Most of it went into storage.  It was only stuff that we were

21  using for litigation other than what we were -- documents we were

22  getting out of Freedom of Information, et cetera.

23  Q.    So primarily you used 975 Ebner as an office in which to do

24  work for this litigation?

02:32PM  25  A.    And other wind-up activities that dragged on for years.  What

1    we were talking about earlier, the Medicare audits and PRI audits,

2    et cetera.  My brother also helped out on that.

3    Q.    Do you have any time sheets for the work that you did these

4    last 13 years?

02:32PM  5    A.    No.

6    Q.    Did you keep track of what you were doing at all?

7    A.    No.

8    Q.    The last 13 years did you do any consulting work?

9    A.    No.

02:32PM  10    Q.    Did you do any work with nursing homes?

11    A.    No.

12    Q.    Did you do any work with software?

13    A.    No.

14    Q.    Other than the wind-up activities and the litigation related

02:32PM  15    activities, did you do any work with your brother Dale?

16    A.    No.

17    Q.    Did you manage any rental properties?

18    A.    No.

19    Q.    Did you manage any investments?

02:33PM  20    A.    I have investments, yes.

21    Q.    Did you spend any time managing them?

22    A.    No.

23           MR. ROTHENBERG: Objection.  Your Honor already ruled on

24    this.

02:33PM  25           THE COURT: Overruled.  He said he did no work.  These

1  are his own investments.

2  BY MR. SHEEHAN:

3  Q.   Did you try to get consulting work?

4  A.   No, I did not.

02:33PM  5  Q.   Did you try to get any work?

6  A.   No, I did not.

7  Q.   There's no physical reason that you couldn't work, is there?

8  A.   No.

9  Q.   I would like to show you an exhibit that I've marked as 1109

02:33PM  10  for identification.

11          Your Honor, may I approach?

12          THE COURT: Sure.

13  BY MR. SHEEHAN:

14  Q.   Exhibit 1109 is a two-page document, Mr. Chambery.  Have you

02:34PM  15  seen these two pages before?

16  A.   I think they're both related, yes.  I've seen these.

17  Q.   Did you create these two pages?

18  A.   No.

19  Q.   Do you know who created these two pages?

02:35PM  20  A.   Yes.  Two people that work for ElderWood.

21  Q.   You gave these two pages to Mr. Canessa as part of the

22  process of creating his report; is that right?

23  A.   Yes.

24  Q.   Mr. Chambery, I'd like to show you what's been marked as

02:35PM  25  Exhibit 1110 for identification.

1          THE COURT: What is it?

2          MR. SHEEHAN: Exhibit 1110, it's a three page document,

3    Your Honor.  Three ones and a zero.

4          THE COURT: Oh, three ones, one one one.  Okay.

5          THE WITNESS:  Yes.

6    BY MR. SHEEHAN:

7    Q.    Mr. Chambery, Exhibit 1110 is a three-page document.  Have

8    you seen these three pages before?

9    A.    Yes.

10   Q.    Did you create these three pages?

11   A.    Yes.

12   Q.    And at the bottom there is an identifying number FE 484 and

13   it continues through FE 486; is that right?

14   A.    Yes.

15   Q.    You provided these three pages to your experts?

16   A.    Yes.

17   Q.    Mr. Chambery, on January 1, 1999, you acquired a 9% interest

18   in Beechwood from your mother; is that right?

19   A.    February of 1999.

20   Q.    But it's listed as January 1, 1999 on the financials, but --

21   A.    That the accounting period, yes.

22   Q.    Okay. And that was about four months before the first April

23   survey at issue; is that right?

24   A.    Yes.  Kind of a bad investment.

25   Q.    And you paid $95,000 to your mother for that 9% share of

1  Beechwood; is that right?

2  A.    Yes.

3  Q.    Was there a valuation prepared supporting that transfer?

4  A.    No.

02:37PM  5  Q.    How was that figure $95,000 for 9% arrived at?

6  A.    I have no idea anymore.

7  Q.    Is it your opinion that the $95,000 that you paid for 9% of

8  Beechwood represented a fair market value for that 9%?

9  A.    No.

02:38PM  10  Q.    Are you aware that the IRS requires this type of transfer of

11  a partnership interest to be valued at fair market value?

12  A.    I sat down with my accountant and I remember going through

13  that with her.

14  Q.    Well, we can get to that.  If you would, Mr. Chambery,

02:38PM  15  please, are you aware that the IRS requires a transfer of a

16  partnership interest to be made at fair market value?

17         MR. ROTHENBERG: Okay, objection.  Assumes facts not in

18  evidence, Your Honor.

19         THE COURT: Overruled.  You may inquire.  Do you know

02:38PM  20  that to be the case or not?

21         THE WITNESS: I don't know what all the IRS rules are on

22  that.

23  BY MR. SHEEHAN:

24  Q.    Are you aware that if the transaction is not done at fair

02:38PM  25  market value or is done at a discount, then the transfer

1  constitutes a gift?

2  A.   Yes.

3  Q.   Was any gift return prepared as part of this transaction?

4  A.   No.

02:39PM 5  Q.   Did anyone file a gift tax return for this transaction?

6  A.   No.

7  Q.   So sitting here today, we have no evidence of how or why

8  perhaps 9% interest was worth only $95,000?

9  A.   This wasn't a fair market transaction.  This was a non-arm's

02:39PM 10  length transaction between family members for a minor part of the

11  nursing home that didn't have establishment with the State of New

12  York.

13  Q.   Are you aware that $95,000 for 9% of Beechwood translates to

14  a value for Beechwood of approximately $1.1 million?

02:39PM 15  A.   You cannot make that assumption, no.

16  Q.   Today sitting here in court, it's your opinion that Beechwood

17  was worth $17 million?

18  A.   It was worth more than that.

19  Q.   Are you aware that if your value of $17 million for Beechwood

02:40PM 20  is accurate, then the taxable gift would have occurred for the

21  difference?

22       MR. ROTHENBERG: Objection.  No foundation, Your Honor.

23       THE COURT: Sustained.

24       MR. SHEEHAN: I have no further questions, Your Honor.

02:40PM 25       THE COURT: Okay.

1    MR. ROTHENBERG:  I just have a couple minutes.  Counsel,

2  can I please see 1110?

3                      REDIRECT EXAMINATION

4  BY MR. ROTHENBERG:

02:41PM  5  Q.   Counsel asked you about 1110, which I have in front of you.

6  A.   Mm-hmm.

7  Q.   Do you see 1110?

8  A.   Yes.

9  Q.   There's a little notation at the upper right-hand corner.

02:41PM  10  What's that little notation says?

11  A.   It says propertyissues.wps.  It was a word processing

12  document.

13  Q.   And just in general, in the most general terms, what's this

14  exhibit about?

02:41PM  15  A.   I was making notes about building valuation in the midst

16  of -- there's more pages that go with that exhibit that are

17  dealing with depreciation issues and Medicaid issues.

18  Q.   Okay. But does this have to do with the business of Beechwood

19  or the property of Beechwood?

02:41PM  20  A.   Property reimbursement.

21        MR. ROTHENBERG: That's all I have.

22        THE COURT: Thank you.  We're through with Mr. Chambery

23  then?

24        MR. ROTHENBERG: Nothing further, Your Honor.

02:42PM  25        MR. SHEEHAN: Nothing further, Your Honor.

1          THE COURT:  You may step down.

2          (WHEREUPON, the witness was excused).

3          THE COURT: Let me see counsel, if I could?

4          (WHEREUPON, a discussion was held at side bar out of the

02:42PM  5  hearing of the jury.)

6          THE COURT: As far as you know, is your guy ready for

7  tomorrow?

8          MR. ROTHENBERG: Yes.

9          THE COURT: What kind of surgery?

02:42PM 10         MR. COOMAN: Went in the emergency room Thursday night

11 for a kidney stone, had to go in Friday morning -- under general

12 anesthesia on Friday.

13         THE COURT: Okay.  So 9 o'clock?

14         MR. ROTHENBERG: Yes.

02:42PM 15         THE COURT: Okay.

16         MR. COOMAN: Actually at 9:00, Your Honor, the subpoena's

17 been issued for John Darling simply to identify that one piece of

18 e-mail, so he'll be five minutes or --

19         MR. SHEEHAN: We have an objection on that pending, Your

02:42PM 20 Honor.

21         THE COURT: Well, we can talk about it when the jury

22 goes.

23         (WHEREUPON, side bar discussion concluded.)

24         THE COURT: All right, ladies and gentlemen, that's going

02:43PM 25 to conclude our work for today.  The next witness will not be

1  available until tomorrow morning, so we'll recess tonight.  Next

2  witness will be the expert Mr. Canessa, who will be here at

3  9 o'clock-ish tomorrow.  So we'll excuse you tomorrow until

4  9 o'clock.  We expect to have a lunch break.  I'm not sure if

02:43PM  5  Mr. Canessa will take the whole day or not, but a good part of it

6  probably.

7          So thank you for your attention.  Please remember the

8  admonitions I gave you in the prior part of the trial not to

9  discuss the case, to keep an open mind.  I especially admonish you

02:43PM  10 not to read any newspaper accounts or other media accounts of the

11 trial and, of course, not to do any online searches or any other

12 media explorations.  Anything you need to decide this case, you'll

13 hear right here.

14          So keep up your steadfast attention to duty in this part

02:44PM  15 of the case and we'll see you tomorrow at 9 o'clock.  The jury can

16 be excused.

17          (WHEREUPON, the jury was excused).

18          THE COURT: Mr. Canessa will be your final witness,

19 except for Mr. Darling?

02:44PM  20          MR. COOMAN: Yes.

21          THE COURT: What's your collective opinion as to whether

22 we will need the whole day with Mr. Canessa or --

23          MR. COOMAN: Your Honor, it appears my direct is two

24 hours, plus or minus a couple of minutes.

02:45PM  25          THE COURT: Okay.  I'm wondering if we need defense

1  witnesses available.  I guess they're here?

2        MR. SHEEHAN: They are here, Your Honor.  I think I

3  probably am going to take about -- right now it's around two

4  hours.  It could get shorter depending on, obviously, on what

02:45PM   5  Mr. Canessa says.

6        THE COURT: Well, I think we've got to plow ahead and be

7  prepared for defense witnesses.

8        MR. SHEEHAN: Okay, Your Honor.  Alternatively, if you

9  wanted to stop early tomorrow, we could do that because I don't

02:45PM  10  know that -- I think Ms. Rutecki is going to be somewhere along

11  the lines, the same length of time as Mr. Canessa.  But it's

12  whatever Your Honor's preference is.

13        THE COURT: I mean, if we finish Mr. Canessa mid to late

14  afternoon, we might break.  But, you know, the jury's here, I'd

02:45PM  15  like to maximize their time.  We lose a juror after this weekend.

16        MR. SHEEHAN: I think we're going to finish pretty --

17  maybe Thursday at the latest.

18        THE COURT: It's up to you.  So have a defense witness

19  available.

02:46PM  20        MR. SHEEHAN: Yes, Your Honor.

21        THE COURT: All right, you want to talk about this

22  Darling issue?

23        MR. COOMAN: Your Honor --

24        THE COURT: I don't have the exhibit with me, but I

02:46PM  25  understand --

 1          MR. SHEEHAN: I have one copy of it, Your Honor.

 2          MR. COOMAN: I think we can put it up on display.

 3          MR. SHEEHAN: It's true, it's Exhibit 567.  Is this

 4    your --

02:46PM  5          MR. COOMAN: Am I using yours, Bernie?

 6          MR. SHEEHAN: Yeah, pull up 567.

 7          THE COURT: I can go get mine.

 8          MR. COOMAN: It's up now I think, Your Honor, or will

 9    be.

02:47PM 10          As we, I think, indicated in our exchange of e-mails

11    that the Court was copied in on, Exhibit 567 is an e-mail of John

12    Darling to the Public Affairs Group person Kristine Smith on July

13    12, 1999.

14          This came up during the first part of the trial, and the

02:47PM 15    Court denied its admission on the grounds that we couldn't

16    authenticate it because we had neither Mr. Darling nor Ms. Smith

17    here, and they are listed as the only author and recipient.

18          So we've subpoenaed Mr. Darling.

19          THE COURT: Who are these people?

02:47PM 20          MR. COOMAN: Mr. Darling was an attorney for the New York

21    State Department of Health; and Kristine Smith was one of the

22    people in leadership at the Public Affairs Group, the media people

23    affiliated with the Department of Health.

24          And Mr. Darling's prepared to authenticate the e-mail as

02:47PM 25    his own.  Its relevance is clear as it relates to the reputation

1  damage to Beechwood which was part of the ordinary foreseeable and

2  intended consequences of the actions that the defendants took.

3          The Court may remember that Mr. Rubin and others were

4  intimately involved in working with Ms. Smith and others at the

02:48PM   5  Public Affairs Group to ensure that there would be plenty of

6  adverse publicity in the form of news releases, website

7  publications, interviews, et cetera and obviously the e-mail

8  speaks for itself.

9          THE COURT: Who is the Joe that's referenced?

02:48PM  10          MR. COOMAN: Joe Rohm.  You may recall Joe Rohm is one of

11  the Public Affairs Group personnel who was copied in on various

12  e-mails, maybe most noticeably where Ms. Leeds said, "Joe, this is

13  the only thing we don't want public."  I think it was a May of

14  1999 e-mail exchange.

02:49PM  15          THE COURT: This was July 12th it looks like?

16          MR. COOMAN: Correct.

17          THE COURT: Well, I think in Mr. Sheehan's exchange in

18  this he indicated difficulty seeing how this was connected to a

19  defendant.

02:49PM  20          MR. COOMAN: That's what he said, Your Honor, but given

21  the causation principles that are in play here, which is that

22  these defendants are liable for any foreseeable consequence of

23  their actions, clearly from the testimony and proof we've had, one

24  of the foreseeable -- in fact, intended consequences was adverse

02:49PM  25  publicity about Beechwood and the Chamberys.

1          And so whether something adverse happened from another

2    Department of Health employee or from HCFA or anybody else, if

3    that was in the chain of events that occurred by reason of what

4    these defendants did, then that is entirely relevant for the jury

02:49PM  5    and this is sort of the classic example of that, where the people

6    within the Department of Health who were specifically enlisted to

7    do the reputational damage did so and acknowledged that they were

8    quite successful in, quote, sullying the good name of the

9    Chamberys and Beechwood.

02:50PM  10         MR. SHEEHAN: Your Honor, our primary problem with this

11   exhibit is that it's hearsay.  I mean, the e-mail alone is

12   hearsay, but this is at least two levels of hearsay.

13         Mr. Darling is talking about comments that were made at

14   a standard of proof hearing and he's implying that the comments

02:50PM  15   that were made imported that Joe had done a fine job.

16         And as far as I can tell, Mr. Darling is talking about

17   what Mr. Cooman said at the administrative law judge hearing.  I

18   don't know that for sure.  We wouldn't know until we get

19   Mr. Darling on the stand, but that's what really seems to be going

02:50PM  20   on here, he's just relaying what Mr. Cooman said at the hearing.

21         THE COURT: You said this was made at a standard of proof

22   hearing?

23         MR. SHEEHAN: Your Honor, at this time the hearing in

24   front of ALJ Zylberberg was going on.

02:51PM  25         THE COURT: Okay.

1          MR. SHEEHAN: Among the arguments they made, I think it's

2     on July 9, there was a standard of proof argument made to the

3     Court back and forth.  As part of that argument it looks like

4     Mr. Cooman made some comments, and that's what I think is the

02:51PM  5     subject matter of this e-mail is that Mr. Darling is relaying and

6     describing what Mr. Cooman said at the hearing.

7          THE COURT: Standard of proof, you mean proffer of proof?

8          MR. SHEEHAN: I think it was the burden of proof.  They

9     use standard of proof there.  I think they were talking about

02:51PM 10     burden of proof at the hearing, but the subject matter is not

11     relevant.  It's that these are not the thoughts of John Darling.

12     John Darling is conveying what he believes to be the thoughts of

13     somebody else.

14          THE COURT: What's the offer of proof as to Mr. Darling?

02:52PM 15     Is he just going to tell the circumstances of this e-mail or what

16     he meant by it?

17          MR. COOMAN: I guess we don't even think that's

18     necessary.  He will simply identify he used e-mail in the ordinary

19     course of his business, and he sent this e-mail to a member of the

02:52PM 20     Public Affairs Group expressing his observation at how successful

21     the Department had been with respect to their sullying effort s.

22          MR. SHEEHAN: It's our argument that's not his opinion,

23     Your Honor.  That's his interpretation of someone else's opinion.

24          And, like I said, lately I went back trying to figure

02:52PM 25     out exactly where it came from.  It's a guess.  I have not talked

1    to Mr. Darling, but I did note I looked to the hearing transcript

2    on July 9th and they had a standard of proof, burden of proof

3    hearing where Mr. Cooman discussed Joe Rohm.  So that's why I

4    think it's a reasonable assumption, certainly one worth meriting,

02:52PM    5    discussing this out of the presence of the jury with Mr. Darling

6    if we get that far.

7            THE COURT: Is Mr. Darling local?

8            MR. COOMAN: Yes, he is.  He was with the Department

9    of Health for a number of years and now works for a firm

02:53PM    10   that's out on, ironically, Sully's Trail in Pittsford, a law firm

11   there.

12           THE COURT: Well, I'm not prepared to rule.  Maybe we

13   have to talk to Mr. Darling outside the presence of the jury.

14   That's the best I can do.

02:53PM    15           MR. COOMAN: Very well.

16           THE COURT: We can do that first thing if you want or

17   hold him until later.  He's subpoenaed at 9:00?

18           MR. COOMAN: He is subpoenaed for 9:00 so...

19           THE COURT: Let's do that then.  Think about it over the

02:53PM    20   evening, take a look at your submissions and, otherwise, I guess

21   we'll be ready with Mr. Canessa.

22           Have you checked with him?  Is he feeling all right so

23   he can --

24           MR. COOMAN: Yes.

02:54PM    25           THE COURT:  -- be here tomorrow?

1          MR. COOMAN: Yes, yes.

2          THE COURT: They say sometimes cross-examination is like

3     passing a kidney stone, but I guess he has firsthand experience.

4     I don't mean to make light of it.

02:54PM  5          MR. LEVINE: Judge, before you recess I wanted to bring

6     something to your attention that came out during the testimony,

7     something for you to think about which will come up tomorrow and

8     then again in the closing charges.

9          Mr. Chambery's asking for compensation for the time he

02:54PM 10    spent working on the litigation.  And I respectfully submit that

11    under 1988, you're not entitled to your own personal time to be

12    compensated.  You're entitled to your attorney's fees.

13         What they're doing by this type of evidence is getting

14    through the back door what they can't get through the front door.

02:54PM 15    He testified that there was a winding up period, that's one thing.

16    But the time he spent working on this litigation would not be

17    otherwise compensable under 1988.

18         And I'd ask the Court to think about the idea that it's

19    not compensable as a measure of damages, and the example I would

02:55PM 20    give you is if a pro se came in and said, "I've spent 20 hours a

21    week on this litigation for the past year, and although I know I

22    can't collect it under 1988, that's what I was doing for the year

23    leading up to the litigation, I want to be -- I would like to be

24    compensated for it."

02:55PM 25         It would not be something that could be compensable.

1   Therefore, with regards to expert testimony on that subject, as

2   well as your charge, whether you give it or not, we would ask the

3   Court to review the law on 1988, as well as compensable damages

4   outside of 1988.

02:55PM   5       MR. ROTHENBERG: Judge, I'm sorry.  We're not asking for

6   that at all.

7       THE COURT: I didn't think plaintiff was.  I thought the

8   testimony really related to what it was that Mr. Chambery was

9   doing over the past 12 years in relation to the mitigation

02:56PM  10   argument.

11       MR. ROTHENBERG: Exactly.  That's exactly correct.

12       MR. LEVINE: As long as they're not seeking damages, I

13   mean, if he's getting X dollars per year in damages and it's

14   supposed to have a compensable component for the litigation work,

02:56PM  15   that would not be compensable.

16       MR. ROTHENBERG: We're not seeking that, and the expert

17   won't testify to that.

18       MR. LEVINE: That's easy.  Thank you, Judge.

19       THE COURT: See you tomorrow.

02:56PM  20       MR. ROTHENBERG: Yes, Your Honor.  Thank you.

21       (WHEREUPON, the proceedings adjourned at 2:54 p.m.)

22                          *    *    *

23

24

25

1                        CERTIFICATE OF REPORTER

2

3            In accordance with 28, U.S.C., 753(b), I certify that

4   these original notes are a true and correct record of proceedings

5   in the United States District Court for the Western District of

6   New York before the Honorable David G. Larimer on August 20, 2012.

7

8   S/ Christi A. Macri

9   Christi A. Macri, FAPR-RMR-CRR-CRI
    Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25