1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5

6

     - - - - - - - - - - - - - - - X
7    BEECHWOOD RESTORATIVE CARE        )      02-CV-6235(L)
     CENTER, BROOK CHAMBERY AND        )
8    OLIVE CHAMBERY,                   )
                    Plaintiffs         )
9    vs.                               )
                                       )      Rochester, New York
10   LAURA E. LEEDS, EDMUND RUSSELL    )      August 6, 2012
     ALTONE, SANFORD RUBIN,            )      9:30 a.m.
11   SUSAN T. BAKER, SHARON A. CARLO,  )
     CYNTHIA T. FRANCIS and ELIZABETH  )
12   RICH,                             )
                    Defendants.        )
13   - - - - - - - - - - - - - - - X

14

15

16

17                     TRANSCRIPT OF PROCEEDINGS
18            BEFORE THE HONORABLE DAVID G. LARIMER
                  UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24   COURT REPORTER:      Christi A. Macri, FAPR, RMR, CRR, CRI
                          Kenneth B. Keating Federal Building
25                        100 State Street
                          Rochester, New York 14614-0222

2

A P P E A R A N C E S

*    *    *

GEIGER & ROTHENBERG, LLP
BY:  DAVID ROTHENBERG, ESQ.
45 Exchange Boulevard
Suite 800
Rochester, New York 14614
          - and -
MCCONVILLE CONSIDINE COOMAN & MORIN, P.C.
BY: KEVIN S. COOMAN, ESQ.
25 East Main Street
Suite 400
Rochester, New York 14614
Appearing on behalf of the Plaintiffs




ERIC T. SCHNEIDERMAN, ESQ.
Attorney General of the State of New York
BY: GARY M. LEVINE, ESQ.
     BERNARD SHEEHAN, ESQ.
Assistant Attorneys General
144 Exchange Boulevard
Suite 200
Rochester, New York 14614
Appearing on behalf of the Defendants

3

P R O C E E D I N G S

*          *          *

(WHEREUPON, the jury is not present).

THE COURT: All right.  Good morning, all.

09:31AM  MR. COOMAN: Good morning, Your Honor.

MR. ROTHENBERG: Good morning.

MR. SHEEHAN: Good morning.

MR. LEVINE: Good morning.

THE COURT: Back in the 50's at some point I was reading
09:31AM  the other day that Adlai Stevenson, he was either running for
governor of Illinois or one of his presidential runs, went to
visit a maximum security prison outside of Chicago and he started
a speech by saying, "It's good to see all of you here."

There are two ways you can take that:  Either he was
09:31AM  glad that they were in jail; or he was glad that they came to see
him.  So, in any event, maybe I'm the captive here, but it is good
to see you.

We have a few things to discuss.  I hope you all enjoyed
your breaks.  I guess I'd like to hear maybe first from the
09:32AM  defense, and it relates to the renewed request, I guess, to put in
some of the stuff relative to the federal determinations, the
federal ALJ decisions, and so forth.

When I envisioned -- well, right after the verdict and
even before that I viewed our task on August 20th as simply a case
09:33AM  of the jury coming in and adding up the numbers, telling us what

1    the amount of damages were or are.  Is it $500,000?  Is it

2    1 million?  Whatever it is.

3         And I'm sure -- I'm still not sure that that's not the

4    case, and I guess the reason I say that -- at least for the

09:33AM  5    purpose of argument here -- is it's hard for me to understand how

6    what the State did in this case, what the jury found that the

7    State actors did isn't almost, as a matter of law, proximate cause

8    of the injuries.

9         I mean, I'm just having trouble seeing how it could not

09:34AM 10    be.  I know we have the defense recent motion *in limine*, but it

11    just seems hard for me to see how a jury couldn't find that what

12    the State defendants did was a cause of the injuries, what was a

13    natural consequence of what the State did that led to the

14    revocation of the operating certificate that closed the place

09:34AM 15    down.

16         Because I'm prepared to instruct the jury that, you

17    know, it doesn't have to be the only cause.  Proximate cause is a

18    cause.  And there are several cases that we have sort of ferreted

19    out, after receiving the defense motion *in limine*, Second Circuit

09:35AM 20    cases and others, especially *Warner vs. Orange County*, 115 F.3d

21    1068, 115 F. 3rd 1068; *Myers vs. County of Orange*, 157 F.3d 66,

22    157 F.3d 66; and *Back vs. Hastings on Hudson*, 365 F.3d 107, 365

23    F.3d 107.

24         At least the *Back* case was in a summary judgment

09:36AM 25    context, but they all sort of relate to proximate cause and this

1    sort of the issue of intervening causes, and I think they're very

2    instructive to me.  But I'm just thinking about this case and what

3    we've heard.  There's a part of me that wants to say as a matter

4    of law what happened here was a proximate cause.  Period.  Ladies

09:36AM  5    and gentlemen, let's focus on whether the plaintiff suffered a

6    dollar injury or, you know, $100,000, whatever it is.

7          But I guess at the very minimum, Mr. Sheehan, I'm

8    certainly not prepared to say today as a matter of law that there

9    was an intervening cause that precludes plaintiff from recovering

09:37AM 10    more than a dollar.

11          I mean, I suppose we really have to hear the proof, but

12    we've heard most of the proof as to what happened.  So whether I

13    go so far -- and I'm just sort of speaking to get the ball rolling

14    here -- whether I go so far as to follow through on my threat

09:37AM 15    that, as a matter of law, proximate cause has been established or

16    whether I submit it to the jury and let you all argue it see what

17    the jury does.  The Court can always post-verdict take what action

18    it feels is appropriate.

19          But, I mean, those three cases that I just cited, there

09:37AM 20    were other actors that were involved.  Classic case in an

21    employment discrimination area where, you know, a supervisor

22    prepares a negative review that turns out to be racially

23    motivated, or gender discrimination, or in violation of the

24    person's First Amendment rights, and that review gets looked at up

09:38AM 25    the line and eventually the superintendent or the chair, somebody

1  terminates the employee.  And the arguments are often made, well,

2  you know, somebody else up the line actually took the action to

3  terminate you, not me.  And I think the Circuit's had little

4  trouble dealing with that, and I think the *Back* case discusses

09:38AM  5  that.

6       So, anyway, I mean, Mr. Sheehan, what are you -- what do

7  you think you want to try to show before this jury based on,

8  presumably, the evidence that's been presented to them over six

9  and a half weeks?

09:39AM  10      MR. SHEEHAN: Well, Your Honor, I'm thinking in terms of

11  the *Back* case that you were just talking about.  For example,

12  that's typical of some cases where the decision maker got bad

13  evidence or arguably bad evidence.

14       We don't have that here.  The evidence HCFA got is the

09:39AM  15  same evidence that the State ALJ got, which is now findings of --

16  which are preclusive in this matter.

17       And what we would like to show, what we intend to show

18  is that based on that evidence that's preclusive, HCFA -- who is

19  an independent decision maker, a totally separate agency -- made a

09:39AM  20  decision, made an independent decision to terminate Beechwood from

21  the Medicare program, which is a completely federal program as

22  well, and that that act constituted the intervening cause because

23  Beechwood could not survive without Medicare funding.

24       THE COURT: Well, they couldn't survive without an

09:40AM  25  operating certificate either.

1          MR. SHEEHAN: But the Medicare termination happened

2    first.

3          THE COURT:  By a couple months, true.

4          MR. SHEEHAN: Five or six months, true.

09:40AM  5          THE COURT: But, you know, but the feds really didn't do

6    any separate investigation, as I recall.  They took the evidence

7    that the State provided to them --

8          MR. SHEEHAN: Which --

9          THE COURT: -- took a look at it, made the determination,

09:40AM  10   I guess the same determination the State ALJ did.

11         But, I mean, you know, you made this argument during the

12   liability phase that that evidence of what the feds did was

13   something the jury should hear, and the Court precluded that.

14         The Second Circuit when they discussed the case focused

09:41AM  15   on the fact that it was what the State people did, not what the

16   federal people did.

17         So I just wonder if we're not sort of rearguing here,

18   attempting to get in, once again -- I mean, how do you envision

19   the case going in terms of proof?  I thought we've got a bunch of

09:41AM  20   experts coming in, we've got the plaintiff prepared to testify

21   about his or their damages, and how did you think --

22         MR. SHEEHAN: You're talking about the offer?  The proof

23   we intend to offer I based on the federal ALJ decision?

24         THE COURT: Yeah.  What do you want to do?

09:41AM  25         MR. SHEEHAN: I would read in limited portions of it into

the record for the jury to show that the federal ALJ made an

analysis that the scope and breadth of the decision to

terminate to show it was not purely administerial, that there was

a substantial analysis based on the evidence presented and --

09:42AM   THE COURT: I don't think there's anything in the

record --

MR. SHEEHAN: I'm sorry, Your Honor?

THE COURT: I don't think there's anything in the record

about that, is there?

09:42AM   MR. SHEEHAN: About?

THE COURT: About what the feds did.  I mean, I know HCFA

made the determination; there was much discussed about that, much

discussion, I guess, about e-mails, but it is true that HCFA in

June of 1999 took the action they did.  I don't have the

09:42AM   exhibit number in front of me, but precluded Beechwood from

accepting new Medicare/Medicaid payments and patients.  That's

part of the record.

And I would think, I guess, you could stand up and argue

that that really was the intervening cause or the primary cause.

09:43AM   Is that what you want to do?

MR. SHEEHAN: In short-terms, yes, Your Honor.

But the federal ALJ decision helps show that it wasn't

just a rubber stamp.  And just the bare decision to terminate

isn't enough to make, in our minds, to make the argument; we would

09:43AM   like to present more evidence to the jury.

1          And we're not planning on putting the entire federal ALJ

2     decision in.  We have no intention of reading descriptions of

3     treatment and that.

4          It's really just the analysis that was made to show the

09:43AM  5     decision was based on substantial evidence and the scope of the

6     decision generally.

7          THE COURT: Well, so you want to mark the decision?  I

8     mean, what practically do you want to do when we start on

9     August 20th when it's your chance to put in proof?

09:43AM 10          What are you going to do?  Who are you going to call?

11          MR. SHEEHAN: Well, we intend to call our experts.  And I

12     do have some, depending on how the direct goes, of Mr. Chambery

13     and his mother.  Mrs. Chambery, we would ask some independent

14     questions.  So we would call them as witnesses.

09:44AM 15          THE COURT: About what?

16          MR. SHEEHAN: Oh, just about the various elements of

17     damages.

18          THE COURT: I don't mean that that's --

19          MR. SHEEHAN: I'm just telling you the whole proof, Your

09:44AM 20     Honor.

21          And in terms of the federal ALJ decision, that would

22     just be reading in portions of it.  We would not call any

23     witnesses.

24          THE COURT: Well, I don't suppose it's happened yet, but

09:44AM 25     have you and the plaintiffs -- if the Court thinks it's all

1  relevant, is there some ability to construct some type of a

2  stipulation as to what happened?  There's a timeline here that I

3  think has been proposed that may be of some assistance, but we're

4  not going to spend days and days dealing with stuff here.  I think

09:45AM  5  we've got enough to do just getting in evidence about the damages.

6          But at this point, if I hear you correctly, what you

7  want to do is I guess just without any foundation, just read

8  portions of the ALJ's decision?

9          MR. SHEEHAN: Yes, Your Honor.  Then make arguments in

09:45AM  10  closing.

11          THE COURT: Well, my concern is the liability ship has

12  sailed here.  We are dealing with the extent of damages that were

13  proximately caused by the jury, found to be the retaliatory acts

14  of the defendants.

09:46AM  15          I'm thinking seriously, although -- well, I'll repeat

16  again.  It just seems to me in terms of proximate cause arguments,

17  it's hard for me to construct a scenario where a jury could

18  reasonably find that what the State did wasn't a proximate cause.

19  We're not here dealing like we are in some cases where there may

09:46AM  20  be multiple tort feasors and you may have to apportion damages.

21          I mean, if they find that the defendants' actions were a

22  proximate cause, then plaintiffs are entitled to recover, I think,

23  all the damages from those actors.

24          MR. SHEEHAN: And that's why we're reciting the criminal

09:46AM  25  cases for the idea that when there is an independent decision

1  maker, that can break the chain.  And in this case our argument is

2  that HCFA was an independent decision maker and broke the chain of

3  causation.

4          THE COURT: But I think those three cases that I cited

5  indicate that if -- I mean, some of their language, if it's

6  reasonably foreseeable by the tort feasor here, the State, that

7  others would rely on their decision, then that's proximate cause.

8          I mean, that's the language that all of those cases use

9  is sort of the foreseeability that the State didn't act in a

10 vacuum here.  I remember those e-mails that some people said, you

11 know, the feds have our back on this.  And it sort of seemed like

12 people could argue that the State and the feds were sort of

13 working hand-in-glove here, but --

14         MR. SHEEHAN: Well, the other element that's missing --

15         THE COURT: It just seems hard to stand up in front of

16 the jury and say, folks, what the State did, it wasn't any cause

17 at all in the damages that occurred here.  I mean, really?

18         MR. SHEEHAN: The other part of it, Your Honor, it's not

19 the State, too.  It's five defendants.

20         THE COURT: Well, I misspoke.

21         MR. SHEEHAN: But what you're saying is is part of what

22 we would be trying to correct, Your Honor.  It's the five -- it's

23 the five defendants' actions, and then there is a consensus, a

24 concurrence and a recommendation to HCFA, which has to happen

25 within the larger part of the Department of Health, 99% of whom

1   are not on trial here.

2          And that's the recommendation that gets passed on to

3   HCFA, who then again looks at the evidence, can choose to do its

4   own investigation or not -- choose to follow-up with DOH or not,

09:48AM  5   and then makes a decision.

6          THE COURT: I guess I would say, okay, let's suppose all

7   that happened.  I would say so what?  They did what they did.

8   They received information from the State, they relied on the

9   information that the State actors had put together and, yes, they

09:49AM  10   came to a decision.

11          But this case is about what the State did and what

12   damages should be paid to the plaintiffs for what the State did

13   and, you know, if the law was that the State -- I use State just

14   as a shorthand for the defendants -- but if the law is that the

09:49AM  15   defendants' retaliatory acts had to be the only cause or the

16   primary cause, fine, I guess I would warm up to your argument

17   more.

18          But I don't think that's the standard.  It just has to

19   be a substantial factor in causing the damages.

09:49AM  20          So let me hear from plaintiffs, but before I do -- so at

21   this point your request is that you be allowed essentially to

22   introduce new evidence to the jury, and that is to read -- you

23   can't agree to a stipulation.  Sort of the bottom line is that

24   there was a federal ALJ pleading and the federal people, some time

09:50AM  25   in 2000 or 2001 or whenever it was, made this decision and that

1  decision, I guess, was the result of the appeals that the

2  plaintiff took from the initial HCFA missive that was sent in June

3  of 1999?

4           MR. SHEEHAN: Yes, Your Honor.

09:50AM  5           THE COURT: And then that's the extent of the proof that

6  you would offer on this, what I'll call the "cause issue" here?

7           MR. SHEEHAN: Yes, Your Honor.

8           THE COURT: All right.  Mr. Cooman or Mr. Rothenberg?

9  What do you -- I mean, what are your thoughts on my idea that

09:51AM  10  perhaps the Court, as a matter of law, should say what happened is

11  a proximate cause, period, and let's get on with deciding the

12  amount of damages?

13           Keeping in mind that there are appellate courts that

14  would look at this and -- I mean, just for sake of argument here,

09:51AM  15  is that something you request or do you think it's really sort of

16  a classic proximate cause argument?

17           Because I remember when I instructed the jury, I gave

18  them four or five elements of what the cause of action was and I

19  went through three or four of them and that was for the jury, and

09:51AM  20  I remember specifically telling them the final one is if there is

21  liability, were those acts the proximate cause of the damages

22  claimed.  And, ladies and gentlemen of the jury, that's not

23  something for you today, that's something for a later time.

24           So this concept of proximate cause has certainly been

09:52AM  25  broached to the jury.  Certainly we haven't discussed intervening

1  causes and all that, but -- so my initial thought was this is just

2  a classic proximate cause argument.  You know, if the defendants

3  really want to stand up and say whatever we did, it wasn't the

4  proximate cause, keeping in mind what the Court's instructions

09:52AM  5  will be, which will be pretty broad, I think that's their

6  prerogative.

7          But the more I thought about it, I wondered if -- I

8  don't want to say wasting time here, but because I thought the

9  primary focus of this was for the jury, having heard all they

09:52AM  10  heard, to tell us whether damages is $10 or $10 million.

11          MR. COOMAN: We essentially agree with the Court.  We do

12  think that defendants are permitted to argue that HCFA's

13  termination in June was an intervening cause, superseding cause,

14  if they really think they can make that argument.

09:53AM  15          But that's different from whether they should be allowed

16  to admit any of the two years later administrative law decisions

17  that HCFA gave because the operative act was the administrative

18  *fiat* decision in June of 1999 essentially agreeing or rubber

19  stamping with what its agent had recommended.

09:53AM  20          This is -- that whole agency principle thing is one of

21  the things that points out why it would be very, very difficult to

22  imagine that HCFA's an intervening or superseding cause because by

23  law, the Department of Health is HCFA's agent and you can't

24  imagine how in an agency relationship you could have the principal

09:53AM  25  acting as an independent force with respect to what DOH had done.

1          And, of course, critically all of those things that

2     Mr. Sheehan proposes to get up and read happened two years later.

3     And so they add nothing to the jury's understanding.

4          It's an admitted fact.  None of us are going to get up

09:54AM  5     and dispute the fact that HCFA ratified and affirmed what DOH had

6     recommended.  It was an accomplished fact in June.

7          Now, we fast forward five months, a revocation occurs.

8     Fast forward another year and a half, you finally get a HCFA

9     post-deprivation administrative determination that the termination

09:54AM 10     was valid.

11          But it doesn't add anything to the analysis because by

12     the time the federal administrative law decisions come out, we've

13     now had revocation.  And all the damages after revocation, without

14     question, have to be laid at the doorstep of these defendants

09:54AM 15     because we can't get back in the program.

16          THE COURT: You mean revocation of the operating

17     certificate?

18          MR. COOMAN: Correct, correct.

19          THE COURT: Right.

09:54AM 20          MR. COOMAN: So the only narrow, conceivable things

21     defendants have is to get up and argue that some piece of the

22     damages between June and December of 1999 are really caused by

23     HCFA's administrative action, and that somehow is a superseding

24     intervening cause.

09:55AM 25          And we think the Court can give an instruction on

1    proximate cause and say if you find a superseding intervening

2    cause, you can decide that.  But it's very close to a matter of

3    law that that's just not possible here.  Very, very close.

4            THE COURT: Well, what do you think I should do?  Should

09:55AM   5    I leave it to the jury?  Is that argument?  Or take it away from

6    them right now?

7            MR. COOMAN: I think the jury can get an instruction

8    about superseding and intervening cause with respect to HCFA.

9            As I understand Mr. Sheehan's last set of arguments at

09:55AM   10   the end of the week, he's actually attempted to come back and say

11   that should be true even with respect to Novello and Zylberberg,

12   and we believe that is absolutely precluded as a matter of law.

13           The Court's instruction to the jury on the liability

14   phase very clearly was saying that the primary adverse action that

09:56AM   15   happened as a result of their conduct was the revocation.

16           And they clearly are all in that same DOH chain, and I

17   don't think the jury could have reached its verdict without having

18   sort of taken a peek, if you will, at the causation element

19   getting to the adverse action because the Court's instruction was

09:56AM   20   in order to find these defendants liable, they must be personally

21   involved in the adverse action.

22           And the Court said two or three times, particularly at

23   pages 16 and 17 of the charge, that adverse action that we're here

24   about is their operating certificate got revoked.  So I think, as

09:56AM   25   a matter of law, that argument is precluded.

1          I could see the Court instructing on superseding,

2    intervening about HCFA, and they can argue it for what it's worth.

3          THE COURT: There was sort of part of the defense

4    argument that it sort of sounded like some of the concepts we

09:57AM  5    discussed when we discussed the Supreme Court's *Mount Healthy*

6    decision that, you know, that it would have happened anyway.

7          That certainly was something that was presented to the

8    jury in the liability phase, and I think Mr. Levine argued that

9    and the Court instructed on that.

09:57AM  10          This sort of -- when I read the defendants' papers, I

11    thought we're sort of resuscitating that in a damage context.

12          MR. COOMAN: Exactly.  That's exactly our concern about

13    anything about the HCFA administrative law decisions coming in is

14    it's -- when they argue, well, the jury ought to hear those things

09:57AM  15    and then be told those are preclusive, that's *Mount Healthy* all

16    over again, that somehow we would have come out that way anyway or

17    this would at the end of the day come out this same way because of

18    HCFA's administrative action.

19          But that was so far after-the-fact of the bomb having

09:58AM  20    gone off and the dust settled, it doesn't matter.  It's very

21    important if you think about the distinction, the continuation

22    between the state and federal process:  The state process we got a

23    post-deprivation remedy; there was a hearing before the revocation

24    took place.

09:58AM  25          The fed system is upside down, in Congress' wisdom,

1   where they said administrators do the termination and some day, a

2   year and a half or two down the road, you finally get a hearing to

3   decide whether or not it was valid.

4            And I can tell the Court that, you know, around the

5   country when this happens to nursing homes, routinely by the time

6   you ever get to that decision, the nursing home is back in

7   operation because it's been in -- the restatement process occurs

8   within a matter of months after the termination, which is

9   typically just a temporary phenomenon.

10            Of course, that wasn't possible for Beechwood because

11   you had no license, you had no CON, and we were gone.

12            THE COURT: I remember there was some discussion that,

13   yes, from June on Beechwood couldn't get payment from the feds for

14   Medicare or Medicaid, but they may be able to survive with private

15   pay patients.  That, of course, was gone in December of 1999 when

16   the operating certificate was cut off.

17            MR. COOMAN: Correct.

18            THE COURT: Well, I mean, I envision having a verdict

19   sheet for the jury to list damages.  I really hadn't thought I

20   would separate the first six months from the jury's damage

21   calculation.

22            MR. COOMAN: I don't think you need to, Your Honor.  It

23   would be subsumed in a line that says what do you find the damages

24   to the Beechwood partnership to be?

25            Let's say hypothetically they find, based on our

1  expert's testimony, those damages are millions of dollars and --

2  but they, in their computations in the back room say, well, you

3  know, I really buy that defense argument that it was something

4  else that caused six months of damages.  So, you know, they do a

10:00AM  5  little computation and, you know, maybe they cut it down by some

6  amount.

7          But I don't see that that needs to be teased out.

8  That's still within the realm of what do you find Beechwood's

9  damages to be and, you know, the jury will gather up what they

10:00AM  10  hear from the defense expert, our expert, the arguments of counsel

11  and they will come up with a number.

12          THE COURT: Well, when I talked about the verdict sheet

13  having lines, like, for instance, it might be appropriate to have

14  one for lost wages for Mr. Chambery.  It might be appropriate to

10:00AM  15  have one for other compensatory damages for humiliation.

16          MR. COOMAN:  Correct.  Probably a three or four line

17  thing.

18          THE COURT: Yeah, we'll talk about Mr. Chambery's lost

19  wages in a minute here, but -- so the plaintiffs are not warm on

10:01AM  20  my perhaps earlier idea to take this away from the jury at this

21  point as a matter of law *vis-a-vis* the causation?

22          MR. COOMAN: That's correct.  I mean, candidly, I guess

23  we don't want to headlight our argument on that.

24          THE COURT: Well, either do I, but it's close.  I

10:01AM  25  think --

1          MR. COOMAN: We agree it's very close.

2          THE COURT: Mr. Sheehan, you wanted some rejoinder?

3          MR. SHEEHAN: Just a little bit, Your Honor.  Plaintiffs

4   are conceding a superseding charge to that extent what we're

10:01AM  5   really asking is the ability to offer some proof to show that the

6   decision to terminate was not a rubber stamp, was not a simple

7   ratification of what the DOH recommended.  And that's the purpose

8   of getting in the federal ALJ decision.

9          THE COURT: Well, Mr. Cooman makes the point that HCFA --

10:02AM  10   his words -- relied on the actions of its agent, the State, and

11   submitted the letter.

12          I'm sure you probably recall the exhibit number, but it

13   was a June letter from HCFA to Beechwood precluding them from

14   getting new pays, new Medicare/Medicaid.

10:02AM  15          And I guess he suggested that's all you need to say.

16   What happened two years later really doesn't add anything to that

17   because that, that is, the ALJ decision, happened long after the

18   December of 1999 decision of Commissioner Novello to sign off on

19   the ALJ's Report and Recommendation.

10:03AM  20          MR. SHEEHAN: The federal ALJ decision shows the scope

21   and degree of the decision.  Shows -- even without getting into

22   the details, shows the evidence relied on; that it was not a

23   simple rubber stamp, it was not a simple ratification.

24          THE COURT: They took all the stuff from the State ALJ's

10:03AM  25   decision, they talked about it, they affirmed most of it except

1   for a couple of patients, as I recall.

2            THE COURT: They didn't go out with their own

3   investigators and do anything?

4            MR. SHEEHAN: They could have if they thought it was

10:03AM   5   necessary.  They didn't think it was necessary.  They would have.

6   They would have.

7            THE COURT: Doesn't sound like a rubber stamp.  I don't

8   mean it pejoratively.  I mean in the sense they took what the

9   State gave them and made a decision.

10:03AM   10           MR. SHEEHAN: Which was -- well, and part of our argument

11   is, Your Honor, the way I look at it comes down to two things:

12   Either bad data or --

13           THE COURT: You what?

14           MR. SHEEHAN: I'm sorry, Your Honor.  The causation comes

10:04AM   15   down to, in my mind, two things:  You have bad data, and I put

16   *Back vs. Hastings* in that area.  You have bad information going to

17   the decision maker.

18           Or you have a bad motive.  And partially what we're

19   receiving here is in addition to the -- by the rubber stamp

10:04AM   20   argument, by the ratification argument, is that HCFA was not

21   independent.  That they, in one way or another, either were --

22   just did whatever DOH asked them to do or they had some part in

23   the bad motive or something else.  And that's what we're trying to

24   rebut.

10:04AM   25           THE COURT: But I think the jury's focus has to be not on

1   what HCFA did, but it was on what the State -- again, I use State

2   so I don't have to repeat the six defendants -- it's the damages

3   that the jury believes should flow from what the State actors, all

4   employees of the Department of Health, did and I think that has to

10:05AM   5   be the focus.

6               And I am concerned, as in my *in limine* decision months

7   before this trial, when I precluded introduction of the ALJ's

8   decisions.  I'm not going to repeat back to you what I said in

9   that, but this is not about what the federal government did.  It's

10:05AM   10   what the State actors did.  I think I reference the

11   Second Circuit's language, perhaps in another context, but related

12   context.

13               Well, all right.  I guess I'm prepared to rule to this

14   extent:  That I will not at this point rule as a matter of law

10:06AM   15   that no reasonable juror could fail to find proximate cause at

16   this stage.  I believe it is a jury issue.

17               Damage is part of every case.  Damages have to be

18   "proximately caused" by the either negligent acts or wrongful acts

19   of the defendants.

10:06AM   20               So I think neither side wants me to take it away from

21   the jury at this point.  I won't.  And I certainly don't intend to

22   preclude the defendants from arguing what's already in the record

23   concerning HCFA's actions and what it meant and what it precluded

24   plaintiffs from receiving.

10:06AM   25               But I will reserve today whether any other proof should

1   be put in front of the jury.

2           Mr. Sheehan, you know, the federal decisions are about

3   three and a half inches thick.  So you've indicated to me -- I

4   view it as a relatively modest proposal to read some, but I don't

10:07AM   5   know which decision or -- I mean, it might be helpful in the next

6   day or so if you could just point to me the pages you think you

7   want to read or summarize.

8           Can you do that?

9           MR. SHEEHAN: Yes, Your Honor.

10:07AM   10           THE COURT: All right.  Say by Wednesday noon?

11           MR. SHEEHAN: Yes, Your Honor.

12           THE COURT: Okay.  Copy plaintiffs, of course.

13           MR. SHEEHAN: Yes, Your Honor.

14           THE COURT: I'm working up a proximate cause instruction,

10:08AM   15   which I think is much broader than what's been submitted to me so

16   far.  The submission I got from the plaintiffs was pretty

17   straightforward and -- yeah, I mean, it was three lines.

18           MR. ROTHENBERG: Well, actually, Judge, there were a

19   couple other submissions that had to do with the proximate cause

10:08AM   20   issue.  We broke them out into more than one.

21           I didn't mean to say that proximate cause was so simple

22   that three lines would do it, but we do have other instructions

23   about the proximate cause topic.

24           THE COURT: All right.  Well, you're right.  You had two

10:09AM   25   proposed instructions, 15 and 16 I guess.

1        MR. ROTHENBERG: 15, 16 and really 14, I think, is part

2   of it because it's the statute that talks about subjects or causes

3   to be subjected.

4        I hope the Court doesn't think that -- yeah, 14, 15 and

5   16.  I hope the Court doesn't think we --

6        THE COURT: All right.  Perhaps I misspoke.  There were

7   three that -- and I guess we're working with those and sort of

8   focusing on three cases that I talked about, you know.  I mean,

9   those three cases that I talked about that I gave you cites for --

10  the *Warner* case, and *Myers* and *Back* --

11       MR. ROTHENBERG: Correct.

12       THE COURT: -- they focused on a legitimate issue, and

13  that is the so-called intervening causes.  But it's not that

14  simple for a tort feasor to absolve itself or themselves from

15  responsibility just because somebody else acted on their bad

16  actions or retaliatory actions or discriminatory actions.  So

17  we're still working on that at this point.

18       Like my normal practice, I don't think I'll say much in

19  terms of a preliminary charge.  I mean, I'll say a few things to

20  just sort of help the jury focus on where we are and where they

21  are and what's not before them and what they have to decide.  I

22  may summarize briefly my understanding as to the damages

23  plaintiffs seek.

24       I hadn't really thought about whether you all want to

25  make new opening statements.

10:09AM (line 5)
10:09AM (line 10)
10:10AM (line 15)
10:10AM (line 20)
10:11AM (line 25)

1          MR. COOMAN: I think when we had our chambers conference,

2     Your Honor, I thought we had agreed it would be about 20 minutes

3     apiece or thereabouts.

4          MR. SHEEHAN: That sounds about right.

10:11AM   5          MR. COOMAN: No more than 30.

6          MR. SHEEHAN: That sounds about right.

7          THE COURT: Okay, I guess we did.  All right.

8          You know, whenever you give speeches or whenever you do

9     anything, you have to keep in mind your audience.  You've got a

10:11AM  10     jury that sat about seven weeks and are being asked to come back

11     again, and you're going to lose one of them after a week.

12          So I think they're a good, solid group of people that

13     will pay attention to the issue, but I don't think they want to

14     have this be, you know, the same old stuff that they've heard for

10:12AM  15     seven weeks.

16          Okay.  Well, so I guess I'm reserving on that part of

17     the argument.

18          There are a couple other issues that we broached at our

19     conferences, and I guess this discussion we've had here for the

10:12AM  20     last half hour focuses also, in part, on the defendants'

21     motion *in limine* to have me reconsider my decision precluding the

22     introduction of the federal ALJ's decision.  So we've talked about

23     that.

24          Initially the plaintiffs sought leave or urged me to

10:12AM  25     reconsider my *in limine* decision, which was docket number 285,

1    where I precluded the letters of interest that at least one, maybe

2    more people had expressed or submitted relative to purchasing

3    Beechwood.

4           But I thought as the discussion went on, my sense was

5    maybe as long as the expert could testify that he had considered

6    those things, as well as other things in coming to the expert's

7    decisions, maybe plaintiffs were not pushing that too much?

8           MR. ROTHENBERG: Well, that's certainly our secondary

9    argument.  We did want the Court to reconsider that ruling in

10   light of the fact that as the proof demonstrated, there could

11   be -- there really could be no final and binding offer here

12   because the defendants would not permit the transfer of the

13   Certificate of Need.

14          So this was a circumstance where the best anybody was

15   ever going to see was a letter of interest or a letter of intent,

16   and not a final binding offer.

17          And so since it was the defendants' conduct that

18   prevented the issuance of a final and binding offer, that

19   perhaps -- and just to step back for one second, this is not a

20   hard and fast rule.  There are cases indicating that this is fact

21   determinative, and it's a flexible rule and it's clearly the

22   general rule that a non-binding letter of intent is not

23   admissible.  I agree.

24          But the cases make it clear that that's not an immutable

25   rule, and we think here where the defendants precluded the

27

1  transfer of the Certificate of Need so that there could never be a

2  final and binding offer, we wanted the Court to reconsider.

3  If you don't reconsider in terms of admissibility, we

4  would like a clarification that the experts can consider this and

10:15AM  5  that we certainly could cross-examine their expert about this

6  topic.

7  THE COURT: You anticipate that your expert would say,

8  among other things, coming to valuation, that he -- it is a he?

9  MR. ROTHENBERG: We have a he, yes.

10:15AM  10  THE COURT: He considered these letters of intent?

11  MR. ROTHENBERG: Well, he did look at the letters of

12  intent. It really didn't play a big role in his determination.

13  He used other methodologies, but he considered that and

14  looked at it kind of as an absolute minimum. I mean, it's in his

10:16AM  15  report.

16  THE COURT: All right. Well, does the defense disagree

17  or take a position that an expert is precluded from considering

18  material, even if that material happens not to be otherwise

19  admissible?

10:16AM  20  MR. SHEEHAN: As stated, we do not disagree with that

21  proposition, Your Honor. But the specific situation we're dealing

22  with here is letters of intent, which are not typically relied on

23  by valuation experts, which is what our expert will testify to,

24  which I don't --

10:16AM  25  THE COURT: Isn't that just a matter of experts jousting

1   whether it is something they can or not?

2           Mr. Rothenberg suggested that their expert, his proffer

3   didn't sound like based his entire decision on that.  It was

4   something he had for him.

10:17AM 5           MR. SHEEHAN: What it sounds like, Your Honor, his expert

6   will say something along the lines of the minimum possible value

7   for Beechwood is $8.1 million based on the letter of intent I

8   reviewed.

9           And to that extent the defense does argue that testimony

10:17AM 10  would be improper, given that it's -- first, it's based on

11  evidence that's not normally relied on.  And, second, it's really

12  just parroting something that we have no way to cross-examine.

13          THE COURT: Why can't you cross-examine him?

14          MR. SHEEHAN: We don't have the people that created the

10:17AM 15  letter of intent on the stand, and because there's no way to

16  disagree with the conjecture about what the letter of intent

17  really represents.

18          THE COURT: Well, your expert, though, apparently is

19  going to say it's not something you rely upon or you shouldn't

10:17AM 20  so --

21          MR. SHEEHAN: But we have no way of knowing what that

22  $8.1 million number is based on, and this $8.1 number is just as

23  unreliable as it was --

24          THE COURT: I thought it was one point something?

10:18AM 25          MR. ROTHENBERG: There's a series of them and it starts

1    with -- I can't remember if it's 8.1, but it's something in that

2    vicinity.  And then there was actually a declining curve as the

3    fall went on.

4              THE COURT: These are reflected in the letters of intent?

10:18AM    5              MR. ROTHENBERG: Yes.  The numbers are in the letters of

6    intent.

7              But if I may, Your Honor?  Whether it's something the

8    expert relied upon or not, that's something that's the subject of

9    cross-examination.  If their expert says "I would never rely on

10:18AM   10   it," that's one thing and our expert can say whatever he wants to

11   say about it.

12             Secondly, the fact that you can't cross-examine the

13   author, that's true of every document that the experts are going

14   to work with.  I mean, the experts have a pile of financial

10:18AM   15   documents that are created by accountants and expenses and

16   everything else.  Nobody can cross-examine any of the actors

17   who -- other than, I suppose, Mr. Chambery who will be on the

18   stand -- but I don't think that argument has any applicability to

19   this phase of the case.

10:19AM   20             MR. SHEEHAN: With all due respect, Your Honor, I

21   disagree.  The difference there is the other documents that the

22   experts are relying on are having a methodology applied to them.

23             In this case it doesn't cash flow one way or another and

24   a number is generated, you can cross-examine the author of the

10:19AM   25   number because the author of the number will be on the stand.

1          In this particular case all Mr. Canessa is going to do

2     is testify to $8.1 million based on a number he's getting from a

3     letter of intent.  There's no analysis.  He's basically just

4     reading the letter of intent to us, and that's inadmissible.

10:19AM  5          But they should not be able to offer that in the first

6     instance as evidence of a floor of value.

7          THE COURT: Well, generally it is the rule that the

8     letters of intent are not admissible.  I stated that in my

9     *in limine* decision, and I'm not inclined to change that.

10:20AM  10          But I think the rule relating to experts and what

11    experts can consider, I think, is quite broad.  And the defense

12    doesn't seem to dispute the general rule that experts may consider

13    even matters that might otherwise be inadmissible.  Experts are

14    subject to cross-examination.  We're going to have, apparently,

10:20AM  15    experts that disagree about valuation, and this may be part of it.

16          So I will not preclude the expert from referencing the

17    letter or letters of intent, giving his opinion as to its

18    significance or their significance in his calculation as to the

19    ultimate loss or damage here.

10:20AM  20          So that's my ruling on that.

21          MR. ROTHENBERG: Yes, Your Honor.

22          MR. SHEEHAN: Your Honor, if I may?  Can I get

23    clarification as to exactly what Mr. Canessa will be allowed to

24    testify to?

10:21AM  25          THE COURT: What don't you understand?

1          MR. SHEEHAN: Whether or not he'll be able to testify as

2     to the floor of value based on his review of the letter of intent.

3          THE COURT: I don't know if that is his testimony, but he

4     can -- certainly he can rely on the letters of intent and give it

5     what weight he thinks it deserves, so...

6          MR. SHEEHAN: Just then for the record, Your Honor, we

7     would just state the objection that he should not be allowed to

8     testify on the number based --

9          THE COURT: I think your record is made on that score.

10          Well, there are just two issues.  In terms of plaintiffs

11     sort of summary of damages focus on post-closure losses and

12     pre-closure lost profits, I don't know exactly what that is, but

13     is this something Mr. Chambery is testifying about or the expert

14     or both or --

15          MR. COOMAN: Both, Your Honor.

16          THE COURT: In a nutshell what's your --

17          MR. COOMAN: What's the distinction between the two?

18          THE COURT: Yeah.

19          MR. COOMAN: The pre-closure loss is a measure of the

20     damages caused by the adverse actions of the defendants taking

21     place prior to the July 17th cutoff.  In other words, the decline

22     of Beechwood's business during those months from April through

23     July.

24          THE COURT: You mean people stopped going there?

25          MR. COOMAN: Yes, exactly.  Once you have the adverse

1    publicity taking place and HCFA -- or rather DOH puts out a, you

2    know, a press release in June saying, you know, the place is

3    terrible, it's going down, your ability to attract any private pay

4    residents or anybody else to come is --

10:23AM    5         THE COURT: Is it measurable?  Do you have 80 patients at

6    this date and then it was 60 or 40?

7         MR. COOMAN: I don't believe so.  I don't remember

8    exactly the methodology by which that was calculated, but it is a

9    piece of what our expert looked at.

10:23AM    10        THE COURT: Let's talk about the lost wages that

11   Mr. Chambery seeks here.  As I understand it, you seek to have the

12   jury award Mr. Chambery lost wages from July of 1999 to the trial,

13   which seems like an exceptionally long period of time here and

14   just seems sort of like asking for a lot here that, here again,

10:24AM    15   this may not be as a matter of law, but it's over a decade.

16        Are you still seeking to ask the jury to award him lost

17   wages for a decade?

18        MR. COOMAN: Yes.  I think it's a clear jury question

19   when they hear what he had to undertake during that period of

10:24AM    20   time:  How long it took to sweep up, mop up, deal with the

21   devasation that the defendants had caused.  And then, obviously,

22   given the tremendous damage to name and reputation, his ability to

23   find any reasonable employment was precluded.

24        And, obviously, defendants are going to make the

10:25AM    25   arguments they're going to make:  That's not really true.  But any

1   argument about mitigation is their burden, as I understand the

2   instructions in the case law.  So they're welcome to argue

3   mitigation all they want and bear the burden of proof on that

4   issue.

10:25AM  5        THE COURT: As I recall, in dealing with mitigation

6   issues in the past, you know, if someone is employed as an

7   accountant, that mitigation doesn't require, I don't think, that

8   he or she, you know, work at McDonalds.

9        I mean, I think there's some -- I don't recall the exact

10:26AM  10  nomenclature of the language, but it's a suit by similar position.

11  I don't think you have to go digging ditches if you were -- is

12  that your understanding?

13        MR. COOMAN: That's our understanding too, Your Honor.

14  As I say, the defendants, I think, bear a rather substantial

10:26AM  15  burden here of showing that an entrepreneur with the kind of

16  talent and background that Mr. Chambery had, having been

17  essentially blackballed by virtue of what happened here, when

18  you're the only person in New York State to have your operating

19  certificate revoked, and you're the subject of all this adverse

10:26AM  20  publicity, and it's a little difficult to argue that, you know,

21  how he ought to be able to go in and be the COO or CEO of some

22  other healthcare organization.

23        THE COURT: You're going to try to convince the jury

24  there's no other work in the healthcare field for a decade?  He

10:26AM  25  couldn't -- I guess that's what you intend to argue?

1      MR. COOMAN: Right.  It's in combination with the fact

2  that the daunting challenge of what he's had to undertake in terms

3  of mop-up operations, multiple pieces of litigation all related to

4  the aftermath of the closure and, you know, the jury will have to

5  assess all that.

6      THE COURT: Certainly there was some -- you say "mop-up,"

7  and there's post-closure losses that I think cover some of that.

8  I certainly -- well, I think I understand your position.  I don't

9  think at this stage I'm prepared to say as a matter of law you

10  can't seek to have the jury compensate him.

11      I guess the Court broached the topic of indemnification,

12  and I think the parties have exchanged some memorandum, which have

13  been filed.  And I think plaintiffs conscientiously have provided

14  the Court with law that suggests that at least as the proof stands

15  now, advising the jury that the defendants are going to be

16  indemnified is not good, could be reversible error.  I guess it's

17  tantamount to advising the jury that there's "insurance."

18      But I just think defendants have to be very careful, and

19  there's a fine line as to whether somehow -- most likely

20  inadvertently -- the defendants sort of, you know, don't make

21  these poor defendants have to pay this kind of money might cause

22  the Court to reconsider whether the Court, it might be appropriate

23  to say something.

24      I mean, there's no request for punitives.  And I think

25  in our pretrial -- or our pretrial of the damage phase I was

1   advised that none of the defendants would testify, present any

2   evidence about their assets or -- that's still the case, I assume?

3           MR. SHEEHAN: Yes, Your Honor.

4           THE COURT: So I haven't worked out the exact charge, but

10:29AM   5   I think I'll just tell the jury you've got to focus on what the

6   plaintiffs' damages were, period.

7           I'll try to get you a draft of what I intend to say.

8   I'm toying with the idea of saying -- essentially adding a line,

9   you know, you shouldn't worry about how it's to be paid.

10:30AM   10          So why don't I get you a draft of that?  You can take a

11   look at it.  I mean, that's pretty much what juries do anyway.  I

12   don't think they -- unless you're talking about punitives, their

13   job is to simply tell us what the damages are.  It's not their

14   worry or task to decide how it gets paid or who pays it or whether

10:30AM   15   there's insurance or not.

16          I mean, the jury's not stupid, I don't think.  They know

17   these people are all employed by the State of New York.  I think a

18   more interesting issue may be if the jury comes back and asks us a

19   question, you know, are these people going to have to pay this?

10:31AM   20   But I guess that's something we can look forward to dealing with

21   at another time.  I mean, I would probably say forget about it,

22   it's not up to you to worry about that.

23          MR. ROTHENBERG: I think that would be fine, Judge.

24   That's like telling them -- that's like telling them not to base

10:31AM   25   their decision on sympathy or on any factor other than the

1   damages.  I mean, it's part and parcel of that same charge.  So I

2   think that additional sentence would be fine.

3          MR. SHEEHAN: Your Honor, we would object to that

4   additional sentence.  We think it's tantamount to raising the

10:31AM  5   indemnification issue by suggesting someone other than the

6   defendants will be paying for the verdict.

7          THE COURT: Okay.  I'll continue to ponder that and will

8   give you a draft of what I think I would like to do.

9          Again, you know, as is often the case, when instructing

10:32AM  10   the jury sometimes you have to see how the proof develops.  But I

11   think we have a pretty good idea based on preparation of counsel

12   the issues that we're going to face, so....

13          Obviously, the prejudgment interest and attorney's fees

14   are something that is not before this jury.

10:33AM  15          Mr. Sheehan, I did when I was talking to Mr. Cooman

16   indicate that the verdict sheet would probably have multiple lines

17   because there are different categories of damages, and I think it

18   might be helpful to review in court to see what the jury did with

19   the various items of damages that are presented to them.

10:33AM  20          Does the State have any objection to that?

21          MR. SHEEHAN: No, Your Honor.

22          THE COURT: Okay.  Well, I will have a copy of the

23   verdict form for you to consider certainly before it goes to the

24   jury.

10:33AM  25          All right.  Well, we talked about a lot of things at our

1   pretrial.  Anything else we need to chew on here?

2       MR. COOMAN: I think the only other -- I don't have it

3   covered, Your Honor, is our motion to quash the two subpoenas that

4   have been issued.

10:34AM   5       THE COURT: I was away all weekend and I just got that

6   this morning so I didn't -- actually knowing you all, I should

7   have checked Sunday night at 10 o'clock to see what had been

8   filed, but this was filed on Friday and I candidly haven't had a

9   chance.

10:34AM   10       I discussed it a little bit with my law clerks, but I

11   haven't really had a chance.  But the gist of it, I guess, is that

12   there's a subpoena for financial records of the Chamberys' tax

13   returns?

14       MR. SHEEHAN: Just tax returns, and the particular years

10:34AM   15   for Mr. Chambery regarding his lost wages to evaluate lost wages

16   claims.  One year of tax returns from Olive Chambery regarding a

17   transfer of an interest in Beechwood, and particularly for that

18   issue.

19       THE COURT: I'm sorry.  Particularly?

10:35AM   20       MR. SHEEHAN: There was a 9% transfer from Olive Chambery

21   to Brook Chambery in 1999, and we wanted documents related to that

22   transfer because there was a number -- a $95,000 number attached

23   to that transfer, and we wanted to examine the underlying basis

24   for that number.

10:35AM   25       THE COURT: $95,000?

1        MR. SHEEHAN: Right.  Was paid by Brook Chambery to Olive

2   Chambery for 9% of Beechwood.

3        THE COURT: Well, I understand the gist of the

4   plaintiffs' objection here.  This is, you know, an hour late and a

10:35AM  5   mile short.  It comes, I don't know, five years after discovery is

6   closed -- or many years.  I mean, talk about late.

7        I don't have all the scheduling orders in front of me

8   now in terms of discovery and when it concluded, but to say there

9   was lots of discovery in this case, I think, probably would be an

10:36AM  10  understatement.

11       So since I haven't read the motion in full, Mr. Cooman,

12  what is your objection?

13       MR. COOMAN: Timing on that, Your Honor, is defendants

14  originally made a request for 17 years of personal tax returns way

10:36AM  15  back at the beginning.  That was objected to as one of those

16  things that presumptively you could get whatever information you

17  wanted from some other source.

18       There was no follow-up.  There was no additional

19  discovery request.  And, finally, in the summer of 2010, which is

10:36AM  20  two years ago, there was a deposition of Mr. Chambery, 231 page

21  transcript.  They never asked him -- never asked him about income

22  other than sort of "Are you employed now?"  To which he said,

23  "Dealing with this lawsuit, yes."  And that was the extent of the

24  testimony.

10:36AM  25       There was never a follow-up request for anything related

1  to that, and we've cited one or two cases to the Court that say

2  really that's waiver by conduct.  If you have a deposition where

3  you can ask about income, and for whatever reason they didn't do

4  it, whether they were so confident it would be a no cause verdict

5  that this just didn't matter getting into, but we think it's

6  inappropriate.

7          But then beyond that, we said, okay, our response to the

8  exchange of letters that I've had with Mr. Sheehan was we'll give

9  you redacted returns showing you there's nothing on the W-2 line,

10  there's no Schedule C, Mr. Chambery had no income.

11          They didn't want that.  They said, no, we've got to have

12  the whole return.

13          THE COURT: This exchange took place --

14          MR. COOMAN: Within the last month, July.  I said to

15  Mr. Sheehan we'll give you redacted things because your only claim

16  is, well, if he had income from some other sources, we ought to be

17  able to count that as mitigation.

18          And we've said -- and now Mr. Chambery's put an

19  affidavit into the Court on this motion saying, "I wasn't

20  employed, I had no W-2, I didn't have any other business interest,

21  I had no 1099 other than for interest and dividends and capital

22  gains."

23          And so our position was they didn't want redacted

24  either, and we moved to quash the subpoena.  They should get

25  nothing.

1          And, frankly, they can ask Mr. Chambery on the witness

2     stand, "Did you work?  Did you have a W-2?"  He'll tell them

3     again, "I didn't."  And so the need for those tax returns

4     discovery has passed, and they shouldn't get them.

10:38AM   5          THE COURT: Was the 1099 information willing to be

6     disclosed?

7          MR. COOMAN: We would have given 1099's if it represented

8     earnings, but the only 1099's are from interest and dividends.  We

9     shouldn't be able to -- it's completely irrelevant to reveal

10:38AM  10    things like that that by deduction then show net worth.

11         And that's clearly not a relevant consideration, and

12    there's just no reason why the tax returns should be produced.

13         MR. SHEEHAN: Your Honor, the trouble with what they were

14    offering is there are certain types of income that wouldn't

10:39AM  15    necessarily show up on the forms they wanted to give us.

16         The example we gave was day trading.  Someone could

17    invest a lot of money in the stock market in -- day trading in the

18    stock market and make millions of dollars.  That happens.  That's

19    what we wanted to check.

10:39AM  20         We offered to do a pre-production review just to see if

21    there was anything to fight about, and they didn't want us to do

22    that; or post-production redaction to keep net worth elements out.

23    They didn't want that either.

24         THE COURT: But you concede that net worth inquiry is not

10:39AM  25    germane to the jury's task here?

1                MR. SHEEHAN: Yes, Your Honor.

2                THE COURT: All right.  Well, subject to my reading --

3        well, have you responded to this?

4                MR. SHEEHAN: No, Your Honor.  We got it on Thursday as

10:39AM   5      well, and I read it and I read some of the cases, the two cases

6        that Mr. Cooman was talking about.  I read those.  They're not

7        lost wages cases.

8                THE COURT: I know you've got a lot to do. I mean, are

9        you content with your stated position here or do you want to file

10:40AM  10      something?

11               MR. SHEEHAN: I did want to look up -- there was a little

12       bit more research, but we should be able to do that very quickly,

13       Your Honor.

14               THE COURT: Well, I need it by tomorrow then --

10:40AM  15               MR. SHEEHAN: Sure, Your Honor.  Yes, Your Honor.

16               THE COURT: -- 5 o'clock.  I guess unless you overwhelm

17       me, Mr. Sheehan, with stuff, my inclination is to grant the

18       plaintiffs' motion that it's much too late.

19               That there was discovery, as Mr. Cooman has articulated

10:40AM  20      here, that went on for months and years.  And essentially this is

21       in the middle of the trial, and I just think it comes much too

22       late.  And I think to the extent plaintiffs have offered some

23       accommodation, that's more than they had to.  But to the extent

24       they've offered that, fine.

10:41AM  25               But I guess my tentative ruling is that I grant the

1    motion to quash based on the timeliness or untimeliness of it.  If

2    I decide after reviewing Mr. Sheehan's submissions to change my

3    ruling, I'll let you know.

4         MR. COOMAN: The second prong of it, Your Honor, there

10:41AM  5    was a request for Olive Chambery's 1999 tax return ostensibly

6    because it might reveal information about the transaction in early

7    1999 whereby Brook Chambery acquired 9% of his mother's interest

8    in the nursing home for an ascribed value of $95,000.

9         Two or three points.  Number one, the practical answer

10:41AM  10   is the return is long gone.  We've checked with both Olive

11   Chambery and her CPA; there's no return.  And there was never a

12   gift tax return in any event.  So the answer is, it can't be

13   produced.

14        Secondarily, we think this whole 9% interest thing is, I

10:42AM  15   guess, kind of a red herring.  Apparently for background, in the

16   State of New York when somebody wants to transfer any interest in

17   a nursing home, you can't just do that.  You may do it only up to

18   less than 10% without Department of Health approval.  Any transfer

19   in excess of 10%, you have to have "establishment approval" from

10:42AM  20   the Department of Health.

21        So, for example, if Mrs. Chambery had wanted to give

22   Brook a 50% interest in the home, the Department of Health would

23   have had to approve that.  The Department of Health did not have

24   to approve something up to 10%.

10:42AM  25        So a 9% interest transfer was made early in 1999.  There

1    was an ascribed value to that of $95,000.  And I guess their

2    expert -- I mean, that's just an established fact, undisputed.

3    For some reason they want more information about that, that how

4    did you get to the $95,000?

10:43AM    5         And in our papers we pointed out nothing about that

6    transaction really has any relevance to value because it's not

7    arm's length.  I mean, a mother-son transfer for an ascribed value

8    doesn't mean anything about what the place is really worth.

9         It was a minority interest, a non-controlling interest.

10:43AM   10   It obviously wasn't an arm's length, and Mr. Chambery's affidavit

11   on our motion to quash has made clear there was no appraisal done

12   of the business in connection with the 9% or the ascribed number

13   of $95,000.

14        THE COURT: Isn't the loss here the loss to the

10:43AM   15   partnership?

16        MR. COOMAN: Correct.

17        THE COURT: Which includes --

18        MR. COOMAN: To both.

19        THE COURT: -- two people?

10:43AM   20        MR. COOMAN: So I think the argument -- my guess is the

21   argument is something like, well, if a 9% interest is worth

22   95,000, it must be that early in 1999 the value of the business

23   was only 10 times that value.  It was only worth a million bucks,

24   you know.

10:44AM   25        THE COURT: You can make that argument, I guess, but it

1  sounds like, Mr. Cooman, Mr. Sheehan, the facts that Mr. Cooman

2  just articulated are already matters of public record and public

3  knowledge.

4          MR. SHEEHAN: If the --

10:44AM  5          THE COURT: Just -- sorry to interrupt, but you can

6  answer this part of my question, too.  Mr. Cooman hasn't yet

7  mentioned the delay in seeking this information also.

8          MR. COOMAN: That's also true.

9          THE COURT: Was Mrs. Chambery deposed?

10:44AM  10         MR. COOMAN: She was never even noticed for deposition.

11         THE COURT: All right.

12         MR. COOMAN: Or it never came to pass.  Maybe it was

13  noticed and it was never requested.

14         THE COURT: All right.  Mr. Sheehan, anything to say

10:44AM  15  relative to any of those matters?

16         MR. SHEEHAN: One thing, Your Honor.  I'm not exactly

17  sure what we learned about the 9% transfer.  I think it came over

18  in some of the expert documents.  I'm not sure.

19         But that's beside the point.  If the returns are not

10:45AM  20  available and the underlying documents that relate to the $95,000,

21  if any, are not available, and there was no gift tax return, it

22  sounds like there's no documents that could even be produced in

23  response to the subpoena.  So that would seem to end the issue all

24  together.

10:45AM  25         THE COURT: Make it moot.  All right, so be it.  Nothing

1 to produce.  And even if there were, I think the Court would be

2 inclined to not require it because of the delay.  Seems like most

3 of the information you got; you can make from it whatever you

4 think is appropriate.

10:45AM 5          All right, anything else from plaintiff?

6          MR. COOMAN: That's it, Your Honor.

7          THE COURT: Anything else from the defense?

8          MR. SHEEHAN: Just one issue, Your Honor.  During one of

9 the conferences we had we were describing the witnesses we had.

10:46AM 10 Defense has two experts; plaintiffs have one expert, Mr. Chambery

11 his mother Olive Chambery, and two other fact witnesses that are

12 supposed to lay the predicate facts, is my understanding, for the

13 expert report.

14          I don't know exactly what those two extra witnesses

10:46AM 15 could say that wouldn't be hearsay.  So I was going to ask for an

16 offer of proof as to what those two witnesses would be testifying

17 to.

18          MR. COOMAN: I think when that discussion was had we were

19 still thinking about or deciding what had to come in as documented

10:46AM 20 evidence before the expert could testify, but I think we clarified

21 that at the conference.  The expert can rely on stuff that's not

22 in evidence.

23          So there won't be other -- there won't be other fact

24 witnesses undergirding that.  Our intended proof is Olive, Brook

10:46AM 25 and James Canessa.

1          MR. SHEEHAN: Your Honor --

2          THE COURT: All right.  If you change your mind, you've

3    got to let us all know quickly.

4          Leaving aside this ALJ, federal ALJ stuff that we've

10:47AM    5    talked about, what's your list of witnesses?

6          MR. SHEEHAN: Maureen Rutecki and James Marasco, the two

7    experts, Your Honor.

8          THE COURT: Two, okay.  All right.  Could you just sit

9    tight for a few minutes?  Let's take a break.  I'd just like to

10:47AM   10   talk to my law clerks and see if there's anything else maybe we

11   should discuss here.

12         MR. COOMAN: One other thing while you're doing that,

13   Your Honor.  My recollection is that we decided on Monday the 20th

14   we're starting at 9:00 and going a full day; but then after that,

10:47AM   15   the subsequent days that week, are reverting to our 8:00 or 8:30

16   to 1:00 or 2:00.

17         THE COURT: I thought we decided full days?

18         MR. SHEEHAN: I thought so too, Your Honor, just in case.

19         THE COURT: I'll look at my -- I don't have my notes on

10:48AM   20   that, but I will.

21         MR. COOMAN: Which is fine.  We just for planning

22   purposes --

23         MR. SHEEHAN: I thought so.

24         THE COURT: I think we were going to see if there was any

10:48AM   25   juror problems with doing that.

1          MR. COOMAN: That's right.

2          THE COURT: Because I do recall one of the jurors during

3    deliberations, I think, had to go to work or something in the

4    afternoon.  So I think we sort of left that up to be decided

10:48AM   5    depending on juror convenience.

6          So my preference is let's do it -- let's start 9:00-ish

7    and go 4:00-ish.  Ms. Rand has been away, but I think our last

8    missive to them, that is, the jury, was if there are any problems,

9    you should let us know.  We haven't heard anything.  I think they

10:48AM  10   were alerted to this full day thing, but we'll work on that.

11         MR. COOMAN: Thank you.

12         THE COURT: All right.  Stand in place for a few minutes

13   and we'll be right back.

14         (WHEREUPON, there was a pause in the proceeding.)

11:01AM  15         THE COURT: I think we've covered everything.  Maybe just

16   two things.  During the trial plaintiffs -- both plaintiffs'

17   counsel presented.  Is that still the same tact here?

18         MR. COOMAN: Yes, Your Honor.  Yes, we're splitting the

19   witnesses.

11:01AM  20         THE COURT: How about the defense?

21         MR. SHEEHAN: I think it will just be me, Your Honor.

22         THE COURT: Okay.  As far as I offer you the opportunity

23   to submit a proposed verdict sheet if you'd like.

24         MR. ROTHENBERG: We'll take you up on that.  I'll get

11:02AM  25   it -- how soon do you want that?

 1          THE COURT: Well, as soon as possible because I'm gone

 2   all next week.  So like Wednesday or Tuesday?

 3          MR. ROTHENBERG: I can do it faster than that.  I mean,

 4   how about the end of business tomorrow?  Tuesday?

11:02AM  5          THE COURT: That's fine.

 6          MR. ROTHENBERG: Okay.

 7          THE COURT: How about do you want to submit one, too?

 8          MR. SHEEHAN: Yes, please, Your Honor.

 9          MR. LEVINE: Do you want us to respond to theirs or do a

11:02AM 10   separate one?

11          MR. ROTHENBERG: I'll e-mail as soon as we have ours in

12   some kind of close to final form.  I'll e-mail Mr. Sheehan and

13   Mr. Levine.

14          THE COURT: If you have any objections, get it to me by

11:02AM 15   the next close of business.

16          MR. ROTHENBERG: We're going to keep it simple again, I

17   know that.

18          THE COURT: The KISS principle: Keep it simple stupid.

19          MR. ROTHENBERG: We omitted one S.  We spell it K-I-S,

11:03AM 20   Your Honor.

21          THE COURT: Whenever I give the speech, that's when my

22   wife tells me "don't forget the KISS principle."

23          Okay, I guess we all have our tasks and our deadlines

24   and we will be talking to you, I'm sure, and --

11:03AM 25          MR. ROTHENBERG: Thank you, Your Honor.

1          MR. COOMAN: Thank you, Your Honor.

2          THE COURT: Okay, we'll see you soon enough.

3          MR. SHEEHAN: Thank you, Your Honor.

4          (WHEREUPON, the proceedings adjourned at 11:01 a.m.)

5                          *     *     *

6                   CERTIFICATE OF REPORTER

7

8          In accordance with 28, U.S.C., 753(b), I certify that

9    these original notes are a true and correct record of proceedings

10   in the United States District Court for the Western District of

11   New York before the Honorable David G. Larimer on August 6th,

12   2012.

13

14   S/ Christi A. Macri

15   Christi A. Macri, FAPR-RMR-CRR-CRI
     Official Court Reporter

16

17

18

19

20

21

22

23

24

25